# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | | |
|---|---|---|
| HAROLD SHURTLEFF, and CAMP CONSTITUTION, a public charitable trust, | : | CIVIL ACTION |
| | : | |
| | : | No. 1:18-cv-11417-DJC |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF BOSTON, and GREGORY T. ROONEY, in his official capacity as Commissioner of the City of Boston Property Management Department, | : | **ORAL ARGUMENT REQUESTED** |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

## MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Ryan P. McLane (Mass. 697464)
MCLANE & MCLANE
975A Springfield Street
PO Box 105
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com

Mathew D. Staver (Fla. 701092)[†]
Horatio G. Mihet (Fla. 26581)[†]
Roger K. Gannam (Fla. 240450)[†]
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854-0774
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org

Attorneys for Plaintiffs
[†]Application to appear *pro hac vice* pending

Plaintiffs, HAROLD SHURTLEFF ("Shurtleff"), and CAMP CONSTITUTION, a public

charitable trust, pursuant to Rule 65, Fed. R. Civ. P., and Local Rule 7.1, file this memorandum of

law in support of Plaintiffs' Motion for Preliminary Injunction against Defendants, CITY OF

BOSTON ("Boston" or the "City"), and GREGORY T. ROONEY, in his official capacity as

Commissioner of the City of Boston Property Management Department ("Rooney").

## **INTRODUCTION**

Defendants have violated Plaintiffs' speech, association, nonestablishment, and equal

protection rights, under both the U.S. and Massachusetts Constitutions, by denying Plaintiffs the

right to access the City's designated public fora at City Hall Plaza to commemorate Constitution

Day and Citizenship Day, along with the civic and social contributions of Boston's Christian

community to the City, the Commonwealth of Massachusetts, religious tolerance, the Rule of Law,

and the U.S. Constitution. Citing an unwritten, *ex post facto* policy against "non-secular" flags,

Defendants have refused and are refusing to grant Plaintiffs a permit to raise the Christian flag on

the City Hall Flagpoles, even though Defendants regularly allow flags from favored speakers,

some of which also contain overtly religious language and symbols. Defendants' unwritten policy

and practice is an unconstitutional viewpoint-based restriction on Plaintiffs' speech, or at best a

content-based restriction that is presumptively unconstitutional unless it can survive strict scrutiny,

which it cannot. The policy and practice also is an unconstitutional prior restraint on speech that

vests unbridled discretion in state officials, is unconstitutionally vague, and violates Plaintiffs'

guarantee of Equal Protection of the laws. Plaintiffs have suffered and are suffering irreparable

injury from the infringement of their cherished constitutional rights. The harm to Plaintiffs far

outweighs any plausible harm to Defendants, and issuing an injunction to prevent further

irreparable injury is in the public interest.

**Plaintiffs specifically seek a preliminary injunction against Defendants' applying their unwritten policy and practice to Plaintiffs, and requiring Defendants to allow Plaintiffs to conduct the Christian flag-raising event that Defendants denied in 2017, on Constitution Day and Citizenship Day, September 17, 2018, or on such alternative date as close as possible to Constitution Day which allows sufficient time for the Court to grant the requested preliminary injunctive relief.** (V. Compl., ECF 1, ¶ 46, Prayer for Relief pp. 23–26.)

## FACTS

Lifelong Massachusetts resident Harold Shurtleff, and his Christian civic organization, Camp Constitution, have frequently used the City of Boston's designated public fora at City Hall Plaza to commemorate the history and heritage of Boston, the Commonwealth, and the United States through expressive events. (V. Compl. ¶¶ 10, 11, 14–21.) Shurtleff and Camp Constitution are among hundreds of individuals and organizations which have obtained permission to use City Hall Plaza, the City Hall Flag Poles, and other public areas to exercise their First Amendment rights. (*Id*. at ¶¶ 17–21, 33–37.) In many cases, the activities include the use of the City Hall Flag Poles to display flags representing countries, events, and causes, and to commemorate historical and cultural milestones. (*Id.* at ¶ 37.) Permits have been issued for flag raisings for the countries of Albania, Brazil, Ethiopia, Italy, Panama, Peru, Portugal, Puerto Rico, and Mexico, as well as the People's Republic of China and Cuba. (*Id.*, at ¶ 37, Ex. I.) Permits also have been granted to raise the flags of private organizations, like the Chinese Progressive Association, National Juneteenth Observance Foundation, Bunker Hill Association, and Boston Pride. (*Id*. at ¶ 37.)

Defendants have a written application process for use of the limited public fora and has a list of written policies and guidelines regulating their use. (V. Compl. ¶¶ 33–35, Exs. G, H.) Those written polices state that an application can be denied if it involves illegal or dangerous activities,

or activities that will conflict with other scheduled events, or applicants who have lied on the application or have a history of damaging city property or failing to pay for city services, or do not include required insurance certification. (*Id.*) No application denials are indicated in the written policies for "non-secular" or religious flags or events. (*Id.*)

Shurtleff and Camp Constitution have obtained permission to use the City Hall Plaza fora for expressive events on several occasions, including in or around 2012 when they received permission to display a flag on the City Hall Flag Poles as part of a free speech event. (V. Compl. ¶¶ 17–21.) Shurtleff and Camp Constitution had never experienced any problems with obtaining permission for expressive events until September 2017, when their request to use the City Hall Flag Poles to display the Christian flag as part of an event commemorating the civic and Christian heritage of Boston, the Commonwealth, and the nation was denied without explanation. (*Id.* at ¶¶ 21, 24–28, Exs. A–C.) After asking for an explanation, Shurtleff was informed for the first time that "the City of Boston maintains a policy and practice of respectfully refraining from flying non-secular flags on the City Hall flagpoles." (*Id.* at ¶¶ 28–29, Ex. D.) In the same e-mail, Defendant Rooney advised Shurtleff:

> According to the above policy and practice, the City of Boston has respectfully denied the request of Camp Constitution to fly on a City Hall flagpole the "Christian" flag, as it is identified in the request, which displays a red Latin cross against a blue square bordered on three sides by a white field.

(*Id.* at ¶ 29, Ex. D.) Rooney added, "The City would be willing to consider a request to fly a non-religious flag, should your organization elect to offer one." (*Id.*)

Following the denial, Shurtleff submitted a new written application for the event, followed by a letter from his attorney informing the City that its exclusion of a "non-secular" flag was unconstitutional and requesting reconsideration. (V. Compl. ¶¶ 30, 31, Exs. E, F.) The new

application included a detailed written description of the event, which was to include speeches on racial reconciliation and religious freedom:

> Celebrate and recognize the contributions Boston's Christian community has made to our city's cultural diversity, intellectual capital and economic growth. The Christian flag is an important symbol of our country's Judeo-Christian heritage. During the flag raising at the City Hall Plaza, Boston recognizes our Nation's heritage and the civic accomplishments and social contributions of the Christian community to the Commonwealth of Massachusetts, religious tolerance, the Rule of Law, and the U.S. Constitution, which together gave our Nation an unprecedented history of growth and prosperity. The event program includes a speech by Rev. Steve Craft, an instructor at Camp Constitution on the need for racial reconciliation, a speech by Pastor William Levi, formerly of the Sudan, on the blessings of religious freedom in the U.S. and an historical overview of Boston by Hal Shurtleff, director of Camp Constitution.

(*Id.* at ¶ 30, Ex. E.) Defendants did not issue a permit or otherwise respond to the second application or Plaintiffs' attorney's letter. (*Id.* at ¶ 32.)

Plaintiffs still desire to exercise their constitutional rights in the same manner as do other individuals and organizations by displaying the Christian flag and providing information on the Christian community and America's Judeo-Christian heritage in Defendants' designated public fora. (V. Compl. ¶ 46.) Because of Defendants' denial of Plaintiffs 2017 proposed flag-raising event based on Defendants' unwritten policy against "non-secular" flags, and Defendants' refusal even to acknowledge Plaintiffs second application or Plaintiffs' counsel's letter, Plaintiffs are left with no choice but to bring the present action seeking declaratory and injunctive relief and damages for Defendants' violation of Plaintiffs' constitutional rights. (*Id.* at ¶ 47.)

## ARGUMENT

The First Circuit employs a familiar four-part framework to determine whether to grant preliminary injunctive relief. "Under this formulation, trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the

balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). Plaintiffs readily satisfy each of the factors.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.

As the First Circuit has determined, the four factors of the preliminary injunction standard "are not entitled to equal weight in the decisional calculus; rather, "'[l]ikelihood of success is the main bearing wall of the four-factor framework.'" *Corp. Techs., Inc. v. Harnett,* 731 F.3d 6, 9–10 (1st Cir. 2013) (alteration in original) (quoting *Ross-Simons,* 102 F.3d at 16). In this case, the bearing wall is solid. Plaintiffs have demonstrated a likelihood of success on the merits because Defendants' unwritten policy and practice of not permitting "non-secular" flags in their designated public fora is a viewpoint- and content-based restriction, and unconstitutional prior restraint, on speech.[1] The policy and practice also violates equal protection.

---

[1]     Although Plaintiffs' have pleaded Defendants' violations of Plaintiffs' rights under both the U.S. and Massachusetts Constitutions, Plaintiffs' authorities cited herein specifically illuminate Defendants' federal constitutional violations. However, "[t]he Mass. Decl. of Rights is generally coextensive with the federal constitution when it comes to the freedom of expression . . . . Where the two depart, **the state actually provides more extensive freedom of expression protections than its federal counterpart.**" *Flaherty v. Knapik*, 999 F. Supp. 2d 323, 332 (D. Mass. 2014) (emphasis added); *cf. Hosford v. Sch. Comm. of Sandwich*, 659 N.E.2d 1178, 1180 n.5 (Mass. 1996) ("Our State freedom of speech analysis is guided by the Federal analysis. Because we find that [plaintiff's] First Amendment rights were violated, we need not distinguish between the State and Federal analyses." (citation omitted)); *Colo v. Treasurer & Receiver Gen.*, 378 Mass. 550, 558, 392 N.E.2d 1195, 1200 (1979) ("[W]e are aided by the criteria which have been established by the United States Supreme Court for judging [Establishment Clause] claims arising under the First Amendment, which criteria we believe are equally appropriate to claims brought under cognate provisions of the Massachusetts Constitution."). Thus, Defendants' Free Speech and Establishment Clause violations under the U.S. Constitution constitute violations of the "cognate provisions" of the Massachusetts Constitution.

**A.     Defendants' Policy and Practice of Excluding "Non-Secular"
Flags Is an Impermissible Viewpoint-Based Restriction.**

A viewpoint-based restriction on private speech has never been upheld by the Supreme Court or any court. Indeed, a finding of viewpoint discrimination is dispositive. *See Sorrell v. IMS Health*, 564 U.S. 552, 571 (2011). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98, 106 (2001) ("The restriction must not discriminate against speech on the basis of viewpoint."). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. In fact, viewpoint-based regulations are **always** unconstitutional. *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984))).

The First Circuit has affirmed that viewpoint-based restrictions are antithetical to the First Amendment. *See, e.g.*, *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004) ("The general principle is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004) (holding regulations unconstitutional under First Amendment if distinctions drawn are viewpoint based).

As the Supreme Court determined in *Good News Club*, where, as here, the government has opened up limited public fora for individuals and community organizations to use for free speech events, speakers and displays cannot be excluded based upon a religious viewpoint. 533 U.S. at 106–07. In *Good News Club*, a school district excluded the Child Evangelism Fellowship ("CEF")

from its after-school activities forum based upon CEF's religious viewpoint. *Id.* at 107. The district permitted community organizations that taught morals and character development, such as the Boy Scouts, to use its forum, but excluded CEF because it taught morals and character development from a "quintessentially religious" viewpoint. *Id.* In striking down the policy, the Supreme Court said, "What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons." *Id.* at 111. Indeed, "**speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the grounds that the subject is discussed from a religious perspective**." *Id.* at 112 (emphasis added); *see also Rosenberger*, 515 U.S. at 831 ("Religion may be a vast area of inquiry, but it also provides . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.")

Similarly here, the City has designated certain venues, including the City Hall Flag Poles, for free speech activities that include the display of flags commemorating nations, events (*e.g.*, Juneteenth, the Battle at Bunker Hill), and causes (*e.g.*, Boston Pride). Activities commemorating historical events in Boston and the United States, and causes such as racial reconciliation, cannot be excluded from the forum on the grounds that they address the events from a religious or Judeo-Christian perspective, *i.e.* by the display of a "non-secular" flag. Defendants' practice of "refraining from flying non-secular flags on the City Hall flagpoles" (V. Compl., ¶ 26) constitutes unconstitutional viewpoint discrimination.

It is no defense to claim, as Defendants do here, that their discriminatory policy is necessary to avoid violating the Establishment Clause. (V. Compl., ¶ 26.) In *Rosenberger,* the Supreme Court

expressly rejected the University of Virginia's attempt to use the Establishment Clause to justify its viewpoint-based speech restrictions:

> A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion. . . . We have held that the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and even-handed policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse. . . . **More than once we have rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design**.

515 U.S. at 838–39 (emphasis added) (citations omitted). *See also*, *Good News Club*, 533 U.S. at 114 ("[A]llowing the Club to speak on school grounds would ensure neutrality, not threaten it . . . ."); *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 763–64 (1995) ("We find it peculiar to say that government 'promotes' or 'favors' a religious display by giving it the same access to a public forum that all other displays enjoy. And as a matter of Establishment Clause jurisprudence, we have consistently held that it is no violation for government to enact neutral policies that happen to benefit religion."); *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 250 (1990) ("[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.")

Here, the guarantee of neutrality is not offended when Defendants, following neutral written criteria for use of their limited public fora, grant a permit for the display of a "non-secular" flag. Consequently, as was true in *Rosenberger, Good News Club*, and *Pinette*, Defendants cannot hide behind the Establishment Clause to justify their unwritten policy and practice of refusing to permit "non-secular" displays. The viewpoint discriminatory policy violates the First Amendment and should be enjoined.

### B. Defendants' Policy and Practice Is an Unconstitutional Content-Based Restriction that Cannot Satisfy Strict Scrutiny.

Even on this motion for preliminary injunction, **Defendants** bear the burden of demonstrating that their restriction on speech satisfies the appropriate level of scrutiny, in this case strict. *See Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665–666 (2004) (holding government bears burden of proof at trial on ultimate question of constitutionality of challenged speech restriction, and that plaintiffs must be deemed likely to prevail at preliminary injunction stage unless government meets its burden of showing that restriction satisfies strict scrutiny elements of compelling interest and narrow tailoring); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (citing *Ashcroft* in holding government failed compelling interest test at preliminary injunction stage, and affirming, "[t]he burdens at the preliminary injunction stage track the burdens at trial."). Defendants here cannot meet their heavy burden under strict scrutiny.

### 1. Content-Based Restrictions on Speech Must Satisfy Strict Scrutiny and Are Presumptively Unconstitutional.

Content-based restrictions on speech "'target speech based on its communicative content.'" *Nat'l Inst. of Family & Life Advocates v. Becerra*, No. 16-1140, 2018 WL 3116336, at *7 (U.S. June 26, 2018) (quoting *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2226 (2015)). Such policies, including Defendants' unwritten policy and practice of "refraining from flying non-secular flags on the City Hall flagpoles" (V. Compl. ¶ 26), "'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *Id.* (quoting *Reed,*135 S. Ct. at 2226); *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1983) ("If the government excludes a speaker who falls within the class to which the designated public forum is made generally available, its action is

subject to strict scrutiny."); *Perry Educator's Ass'n. v. Perry Local Educators Ass'n.*, 460 U.S.37, 46 (1993) ("a content-based prohibition must be narrowly drawn to effectuate a compelling state interest").

"It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 818 (2000) (emphasis added). Indeed, the notion that a content-based restriction on speech is presumptively unconstitutional is "so engrained in our First Amendment jurisprudence that last Term we found it so 'obvious' as to not require explanation." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115–16 (1991) (citation omitted). "'**Regulations that permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment**.'" *Id.* at 116 (emphasis added) (quoting *Reagan v. Time, Inc.*, 468 U.S. 641, 648–49 (1984)). Here, Defendants' unwritten policy and practice is intolerable under the First Amendment because it serves no compelling government interest and is not narrowly tailored.

### 2. There Is No Compelling Interest in Prohibiting the Display of "Non-Secular" Flags on City Hall Flag Poles.

Defendants have no interest whatsoever, much less a compelling one, to exclude from their designated public forum flags which represent religious communities, when they permit the display of flags for events and organizations that are non-religious. As discussed above, Defendants cannot claim a compelling interest in avoiding an Establishment Clause violation. (*See Rosenberger, Good News Club*, and *Pinette*, *supra* pp. 8–9.) To the contrary, Defendants' policy and practice specifically prohibiting "non-secular" displays is overtly hostile to religion and

violates the Establishment Clause.[2] The only other interest cited by Defendants, that "this policy and practice is also consistent with the City's legal authority to choose how a limited government resource, like the City Hall flagpoles, is used," likewise is not compelling nor even legitimate, in that the First Amendment does not countenance the use of illegal viewpoint- or content-based classifications to restrict free speech activities. *See Good News Club*, 533 U.S. at 106.

The *ex post facto* assertion of a purported unwritten policy and practice, only after Plaintiffs' request was denied, further belies any claim that Defendants have a compelling interest in denying displays of "non-secular" flags. Neither the City's online policies nor those on its application form contain any mention of secular versus "non-secular" displays. (V. Compl. ¶¶ 32, 35, Ex. G). Both the online and form policies state that applications can be denied if: (1) they propose illegal or dangerous activities, (2) they conflict with other events, (3) the applicants have lied about their information, (4) the applicants are not legally able to make contracts, sue, or be sued, or (5) the applicants have a history of disobeying City regulations. (V. Compl. ¶¶ 32, 35, Ex. G). Each of these written policies represents a legitimate state interest in public health and safety, protection of the public fisc, protection of public property, and prevention of crime. Conspicuously absent from these written listings is reference to whether the display contains secular or "non-secular" materials. If Defendants' preference for secular displays were a legitimate state interest on a par with the listed interests, then it would be included in Defendants' written policies. The

---

[2] The Establishment Clause "affirmatively mandates accommodation, not merely tolerance, of all religions, **and forbids hostility toward any**." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984) (emphasis added) (citing *Zorach v. Clauson*, 343 U.S. 206 (1952)); *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144-45 (1987) ("[T]he government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause."). "Indeed, the message is one of neutrality rather than endorsement; **if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility towards religion**." *Mergens*, 496 U.S. at 248 (emphasis added).

exclusion of Defendants' secular preference from their written policies reinforces the reality that there is no legitimate—let alone compelling—state interest in excluding "non-secular" displays, a reality made plain by the Supreme Court. *See Simon & Schuster,* 502 U.S. at 115–16; *Reagan v. Time, Inc.*, 468 U.S. at 648–49.

### 3. Defendants' Policy and Practice Is Not Narrowly Tailored.

Even if Defendants could articulate a compelling interest for excluding religious speech, which they cannot, their policies would still fail strict scrutiny because they are not narrowly tailored. "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Total prohibitions on constitutionally protected speech are substantially broader than any conceivable government interest could justify. *Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).

A narrowly tailored regulation of speech is one that achieves the government's interest "without unnecessarily interfering with First Amendment freedoms." *Sable Commc'ns*, 492 U.S. at 126. The unwritten policy and practice, by its very nature of being unwritten and by ostensibly prohibiting all "non-secular" displays cannot meet the Supreme Court's narrow specificity requirement. Rather than providing "breathing space," Defendants' policy and practice smothers First Amendment freedoms with a total prohibition on any "non-secular" displays. No conceivable government interest could justify the prohibition. *Bd. of Airport Comm'rs,* 489 U. S. at 574.

**C.** **Defendants' Policy and Practice Is an Unconstitutional Prior Restraint.**

Defendants' unwritten, standard-less policy and practice is also an unconstitutional prior restraint that vests unbridled discretion in City officials to determine whether a display is "non-secular" and can be denied despite meeting all of the written criteria for use of Defendants' designated public fora. It is axiomatic that prior restraints are highly suspect and disfavored. *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Indeed, "**[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity**." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (emphasis added) (citing cases). "Because a censor's business is to censor, there inheres the danger that he may well be less responsive than a court . . . to the constitutionally protected interests in free expression." *Freedman v. Maryland*, 380 U.S. 51, 57–58 (1965).

> It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so. . . . **[A] law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition**.

*Watchtower Bible & Tract Soc'y of N.Y. v. Vill. of Stratton*, 536 U.S. 150, 165–66 (2002) (emphasis added).

> [A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority. The reasoning is simple: If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted.

*Forsyth Cnty.*, 505 U.S. at 131 (internal quotation marks and citations omitted).

> It is settled by a long line of recent decisions of this Court that an ordinance which . . . makes the peaceful enjoyment of freedoms

which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) (alteration in original) (internal quotation marks and citations omitted).[3]

Defendants' unwritten policy and practice sits at the zenith of danger to First Amendment freedoms. The purported policy and practice is nowhere listed in written guidelines provided to applicants seeking to use Defendants' limited public fora (V. Compl. ¶¶ 32, 35, Ex. G), nor was it mentioned in e-mail correspondence between Shurtleff, a longstanding user of the fora, and city staff, even after Shurtleff indicated that his event would include displaying the Christian flag (V. Compl. ¶¶ 19–25, Exs. B, C). Only after receiving word that his request had been denied, and then requesting a reason, was Shurtleff told by Rooney that this policy and practice existed and had been used to deny the permit. (V. Compl. ¶ 26, Ex. D.) Since the policy and practice is unwritten, there is no definition of "non-secular," nor any criteria for making a determination that the label should be applied. Rooney's comment at the end of his e-mail that the City would consider a request for a "non-religious" flag (V. Compl. ¶ 26, Ex. D) offers the only clue to the standard

---

[3]       *See also Saia v. People of State of N.Y.*, 334 U.S. 558, 562 (1948) ("When a city allows an official to ban [speech] in his unfettered control, it sanctions a device for suppression of free communication of ideas."); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988) (holding danger of viewpoint discrimination "at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official"); *id.* at 764 ("[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, **it may not condition that speech on obtaining a license or permit from a government official in that official's boundless discretion**." (emphasis added)); *id.* at 757 ("[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused."); *Forsyth County.*, 505 U.S. at 133 ("**The First Amendment prohibits the vesting of such unbridled discretion in a government official**." (emphasis added)).

underlying the policy—opposition to religious displays, at least on the part of Rooney—which is an unlawful viewpoint-based restriction. Rooney's express statement that no religious displays will be allowed confirms that the policy and practice is a viewpoint-based prior restraint wholly incompatible with the First Amendment.

**D.    Defendants' Policy and Practice Is Unconstitutionally Vague.**

Defendants' unwritten policy and practice is unconstitutionally vague. The term "non-secular" is nowhere defined, which renders the policy vague because it "either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926). The vagueness doctrine ensures that "all be informed as to what the state commands or forbids." *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939). The prohibition against overly vague regulations protects citizens from having to voluntarily curtail their First Amendment activities because of fear that those activities could be characterized as illegal. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Furthermore, "without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or view-point of the speaker." *City of Lakewood,* 486 U.S. at 763–64. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Button*, 371 U.S. at 438.

Precision is wholly absent from Defendants' unwritten policy and practice. The vagueness of the term "non-secular" is particularly apparent when viewed in context of the history of permitted events. While Plaintiffs' request to fly the Christian flag was denied because it ostensibly violated a policy of prohibiting "non-secular" flags, the flag of Portugal was approved, containing "dots inside the blue shields represent[ing] the five wounds of Christ when crucified" and "thirty

dots that represents [sic] the coins Judas received for having betrayed Christ." (V. Compl. ¶ 36.)

Moreover, the City flies the Boston flag incorporating the Boston Seal's Latin inscription, "God be with us as he was with our fathers," and flies or allows to be flown the Bunker Hill Flag, consisting of a red St. George's Cross in a white canton, bordered by a blue field. (V. Compl. ¶ 41.) If flags containing representations of the "wounds of Christ," imploring "God be with us," or displaying a red cross in a white canton surrounded by blue can be approved under Defendants' unwritten policy against "non-secular" flags, but a flag containing a red cross in a blue canton surrounded by white cannot be approved, then what constitutes "non-secular?"

Apparently, there are no standards, let alone precise standards, for the determination of whether a particular flag will be permitted on the City Hall Flag Poles. "Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *City of Lakewood*, 486 U.S. at 758. Defendants unwritten policy and practice vests the right to suppress free speech in the discretion of one individual, Rooney, without providing applicants any standards or even hints of the policy's existence. This is precisely the kind of vague regulation that has been consistently invalidated by the Supreme Court.

E.     **Defendants' Policy and Practice Violates Plaintiffs' Right to Equal Protection.**

The Equal Protection Clause of the Fourteenth Amendment makes it unconstitutional for any state to "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "[T]he concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the government action questioned or challenged." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). Indeed, the Equal

Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

"Content-based restrictions also have been held to raise Fourteenth Amendment equal protection concerns because, in the course of regulating speech, such restrictions differentiate between types of speech." *Burson v. Freeman*, 504 U.S. 191, 197 n.3 (1992). Indeed,

> under the Equal Protection Clause, . . . . [o]nce a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on this basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

*Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (emphasis added); *see also Carey v. Brown*, 447 U.S. 455, 463 n.7 (1980) (quoting *Cox v. Louisiana*, 379 U.S. 536, 581 (1965) (Black, J., concurring) (noting that differentiating between groups who may use a forum available for expression based entirely on what the groups say is "censorship in its most odious form" and "**invidious discrimination forbidden by the Equal Protection Clause** of the Fourteenth Amendment" (emphasis added))).

In *Mosley*, a local ordinance prohibited picketing or demonstrating within a specified distance of a school unless it was a peaceful picket concerning a labor dispute with the school. 408 U.S. at 93. A local resident who had been picketing regarding other issues outside the local high school prior to the ordinance challenged it on Equal Protection grounds. *Id.* at 93–94. The Court reasoned that such distinctions involving First Amendment activities must be "carefully scrutinized" and narrowly "tailored to serve a substantial government interest," *id.* at 99, and held that the ordinance violated Equal Protection because it discriminated solely on the content of the message being expressed and could not satisfy the requisite strict scrutiny. *Id.* at 102.

In *Carey*, the Court again faced a regulation of speech which discriminated on the basis of the category of speech, in a forum otherwise open for expressive activities. *Carey*, 447 U.S. at 457. The Court described the critical inquiry as whether regulations aimed at speech advance the government objective in a manner consistent with the demands of Equal Protection, and held that the subject regulation violated Equal Protection "because the statute discriminates among pickets based on the subject matter of their expression." *Id.* at 471.

Here, as in *Mosley* and *Carey*, Defendants' policy and practice creates two distinct classes of displays in the City's designated public fora based upon the content of the message of the display. Defendants will issue a permit to an event commemorating history and heritage featuring a "non-religious" flag, such as the Battle of Bunker Hill or "Juneteenth," but will deny a permit to an event commemorating history and heritage featuring a "non-secular," *i.e.,* religious, flag, such as the Christian flag proposed by Plaintiffs. This represents a flagrant violation of the Equal Protection Clause.

## II.    PLAINTIFFS FACE IRREPARABLE HARM IF AN INJUNCTION IS DENIED.

It is axiomatic that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Wallace v. Jaffree*, 472 U.S. 38, 44 n.22 (1985); *N.Y. Times Co. v. U.S.*, 403 U.S. 713 (1971). A citizen who exercises the right to free speech, exercises a right that "'lies at the foundation of free government . . . .'" *Schneider v. State*, 308 U.S. 147, 165 (1939). The deprivation of such protected rights constitutes, *a priori*, irreparable harm. "'The constitutional right of free expression is . . . intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of

us . . . .'" *Simon & Schuster*, 502 U.S. at 116, (quoting *Leathers v. Medlock,* 499 U.S. 439, 448–49 (1991)).

The First Circuit has affirmed that where, as here, Plaintiffs have made "a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012) (citing *Elrod*, 427 U.S. at 373). *See also, Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981) ("We also believe that plaintiffs have made a sufficient showing of irreparable injury. It is well established that the loss of first amendment freedoms constitutes irreparable injury."). Since Plaintiffs have shown a likelihood of success on the claim that Defendants' policy and practice violates the First and Fourteenth Amendments, "[t]here is no need for an extensive analysis of this element of the preliminary injunction inquiry." *Fortuno*, 699 F.3d at 15.

## III. THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF PLAINTIFFS.

Where, as here, Defendants' policy and practice is depriving Plaintiffs of the ability to speak and provide information, it creates a hardship for both Plaintiffs and their intended audience. *Fortuno*, 699 F.3d at 15. Quoting the Supreme Court's decision in *Citizens United v. Federal Election Commission,* 558 U.S. 310, 339 (2010), the First Circuit said, "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Fortuno*, 699 F.3d at 15. "To deprive plaintiffs of the right to speak will therefore have the concomitant effect of depriving 'the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration.'" *Id.* (citing *Citizens United*, 558 U.S. at 340–41).

By contrast, permitting the display of the Christian flag on the City Hall Flag Poles will not harm Defendants. As discussed above, there is no viable Establishment Clause concern. Additionally, Defendants will not have to change the written guidelines that applicants have relied upon, but will merely have to set aside their unwritten policy and practice. Therefore, as was true in *Fortuno*, there will be no disruption. *Id.* at 16. "The only consequence of this injunction will be that juridical persons who were unlawfully prevented from engaging in political speech will now be able to engage in such speech." *Id.* The balance of harms clearly weighs in favor of Plaintiffs.

## IV. AN INJUNCTION IS IN THE PUBLIC INTEREST.

The protection of constitutional rights is of the highest public interest. *Elrod*, 427 U.S. at 373. Protecting First Amendment rights is *ipso facto* in the interest of the general public. *Machesky v. Bizzell,* 414 F.2d 283, 288–90 (5th Cir. 1969) ("First Amendment rights are not private rights . . . so much as they are rights of the general public.") The protection of constitutional rights and the public policy considerations of free dissemination of ideas clearly outweigh any purported concerns of Defendants. *Fortuno*, 699 F.3d at 15. Whatever inconvenience Defendants might claim to suffer would pale into insignificance when contrasted with what Plaintiffs and the public must suffer under Defendants' unconstitutional prior restraint.

## <u>CONCLUSION</u>

Based upon the foregoing and the allegations in the Verified Complaint, Plaintiffs respectfully request that the Court enter a Preliminary Injunction as requested in Plaintiffs' Motion for Preliminary Injunction and Verified Complaint.

Respectfully submitted,

/s/ Ryan P. McLane          
Ryan P. McLane (Mass. 697464)
MCLANE & MCLANE
975A Springfield Street
PO Box 105
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com

/s/ Roger K. Gannam         
Mathew D. Staver (Fla. 701092)[†]
Horatio G. Mihet (Fla. 26581)[†]
Roger K. Gannam (Fla. 240450)[†]
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854-0774
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org

Attorneys for Plaintiffs
[†]Application to appear *pro hac vice* pending

## CERTIFICATE OF SERVICE

I hereby certify that on this July 9, 2018, I caused the foregoing to be electronically filed through the Court's ECF system. I further certify that I will cause a true and correct copy of the foregoing, along with the Summons and Verified Complaint (ECF 1), to be served by process server on each of the Defendants.

/s/ Ryan P. McLane         
Attorney for Plaintiffs