UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 1:18-CV-11417-DJC

_____
                                                    )
HAROLD SHURTLEFF, and                               )
CAMP CONSTITUTION, a public charitable trust,  )
                                                    )
                        Plaintiffs,                 )
v.                                                  )
                                                    )
                                                    )
CITY OF BOSTON and GREGORY T. ROONEY,  )
in his official capacity as Commissioner of the City  )
of the Boston Property Management Department,        )
                                                    )
                        Defendants.                 )
_____)

**DEFENDANTS, CITY OF BOSTON'S AND GREGORY T. ROONEY'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

Defendants, City of Boston and Gregory T. Rooney, in his official capacity as

Commissioner of the City of Boston Property Management Department ("City"),[1] respectfully

request that this Court deny Plaintiffs' Motion for Preliminary Injunction seeking an order

requiring the City of Boston to fly the Christian Flag on a prominent City flagpole located in

front of Boston City Hall.

This Court should deny Plaintiffs' request. Plaintiffs cannot demonstrate a substantial

likelihood of success on the merits of their claim, because the City may choose not to raise non-

secular flags on its flagpole.

_____

[1] A suit against a municipal official in his or her official capacity is a suit against the City.
*Stratton v. City of Boston*, 731 F. Supp. 42, 46 (D. Mass. 1989).

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This case arises from Plaintiffs' claim that the City violated their federal and state constitutional rights when it denied their request that the City raise the Christian Flag on its flagpole, located mere steps from the entrance to Boston City Hall ("City Hall").  Plaintiffs now seek a mandatory preliminary injunction ordering the City to grant their request to raise the flag on September 17, 2018.  The City submits this memorandum in opposition to the Plaintiffs' motion.

The City owns and manages three flagpoles on Boston City Hall Plaza ("City Hall Plaza"), and two flagpoles on the Congress Street side of City Hall.  Affidavit of Gregory T. Rooney ("Rooney Affidavit") (attached hereto at *Exhibit A*) ¶ 5.   The City Hall Plaza flagpoles are each approximately 83 feet tall and are prominently located in front of the entrance to City Hall, which is the seat of the city government of Boston.  *Id.* at ¶¶ 6-7.  Generally, the City raises the United States of America flag and the National League of Families POW/MIA flag on one pole, the Commonwealth of Massachusetts flag on a second pole, and the City of Boston flag on the third pole.  *Id.* at ¶ 8.  However, the City sometimes raises other flags in place of the City of Boston flag.  *Id.* at ¶ 9.  For example, the City has flown geographical flags, the LGBT rainbow flag, the transgender rights flag, and the Juneteenth flag recognizing the end of slavery.  *Id.* at ¶ 10.  Typically, the City raises a substitute flag after receiving a third-party request.  *Id.* at ¶ 9. Often, the request is made in connection with a proposed event.  *Id.* at ¶ 11.  In many cases, the requester asks for a podium displaying the City seal to be used by speakers at the event, and such events have also featured City officials as attendees and speakers.  *Id.* at ¶ 12.

The City has published event guidelines on its website for those wishing to hold an event near City Hall.  *Id.* at ¶ 13.  The guidelines explicitly state that applicants need permission from the City to hold events at certain City-owned properties, and direct applicants to an application form that they can fill out to request an event. *Id.*  From a list on the application, an applicant selects the City-owned location at which it wishes to hold an event.  *Id.* at ¶ 14.  Locations include City-owned sites such as Faneuil Hall, City Hall Plaza, Samuel Adams Park, and the City Hall flagpoles.  *Id.*  Once an application is received, the City's policy is to review the request, ensuring that there are no conflicting events occupying the same space, that the applicant has submitted a complete application that accurately reflects the requested event, that the proposed event would not pose an unreasonable danger to the public, and that the applicant has satisfied other administrative requirements.  *Id.* at ¶ 15.  Finally, an event request must be approved by the Commissioner of Property Management, who determines whether flag requests are consistent with the City's message, policies, and practices.  *Id.* at ¶ 16-17.   If the Commissioner denies a flag-raising request, an applicant is free to request holding its event, without the flag-raising, on City Hall Plaza or at another location.  *Id.* at ¶ 18.  The City has no record of having raised a non-secular flag, such as the Christian Flag, on the flagpoles in front of City Hall.   *Id.* at ¶ 19. Religious events have regularly occurred on City Hall Plaza.[2]  *Id.*

On July 28, 2017, Plaintiff Hal Shurtleff sent an e-mail to an employee in the City's Property Management Department requesting to raise the Christian Flag on City Hall Plaza in connection with an event.  *Id.* at ¶ 20.  The Plaintiff suggested several potential dates and times for the event.  *Id.*  On September 5, 2017, the City denied the Plaintiffs' flag raising request.  *Id.* at ¶ 21.  The City's decision was grounded in its position that it is inappropriate for the City to

---

[2] For example, over the past nine months, City-owned properties have hosted events such as the Greater Boston Jewish Community Holocaust Commemoration, Open Air Church Evangelism (Boston for Jesus), and FBD Student Worship.

fly a non-secular flag on its flagpole.  *Id.*   On September 6, 2017, Shurtleff requested an official

reason for the denial.  *Id.* at ¶ 22.   On September 8, 2017, the City sent Shurtleff a written denial,

citing both its policy and practice of not raising non-secular flags on the flagpole in accordance

with well-established First Amendment jurisprudence, as well as the City's legal authority to

choose how to use its flagpoles, which are a limited government resource.  *Id.*   Subsequently, on

September 14, 2017, the City received a letter from Shurtleff's counsel stating its legal opinion

on the constitutionality of the City's denial, requesting that the City approve Camp

Constitution's original flag pole request, attaching a second application to raise the Christian

Flag, and informing the City that if it did not respond to the letter, Shurtleff would take legal

action.  *Id.* at ¶ 23.  The City did not respond. *Id.*

On July 6, 2018, the Plaintiffs filed their Complaint (Docket No. 1) and on July 9, 2018

moved for a mandatory preliminary injunction (Docket No. 2).

## II.      ARGUMENT

### A.      Legal Standard

The standard for granting a preliminary injunction is well-known.  Plaintiffs bear the

burden of persuasion, and the Court considers: "(1) the likelihood of success on the merits; (2)

the potential for irreparable harm to the movant in the absence of an injunction; (3) the balance

of the movant's hardship if relief is denied versus the nonmovant's hardship if relief is granted;

and (4) the effect, if any, of the decision on the public interest."  *The Maine Educ. Assoc.*

*Benefits Trust v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012).

Importantly, in their motion, Plaintiffs do not seek a traditional, prohibitory preliminary

injunction.  Rather, Plaintiffs seek a *mandatory* preliminary injunction *requiring* the City to take

affirmative steps in advance of trial (here, to raise the Christian Flag in front of City Hall).  "The

moving party has a greater burden when it seeks a 'mandatory' preliminary injunction that would compel the non-moving party to perform an affirmative act rather than a 'negative' injunction that would prevent the non-moving party from engaging in a certain activity for the period before trial." *Northeastern Univ. v. BAE Systems Info. and Elec. Systems Integration Inc.*, C.A. No. 13-12497-NMG, 2013 WL 6210646, at *7 (D. Mass. Nov. 27, 2013). Indeed, "[b]ecause a mandatory preliminary injunction alters rather than preserves the status quo, it normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Braintree Laboratories, Inc. v. Citigroup Global Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (quotations omitted). Courts are disinclined to issue mandatory preliminary injunctions "unless the facts and the law clearly favor the moving party." *Northeastern Univ.*, 2013 WL 6210646, at *7 (quotations omitted).

**B.    Plaintiffs Have Not Demonstrated a Substantial Likelihood of Success on Their Claims Where Raising a Flag on a City Flagpole Does Not Constitute Private Speech, and Where, Even if it Was Considered Private Speech, the City's Decision Not to Open the Flagpole to Non-Secular Flags is Reasonable and Viewpoint Neutral.**

"[T]he movant's likelihood of success is the touchstone of the preliminary injunction inquiry." *Maine Educ. Ass'n*, 695 F.3d at 152 (quotations omitted). Where plaintiffs have not demonstrated a substantial likelihood of success on the merits of their First Amendment and equal protection claims, the Court should deny the motion for a mandatory preliminary injunction.

First, the City's decision not to fly the non-secular Christian Flag is a constitutional exercise of its discretion when engaging in government speech and does not infringe on Plaintiffs' First Amendment rights under the Free Speech Clause.[3] The City's act of raising a

---

[3] Such conduct similarly does not violate Plaintiffs' rights under article 16 of the Massachusetts Declaration of Rights. Although Article 16 of the Massachusetts Declaration of Rights has been

flag on the City Hall flagpoles, which are prominently located in front of City Hall and over which the City maintains ownership and control, constitutes government speech. Therefore, because the City engages in expressive conduct when it agrees to fly a flag on the flagpoles, the traditional forum analysis applicable to private speech on government property does not apply, and plaintiffs may not maintain their claims that the City engaged in viewpoint discrimination. Additionally, even if the City's decision to raise a flag on the City Hall flagpoles was viewed as private speech in a limited public forum, the City's decision not to raise non-secular flags, including the Christian Flag, outside of City Hall would be a constitutionally valid regulation of such speech. Moreover, if the City was to raise the Christian Flag outside of City Hall, the City would violate the Establishment Clause of the First Amendment to the United States Constitution by providing an unmistakable endorsement of the Christian religion and also by unnecessarily entangling the City with religion.

Secondly, because raising a flag is properly classified as government speech, the Plaintiffs cannot maintain their equal protection claims because they do not have a constitutional right to force the City to express itself in a particular way. And, even if the speech at issue was classified as private speech in a limited public forum, Plaintiffs have not alleged how they have been treated differently from other speakers who wish the City to fly a non-secular flag. Therefore, the Plaintiffs do not have a likelihood of succeeding on their claims, and this Court should deny their motion.

1.     **The City's Decision not to Raise the Christian Flag on the City's Flagpole in Front of Boston City Hall is Government Speech.**

---

interpreted, in certain circumstances, to provide greater protections than the First Amendment, *see Batchelder v. Allied Stores Intern., Inc.*, 388 Mass. 83, 87-88 (1983), no court of the Commonwealth has held that government speech implicates First Amendment concerns.

The entire premise of Plaintiffs' argument rests on its conclusion that the City's flagpoles are a public forum available for private speech, and that the City violated Plaintiffs' free speech rights when it denied their request to fly the Christian Flag.  Yet the Free Speech Clause does not regulate or limit the government when it uses its own property to engage in its own speech. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-468 (2009).  A governmental entity is "entitled to say what it wishes," *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and to select the views that it wants to express.  *See Rust v. Sullivan*, 500 U.S. 173, 194 (1991); *National Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998). Additionally, the government's use of its editorial discretion in the selection and presentation of the speech of private citizens is a communicative act that may constitute government speech. *See Summum*, 555 U.S. at 471-72 (finding city's selection of only some privately donated monuments for display in city park was government speech where city exercised final approval authority over selection and where objective observer viewing monuments would determine that city was speaker); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 29-30 (D.C. Cir. 2005) (holding that government was engaged in its own speech where it selected third-party designs to be placed on sidewalks and in parks, and therefore a third party could not require government to include an unwanted design).

In *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2253 (2015), the Supreme Court of the United States held that the Texas Department of Motor Vehicles did not violate the Sons of Confederate Veterans' ("SCV") First Amendment rights when it denied their request to issue a specialty license plate depicting the Confederate flag because the privately-created designs constituted government speech.  In reaching its conclusion that the state was allowed to choose what messages and views it wished to express on its license

plates, even those proposed by private parties pursuant to an officially-sanctioned specialty plate

program, the Court, relying on its previous analysis in *Summum*, focused on several factors.  *Id.*

at 2248.  First, the Court noted the long history of license plates communicating messages from

the states, including the inclusion of symbols representative of a particular state.  *Id.*  Second, the

Court found that license plates "are often closely identified in the public mind with the [State]"

and that in this case they were "essentially government IDs," noting that in Texas the state

required each driver to display a plate, issued its own plates, and included the word "TEXAS" at

the top of every plate.  *Id.*  Third, the Court found that one who displays a message on a Texas

specialty plate "likely intends to convey to the public that the State has endorsed that message,"

and that Texas's license plate designs "convey government agreement with the message

displayed."  *Id.* at 2249.  Finally, the Court pointed to the fact that Texas had "maintain[ed]

direct control" over the messages conveyed by the specialty plates, by reserving for itself sole

approval authority over design proposals, which allowed it "to choose how to present itself and

its constituency."  *Id.*  Therefore, even where the state had previously approved numerous plate

designs of private parties, including plates promoting the "Keller Indians," the slogan "Get it

Sold with Re/MAX," the words "The Gator Nation" with the Florida Gators logo, and the logo of

Rotary International with the words "SERVICE ABOVE SELF," the Court concluded that the

state had not violated SCV's free speech rights where it denied their specialty license plate

design, because the license plates were not a public forum, and the selection of designs was an

exercise in government speech.  *Id.* at 2244-2245, 2250.

Other courts, including the First Circuit, have focused on the *Summum* and *Walker*

factors in determining that government rejection of private viewpoints constituted government

speech.  *See Sutliffe v. Epping School Dist.*, 584 F.3d 314, 329 (1st Cir. 2009) (holding town's

use of town website to advocate for approval of budget and its refusal to include hyperlink to plaintiffs' website, which communicated opposing views, constituted government speech because town's decision to include certain hyperlinks, even to other private organizations, was within its sole discretion and communicated an important message about its own views); *see also Mech v. School Bd. of Palm Beach Cty., Fla.*, 806 F.3d 1070, 1075 (11th Cir. 2015) (finding school's decision to remove appellant's advertising banner from its fence constituted government speech where banners were located on school property and bore its colors and initials, stated that the advertiser was school's "partner," therefore indicating school's endorsement, and were subject to the approval of school principals prior to being displayed); *United Veterans Memorial and Patriotic Ass'n of the City of New Rochelle v. City of New Rochelle*, 72 F. Supp. 3d 468, 474, 478 (S.D.N.Y. 2014) (granting city's motion to dismiss plaintiff's claim that city violated its First Amendment rights by removing its flag from city armory flagpole where reasonable observer would assume flag, located on a flagpole on city property used for park and recreation purposes, was conveying a message on city's behalf, even where city had ceded control of flagpole to private organization).

Similarly, the City of Boston's selection of flags to fly (or not fly) in front of City Hall is expressive conduct constituting government speech.  Governments have conveyed messages on flags since time immemorial.  *See Texas v. Johnson,* 491 U.S. 397, 405 (1989) ("Pregnant with expressive content, the flag as readily signifies this Nation as does the combination of letters found in 'America'."); *see also West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 632 (1943) ("The use of an emblem or flag to symbolize some system, idea, institution, or personality is a shortcut from mind to mind . . . [c]auses and nations, political parties, lodges and ecclesiastical groups seek to knit loyalty of their followings to a flag or banner.").  In fact, the

government's choice of which flags to fly has previously been found to constitute government speech. *See Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1324 (Fed. Cir. 2002) ("We have no doubt that the government engages in speech when it flies its own flags over a national cemetery, and that its choice of which flags to fly may favor one viewpoint over another . . . [s]uch speech, and such discrimination between competing viewpoints, does not . . . implicate the First Amendment rights of others."). Importantly, Boston residents and visitors standing on City Hall Plaza observing the City raising the Christian Flag on the City's approximately 83-foot-tall flagpole, on City-managed land, in front of, and mere steps from the entrance to City Hall, would easily identify the City as the speaker of the message communicated by a particular flag. See *Summum*, 555 U.S. at 1133. The City of Boston, like the Texas Department of Motor Vehicles, also maintains direct control over the messages conveyed by exercising final approval authority over the selection of flags for display outside City Hall. Rooney Affidavit at ¶ 16; *See Walker*, 135 S. Ct. at 2247. Additionally, it is also apparent from the circumstances of Plaintiffs' request that they are not merely seeking to engage in their desired speech, but are instead seeking to convey government endorsement of their views. *See Walker*, 135 S. Ct. at 2249. As the Supreme Court reasoned in *Walker*,

> Indeed, a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message. If not, the individual could simply display the message in question in larger letters on a bumper sticker right next to the plate. But the individual prefers a license plate design to the purely private speech expressed through bumper stickers. That may well be because Texas's license plate designs convey government agreement with the message displayed.

*Id.*

Similarly here, there is no reason that the Plaintiffs in this case could not hold an even larger Christian Flag on City Hall Plaza near the flagpoles at issue. Therefore, it can be inferred from the circumstances that the Plaintiffs are not seeking permission to fly their flag or to engage

in private speech, but are instead seeking to use the flagpole to obtain the powerful image of City approval of their religious views. *See id.* If this Court grants Plaintiffs' motion, City employees would raise the Christian Flag on the City flagpole, in front of City Hall, at an event likely including a podium displaying the City seal. This would undeniably appear to represent government endorsement.

Finally, if the City was required to permit any and all flags to fly in front of City Hall, it would have untenable and absurd consequences. If the City wanted to fly the LGBT rainbow flag, it would also have to fly the Ku Klux Klan flag. If the City wanted to fly the flag of the Dominican Republic, it would also have to fly the Nazi flag. Such a ruling would force the City to associate itself with positions that are deeply offensive to residents and visitors alike. The City should not be forced to place its imprimatur on these messages and symbols that are inconsistent with the City's message.

2. **Forum Analysis is Not Applicable Here Where the City is Engaging in its Own Expressive Conduct.**

Where the City is engaging in government speech when it decides to fly certain flags, the traditional forum analysis applied to government's action related to private speech on government property does not apply, and Plaintiffs cannot maintain their claims that the City has engaged in viewpoint discrimination. When the City approves an applicant's flag-raising request, it has determined that the message conveyed by the proposed flag comports with the City's policies and positions, and that it agrees to engage in the expressive conduct of raising it on its own flagpoles. *See* Rooney Affidavit ¶ 17. Thus, the inquiry into whether the flagpoles constitute a "traditional" or "designated" public forum does not apply. Unlike in the case of public parks or squares, there is not a history of governments allowing their flagpoles to be used in a way that does not express a message with which the government agrees. *Cf. Capitol Square*

*Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 757 (1995) (finding analysis of content-based restriction on speech appropriate where statute authorized state-owned plaza at issue to be used for public speeches, gatherings and festivals, both religious and non-religious, and where property had been used this way for over a century).  Additionally, by allowing applicants to make flag-raising requests, the City has not made an affirmative choice to open up its flagpoles as a public forum.  *See U.S. v. American Library Ass'n*, 539 U.S. 194, 206 (2003)  ("The government does not create a public forum by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse.").  Instead, the City has engaged in a process where it allows applicants to propose the type of expressive conduct in which the City may or may not choose to engage.  Because the City is engaged in its own speech, therefore, the "First Amendment strictures that attend the various types of government-established forums do not apply."  *See Walker*, 135 S. Ct. at 2250.

3. **Even if the City's Decision Not to Raise Non-Secular Flags Was Analyzed as a Restriction on Private Speech, the City's Decision Would Be a Constitutional Regulation of Speech in a Non-Public or Limited Public Forum.**

Even if the flags raised by the City on its flagpole are considered private speech, the City's policy of excluding non-secular flags is constitutional because it is reasonable and viewpoint neutral in that it does not discriminate between religious viewpoints, but excludes the category of non-secular flags entirely.

The government may reserve a non-public or a limited public forum[4] to the limited and

---

[4] The City's flagpole is not a traditional public forum under First Amendment jurisprudence, because, unlike a street or a park, it is not "immemorially . . . held in trust for the use of the public, and, time out of mind . . . used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Hague v. CIO*, 307 U.S. 496, 515 (1939).  If the flags raised by the City on  its flagpole are considered private speech as opposed to government speech, contested but assumed for the purposes of this section of the City's

legitimate purposes for which it was created by reserving it for certain types of groups or for the discussion of certain topics as long as the restrictions are both reasonable and viewpoint neutral. *Perry Ed. Ass'n v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-107 (2001).

While the government may not refuse to allow the expression of a religious viewpoint on a subject that the government has allowed to be discussed in a non-public or limited public forum, *see Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 393-94 (1993), the government may exclude categories of speech unless "its distinction is not 'reasonable in light of the purpose served by the forum,' . . . [or] it discriminate[s] against speech on the basis of its viewpoint." *Rosenberger*, 515 U.S. at 829.

In *Rosenberger*, the Supreme Court struck down the University of Virginia's decision to refuse to reimburse the printing costs of a student newspaper with a Christian editorial viewpoint where it maintained a policy of reimbursing the printing costs of other student newspapers. *Id.* In so ruling, the Supreme Court specifically emphasized that the constitutional infirmity in the University of Virginia's decision was that it was excluding religious editorial viewpoints on otherwise permissible subjects, as opposed to excluding religion as a subject matter, stating:

> the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints . . . [t]he prohibited perspective, not the general subject matter, resulted in the refusal to make third-party payments, for the subjects discussed were otherwise within the approved category of publications.

---

memorandum, then the flagpole is likely to be viewed as either a non-public forum, which is a place "which is not by tradition or designation a forum for public communication," *Perry*, 460 U.S. at 46, or a limited public forum, which is a non-public forum which the government "has opened for use by the public as a place for expressive activity." *Id.* at 39-40.   Courts have applied the same analysis regarding government restrictions on speech in non-public and limited public fora – to be constitutional, the restriction must be reasonable and viewpoint neutral. *Rosenberger*, 515 U.S. at 829 (restrictions in a limited public forum must be reasonable and viewpoint neutral); *Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 806 (1985) (restrictions in a non-public forum must be reasonable and viewpoint neutral).

*Id.* at 831.

Following *Rosenberger*, courts have specifically identified religion as a subject that the government may exclude from a forum while remaining viewpoint neutral, as long as all speech on the subject of religion is excluded and not just particular religious viewpoints or religious viewpoints on otherwise permissible subjects. *DiLoreto v. Downey Unified School District Board of Educ.*, 196 F.3d 958, 969 (6th Cir. 1999); *Archdiocese of Washington v. Washington Metropolitan Area Transit Auth.,* 281 F. Supp. 3d 88, 105 (D.D.C. 2017).

The City's restriction on raising non-secular flags is consistent with the above authorities and is viewpoint neutral. Unlike in cases where the government refused to allow the expression of a religious perspective on an otherwise permissible subject, the City does not seek to restrict the Plaintiffs' expression of a Christian viewpoint on such a subject, but seeks to exclude non-secular flags from the flagpole entirely. Rooney Affidavit at ¶ 23. This is precisely the kind of content-based restriction that the City is permitted to make in a non-public or limited public forum.

Additionally, the City's policy is reasonable where an onlooker would perceive that the City is endorsing a religion at the expense of other religious views. "[W]here allowing private expression in a nonpublic forum may imply government endorsement of that expression, limiting or excluding speakers may be reasonable." *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, *citing Cornelius*, 473 U.S. at 809 ("avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum"). In addition, the Supreme Court has found that the government's interest in avoiding an Establishment Clause violation may be a compelling one. *Summum*, 130 F.3d at 921. These authorities are precisely applicable here, where the City would be selecting and raising the Christian Flag on an 83-foot-tall, prominent

flagpole in front of City Hall, alongside the United States flag and the Commonwealth of Massachusetts flag. Such an action would provide an unmistakable endorsement of the Christian religion and that endorsement would likely constitute an Establishment Clause violation, as set forth in the next section of this memorandum.

Plaintiffs improperly seek to apply strict scrutiny review to the City's decision to refrain from raising non-secular flags on its flagpole, apparently regarding the flagpole as either a traditional public forum or a designated public forum. As noted earlier, the City's flagpole is not a traditional public forum under First Amendment jurisprudence, because, unlike a street or a park, it is not "immemorially . . . held in trust for the use of the public, and, time out of mind . . . used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague*, 307 U.S. at 515. If the flags raised by the City are viewed as private speech, as the City contests but assumes for the purposes of this section of its memorandum, the City's flagpole should not be viewed as a designated public forum because the City has not opened the forum to any type of private speech, but has restricted the forum by adopting a policy and practice of refraining from flying non-secular flags. Therefore, the flagpole would be more properly viewed as a limited public forum or a non-public forum.[5]

Finally, the City is not refusing to allow the Plaintiffs to hold an event on City Hall Plaza or refusing to allow the Plaintiffs to request a different flag raising. This demonstrates that the City does not seek to silence the Plaintiffs and that the Plaintiffs have alternative public options available to engage in their speech.

---

[5] Even if, despite the foregoing analysis, this Court was to determine that the flagpole is a designated public forum and not a limited public forum, and therefore applied strict scrutiny to the City's decision, the City notes that there is a compelling governmental interest in avoiding a violation of the Establishment Clause that would apply to Plaintiffs' request. *See Summum*, 130 F.3d at 921; *Lamb's Chapel*, 508 U.S. at 394-95. The City asserts that its policy and practice of respectfully declining to raise non-secular flags is narrowly tailored to achieve the above-stated government interest.

For the above stated reasons, even if the City's decision not to raise non-secular flags on its flagpole was determined to be a restriction on private speech, the categorical exclusion of non-secular flags does not violate the Plaintiffs' constitutional rights.

4. **The City would violate the Establishment Clause of the First Amendment to the United States Constitution and the Massachusetts Declaration of Rights if it was to Raise the Christian Flag on a Flagpole Prominently Located Outside of City Hall.**

The Supreme Court has reviewed the constitutionality of religious displays on government property on numerous occasions. *See Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989); *Lemon v. Kurtzman*, 403 U.S. 602 (1971). The Court has reviewed such religious displays to determine whether they violate the Establishment Clause of the First Amendment to the United States Constitution. *See id*. The Establishment Clause states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *Cty. of Allegheny*, 492 U.S. at 589-590. These prohibitions were incorporated to restrict the conduct and activities of state and local government by the Fourteenth Amendment to the United States Constitution. *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947).[6]

The Court has created several tests to aid the lower courts when reviewing the constitutionality of religious displays on government property. The test most identifiable with Establishment Clause jurisprudence, the *Lemon* test, holds that a challenged display (1) must have a secular purpose, (2) the principal or primary effect must neither advance nor inhibit religion, and (3) must not foster excessive government entanglement with religion. *Lemon*, 403 U.S. at 612-613; *see Lynch v. Donnelly*, 465 U.S. 668, 679 (1984).

---

[6] Courts of the Commonwealth utilize the standards set forth in First Amendment jurisprudence to analyze claims under Article 2 of the Massachusetts Declaration of Rights. *See Opinion of the Justices to the House of Representatives*, 423 Mass. 1244, 1246-1247 (1996).

The Supreme Court has used the Endorsement Test to review similar cases.  *See Cty. of Allegheny*, 492 U.S. at 598-602.[7]  Under the Endorsement Test, the Establishment Clause prohibits the government from demonstrating an allegiance to, or endorsement of, a particular religion or religious sect.  *See id*.  Endorsement of religion "sends a message to non-adherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch*, 465 U.S. at 688.  Such a message violates the Establishment Clause.  *Id.*

Applying the *Lemon* test factors to the facts of the instant case, it is apparent that the purpose of flying the Christian Flag in front of City Hall would be non-secular, and the principal or primary effect would advance religion, because it would imbue the Christian Flag with the weight of an endorsement by the City of Boston.  In terms of entangling the City with religion, not only would flying the Christian Flag clearly entangle the City with Christianity, but it would mean that the City would be required to fly the flag of any religious group that asked.  This would include Satanists and the occult, as well as every other religion or religious sect (Christianity and its denominations, Islam, Judaism, Buddhism, Hinduism, et al.).  Plainly, the City's adoption of a policy and practice where it chose to raise religious flags would entangle it with religion to a constitutionally unacceptable degree.

Applying the Endorsement Test, if the City was to fly the Christian Flag on a prominent flagpole in front of City Hall, the seat of the municipal government of the City of Boston, 83 feet in the air alongside the United States of America flag and the Commonwealth of Massachusetts flag, the City would provide a clear, unequivocal, and unmistakable endorsement of the Christian

---

[7] Courts have often considered the Endorsement Test to be part of the *Lemon* test.  *See American Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1117 (10th Cir. 2010); *Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 282-283 (3rd Cir. 2011).

religion.  A reasonable onlooker would understandably interpret the image as the City conveying its approval of the Christian religion.

Relatedly, the potential coercive effect of such an endorsement is equally concerning. *See Engel v. Vitale*, 370 U.S. 421, 431 ("When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.").  The Establishment Clause prohibits from the government from endorsing this type of coercive expression.

For the above reasons, the City would violate the Establishment Clause if it agreed to raise non-secular flags on the City Hall Plaza flagpole.

> 5.      **Plaintiffs' Equal Protection Claims Fail Because Plaintiffs Do Not Have a First Amendment Right to Force the City to Adopt Their Speech as its Own, Nor Can Plaintiffs Demonstrate That They Were Denied a Right Protected By the First Amendment.**

Where, as here, the speech at issue is properly classified as government speech, Plaintiffs cannot assert a viable equal protection claim under either the Equal Protection Clause of the Fourteenth Amendment or the Massachusetts Declaration of Rights[8]  because they do not have a constitutional right to force the City to express itself in a particular way.  *See Perry*, 460 U.S. at 54-55 (the key to decisions finding that distinctions between classes of speech violated the Equal Protection Clause was the presence of a public forum that all parties had a constitutional right to access).

Even if the flag was considered private speech, a viable equal protection claim based on an alleged denial of the right to free speech requires that a plaintiff demonstrate that he or she

---

[8] Analysis of equal protection claims is the same under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Massachusetts Declaration of Rights.  *See Brackett v. Civil Serv. Comm'n*, 447 Mass. 233, 243 (2006).

was treated differently than a similarly situated speaker.  *See id.*  Additionally, if a party does not have a right to speak in a particular forum that is protected by the First Amendment, a restriction on that party's speech need only rationally further a legitimate governmental purpose to be constitutional.  *See id.*

In this case, Plaintiffs do not allege that the City previously granted another speaker's request to raise a non-secular flag on the City's flagpole. On the contrary, the City has declined Plaintiffs' request that it raise a non-secular flag on a flagpole because the City does not raise non-secular flags.  Therefore, Plaintiffs cannot demonstrate that they were treated differently from a similarly situated speaker.

In addition, Plaintiffs do not have a First Amendment right to force the City to raise a non-secular flag on the City's flagpole, for the reasons stated in section three of this memorandum.  The City's reasons for deciding not to fly non-secular flags rationally furthers legitimate governmental purposes including the City's interest in avoiding the perception that it is endorsing a particular religion.  The City also has a compelling interest in avoiding a violation of the Establishment Clause that would occur if it was to approve Plaintiffs' request.  *See Summum*, 130 F.3d at 921; *Lamb's Chapel*, 508 U.S. at 394-95.

For these reasons, Plaintiffs fail to state a viable equal protection claim.

**C.**     **The Plaintiffs Will Not Be Irreparably Harmed if the Court Denies their Request for a Mandatory Injunction, and the Balance of Harms Favors the City Where An Injunction Would Force the City to Fly Every Requested Flag on its Own Flagpoles, Even if the City is Ultimately Successful on the Merits.**

The Plaintiffs will not be irreparably harmed in the absence of an injunction.  Plaintiffs have waited over nine months between the time the City denied their flag-raising request and the date they filed suit.  They have not made further requests for flag raisings during that time.  Additionally, Plaintiffs have not applied to hold an event on City Hall Plaza, or another public

forum (with or without a flag).  Therefore, the only "speech" that the City has declined to accommodate is the speech that Plaintiffs insist can only take place on the City Hall Plaza flagpoles – which reinforces the City's argument that such flag raising constitutes government speech and Plaintiffs' goal is to create the appearance of the City's endorsement of its speech – not to ensure the speech itself.

Further, the City's policies would be drastically changed if it was suddenly forced to accept any request to raise a flag on its own flagpoles.  Given that the City may prevail on the merits, requiring the City to accept Plaintiffs' request pending the outcome of this lawsuit would cause confusion and make the City vulnerable to additional Establishment Clause and other constitutional claims.  Therefore, the balance of harms favors the City and the Court should deny Plaintiffs' request for injunctive relief.

## III.        CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,
DEFENDANTS CITY OF BOSTON and
GREGORY T. ROONEY, in his official
capacity as COMMISSIONER OF THE
BOSTON PROPERTY MANAGEMENT
DEPARTMENT,

By their attorneys:

Eugene L. O'Flaherty,
Corporation Counsel


/s/ David J. Zuares
David J. Zuares (BBO #681996)
Assistant Corporation Counsel
City of Boston Law Department

One City Hall Plaza, Room 615
Boston, MA 02201
(617) 635-4048
David.zuares@boston.gov


/s/ Catherine Lizotte
Catherine Lizotte (BBO #666468)
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-3215
Catherine.lizotte@boston.gov


**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2018 this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.


/s/ David J. Zuares
David J. Zuares