## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HAROLD SHURTLEFF et al., ) ) ) ) | |
| Plaintiffs, | |
| v. | Civil Action No. 18-cv-11417-DJC |
| CITY OF BOSTON et al., | |
| Defendants. | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                           **August 29, 2018**

### I.    Introduction

Plaintiffs Harold Shurtleff and Camp Constitution ("Plaintiffs") have moved for a preliminary injunction against Defendants, the City of Boston and Gregory T. Rooney, in his official capacity as Commissioner of the City of Boston Property Management Department (collectively, "Defendants" or "the City"). D. 7. Plaintiffs seek to enjoin the City from denying permission to the Plaintiffs to display "the Christian flag" on a City Hall flagpole in conjunction with their Constitution Day and Citizenship Day event on or around September 17, 2018. D. 7 at 2. For the reasons discussed below, Plaintiffs' motion for a preliminary injunction, D. 7, is DENIED.

### II.    Standard of Review

"A preliminary injunction is an 'extraordinary and drastic remedy.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)). To obtain a preliminary injunction, the Court must consider:

(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest. Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). Plaintiffs "bear[] the burden of establishing that these four factors weigh in [their] favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006); see Rivera-Vega v. Conagra Inc., 70 F.3d 153, 164 (1st Cir. 1995) (quoting Pye ex rel. NLRB v. Sullivan Bros. Printers, 38 F.3d 58, 63 (1994)) (noting that when the relief sought by the moving party "is essentially the final relief sought, the likelihood of success should be strong") (emphasis in original) (internal quotation marks omitted).

## III.    Factual Background

The following facts, largely undisputed, are drawn from the complaint, D. 1, Plaintiffs' motion for a preliminary injunction, D. 7-8, and the City's opposition, D. 11. The City owns and manages three flagpoles located in front of the entrance to City Hall, in an area called City Hall Plaza. D. 11 at 2; D. 11-1 ¶ 5. The three poles are the same height, approximately 83 feet tall. D. 11 at 2. One pole regularly displays the flags of the United States and the National League of Families Prisoner of War/Missing in Action ("POW/MIA") flag. Id. A second pole flies the flag of the Commonwealth of Massachusetts. Id. The dispute in this case centers on the third flagpole, which displays the City of Boston flag except when replaced by another flag—usually at the request of a third-party. Id. Such a request is often made in conjunction with a proposed third-party event to take place at a location owned by the City, one of which is City Hall Plaza. Id. Examples of other flags that have been raised on the third flagpole are country flags, e.g., the flags of Brazil, Ethiopia, Portugal, Puerto Rico, the People's Republic of China and Cuba, and the flags of private organizations, including the Juneteenth flag recognizing the end of slavery, the LGBT rainbow pride flag, the pink transgender rights flag, and the Bunker Hill Association flag. D. 8 at

3; D. 11 at 2.  As Plaintiffs allege, the flag of Portugal contains "dots inside the blue shields represent[ing] the five wounds of Christ when crucified" and "thirty dots that represents [sic] the coins Judas received for having betrayed Christ."  D. 1 ¶ 36.  The City of Boston flag includes the Boston seal's Latin inscription, which translates to "God be with us as he was with our fathers."  D. 1 ¶ 41(a).  As Plaintiffs note, the Bunker Hill Flag contains a red St. George's cross.  D. 1 ¶ 41(b).  Many religious groups, including Plaintiffs, have held events at City-owned properties in the past.  D. 8 at 4; D. 11 at 3.[1]

To apply for a permit to raise a flag at City Hall and hold an event on a City-owned property, a party submits an application to the City.  D. 11 at 3; D. 11-1 ¶ 13.  The City has published guidelines on its website for applicants.  D. 8 at 3; D. 11 at 3; D. 11-1 ¶ 13.  The guidelines state that an application may be denied if the event involves illegal or dangerous activities or if it conflicts with scheduled events.  D. 8 at 3-4; D. 11 at 3.  In addition, an application may be denied if the applicant lacks an insurance certification, lies on their application, has a history of damaging city property or failing to pay city fees or fails to comply with other administrative requirements.  D. 8 at 4; D. 11 at 3.  After a party has submitted an application, the City reviews the request to ensure it complies with all guidelines.  D. 1-8 at 2; D. 11 at 3; D.11-1 ¶ 15.  The Commissioner of Property Management reviews applications for the City flagpole to ensure flag requests are "consistent with the City's message, policies, and practices."  D. 11 at 3; D. 11-1 ¶¶ 16-17.  The City does not have a written policy regarding the content of flags to be raised.  D. 8 at 4.

---

[1] In or about 2012, Plaintiffs obtained permission to and did fly an unspecified flag on the City Hall flagpole as part of a free speech event.  D. 1 ¶ 19; D. 8 at 4.  Plaintiffs do not allege that they received permission to fly the Christian flag at that event.

On July 28, 2017, Plaintiff Shurtleff emailed the City on behalf of his organization, Camp Constitution, requesting to "raise the Christian flag on City Hall Plaza," accompanied by "short speeches by some local clergy focusing on Boston's history" on one of several dates in September 2017.  D. 1-1.  The email included a photograph of the Christian flag, D. 1-1, which "displays a red Latin cross against a blue square bordered on three sides by a white field."  D. 1-4.  On September 5, 2017, the City denied Shurtleff's request to raise the Christian flag without explanation.  D. 1-3.  Shurtleff asked for the "official reason" for denying the permit.  Id. Defendant Rooney wrote to Shurtleff that "[t]he City of Boston maintains a policy and practice of respectfully refraining from flying non-secular flags on the City Hall flagpoles."  D. 1-4.  Rooney further explained that the City's "policy and practice" was based on the First Amendment prohibition on government establishing religion and the City's authority to decide how to use its flagpoles, which are a "limited government resource."  Id.  Rooney concluded that "[t]he City would be willing to consider a request to fly a non-religious flag, should [Shurtleff's] organization elect to offer one."  Id.  In response, Plaintiffs' counsel sent a letter to the City on September 14, 2017, taking the position that the denial was unconstitutional and declining to "submit a 'non-religious' flag."  D. 1-6 at 2.  Plaintiffs' counsel attached a second application for "Camp Constitution's Christian Flag Raising" on October 19 or October 26, 2017.  D. 1-5.  The stated purpose of the event was to "[c]elebrate and recognize the contributions Boston's Christian community has made to our city's cultural diversity, intellectual capital and economic growth." Id.  The letter stated that if Plaintiffs did not receive a response by September 27, 2017, Plaintiffs would take "additional actions to prevent irreparable harm to the rights of [their] clients."  D. 1-6 at 4.  The City neither issued a permit to Plaintiffs nor responded to the letter.  D. 8 at 5; D. 11 at

4. Since receiving the letter, Plaintiffs have not applied to hold further events on City-owned property, with or without a flag. D. 11 at 19-20.

## IV. Procedural History

On July 6, 2018, Plaintiffs filed the present complaint seeking injunctive relief, declaratory relief and damages against Defendants. D. 1. On July 9, 2018, Plaintiffs moved for a preliminary injunction. D. 7. On August 9, 2018, the Court heard the parties on the pending motion and took this matter under advisement. D. 14.

## V. Discussion

Plaintiffs have asserted six claims—three federal and three state constitutional: 1) a violation of the First Amendment free speech clause; 2) a violation of the First Amendment establishment clause; 3) a violation of the Fourteenth Amendment equal protection clause; 4) a violation of the freedom of speech clause of Article 16 of the Massachusetts Declaration of Rights; 5) a violation of the non-establishment of religion clauses of Articles 2 and 3 of the Massachusetts Declaration of Rights; and 6) a violation of equal protection under Articles 1 and 3 of the Massachusetts Declaration of Rights.[2]

As an initial matter, federal law governs the Court's analysis of the Plaintiffs' claims under both the United States and Massachusetts Constitutions. See, e.g., Commonwealth v. Barnes, 461 Mass. 644, 650 (2012) (classifying the free speech provisions of Article 16 of the Massachusetts

---

[2] Although Plaintiffs request an order compelling the City to include a description of Plaintiffs' event on its website, Plaintiffs have not alleged that the City denied any such request. As such, Plaintiffs have not "present[ed] a real, substantial controversy . . . a dispute definite and concrete, not hypothetical or abstract" that is ripe for resolution as to this request. Nomad Acquisition Corp. v. Damon Corp., 701 F. Supp. 10, 11 (D. Mass. 1988) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)) (internal quotation marks and punctuation omitted). Accordingly, the Court's analysis is limited to Plaintiffs' claims with respect to the prayer for relief concerning the denial of permission to raise the Christian flag on the City flagpole.

Declaration of Human rights as a "cognate provision" of the First Amendment); Brackett v. Civil Serv. Comm'n, 447 Mass. 233, 243 (2006) (noting that "[t]he standard for equal protection analysis under [Massachusetts'] Declaration of Rights is the same as under the Federal Constitution"); Opinion of the Justices to the House of Representatives, 423 Mass. 1244, 1247 (1996) (explaining that the court's analysis under Article 2 of the Declaration of Rights of the Massachusetts Constitution was "based on the same standards applied under the establishment clause of the First Amendment").  Here, neither party has meaningfully cited to Massachusetts law to assess the constitutionality of the City's actions.  In a single footnote, Plaintiffs assert that rights to freedom of expression are generally coextensive under the United States and Massachusetts Constitutions and that where the two diverge, the state protections are "more extensive."  D. 8 at 6, n.1 (citing Flaherty v. Knapik, 999 F. Supp. 2d 323, 332 (D. Mass. 2014)).  Plaintiffs, however, do not specifically address how these "more extensive" protections under Massachusetts law would apply to the instant case.  Defendants assert that federal jurisprudence governs the analysis. D. 11 at 5, n. 3.  Like Plaintiffs, they note that in some instances, provisions of the Massachusetts Constitution are more protective than those of the United States Constitution, but Defendants contend that those instances are inapplicable to the present case.  Because neither party has argued that the Court should rely on Massachusetts law rather than federal law, the Court will address the Massachusetts constitutional claims coextensively with their federal counterparts.

### A.    Likelihood of Success on the Merits

Although the Court considers all factors of the preliminary injunction analysis, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity."  New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002);

see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011) (explaining that "[l]ikelihood of success on the merits is the critical factor in the analysis and, accordingly, a strong likelihood of success may overcome a 'somewhat less' showing of another element") (quoting EEOC v. Astra U.S.A., Inc., 94 F.3d 738, 743 (1st Cir. 1996)).

### 1.  Free Speech Claims

The parties disagree about whether the City's selection and presentation of the flags on the City flagpole constitute government speech or private speech. If the flags are government speech, as Defendants assert, "then the Free Speech Clause has no application" and the City may "select the views that it wants to express." Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467-68 (2009). In contrast, if the flags are private speech displayed in a limited public forum, as Plaintiffs argue, the restriction on non-secular flags must be reasonable and viewpoint neutral. Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829 (1995). This Court concludes that the selection and display of the flags on the City flagpole constitute government speech. Moreover, even if they did not constitute government speech, the Court finds that the City's restriction on non-secular flags satisfies the constitutional requirements for limitations on speech in a limited public forum.

### a)  The City's Selection and Presentation of Flags Constitutes Government Speech

Two leading Supreme Court cases compel the conclusion that the City's selection and presentation of flags on the City flagpole constitute government speech. In the first case, Pleasant Grove City, members of a religious organization called Summum sued the city of Pleasant Grove under the free speech clause of the First Amendment for the city's failure to erect Summum's proposed monument in a public park. Pleasant Grove City, 555 U.S. at 464. The city had previously erected other privately donated monuments in the park, including a monument of the

Ten Commandments.  Id. at 465.  Summum's proposed monument was to contain "the Seven

Aphorisms of SUMMUM" and would "be similar in size and nature to the Ten Commandments

monument."  Id.  The city rejected Summum's proposal pursuant to an unwritten rule "limit[ing]

monuments in the Park to those that 'either (1) directly relate[d] to the history of Pleasant Grove,

or (2) were donated by groups with long-standing ties to the Pleasant Grove community.'"  Id.  The

Supreme Court unanimously concluded that the city's rejection of Summum's proposal constituted

government speech and that the "Free Speech Clause . . . does not regulate government speech."

Id. at 467.

The Supreme Court subsequently considered a similar free speech challenge in Walker v.

Tex. Div., Sons of Confederate Veterans, Inc., __ U.S. __, 135 S. Ct. 2239 (2015).  Walker

concerned the Texas Department of Motor Vehicle Board's rejection of a proposal by the Sons of

Confederate Veterans for a vanity license plate featuring the Confederate flag.  Id. at 2243-44.  In

considering the design, the Board sought public comments.  Id. at 2245.  Following the comments,

the Board voted unanimously to reject the proposed plate because "many members of the general

public [found] the design offensive," "such comments [were] reasonable" and "a significant

portion of the public associate the confederate flag with organizations advocating expressions of

hate directed toward people or groups that is demeaning to those people or groups."  Id. (internal

quotation mark omitted).  The Court held that the Texas license plates, like the monuments in

Summum, constituted government speech and thus were not subject to the free speech clause.  Id.

at 2246-47.  The Court primarily focused on 1) the history of the speech at issue; 2) a reasonable

observer's perception of the speaker and 3) control over the speech.  Id. at 2248-50.  Relying

heavily on Summum, the Court concluded that 1) license plates "long have communicated

messages from the States;" 2) license plates "are often closely identified in the public mind with

the [State]" and reasonable observers "interpret them as conveying some message on the [State's]

behalf" and 3) the state had "effectively controlled" the content of the license plates by exercising

approval authority over each request.  Id. at 2247-48 (internal quotations and citations omitted).

Applying the factors from Summum and Walker to this case, the Court concludes that the

City's selection and presentation of flags on the City flagpole constitute government speech.  First,

like public monuments, "[g]overnments have long used [flags] to speak to the public."  Summum,

555 U.S. at 470; see Texas v. Johnson, 491 U.S. 397, 405 (1989) (observing that "[p]regnant with

expressive content, the flag as readily signifies this Nation as does the combination of letters found

in 'America'"); W. Va. State Bd. of Educ. v Barnette, 319 U.S. 624, 632 (1943) (noting that "[t]he

use of an emblem or flag to symbolize some system, idea, institution, or personality, is a shortcut

from mind to mind.  Causes and nations, political parties, lodges and ecclesiastical groups seek to

knit the loyalty of their followings to a flag or banner . . .").  Second, "there is little chance that

observers [would] fail to appreciate the identity of the speaker" as the City when confronted with

a flag flying 83 feet in the air above City Hall on City property next to the flags of the United

States and the Commonwealth.  Summum, 555 U.S. at 471.  Third, the City has "effectively

controlled" which flags have flown at City hall "by exercising 'final approval authority' over their

selection."  Walker, 135 S. Ct. at 2247 (quoting Summum, 555 U.S. at 473) (internal quotation

marks omitted).  Like the government entities in Summum and Walker, here the City has a

controlled process through which applicants can request to fly a flag on City-owned property.

Plaintiffs' rejection of a proposed alternative for expressing itself also supports the

contention that flag-raising is government speech.  As the Supreme Court reasoned in Walker:

> Indeed, a person who displays a message on a Texas license plate likely intends to
> convey to the public that the State has endorsed that message.  If not, the individual
> could simply display the message in question in larger letters on a bumper sticker
> right next to the plate.  But the individual prefers a license plate design to the purely

private speech expressed through bumper stickers.  That may well be because Texas's license plate designs convey government agreement with the message displayed.

Walker, 135 S. Ct. at 2249.

Similar to the bumper sticker, there is nothing in the record to suggest that Plaintiffs could not display the Christian flag on City Hall Plaza as part of their event.  See D. 11 at 10.  That Plaintiffs have apparently rejected this option indicates a wish to "convey government agreement with the message displayed."  Id.

Since the Supreme Court decisions in Summum and Walker, at least one federal court has determined that a city's selection of private flags on a city-owned flagpole constitutes government speech.  In United Veterans Mem'l & Patriotic Ass'n of New Rochelle v. City of New Rochelle, 615 Fed. App'x. 693, 694 (2d Cir. 2015), the court considered a First Amendment challenge to the city's removal of a veterans group's flag from a flagpole in a city-owned armory.  Id.  The group had previously been granted "the right to display and maintain flags" on the flagpole.  Id. Nonetheless, considering the Supreme Court decision in Walker, the Second Circuit held that "[t]he City was well within its rights to delegate to [a private organization] the right to display and maintain flags on the City-owned flagpole without creating a public forum of any sort, or relinquishing control of the flags displayed."  Id.  Like the court in New Rochelle, this Court concludes that the City's selection of flags on City-owned property is government speech and, as a result, the free speech clause does not apply.

> b) <u>Even if the Selection and Presentation of Flags Were Not Government Speech, the Restriction on Non-Secular Flags is Reasonable, View-Point Neutral and Permissible in a Limited Public Forum</u>

If the City's selection and presentation of flags on the City flagpole were not government speech, their permissibility under the Constitution would be determined based on the type of forum

at issue.  There are three types of fora under First Amendment jurisprudence.  One is a traditional public forum, such as a street or a park, which "has immemorially been held in trust for the use of the public . . . ."  Hague v. CIO, 307 U.S. 496, 515 (1939).  The second type is a non-public forum, "which is not by tradition or designation a forum for public communication . . . ."  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983).  Between these two types is a "limited public forum," which is a non-public forum that the government "has opened for use by the public as a place for expressive activity."  Id. at 45.

Plaintiffs assert that the City has designated the flagpole as a limited public forum and that the City's restriction on non-secular flags in such a forum should be subject to strict scrutiny.[3] Strict scrutiny, however, is not the correct standard for speech in a limited public forum.  Rather, the Supreme Court's rule is that in a limited public forum government may not exercise viewpoint discrimination and "may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum.'"  Rosenberger, 515 U.S. at 829 (quoting Cornelius v. Nat'l Ass'n for the Advancement of Colored People Legal Def. & Ed. Fund, Inc., 473 U.S. 788, 806 (1985)).[4]

---

[3] Because Plaintiffs assert that the flagpole is a limited public forum, rather than a traditional public forum, the cases that Plaintiffs cite concerning this latter category do not aid the Court's analysis. See Rosenberger, 515 U.S. at 829-30 (stating that a prior restraint on content discrimination, unlike viewpoint discrimination, "may be permissible if it preserves the purposes of [the] limited forum"); cf. D. 8 at 13-14; Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 154 (2002) (scrutinizing ordinance that regulated speech on "private residential property"); Forsyth County v. Nationalist Movement, 505 U.S. 123, 129 (1992) (considering "the constitutionality of charging a fee for a speaker in a public forum"); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 753 (adjudicating appellee's rights to place newsracks on "city sidewalks," which are traditional public fora).

[4]  Similarly, Plaintiffs' argument that the burden shifts to the City to prove the constitutionality its policy is unavailing in the context of a limited public forum.  In support of their arguments, Plaintiffs rely on Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 665-66 (2004) and Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal, 546 U.S. 418, 429 (2006).  Those cases, however, involved challenges to federal legislation restricting speech and religious expression, rather than a municipal policy regulating private speech in a limited public forum.

The City's policy of excluding non-secular flags is viewpoint neutral because it excludes religion as a subject matter of speech on the flagpole, rather than prohibiting religious viewpoints on otherwise permissible subjects.  See Rosenberger, 515 U.S. at 831.  In Rosenberger, the Supreme Court held that a public university could not deny funding to a student magazine expressing Christian viewpoints on a wide range of topics while it subsidized other student journals.  Id. at 837, 846.  The Court emphasized that the reason the University's policy ran afoul of the free speech clause was that "the University [did] not exclude religion as a subject matter but select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints."  Id. at 831.  Following Rosenberger, other courts have upheld government exclusions of religion when the policy excluded religion as a subject matter, rather than a viewpoint on other subjects, in limited public fora.  See, e.g., DiLoreto v. Downey Unified Sch. District Bd. of Ed., 196 F.3d 958, 969 (9th Cir. 1999) (upholding high school's decision to exclude religious advertising funded by third parties on baseball field fence open exclusively to commercial messages); Archdiocese of Wash. v. Wash. Metro Area Transit Auth., 281 F. Supp. 3d 88, 96 (D.D.C. 2017) (denying injunctive relief to plaintiffs challenging bus company's policy of excluding religious advertisements funded by third parties on buses).  Here, as in the cases above, the City has permissibly chosen to exclude religion as a subject matter, rather than as one perspective among many on other subjects.  Therefore, the City's policy is viewpoint neutral.

The City's policy is also reasonable based on the City's interest in avoiding the appearance of endorsing a particular religion and a consequential violation of the Establishment Clause.  See

---

Such legislation is reviewed under strict scrutiny, which places the burden on the government to demonstrate a compelling interest in limiting speech and narrow tailoring of the legislation, even at the preliminary injunction stage.  Gonzales, 546 U.S. at 429.  In contrast, as explained above, strict scrutiny is not the proper standard of review for a restriction on speech in a limited public forum.

Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 394-95 (1993) (noting that "[t]he interest of the State in avoiding an Establishment Clause violation 'may be [a] compelling' one justifying an abridgement of free speech otherwise protected by the First Amendment") (quoting Widmar, 454 U.S. at 271). Moreover, where the Plaintiffs the opportunity to conduct their event on City Hall Plaza, fly a secular flag on the City flagpole or display the Christian flag on City Hall Plaza but not on the City flagpole, the City has demonstrated reasonableness and that it does not seek to silence Plaintiffs.

### 2.    *The Establishment Clause*

As discussed above, the Court rules that the City's selection and presentation of flags on the City flagpole constitute government speech. Government speech must still comply with the Establishment Clause. Summum, 555 U.S. at 468. Plaintiffs allege that the City's policy of displaying only non-secular flags is "overtly hostile to religion and violates the Establishment Clause." D. 8 at 11-12. Defendants, on the other hand, argue that the City would violate the Establishment Clause if it were to raise the Christian flag on the City flagpole. D. 11 at 16-18. The Court concludes that Plaintiffs have not demonstrated a substantial likelihood of success on the merits of their claim under the Establishment Clause.

The test for reviewing the constitutionality of religious displays on government property is the Lemon test, which holds that a government regulation must 1) "have a secular legislative purpose," 2) the "principal or primary effect must be one that neither advances nor inhibits religion" and 3) the regulation "must not foster an excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971) (internal quotations omitted). Cases subsequent to Lemon have augmented the analysis with the "endorsement test." Lynch v. Donnelly, 465 U.S. 668, 688-89 (1984) (O'Connor, J. concurring); see Devaney v. Kilmartin, 88

F. Supp. 3d 34, 50 (D.R.I. 2014) (treating the endorsement test as having "amplified" the <u>Lemon</u> test).   Under the endorsement test, the Court must consider whether the City's actions have the "purpose or effect of endorsing, favoring or promoting religion."   <u>Id.</u> at 51-52 (D.R.I. 2014) (quoting <u>Freedom from Religion Found. v. Hanover Sch. Dist.</u>, 626 F.3d 1, 10 (1st Cir. 2010)).

Applying the <u>Lemon</u> and endorsement test, the Court concludes that compelling the City to display the Christian flag on the City flagpole, as Plaintiffs seek to do, may well violate the Establishment Clause.   Certainly, an event to "raise the Christian flag" could serve some of Plaintiffs' cited secular purposes, such as the celebration of religious freedom in Boston and the contributions of Boston's Christian residents to the City.   However, its primary purpose would be to convey government endorsement of a particular religion by displaying the Christian flag alongside that of the United States and the Commonwealth in front of City Hall.   Blowing in the wind, these side-by-side flags could quite literally become entangled.   If Plaintiffs were not seeking government endorsement, then Plaintiffs would presumably be content to raise their own flag on their own in the same location as has been suggested.   <u>See</u> <u>Walker</u>, 135 S. Ct. at 2249 (explaining that plaintiffs sought to have their speech displayed on a license plate, rather than on a sticker next to a license plate, because the license plate would "convey government agreement with the message displayed").

### 3.      *Fourteenth Amendment Equal Protection*

Plaintiffs argue that the City's policy violates the Equal Protection Clause of the Fourteenth Amendment as it is stated and as it is applied to Plaintiffs.   The Court does not conclude that Plaintiffs have shown a likelihood of success that the City's policy as it stands and as applied does not rise to the level of violating Plaintiffs' rights under the Equal Protection Clause.

First, Plaintiffs allege that they have been deprived of equal protection of the laws because the City's policy prohibiting non-secular flags is unconstitutionally vague.  Plaintiffs cite to five cases standing for the proposition that government regulations cannot be overly vague so that citizens can be informed of their rights.  D. 8 at 16-17.  However, none of these cases apply to the regulation of government speech or even private speech in a limited public forum.  Moreover, although the City's policy against flying non-secular flags is unwritten, that does not make it unconstitutional.  See Summum, 555 U.S. at 465 (upholding city's practice of limiting the types of monuments in park despite the policy not being put into writing until the year after the city's rejection of Plaintiffs' proposed monument).  While the City should strive to make its policies clear, here Plaintiffs have failed to show that any vagueness in the policy has risen to the level of a Fourteenth Amendment violation.

Next, Plaintiffs allege that the City's policy against non-secular flags violates Equal Protection because it discriminates against speech based on its content.  In support, Plaintiffs mainly rely on Police Dep't of City of Chicago v. Mosley, 408 U.S. 92 (1972) and Carey v. Brown, 447 U.S. 455 (1980), in which the plaintiffs prevailed on claims of speech-related Equal Protection violations.  However, the Supreme Court specifically held that the "key" to the plaintiffs' success in Mosley and Carey was "the presence of a public forum."  Perry, 460 U.S. at 55.  The Court further reasoned that "[c]onversely on government property that has not been made a public forum, not all speech is equally situated, and the State may draw distinctions which relate to the special purpose for which the property is used."  Id.  For the reasons already discussed above, and consistent with the conclusions in Perry, the Court concludes that here the City's policy, as applied outside of a public forum, permissibly excludes the subject of religion and does not violate Equal Protection.

Finally, Plaintiffs allege that they have been treated differently from other similarly situated groups under the City's policy in violation of Equal Protection.  The Supreme Court has held that "[w]hen speakers and subjects are similarly situated, the State may not pick and choose."  Id.  As evidence of their differential treatment, Plaintiffs cite to the display of the flags of Portugal, the City of Boston and the Bunker Hill Association—all of which feature references to God and Christ—on the City flagpole.[5]  Plaintiffs are correct that under the City's unwritten policy, there may be some close cases regarding which flags are "non-secular," but these examples are not among them.  The exemplar flags, unlike the Christian flag, comply with the Lemon test in that their primary effect is not to advance or inhibit religion.  Lemon, 403 U.S. at 612.  The names of the flags alone are enough to reveal their primary purposes.  The Christian flag primarily represents a specific religion, while the other cited flags represent a sovereign nation, a city government and a group committed to remembering a military victory.  Therefore, Plaintiffs are not similarly situated to the sponsors of the Portuguese, City of Boston and Bunker Hill Association flag events and have failed to make out a claim of differential treatment in violation of the Fourteenth Amendment.

For all of the aforementioned reasons, Plaintiffs have failed to show a reasonable likelihood of success on the merits of their claims.

---

[5] Plaintiffs also emphasize the City's prior decisions to grant permission to private parties to raise the LGBT rainbow pride flag, transgender rights flag and the Juneteenth flag on the City flagpole. However, none of these flags are religious on their face.  To the extent that Plaintiffs are being treated differently than the groups that raised those flags, that treatment is based on the City's reasonable choice to exclude religion as a subject matter on the flagpole and does not violate the Fourteenth Amendment.

### B.        <u>Irreparable Harm</u>

To obtain a preliminary injunction, Plaintiffs must show a "significant risk of irreparable harm if the injunction is withheld," <u>Nieves-Márquez v. P.R.</u>, 353 F.3d 108, 120 (1st Cir. 2002).  It is well-established "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."   <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976). Plaintiffs' claims of irreparable harm absent expedited relief, however, are undermined by their delay in raising constitutional claims related to the City's denial of their application.  <u>See</u> <u>Gorman v. Coogan</u>, 273 F. Supp. 2d 131, 134 (D. Me. 2003) (noting that "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action") (internal citation and quotation marks omitted).

Plaintiffs are also unlikely to suffer irreparable harm without a preliminary injunction because they may still hold an event celebrating Constitution Day in their desired forum.  Although Plaintiffs have not applied to the City to hold an event since September 2017, the record in this case indicates that the City will give Plaintiffs permission to communicate their ideas in several ways, on or around Plaintiffs' requested date this year.  As the City has done in the past, it will allow Plaintiffs to hold an event on City Hall Plaza.  It will also give Plaintiffs the opportunity to raise a non-secular flag on the City flagpole and display the Christian flag while on City Hall Plaza. D. 1-4; D. 11 at 10.  The City has only denied Plaintiffs permission to compel the City to endorse a particular religion by raising the Christian flag.  Given the range of options available to Plaintiffs for their event on City-owned property, the Court concludes Plaintiffs are unlikely to suffer irreparable harm without an injunction.

17

C.      **The Balance of Harms and the Public Interest**

The final considerations in weighing the grant of a preliminary injunction are "a balance of equities in the plaintiff's favor, and [] service of the public interest." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, 794 F. 3d 168, 171 (1st Cir. 2015).  In support of their arguments, Plaintiffs rightly remind the Court that "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 15 (1st Cir. 2012) (quoting Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339 (2010)) (internal quotation marks omitted).  However, on this record, the Court is persuaded that Defendants have not unlawfully restricted Plaintiffs' ability to speak publicly.

On the other hand, Defendants risk serious consequences from the grant of a preliminary injunction.  Given that Plaintiffs have not established a substantial likelihood of success on the merits, it makes little sense to require the City to fly the requested flag pending the adjudication of this case.  Raising the Christian flag might also possibly make the City vulnerable to Establishment Clause claims and other constitutional challenges before this case had been decided on the merits. D. 11 at 20.  With these considerations in mind, the balance of harms to the parties and the public interest weigh against granting the preliminary injunction that Plaintiffs seek.

VI.     **Conclusion**

For these reasons, Plaintiffs' motion for preliminary injunction, D. 7, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

18