UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HAROLD SHURTLEFF et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 18-cv-11417-DJC |
| CITY OF BOSTON et al., | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                    **May 3, 2019**

## I.    Introduction

Plaintiffs Harold Shurtleff and Camp Constitution (collectively, "Plaintiffs") filed this lawsuit against Defendants, the City of Boston and Gregory T. Rooney, in his official capacity as Commissioner of the City of Boston Property Management Department (collectively, "Defendants" or "the City"), seeking to enjoin the City from denying permission to the Plaintiffs to display the Christian flag on a City Hall flagpole in conjunction with their Constitution Day and Citizenship Day event.  D. 1.  Defendants have now moved for judgment on the pleadings.  D. 39.  For the reasons discussed below, the Court DENIES Defendants' motion for judgment on the pleadings, D. 39.

## II.   Standard of Review

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), is "ordinarily accorded much the same

treatment" as a Rule 12(b)(6) motion. Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006). To survive a motion for judgment on the pleadings, therefore, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the Court "view[s] the facts contained in the pleadings in the light most favorable to the nonmovant and draw[s] all reasonable inferences therefrom" in their favor. Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (citation omitted).

On a Rule 12(c) motion, unlike a Rule 12(b) motion, the Court considers the pleadings as a whole, including the answer. See Aponte-Torres, 445 F.3d at 54-55. Those assertions in the answer that have not been denied and do not conflict with the assertions in the complaint are taken as true. See Santiago v. Bloise, 741 F. Supp. 2d 357, 360 (D. Mass. 2010). In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006).

### III. Factual Background

The City owns and manages three flagpoles located in front of the entrance to City Hall, in an area called City Hall Plaza. D. 11-1 ¶ 5. The three poles are the same height, approximately 83 feet tall. D. 11-1 ¶ 6. One pole regularly displays the flags of the United States and the National League of Families Prisoner of War/Missing in Action ("POW/MIA") flag. D. 11-1 ¶ 8. A second pole flies the flag of the Commonwealth of Massachusetts. Id. The dispute in this case centers on the third flagpole, which displays the City of Boston flag except when replaced by another flag— usually at the request of a third-party. Id. ¶¶ 8-9. Such a request is often made in conjunction with

a proposed third-party event to take place at a location owned by the City, one of which is City Hall Plaza. D. 11 at 2. Examples of other flags that have been raised on the third flagpole are country flags, e.g., the flags of Brazil, Ethiopia, Portugal, Puerto Rico, the People's Republic of China and Cuba, and the flags of private organizations, including the Juneteenth flag recognizing the end of slavery, the LGBT rainbow pride flag, the pink transgender rights flag, and the Bunker Hill Association flag. D. 1 ¶¶ 36-37; D. 43 at 18; D. 11 at 2. As Plaintiffs allege, the flag of Portugal contains "dots inside the blue shields represent[ing] the five wounds of Christ when crucified" and "thirty dots that represents [sic] the coins Judas received for having betrayed Christ." D. 1 ¶ 36. The City of Boston flag includes the Boston seal's Latin inscription, which translates to "God be with us as he was with our fathers." D. 1 ¶ 41(a). As Plaintiffs note, the Bunker Hill Flag contains a red St. George's cross. D. 1 ¶ 41(b). Many religious groups, including Plaintiffs, have held events at City-owned properties in the past. D. 8 at 4; D. 11 at 3.[1]

To apply for a permit to raise a flag at City Hall and hold an event on a City-owned property, a party submits an application to the City. D. 11 at 3; D. 11-1 ¶ 13. The City has published guidelines on its website for applicants. D. 8 at 3; D. 11 at 3; D. 11-1 ¶ 13. The guidelines state that an application may be denied if the event involves illegal or dangerous activities or if it conflicts with scheduled events. D. 8 at 3-4; D. 11 at 3. In addition, an application may be denied if the applicant lacks an insurance certification, lies on their application, has a history of damaging city property or failing to pay city fees or fails to comply with other administrative requirements. D. 8 at 4; D. 11 at 3. After a party has submitted an application, the City reviews the request to ensure it complies with all guidelines. D. 1-8 at 2; D. 11 at 3; D.11-1

---

[1] In or about 2012, Plaintiffs obtained permission to and did fly an unspecified flag on the City Hall flagpole as part of a free speech event. D. 1 ¶ 19; D. 8 at 4. Plaintiffs do not allege that they received permission to fly the Christian flag at that event.

3

¶ 15. The Commissioner of Property Management reviews applications for the City flagpole to ensure flag requests are "consistent with the City's message, policies, and practices." D. 11 at 3; D. 11-1 ¶¶ 16-17. The City does not have a written policy regarding the content of flags to be raised. D. 8 at 4.

On July 28, 2017, Plaintiff Shurtleff emailed the City on behalf of his organization, Camp Constitution, requesting to "raise the Christian flag on City Hall Plaza," accompanied by "short speeches by some local clergy focusing on Boston's history" on one of several dates in September 2017. D. 1-1. The email included a photograph of the Christian flag, D. 1-1, which "displays a red Latin cross against a blue square bordered on three sides by a white field." D. 1-4. On September 5, 2017, the City denied Shurtleff's request to raise the Christian flag without explanation. D. 1-3. Shurtleff asked for the "official reason" for denying the permit. Id. Defendant Rooney wrote to Shurtleff that "[t]he City of Boston maintains a policy and practice of respectfully refraining from flying non-secular flags on the City Hall flagpoles." D. 1-4. Rooney further explained that the City's "policy and practice" was based upon the First Amendment prohibition on government establishing religion and the City's authority to decide how to use its flagpoles, which are a "limited government resource." Id. Rooney concluded that "[t]he City would be willing to consider a request to fly a non-religious flag, should [Shurtleff's] organization elect to offer one." Id. In response, Plaintiffs' counsel sent a letter to the City on September 14, 2017, taking the position that the denial was unconstitutional and declining to "submit a 'non-religious' flag." D. 1-6 at 2. Plaintiffs' counsel attached a second application for "Camp Constitution's Christian Flag Raising" on October 19 or October 26, 2017. D. 1-5. The stated purpose of the event was to "[c]elebrate and recognize the contributions Boston's Christian community has made to our city's cultural diversity, intellectual capital and economic growth."

Id. The letter stated that if Plaintiffs did not receive a response by September 27, 2017, Plaintiffs would take "additional actions to prevent irreparable harm to the rights of [their] clients." D. 1-6 at 4. The City neither issued a permit to Plaintiffs nor responded to the letter. D. 8 at 5; D. 11 at 4. Since receiving the letter, Plaintiffs have not applied to hold further events on City-owned property, with or without a flag. D. 11 at 19-20.

## IV. Procedural History

On July 6, 2018, Plaintiffs filed the present complaint seeking injunctive relief, declaratory relief and damages against Defendants. D. 1. Plaintiffs moved for a preliminary injunction, D. 7, which the Court denied on August 29, 2018, D. 19. Plaintiffs have appealed the Court's decision denying them injunctive relief to the First Circuit. D. 23. The Court denied Plaintiffs' motion to stay these proceedings during the pendency of that appeal. D. 34. Defendants have now moved for judgment on the pleadings. D. 39. The Court heard the parties on the pending motion and took the matter under advisement. D. 46.

## V. Discussion

Plaintiffs have asserted six claims—three federal and three state constitutional: 1) a violation of the First Amendment free speech clause; 2) a violation of the First Amendment establishment clause; 3) a violation of the Fourteenth Amendment equal protection clause; 4) a violation of the freedom of speech clause of Article 16 of the Massachusetts Declaration of Rights; 5) a violation of the non-establishment of religion clauses of Articles 2 and 3 of the Massachusetts Declaration of Rights; and 6) a violation of equal protection under Articles 1 and 3 of the Massachusetts Declaration of Rights. The City seeks judgment on the pleadings as to all of those claims. Federal law governs the Court's analysis of Plaintiffs' claims under both the United States and Massachusetts Constitutions. See, e.g., Commonwealth v. Barnes, 461 Mass. 644, 650 (2012) (classifying the free speech provisions of Article 16 of the Massachusetts Declaration of Rights as

5

a "cognate provision" of the First Amendment); Brackett v. Civil Serv. Comm'n, 447 Mass. 233, 243 (2006) (noting that "[t]he standard for equal protection analysis under [Massachusetts'] Declaration of Rights is the same as under the Federal Constitution"); Opinion of the Justices to the House of Representatives, 423 Mass. 1244, 1247 (1996) (explaining that the court's analysis under Article 2 of the Massachusetts Declaration of Rights was "based on the same standards applied under the establishment clause of the First Amendment").

### A. Free Speech Claims

The parties disagree about whether the City's selection and presentation of the flags on the City flagpole constitute government speech or private speech. If the flags are government speech, as the City asserts, "then the Free Speech Clause has no application" and the City may "select the views that it wants to express." Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467-68 (2009). In contrast, if the flags are private speech displayed in a limited public forum, as Plaintiffs argue, the restriction on non-secular flags must be reasonable and viewpoint neutral. Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 829 (1995). In its order denying the preliminary injunction, the Court concluded that the selection and display of the flags on the City Hall flagpole constituted government speech. That, however, was based upon a standard of reasonable likelihood of success, unlike here, where the City seeks judgment in its favor without the benefit of discovery (which was scheduled to close this week, months after the filing of this motion). At this stage, the Court "must view the facts contained in the pleadings in the light most favorable to the nonmovant," in this case, the Plaintiffs. Pérez-Acevedo, 520 F.3d at 29. Accordingly, the Court cannot enter judgment for the City where the record upon which this motion relies was not as fully developed as to the determination of government speech.

> 1. *The Court Cannot, at this Juncture, Issue Judgment in the City's Favor As to the Government Speech Issue*

Two leading Supreme Court cases inform this Court's analysis of whether the City's selection and presentation of flags on the City flagpole constitute government speech. In the first case, Summum, members of a religious organization called Summum sued the city of Pleasant Grove under the free speech clause of the First Amendment for the city's failure to erect Summum's proposed monument in a public park. Summum, 555 U.S. at 464. The city had previously erected other privately donated monuments in the park, including a monument of the Ten Commandments. Id. at 465. Summum's proposed monument was to contain "the Seven Aphorisms of SUMMUM" and would "be similar in size and nature to the Ten Commandments monument." Id. The city rejected Summum's proposal pursuant to an unwritten rule "limit[ing] monuments in the Park to those that 'either (1) directly relate[d] to the history of Pleasant Grove, or (2) were donated by groups with long-standing ties to the Pleasant Grove community.'" Id. The Supreme Court unanimously concluded that the city's rejection of Summum's proposal constituted government speech and that the "Free Speech Clause . . . does not regulate government speech." Id. at 467.

The Supreme Court subsequently considered a similar free speech challenge in Walker v. Tex. Div., Sons of Confederate Veterans, Inc., __ U.S. __, 135 S. Ct. 2239 (2015). Walker concerned the Texas Department of Motor Vehicle Board's rejection of a proposal by the Sons of Confederate Veterans for a vanity license plate featuring the Confederate flag. Id. at 2243-44. In considering the design, the Board sought public comments. Id. at 2245. Following the comments, the Board voted unanimously to reject the proposed plate because "many members of the general public [found] the design offensive," "such comments [were] reasonable" and "a significant portion of the public associate the confederate flag with organizations advocating expressions of

hate directed toward people or groups that is demeaning to those people or groups." Id. (internal quotation mark omitted). The Court held that the Texas license plates, like the monuments in Summum, constituted government speech and thus were not subject to the free speech clause. Id. at 2246. The Court primarily focused on 1) the history of the speech at issue; 2) a reasonable observer's perception of the speaker and 3) control over the speech. Id. at 2248-50. Relying heavily on Summum, the Court concluded that 1) license plates "long have communicated messages from the States;" 2) license plates "are often closely identified in the public mind with the [State]" and reasonable observers "interpret them as conveying some message on the [State's] behalf" and 3) the state had "effectively controlled" the content of the license plates by exercising approval authority over each request. Id. at 2247-49 (first alteration in original) (citations omitted).

Summum and Walker, which govern the analysis here, were resolved upon more developed records, particularly as to the first two Walker factors. Here, as to the first Walker factor, the current record does not detail the history of the flagpole and whether the non-governmental flags at City Hall "long have communicated messages from the [City]." Id. at 2248. Although "[t]he absence of historical evidence can be overcome by other indicia of government speech," here Defendants have not provided any other such indicia. Mech v. Sch. Bd. of Palm Beach Cnty., Fla., 806 F.3d 1070, 1076 (11th Cir. 2015). Defendants have cited to general propositions about the messaging of flags, see, e.g., Texas v. Johnson, 491 U.S. 397, 405 (1989) (observing that "[p]regnant with expressive content, the flag as readily signifies this Nation as does the combination of letters found in 'America'"), but have not supplied the Court with any information about the history of the flags flown at City Hall. "The absence of historical evidence weighs in [Plaintiffs'] favor." Mech, 806 F.3d at 1075.

8

As to the second Walker factor, the present record contains limited facts relevant to whether the reasonable observer would perceive the flying of a flag to be an endorsement of the flag's message by the City. See Walker, 135 S. Ct. at 2260-2261 (Alito, J., dissenting) (warning against the use of "extrarecord" information in the government speech analysis). Moreover, the reasonable observer's perception of a given display may be informed by the history of the display itself. See Summum, 555 U.S. at 477 (explaining that an observer's perception of a display may change over time as society and "historical interpretations" evolve) (citation omitted). Accordingly, without sufficient information to analyze the first Walker factor, the Court cannot properly assess the second, making judgment on the pleadings inappropriate.

The Court is aware that since the decisions in Summum and Walker, at least one federal court has determined that a city's selection of private flags on a city-owned flagpole constitutes government speech. In United Veterans Mem'l & Patriotic Ass'n of New Rochelle v. City of New Rochelle, 615 Fed. App'x. 693, 694 (2d Cir. 2015), the court considered a challenge to the city's removal of a veterans group's flag from a flagpole in a city-owned armory. Id. Applying the Supreme Court's reasoning in Walker, the Second Circuit in New Rochelle held that "[t]he City was well within its rights to delegate to [a private organization] the right to display and maintain flags on the City-owned flagpole without creating a public forum of any sort, or relinquishing control of the flags displayed." Id. at 694. In New Rochelle, however, the record before the district court contained more information about the history of the speech at issue. See United Veterans Mem'l & Patriotic Ass'n of New Rochelle v. City of New Rochelle, 72 F. Supp. 3d 468, 471, 475, 477-78 (S.D.N.Y. 2014) (relying upon facts in the record that detailed the history of the armory and the flags flown there, the shifting meaning of the particular flag over time, the length of time for which flags flew at the armory, a demonstrated history of complaints about the flag and a

breakdown of the city council's vote against flying the flag). The record in the case before this Court has not been similarly developed, however, and such judgment now would be premature.

>  2. *Alternatively, the City is Not Entitled at this Juncture to Judgment that any Restriction on Flag Selection and Presentation was Reasonable and Viewpoint Neutral in a Limited Public Forum*

If the City's selection and presentation of flags on the City flagpole was not government speech, its permissibility under the Constitution would be determined based on the type of forum at issue. There are three types of fora under First Amendment jurisprudence. One is a traditional public forum, such as a street or a park, which "has immemorially been held in trust for the use of the public . . . ." Hague v. CIO, 307 U.S. 496, 515 (1939). The second type is a non-public forum, "which is not by tradition or designation a forum for public communication . . . ." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983). Between these two types is a "limited public forum," which is a non-public forum that the government "has opened for use by the public as a place for expressive activity." Id. at 45, 47.

Plaintiffs assert that the City has designated the flagpole as a limited public forum and that the City's restriction on non-secular flags in such a forum should be subject to strict scrutiny.[2] Strict scrutiny, however, is not the correct standard for speech in a limited public forum. Rather, the Supreme Court's rule is that in a limited public forum the government may not exercise

---

[2] Because Plaintiffs assert that the flagpole is a limited public forum, rather than a traditional public forum or non-public forum, the cases that Plaintiffs cite concerning the latter categories do not aid the Court's analysis. See Rosenberger, 515 U.S. at 829-30 (stating that a prior restraint on content discrimination, unlike viewpoint discrimination, "may be permissible if it preserves the purposes of [the] limited forum"); cf. D. 43 at 15-16; Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 154 (2002) (scrutinizing ordinance that regulated speech on "private residential property"); Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 129 (1992) (considering "the constitutionality of charging a fee for a speaker in a public forum"); FW/PBS, Inc. v. Dallas, 493 U.S. 215, 220 (weighing zoning ordinance regulating "sexually oriented business[es]").

viewpoint discrimination and "may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum.'" Rosenberger, 515 U.S. at 829 (quoting Cornelius v. Nat'l Ass'n for the Advancement of Colored People Legal Def. & Ed. Fund, Inc., 473 U.S. 788, 806 (1985)).

In Rosenberger, the Supreme Court held that a public university could not deny funding to a student magazine expressing Christian viewpoints on a wide range of topics while it subsidized other student journals. Id. at 837, 846. The Court emphasized that the reason the University's policy ran afoul of the free speech clause was that "the University [did] not exclude religion as a subject matter but select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints." Id. at 831. Following Rosenberger, other courts have upheld government exclusions of religion when the policy excluded religion as a subject matter, rather than a viewpoint on other subjects, in limited public fora. See, e.g., DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 969 (9th Cir. 1999) (upholding high school's decision to exclude religious advertising funded by third parties on baseball field fence open exclusively to commercial messages); Archdiocese of Wash. v. Wash. Metro Area Transit Auth., 281 F. Supp. 3d 88, 96 (D.D.C. 2017) (denying injunctive relief to plaintiffs challenging bus company's policy of excluding religious advertisements funded by third parties on buses), aff'd, 897 F.3d 314 (D.C. Cir. 2018), reh'g denied, 910 F.3d 1248 (D.C. Cir. 2018).

None of the cases cited above, however, were resolved at the "embryonic stage" under Rule 12(c). Pérez-Acevedo, 520 F.3d at 29; see Rosenberger, 515 U.S. at 827, 846 (reversing summary judgment); DiLoreto, 196 F.3d at 962 (affirming summary judgment); Archdiocese of Wash., 281 F. Supp. 3d at 116 (denying preliminary injunction and temporary restraining order). In Rosenberger specifically, the developed record included prior issues of the student magazine,

11

the history of the student magazine's organizational status on campus and the number of applications and approvals for school funding for all student organizations during the relevant school year. Rosenberger, 515 U.S. at 825-26.

At this stage of the litigation, the Court cannot determine whether exclusion of the Christian flag is reasonable in light of the purpose served by the forum. Here, the City's written policies about the flagpole do not include any provisions about non-secular flags, nor do they provide insight into the City's purpose in controlling the flags that may be flown. See D. 1-7; D. 1-8. The City asserts that the policy is reasonable given its interest in avoiding the appearance of endorsing a particular religion and a consequential violation of the Establishment Clause. See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 394-95 (1993) (noting that "[t]he interest of the State in avoiding an Establishment Clause violation 'may be [a] compelling' one justifying an abridgement of free speech otherwise protected by the First Amendment") (alteration in original) (quoting Widmar v. Vincent, 454 U.S. 263, 271 (1981)). This assertion, however, is contested, and the Court must view all facts contained in the pleadings in the light most favorable to Plaintiffs. Pérez-Acevedo, 520 F.3d at 29. Applying this standard, the City is not entitled to judgment at this stage as to whether any restriction on the flagpole is reasonable and viewpoint neutral.

### B. The Establishment Clause

As discussed above, the Court cannot grant judgment for the City as to the free speech issue. Even if it could, however, the Court would still be required to analyze the application of the Establishment Clause, because government speech must comply with the Establishment Clause. Summum, 555 U.S. at 468. Plaintiffs allege that the City's policy of displaying only non-secular flags is "overtly hostile to religion and violates the Establishment Clause." D. 8 at 11-12.

Defendants, on the other hand, argue that the City would violate the Establishment Clause if it were to raise the Christian flag on the City flagpole. D. 11 at 16-18.

The test for reviewing the constitutionality of religious displays on government property is the <u>Lemon</u> test, which holds that a government regulation must 1) "have a secular legislative purpose," 2) the "principal or primary effect must be one that neither advances nor inhibits religion" and 3) the regulation "must not foster an excessive government entanglement with religion." <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971) (internal quotations omitted). Cases subsequent to <u>Lemon</u> have augmented the analysis with the "endorsement test." <u>Lynch v. Donnelly</u>, 465 U.S. 668, 688-89 (1984) (O'Connor, J. concurring); <u>see</u> <u>Devaney v. Kilmartin</u>, 88 F. Supp. 3d 34, 50 (D.R.I. 2014) (treating the endorsement test as having "amplified" the <u>Lemon</u> test). Under the endorsement test, which parallels part two of the <u>Lemon</u> test, the Court must consider whether the City's actions have the "purpose or effect of endorsing, favoring or promoting religion." <u>Id.</u> at 51-52 (quoting <u>Freedom from Religion Found. v. Hanover Sch. Dist.</u>, 626 F.3d 1, 10 (1st Cir. 2010)).

Like government speech, "the Establishment Clause must be interpreted 'by reference to historical practices and understandings.'" <u>Town of Greece, N.Y. v. Galloway</u>, 572 U.S. 565, 576 (2014) (citation omitted); <u>see</u> <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 309 (2000) (reviewing a challenged policy's history to determine its purpose). Specifically, "the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears." <u>Capitol Square Review and Advisory Bd. v. Pinette</u>, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring). Analysis of the Establishment Clause is also "a delicate and fact-sensitive one." <u>Lee v. Weisman</u>, 505 U.S. 577, 597 (1992); <u>see</u> <u>Town of Greece</u>, 572 U.S. at 587 (noting that analysis of prayer at town board

13

meetings under the Establishment Clause is "fact-sensitive" and that the Court "considers both the setting in which the prayer arises and the audience to whom it is directed"). As explained above, the current record does not contain sufficient information about the history of flags on the City flagpole to assess the primary effect of the City's policy on non-secular flags. Accordingly, the Court cannot resolve the Establishment Clause claim at this time.

### C. Fourteenth Amendment Equal Protection

Plaintiffs argue that the City's policy violates the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause requires that "all persons similarly situated . . . be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish an equal protection claim, Plaintiffs must allege facts showing that "(1) the person, compared with others similarly situated, was selectively restricted; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Davis v. Coakley, 802 F.3d 128, 132-33 (1st Cir. 2015) (citation omitted).

Plaintiffs allege that the City's policy against non-secular flags violates equal protection because it discriminates against speech based on its content—namely, against religious speech. D. 43 at 21. In holding that a teacher's group separate from the union lacked a First or Fourteenth Amendment right to access a school's internal mail system, the Supreme Court in Perry explained that "on government property that has not been made a public forum, not all speech is equally situated, and the State may draw distinctions which relate to the special purpose for which the property is used." Perry, 460 U.S. at 55. In Perry, however, the Court's equal protection analysis was informed by its conclusion that the teacher's group did not have a "First Amendment or other right of access" to the mail system. Id. at 54. Here, as explained above, the Court cannot reach a

conclusion on the First Amendment issue at this stage. Moreover, unlike in this case, the Court in Perry had the benefit of the full summary judgment record and was able to consider, for example, the other groups that had been granted access to the school's mail system, the history of the school's policy regarding the mail boxes and the availability of other means to transmit messages at the school. Id. at 47; Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 652 F.2d 1286, 1287 (7th Cir. 1981). Accordingly, the Court, therefore, also cannot grant judgment to the City on the equal protection claim at this juncture.

## VI. Conclusion

For the aforementioned reasons, the Court DENIES Defendants' motion for judgment on the pleadings, D. 39.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge