# United States Court of Appeals
## For the First Circuit

No. 18-1898

HAROLD SHURTLEFF, and CAMP CONSTITUTION,
a public charitable trust,

Plaintiffs, Appellants,

v.

CITY OF BOSTON, and GREGORY T. ROONEY, in his official
capacity as Commissioner of the City of Boston
Property Management Division,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Torruella, Selya, and Lynch,
Circuit Judges.

Mathew D. Staver, with whom Roger K. Gannam, Horatio G. Mihet, Daniel J. Schmid, and Liberty Counsel were on brief, for appellants.
John Eidsmoe, Foundation for Moral Law, on brief for Foundation for Moral Law, amicus curiae.
Daniel M. Ortner, Deborah J. La Fetra, and Pacific Legal Foundation, on brief for Pacific Legal Foundation, amicus curiae.
Robert S. Arcangeli, Assistant Corporation Counsel, City of Boston Law Department, with whom Eugene L. O'Flaherty, Corporation Counsel, was on brief, for appellees.

Richard B. Katskee, Carmen N. Green, Patrick Grubel, Americans United for Separation of Church and State, Jeffrey I. Pasek, Cozen O'Connor, Steven M. Freeman, David L. Barkey, Amy E. Feinman, Anti-Defamation League, Amrith Kaur, Cindy Nesbit and Sikh Coalition, on brief for Religious and Civil-Rights Organizations, amici curiae.

———————————

June 27, 2019

———————————

**TORRUELLA**, <u>Circuit Judge</u>.  This appeal arises from the denial of a preliminary injunction that would have required the City of Boston ("City") to temporarily raise a "Christian flag" on a government-owned flagpole in front of its City Hall.  Plaintiff-appellant Harold Shurtleff is the director of Camp Constitution, a volunteer association (and also a plaintiff-appellant here) established in 2009 to "enhance understanding of the country's Judeo-Christian moral heritage, the American heritage of courage and ingenuity, [and] the genius of the United States Constitution," among other things.  To commemorate Constitution and Citizenship Day in September 2017, Shurtleff, in his role as director of Camp Constitution, organized an event to be held at the plaza in front of City Hall.  Shurtleff alleges he intended this event to be a celebration of the Christian community's civic and social contributions to the City and the Commonwealth of Massachusetts, as well as of Christian support for religious tolerance, the rule of law, and the United States Constitution.  Shurtleff sought a permit from the City to raise a Christian flag[1] on one of the City Hall Plaza flagpoles during the proposed celebration.  That flag would have been raised next to poles flying the United States and

---

[1]  The parties refer to this flag as "the Christian flag."  We use the term "a Christian flag" throughout.  In doing so, we do not suggest that all Christian denominations accept that flag as the flag of Christianity.  There is no evidence of that before us.

-3-

Massachusetts flags and in place of the City of Boston flag, normally flown there.

The City denied Shurtleff's flag-raising request, but otherwise allowed him and Camp Constitution to host their event at City Hall Plaza. Shurtleff and Camp Constitution filed suit almost a year later, raising Free Speech, Establishment Clause, and Equal Protection claims, and seeking a preliminary injunction to prevent the City from denying them a permit to raise the flag. The district court denied the injunction and we now affirm.

## I.

City Hall Plaza is at the entrance of Boston's City Hall. A trio of eighty-three-foot tall poles that the City owns and controls stands in the Plaza. Two of the poles usually fly the United States and Massachusetts flags. At issue here is the third pole, which displays the City's flag except when temporarily replaced by another flag upon the request of a third-party person or organization. Requests to replace the City's flag with another flag are often accompanied by a proposed third-party event to take place at a City-owned venue, such as the Plaza. In the past, the pole in dispute has displayed country flags (according to the complaint, those of Albania, Brazil, Cuba, Ethiopia, Italy, Mexico, Panama, the People's Republic of China, Peru, Portugal, and also that of the territory of Puerto Rico) as well as the flag

-4-

of the Chinese Progressive Association, the LGBT rainbow flag, the transgender rights flag, the Juneteenth flag commemorating the end of slavery, and that of the Bunker Hill Association.

Some of these third-party flags contain what Shurtleff alleges is religious symbolism. For instance, the Portuguese flag contains "dots inside the blue shields represent[ing] the five wounds of Christ when crucified" and "thirty dots that represents [sic] the coins Judas received for having betrayed Christ." The Bunker Hill Flag contains a red St. George's cross. And the City flag itself includes the Boston seal's Latin inscription, which translates to "God be with us as he was with our fathers." But nothing in the record indicates that the City has ever allowed the flag of any religion to be raised on the flagpole at issue.[2]

Interested parties must apply to the City for a permit before they can hold an event and/or raise a flag at the Plaza. The City has published guidelines for permit applicants on its website. According to the guidelines, permits may be denied for several reasons, including that the applicant plans to host illegal activities on City property or if the proposed event poses a danger to public health and safety. Applications may also be denied if

---

[2] Shurtleff avers that, in 2012, he applied for and received a permit to display a flag on the pole at issue here. He does not specify, however, the type of flag that the City allowed him to raise.

-5-

they do not comply with other relevant permit requirements, ordinances, or regulations. The Office of Property and Construction Management leads the application review process and is charged with ensuring that all applications meet City guidelines. And the Commissioner of Property Management himself reviews flag-raising applications for the City Hall Plaza poles to ensure that they are "consistent with the City's message, policies, and practices." There is no written policy regarding which flags may be raised on the City Hall poles.

On July 28, 2017, Shurtleff emailed the City requesting a permit to "raise the Christian Flag on City Hall Plaza." Shurtleff proposed several dates in September 2017 for the flag raising and explained that Camp Constitution would sponsor the event, which was also to include "short speeches by some local clergy focusing on Boston's history." Shurtleff's email to the City also included a photo of a Christian flag to be raised, which has a white field and a red Latin cross inside a blue canton. On September 5, 2017, Shurtleff received an email response from the City denying his request to raise the flag. The City's response did not offer a reason for the denial.

Unsatisfied, Shurtleff emailed the City the next day to inquire about the "official reason" for denying his application. Two days later, on September 8, Shurtleff received an email from

-6-

Gregory T. Rooney, the City's Commissioner of Property Management, explaining that his request was denied because "[t]he City of Boston maintains a policy and practice of respectfully refraining from flying non-secular flags on the City Hall flagpoles." Rooney's email explained that such a "policy and practice is consistent with [both] well-established First Amendment jurisprudence . . . [and] with [the] City's legal authority to choose how a limited government resource, like the City Hall flagpoles, is used." Before signing off, Rooney informed Shurtleff that the "City would be willing to consider a request to fly a non-religious flag, should your organization elect to offer one." Shurtleff's plan to host an event at City Hall Plaza, however, was allowed to go forward.

Around September 13, 2017, Shurtleff submitted a renewed event and flag-raising application to the City, asking to use City Hall Plaza and its flagpoles for the "Camp Constitution Christian Flag Raising." Shurtleff's event description explained that the "Christian flag is an important symbol of our country's Judeo-Christian heritage" and that the aim of the flag raising was to celebrate "our Nation's heritage and the civic accomplishments and social contributions of the Christian community to the Commonwealth of Massachusetts, religious tolerance, the Rule of Law, and the U.S. Constitution." On September 14, Shurtleff's

-7-

counsel sent a letter to Boston Mayor Martin Walsh -- with copy to other City officials -- that enclosed Shurtleff's September 13 application to celebrate a "Christian Flag Raising."  This letter requested that the City approve Shurtleff's flag-raising application on or before September 27, 2017.  The City neither issued a permit nor replied in reaction to Shurtleff's September 13 and 27 communications.  Since then, Shurtleff has not applied to hold any events on City grounds, with or without a flag.

Shurtleff and Camp Constitution filed suit on July 6, 2018, seeking injunctive relief, declaratory relief, and damages against the City and Rooney in his official capacity as Commissioner of the City's Property Management Division. Appellants aver, inter alia, that the City "violated [their] First Amendment right to Freedom of Speech by preventing [them] from displaying the Christian flag as part of a celebration of the Christian community and America's Judeo-Christian heritage to be held at [the City's] designated public fora at City Hall Plaza and [its] flagpoles."  Shurtleff and Camp Constitution moved for a preliminary injunction on July 9, 2018.  The district court heard argument on August 9, 2018, and issued an opinion denying their request on August 29, 2018.  Shurtleff v. City of Bos., 337 F. Supp. 3d 66, 79 (D. Mass. 2018).  Among other things, the court held that the preliminary injunction could not proceed because the

"City's selection and presentation of flags on the City flagpole constitute government speech," id. at 73, and government speech escapes scrutiny under the Free Speech Clause.

## II.

Before it grants a preliminary injunction, a district court is required to consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest. Díaz-Carrasquillo v. García-Padilla, 750 F.3d 7, 10 (1st Cir. 2014). And when faced with an interlocutory appeal, as we are in this case, we review the district court's decision to deny a preliminary injunction for abuse of discretion but review its findings of fact for clear error and its conclusions of law de novo. Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth., 781 F.3d 571, 578 (1st Cir. 2015). Because Shurtleff and Camp Constitution did not "'establish a strong likelihood that they will ultimately prevail' on the merits of their First Amendment claim[s]," we affirm the district court's denial of their request for a preliminary injunction.[3] Id. (quoting Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012)).

---

[3] Since the "sine qua non of th[e] four-part inquiry is likelihood of success on the merits," New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002), and appellants

**III.**

The centerpiece of Shurtleff's argument on appeal is that the City's choice of which flags to raise temporarily in place of the usual Boston flag on the City Hall Plaza flagpole at issue does not constitute government speech and that the flagpole is instead a designated public forum. We tackle first his challenge to the district court's finding of government speech.

**A.**

Shurtleff argues that neither Walker v. Texas Division, Sons of Confederate Veterans, Inc., 135 S. Ct. 2239 (2015), nor Pleasant Grove City, Utah v. Summum, 555 U.S. 460 (2009) -- the pair of recent cases the district court relied on to conclude that the City's choice of which flags to fly on the flagpole at issue is government speech -- supports a government speech label for a third-party group's temporary display of a flag owned by the group. Shurtleff explains that Summum resolved that the placement of "permanent" monuments in a public park was a form of government speech, which is inapposite to "temporarily" raising flags on a city-owned pole. Further, Shurtleff argues that Walker reaffirmed the relevance of permanence for finding government speech.

---

failed to meet that burden, we do not address the final three factors of the inquiry for preliminary injunctive relief. See Am. Freedom Def. Initiative, 781 F.3d at 578 n.4 (following this approach).

-10-

Shurtleff also maintains that the government "ownership" and "control" elements that the Court identified in Walker and Summum as creating government speech are not present for occasionally displayed third-party flags on the City Hall flagpole. We disagree with each of Shurtleff's points, but before responding we find it helpful to revisit in some detail the contours that the Supreme Court has established for the government speech doctrine.

In Summum, the Court considered "whether the Free Speech Clause of the First Amendment entitles a private group to insist that a municipality permit it to place a permanent monument in a city park in which other donated monuments were previously erected." 555 U.S. at 464. The Free Speech Clause did not mandate that result, the Court concluded, because "the display of a permanent monument in a public park is not a form of expression to which forum analysis applies" since it is "best viewed as a form of government speech." Id. The Court reached that conclusion after making three observations. First, that "[g]overnments have long used monuments to speak to the public." Id. at 470. Second, that "[p]ublic parks are often closely identified in the public mind with the government unit that owns the land," which is the reason why "there is little chance that observers will fail to appreciate the identity of the speaker" as the government when they see a monument at a public park. Id. at 471-72. And third,

-11-

that the government "has 'effectively controlled' the messages
sent by the monuments in the Park by exercising 'final approval
authority' over their selection." Id. at 473 (citing Johanns v.
Livestock Marketing Assn., 544 U.S. 550, 560-61 (2005)).

The Court reaffirmed the Summum framework six years
later in Walker. That case originated after a nonprofit
organization applied to the Texas Department of Motor Vehicles
Board for a specialty license plate featuring the Confederate flag.
The Board rejected the application, 135 S. Ct. at 2244, and members
of the nonprofit filed suit alleging that the rejection violated
their free speech rights. Not so, said the Court, holding that
"Texas's specialty license plate designs constitute government
speech," for which the Board was entitled to refuse issuing license
plates that feature the Confederate flag. Id. at 2253. The Court
pinpointed three factors as relevant to identifying government
speech in light of Summum: (1) whether the government has
traditionally used the message or conduct at issue to speak to the
public; (2) whether persons would interpret the speech as conveying
some message on the government's behalf; and (3) whether the
government maintains control over the selection of the message.
See id. at 2247. Applying these factors, the Court concluded that
the license plates are government speech because (1) "they long
have communicated messages from the States," id. at 2248; (2) they

-12-

"are often closely identified in the public mind with the [State],"
id. (citing Summum, 555 U.S. at 472); and (3) "Texas maintains
direct control over the messages conveyed on its specialty plates,"
id. at 2249.  The Court later remarked that Walker "likely marks
the outer bounds of the government-speech doctrine."  Matal v.
Tam, 137 S. Ct. 1744, 1760 (2017).

        The Summum/Walker three-part test controls here and each
of its factors strongly favors a finding that the City engages in
government speech when it decides which flags to display in place
of the City flag on the City Hall flagpole.  This case lies well
within the established bounds of the government speech doctrine.

        First, the government has long used flags to communicate
messages.  See, e.g., W. Va. State Bd. of Educ. v. Barnette, 319
U.S. 624, 632 (1943) ("The use of an emblem or flag to symbolize
some system, idea, institution, or personality, is a short cut
from mind to mind.  Causes and nations, political parties, lodges
and ecclesiastical groups seek to knit the loyalty of their
followings to a flag or banner . . . ."); Griffin v. Sec'y of
Veterans Affairs, 288 F.3d 1309, 1324 (Fed. Cir. 2002) ("We have
no doubt that the government engages in speech when it flies its
own flags over a national cemetery, and that its choice of which
flags to fly may favor one viewpoint over another.").  For
instance, "Congress has provided that the flag be flown at half-

-13-

staff upon the death of the President, Vice President, and other government officials 'as a mark of respect to their memory.'" <u>Texas</u> v. <u>Johnson</u>, 491 U.S. 397, 427 (1989) (Rehnquist, C.J., dissenting) (quoting 36 U.S.C. § 175(m) (current version at 4 U.S.C. § 7(m))). And when a visiting dignitary comes to Washington for a state or official visit, Blair House (the President's guest house) flies the flag of the dignitary's country. Mary Mel French, <u>United States Protocol</u> 298 (2010).[4]

---

[4] Of course, flags themselves communicate a message. In a 1944 Presidential Proclamation, President Franklin Roosevelt stated, "The flag of the United States of America is universally representative of the principles of justice, liberty, and democracy enjoyed by the people of the United States." Proclamation No. 2605, 9 Fed. Reg. 1957 (Feb. 22, 1944). Congress has provided that the American "flag represents a living country and is itself considered a living thing." 4 U.S.C. § 8(j). When United States Marines reached the top of Mount Suribachi at Iwo Jima, "they raised a piece of pipe upright and from one end fluttered a flag." <u>Johnson</u>, 491 U.S. at 425-26 (Rehnquist, C.J., dissenting). And troops marked their successful landing at Inchon during the Korean war with the raising of an American flag. <u>Id.</u> at 426.

Shurtleff's proposed flag is no different: it was designed to incorporate certain Christian symbolism, including the Latin cross. <u>See</u> <u>Trunk</u> v. <u>City of San Diego</u>, 629 F.3d 1099, 1110 (9th Cir. 2011) (recognizing the Latin cross as "the preeminent symbol of Christianity"); <u>cf.</u> <u>Barnette</u>, 319 U.S. at 632 ("[T]he church speaks through the Cross, the Crucifix, the altar and shrine, and clerical raiment."); <u>Salazar</u> v. <u>Buono</u>, 559 U.S. 700, 747 (2010) (Stevens, J., dissenting) ("We have recognized the significance of the Latin cross as a sectarian symbol, and no participant in this litigation denies that the cross bears that social meaning.").

The City partakes of similar practices and has historically used the City Hall Plaza pole at issue here to convey a message when the City flag is replaced with another flag. For instance, the City flew the flag of Portugal on that pole to recognize "the Portuguese community's presence and importance in the State of Massachusetts." The City also sometimes displays its municipal flag to signify that its mayor is present at a given event. It therefore follows that the City recognizes flag flying as a symbolic act and that it uses flags -- in particular those raised on the City Hall Plaza pole -- to speak to the public.

Next, we examine whether an observer would identify the City as the "speaker" when she sees a third-party flag, like a Christian flag, raised in front of City Hall and flying alongside the United States and Massachusetts flags. See Walker, 135 S. Ct. at 2249; Summum, 555 U.S. at 471.[5] We have little doubt that the third-party flag's message would be attributed to the City.

---

[5] In his Summum concurrence, Justice Souter proposed using a "reasonable person" test to analyze the attribution prong. See Summum, 555 U.S. at 487 (Souter, J., concurring) ("[T]o say when speech is governmental, the best approach that occurs to me is to ask whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige by allowing the monument to be placed on public land."). If the Court adopts this standard in a future case, it would be easily met here.

-15-

If the observer arrived in time, she could well see a City employee lower the Boston flag and replace it with a third party's flag. The replacement flag would fly eighty-three feet into the sky only steps away from the entrance to Boston's seat of government, City Hall. That height would make the flag visible from far away, even from places that have no view of what is happening on the plaza below. And the third-party flag would keep company with the United States flag and the flag of the Commonwealth of Massachusetts, two powerful governmental symbols. "In this context, there is little chance that observers will fail to appreciate the identity of the speaker" as being the City. Summum, 555 U.S. at 471.

Lastly, we assess if the City maintains control over the selection of the messages it conveys on its City Hall flagpole. See Walker, 135 S. Ct. at 2247. Shurtleff argues that, to find government speech, Summum and Walker require the government to take physical control over previously private expression, control every aspect of its design and maintenance, and require relinquishment of private ownership rights. We reject the argument as a misreading of those cases. See Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 331 (1st Cir. 2009) (finding that links placed on a government website were government speech and emphasizing that the town "controlled the content of [the] message

-16-

by exercising final approval authority over the [] selection of
the hyperlinks on the website"); cf. Ridley v. Mass. Bay Transp.
Auth., 390 F.3d 65, 82 (1st Cir. 2004) (rejecting the plaintiffs'
argument that the MBTA had created a public forum in part because
"[t]he MBTA's policy clearly evidenced an intent to maintain
control over the forum").

      The record is clear that the City owns the flagpole at
issue and that it controls which third-party flags are raised in
place of the City flag.  Interested persons and organizations must
apply to the City for a permit before they can raise a flag on
this flagpole.  The City's Office of Property and Construction
Management then reviews all applications to ensure that they comply
with governing guidelines, and the Commissioner of Property
Management himself screens flag-raising requests for the pole at
issue to ensure that those requests are "consistent with the City's
message, policies, and practices."  And unlike many other public
spaces controlled by a permitting process, for access to which the
City might grant thousands of applications a year, the flagpole at
issue is only rarely occupied by a third-party flag.  Appellant's
complaint lists only fifteen instances, over a period of years, in
which the City has granted a third party's flag-flying request.
That rarity highlights the City's tight control over the flagpole
in question and that it engages in symbolic speech as to the

-17-

replacement flags it allows.  Moreover, the absence of a written
policy outlining the content of the flags that may be raised on
City Hall Plaza is irrelevant to the government speech analysis.
Summum, 555 U.S. at 473 (finding that the City there effectively
controlled its message even though it did not adopt an express
policy as to which monuments it would accept or reject until after
rejecting the plaintiff's proposed monument); see also Sutliffe,
584 F.3d at 332 (noting that the absence of a written policy is
"irrelevant to whether the [City's] actions constitute government
speech").

A straightforward assessment under the Summum/Walker
factors thus requires us to conclude that the City's decision about
which flags to display on the flagpole at issue is likely
government speech.  However, as we noted before, Shurtleff insists
that the flagpole cannot convey government speech because the flags
raised on it are those of third parties and they are only displayed
temporarily.  This argument is unavailing.  First, the fact that
the flags are privately owned (or at least not owned by the City)
changes nothing because the City enjoys the "same freedom to
express its views when it receives assistance from private sources
for the purpose of delivering a government-controlled message"
like that which the City Hall flagpole communicates.  Summum, 555
U.S. at 468.  Second, Shurtleff is wrong to suggest that permanence

-18-

is required for there to be government speech.  Shurtleff contends
that the Summum Court emphasized the permanent nature of monuments
as supporting a finding of government speech, and that Walker
reiterated the relevance of permanence in government speech
analysis.  But the Walker Court actually clarified that permanence
is not a necessary element of its government speech framework.[6]
See Walker, 135 S. Ct. at 2249 ("That is not to say that every
element of our discussion in Summum is relevant here.  For
instance, in Summum we emphasized that monuments were 'permanent'
. . . .").

        Shurtleff argues that this is a case in which the City
is using government speech doctrine "as a subterfuge for favoring
certain private speakers over others based on viewpoint," Summum,
555 U.S. at 473, or as a means of "silenc[ing] or muffl[ing] the
expression of disfavored viewpoints," Matal, 137 S. Ct. at 1758.
We think not.  The record shows that the City has "regularly"
granted permission for religious events to be held on City Hall
Plaza.  And the City has not refused Shurtleff permission to hold

---

[6]  We also note that Shurtleff's argument takes Summum's discussion
of permanence out of context.  There, it was important that the
monuments were permanent because public parks could "accommodate
only a limited number of permanent monuments."   Summum, 555 U.S.
at 478.  Thus, the real issue was not permanence, but space.  See
Walker, 135 S. Ct. at 2261 (Alito, J., dissenting) ("A final factor
that was important in Summum was space.").

an event at City Hall Plaza that celebrates Christianity and
includes speeches by local clergy. Nor has it refused him the
opportunity to request to raise a flag that conforms with City
policy.

We now turn to Shurtleff's argument that the government
speech doctrine is inapplicable here because the City has
designated the flagpole as a public forum. Shurtleff's success
on this theory is also unlikely because that argument is precluded
by our government-speech finding. <u>Walker</u>, 135 S. Ct. at 2250
("Because the State is speaking on its own behalf, the First
Amendment strictures that attend the various types of government-
established forums do not apply.").

However, the argument also fails under traditional
public-forum analysis. "The government does not create a public
forum by inaction or by permitting limited discourse, but only by
intentionally opening a nontraditional forum for public
discourse." <u>Cornelius</u> v. <u>NAACP Legal Def. & Educ. Fund, Inc.</u>, 473
U.S. 788, 802 (1985). To ascertain if the City has designated the
flagpole as a public forum, we look to the City's "policy and
practice" and may also consider "the nature of the [flagpole] and
its compatibility with expressive activity." <u>See</u> <u>id.</u> However,
"[w]e will not find that a public forum has been created in the
face of clear evidence of a contrary intent . . . nor will we infer

-20-

that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." Id. at 803.

In Shurtleff's view, the City Hall pole at issue is a designated public forum because the application to request a permit for its use states that, "[w]here possible, the Office of Property and Construction Management seeks to accommodate all applicants seeking to take advantage of the City of Boston's public forums." But other than that statement, the record is barren of any indication that the City "intentionally open[ed] a nontraditional forum," on that flagpole, "for public discourse." Sutliffe, 584 F.3d at 333 (citing Del Gallo v. Parent, 557 F.3d 58, 72 (1st Cir. 2009)). Instead, the record contains clear evidence suggesting that the City did not intend to create a public forum in the choice of which flags to fly from that pole. As we have noted before, the City strictly controls which third-party flags are raised on the City Hall pole, with the Commissioner of Property Management screening all proposed flags for "consisten[cy] with the City's message, policies, and practices." The City has articulated a policy of not flying non-secular flags in place of the City flag and its rejection of Shurtleff's flag-flying request is consistent with that policy.

Moreover, the nature of this flagpole is also inconsistent with unregulated expressive activity. City Hall Plaza has three flagpoles, and only one of these is occasionally available for the temporary use of the flags of qualifying third parties. The Plaza, therefore, may only accommodate a very limited number of flag-flying requests. The City may reasonably conclude that opening the pole for widespread public use could create disruptions that compromise the access and operations of City Hall. Cf. Summum, 555 U.S. at 478 (noting that "[t]he forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program"). Accordingly, Shurtleff's argument that the choice of flag cannot be government speech because the City has designated the flagpole as a public forum lacks any likelihood of success.

Considering the foregoing and the record as it is at present, we find that the City's choice of which flags to raise on the flagpole at issue likely conveys government speech. And because this is the case, the City retains the ability not to promote or be associated with certain flags flown in place of the City flag on the flagpole in dispute. Thus, Shurtleff and Camp Constitution failed to establish a likelihood of success on their

-22-

free speech claim against the City. See <u>Summum</u>, 555 U.S. at 467
("The Free Speech Clause restricts government regulation of
private speech; it does not regulate government speech." (citing
<u>Johanns</u>, 544 U.S. at 553)).[7]

**B.**

Our final task is to review the district court's
determination that Shurtleff's Establishment Clause claim is
unlikely to succeed.

Shurtleff argues that the City violated the
Establishment Clause by excluding Camp Constitution's religious
speech while flying what he calls "other religious flags." He
alleges, for example, that the City has flown the flag of Portugal
and the Bunker Hill Association flag, which both contain some
religious symbols. But a flag that references religion by using
religious symbols in part of its field is not itself a religious
flag. And as appellants conceded at oral argument and is also
evident from the record, there is no evidence that the City has
ever raised the flag of any religion on the flagpole at issue.

---

[7] We also note that, in making choices about which flags to allow
as temporary replacements for the City flag, the City and its
officials are subject to "the democratic electoral process."
<u>Walker</u>, 135 S. Ct. at 2245; <u>Sutliffe</u>, 584 F.3d at 331 n.9 ("If the
voters do not like those in governance or their government speech,
they may vote them out of office or limit the conduct of those
officials 'by law, regulation, or practice.'" (quoting <u>Summum</u>,
555 U.S. at 468) (citation omitted)).

-23-

Shurtleff has not established that the City's policy and practice shows a preference for one religion or religious denomination over another.

Next, Shurtleff claims that the City acts in contravention of the Establishment Clause "by allowing the numerous and varied [secular] flags of a broad spectrum of private organizations while specifically excluding Camp Constitution's 'non-secular' flag." But the "secular" flags -- really, flags of secular organizations or causes -- the City has allowed to fly instead of the City flag do not show that the City has espoused a preference for non-religion over religion. And the record contains no evidence that would suggest otherwise. Thus, in light of the current record, we agree with the district court that the likelihood of success of Shurtleff's Establishment Clause claim is dim.

### IV.

For the reasons explained above, the district court did not abuse its discretion in denying Shurtleff's request for a preliminary injunction and its judgment is affirmed.

**Affirmed.**

-24-