UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HAROLD SHURTLEFF et al.,<br>    Plaintiffs<br><br>v.<br><br>CITY OF BOSTON et al.,<br>    Defendants. | CIVIL ACTION NO. 18-CV-11417-DJC |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

**FACTS**

The City incorporates by reference all facts contained within the Joint Statement of Undisputed Facts.[1]

**STANDARD OF REVIEW**

Pursuant to Fed. R. Civ. P. 56, summary judgment should be granted when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). If that

---

[1] Referred to hereinafter as "SOF".

1

burden is met, the burden shifts to the opposing party and it can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994). Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial. Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. See Vineberg, 548 F.3d at 56. "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F.Supp.2d 134, 143 (D.Mass. 2006).

**ARGUMENT**

**I.    THE SELECTION AND PRESENTATION OF FLAGS ON A CITY OWNED FLAG POLE CONSTITUTES GOVERNMENT SPEECH.**

The entire premise of Plaintiffs' argument rests on its conclusion that the City's flagpoles are a public forum available for private speech, and that the City violated Plaintiffs' free speech rights when it denied their request to fly the Christian Flag. But the City's flagpoles are not a public forum, but rather property used to express the City's speech.[2]  The Free Speech Clause does not regulate or limit the government when it uses its own property to engage in its own speech.  Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467-68 (2009). "A governmental

---

[2] Such conduct similarly does not violate Plaintiffs' rights under article 16 of the Massachusetts Declaration of Rights.  Although Article 16 of the Massachusetts Declaration of Rights has been interpreted, in certain circumstances, to provide greater protections than the First Amendment, *see Batchelder v. Allied Stores Intern., Inc.*, 388 Mass. 83, 87-88 (1983), no court of the Commonwealth has held that government speech implicates First Amendment concerns.

entity is "entitled to say what it wishes," Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833 (1995), and to select the views that it wants to express. See Rust v. Sullivan, 500 U.S. 173, 194 (1991); National Endowment for Arts v. Finley, 524 U.S. 569, 598 (1998). Furthermore, a government's own speech is exempt from First Amendment scrutiny. Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 329 (1st Cir. 2009). Government has the same freedom to express itself as it wishes even when receiving third-party assistance for the purpose of delivering a government message. See Summum, 555 U.S. at 468. There are certain restraints though on a government's ability to engage in government speech. Relevant here, a government engaging in government speech must comport with the Establishment Clause. Id.

The *Summum* Court relied on three factors in determining that the selection and presentation of privately donated, permanent monuments in a city-owned park constituted government speech. See id. at 470-80; Walker *v*. Texas Division, Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2247(2015) . First the Court focused on tradition and the fact that history has demonstrated that governments have long used monuments to speak to the public. Summum 555 U.S. at 470; see also Walker, 135 S. Ct. at 2247. Second the *Summum* Court accepted the proposition that a property owner typically does not open his or her property to the installation of monuments that convey messages with which he or she do not want to associate. 555 U.S. at 471. Because property owners do not usually behave in such a manner, those "who observe donated monuments routinely – and reasonably – interpret them as conveying some message on the owner's behalf", and there is little chance that "observers will fail to appreciate the identity of the speaker." Id.; see also Walker, 135 S. Ct. at 2247. The third factor relied upon is that the government had effectively controlled the monuments by exercising final approval authority over their selection. Summum, 555 U.S. at 473; see also Walker, 135 S. Ct. at 2247.

3

Furthermore, the fact that a town or government does not have a written policy in place is irrelevant as to whether a government or town's actions constitute government speech. See Sutliffe, 584 F.3d at 332; see also Summum, 555 U.S. at 473 (stating that the town's subsequent adoption of express criteria to use in making future monument selections supported a finding of government speech).

Other courts, including the First Circuit, have focused on the *Summum* and *Walker* factors in determining that government rejection of private viewpoints constituted government speech. See Sutliffe 584 F.3d at 329 (holding town's use of town website to advocate for approval of budget and its refusal to include hyperlink to plaintiffs' website, which communicated opposing views, constituted government speech because town's decision to include certain hyperlinks, even to other private organizations, was within its sole discretion and communicated an important message about its own views); see also Mech v. School Bd. of Palm Beach Cty., Fla., 806 F.3d 1070, 1075 (11th Cir. 2015) (finding school's decision to remove appellant's advertising banner from its fence constituted government speech where banners were located on school property and bore its colors and initials, stated that the advertiser was school's "partner," therefore indicating school's endorsement, and were subject to the approval of school principals prior to being displayed).

### A. **Governments Like The City Have Long Used Flags To Communicate Messages To The Public And Select Messages With Which The City Chooses To Identify.**

In concluding that by tradition, governments have long used monuments to speak to the public, the *Summum* Court relied on generally understood historical principles regarding monuments as a basis for its decision. Summum, 555 U.S. at 470. The Court stated:

> Governments have long used monuments to speak to the public. Since ancient times, kings, emperors, and other rulers have erected statues of themselves to remind their

subjects of their authority and power. Triumphal arches, columns, and other monuments have been built to commemorate military victories and sacrifices and other events of civic importance. A monument, by definition, is a structure that is designed as a means of communication. When a government entity arranges for the construction of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure.

Id.

The *Walker* Court relied on this reasoning where it held that "insofar as license plates have conveyed more than state names and vehicle identification numbers, they long have communicated messages from the States". 135 S. Ct. at 2248. Moreover, while a medium that has long communicated a government message favors a finding of government speech in most circumstances, a long history of expressing a government message is not a prerequisite to find that a particular communication is government speech. Mech, 806 F.3d at 1075-76). A finding of the existence of government speech may be based on present day circumstances and the absence of historical evidence can be overcome by other indicia of government speech. Id.

With regards to the instant case, governments have long used flags to communicate messages. See Shurtleff et al. *v* City of Boston et al., 2019 WL 2635622 (1st Cir. 2019) (citing W. Va. State Bd. Of Educ. *V.* Barnette, 319 U.S. 624, 632 (1943)) ("The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or a banner…"); Griffin v. Sec'y of Veterans Affairs, 288 F.3d 1309, 1324 (Fed. Cir. 2002) ("We have no doubt that the government engages in speech when it flies its own flags over a national cemetery, and that its choice of which flags to fly may favor one viewpoint over another."). The City of Boston itself has City ordinances governing the

presentment of flags at City Hall.[3] These flags communicate important symbols as memorialized in the City's ordinances and serve to identify City Hall as the seat of City government in Boston.

Furthermore, the City maintains a website dedicated to its flag-raising events declaring the City's goal of "commemorat(ing) flags from many countries and communities at City Hall Plaza during the year" by conducting such events. (SOF ¶ 27). The website further states fostering diversity and strengthening connections among Boston's many communities as goals of its flag-raising program. Id. On this record, the City has demonstrated a purpose in conducting flag-raising ceremonies. The City has chosen to communicate messages to the public through the presentation of flags on its flagpoles celebrating the many communities that make up Boston and identify the City as a diverse community. Even the message produced by the City's partner at Delaware North recognized that the flag ceremony was meant to honor "the flag of Portugal in what represents the official recognition of the Portuguese community's presence and importance in the State of Massachusetts." (SOF ¶ 34). Evidence of such a purpose is consistent with both the traditional use of flags as a means for government to communicate with and identify itself to the public and supports a finding that the City has engaged in government speech through the selection and presentation of flags on its flagpoles. See Summum, 555 U.S. at 472 (stating that governments "select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local culture.").

---

[3] C.B.C. 1-3: DISPLAY OF UNITED STATES FLAG: "The United States Flag shall be displayed, unless the weather is unsuitable, upon the City Hall on every day except Sunday.

C.B.C. 1-2.4: DISPLAYING FLAG ON CITY HALL AND BOSTON COMMON: "The City Flag shall be displayed on City Hall and may be displayed on Boston Common on occasions when the national flag is ordered displayed.

### B. Observers Of A Flag Flying Above City Hall Would Reasonably Interpret The Flag As Conveying A Message On The City's Behalf And Perceive The City As The Speaker.

The second factor in the *Summum* analysis focused on the close identification between government-owned land and the public mind resulting in "little chance that observers will fail to appreciate the identity of the speaker" as the government when viewing a monument situated on public land. 555 U.S. at 471-72. When the Court in *Summum* determined that the City would be the reasonably perceived speaker with regards to monuments placed in its public park, it focused on the practical, common sense principal that "it certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." Id. The Court held that just as government commissioned monuments speak for the government, so do privately financed monuments that are accepted and displayed to the public on government land. Id. at 470-71. Because monuments have long been used to speak to the public, and because it is uncommon for property owners to display on their property monuments that send messages with which they do not agree, and because it is the City that owns the property on which the message bearing monument is displayed, "persons who observe donated monuments routinely – and reasonably – interpret as conveying some message on the property owner's behalf." Id. at 471. Because the monuments, which were historically used to communicate to the public, were displayed in public parks and those parks are "closely identified in the public mind with the government," the court held that it would be reasonable for an observer to interpret them as conveying a message on behalf of the town that owned the park. Id.

In *Walker,* the Court found that license plates "are often closely identified in the public mind with the [State]" and that in this case they were "essentially government IDs," noting that

7

in Texas the state required each driver to display a plate, issued its own plates, and included the word "TEXAS" at the top of every plate. 135 S. Ct. at 2248. Furthermore, the state dictated the manner in which drivers disposed of unused plates. Id. The presence of close identification between the license plates and the state that issued them made it reasonable that the state issuing the plate would routinely and reasonably be perceived as the speaker of the displayed message. See also United Veterans Memorial and Patriotic Ass'n of the City of New Rochelle v. City of New Rochelle, 72 F. Supp. 3d 468, 474, 478 (S.D.N.Y. 2014) aff'd, 615 F. App'x 693 (2d Cir. 2015) (granting city's motion to dismiss plaintiff's claim that city violated its First Amendment rights by removing its flag from city armory flagpole where reasonable observer would assume the flag, located on a flagpole on city property used for park and recreation purposes, was conveying a message on city's behalf, even where city had ceded control of flagpole to private organization). Additionally, government speech is found where it is inherent from the nature of a request that the requestor is not merely seeking to engage in his or her desired speech, but is instead seeking to convey government endorsement of their views. See Walker, 135 S. Ct. at 2249. As the Supreme Court reasoned in *Walker*,

> Indeed, a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message. If not, the individual could simply display the message in question in larger letters on a bumper sticker right next to the plate. But the individual prefers a license plate design to the purely private speech expressed through bumper stickers. That may well be because Texas's license plate designs convey government agreement with the message displayed.

Id.

In the instant case, there is little doubt that a third-party would observer would identify the City as the speaker at the time he or she observes a third-party flag raised approximately eighty-three feet in the air, in front of Boston City Hall, flying alongside the United States and Commonwealth of Massachusetts flags. See Shurtleff, 2019 WL 2635622 at 15. The substitute

8

flag would fly steps from the entrance to City Hall and its height would make it visible far beyond the immediate area of City Hall Plaza where the happenings of the corresponding event are occurring. Id. at 16. In such a context, the City would be agreeing to lower its flag, which under City ordinance, flies on those days where the United States Flag is ordered flown, and replace it with a thrid-party flag to fly alongside the powerful symbols created by the United States and Commonwealth of Massachusetts flags. (SOF ¶ 22-23). "In this context, there is little chance that observers will fail to appreciate the identity of the speaker" as being the City. Summum, 555 U.S. at 471.

Furthermore, in the instant case, the City offered to allow the Plaintiffs' event to occur that would feature local clergy and a celebration of the Christian contributions to the founding of the United States and the only request that was denied was that of raising a Christian Flag on the city-owned flagpole. (SOF ¶ 51). Here, there is no reason that the Plaintiffs in this case could not hold an even larger Christian Flag on City Hall Plaza near the flagpoles at issue. The City did not deny the Plaintiffs the ability to hold an event featuring speeches by local clergy and celebrating Christian values at the location of the City Hall Flag Poles. Rather, the City denied them access to one of three city-owned flagpoles to raise a flag representing a particular religion in place of the City's flag. Thus, it can be inferred from the circumstances that the Plaintiffs are not seeking permission to present their flag as part of an event celebrating the Christian religion or to engage in private speech, but are instead seeking to use the flagpole to obtain the powerful image of City approval of their religious views. See Walker, 135 S. Ct. at 2249.

**C. The City Effectively Controls The Messages Broadcast Through Its Flag Pole By Exercising Final Approval Authority Over The Flags That Are Raised.**

The third factor relied upon by the *Summum* Court in determining the existence of government speech was the fact that the town "effectively controlled" the messages sent by

monuments in the public park by "exercising final approval authority" over their selection. U.S. 555 at 473. The Court held that public parks, which are closely identified with the government in the public mind, play an important role in defining the identity projected by a town or city to its residents and visitors alike. Id. at 472. The fact that government decision-makers took care to select the monuments that they deemed to be appropriate identifiers for the city, taking into account "content-based factors as aesthetics, history and local culture", demonstrated that the monuments were meant to convey and had the effect of conveying a government message, thus constituting government speech. Id. The City selected those monuments that it wanted to display for the purpose of presenting a desired image of the City to all visitors of the park. Id. at 473; see also e.g., Sutliffe, 584 F.3d at 331 (Town defendants effectively controlled the content of the message on the town's website by exercising final approval authority over the hyperlinks to be displayed on the website supporting a finding of government speech); Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004) (Where "MBTA's policy clearly evidenced an intent to maintain control over the forum", plaintiffs could not maintain argument that public forum had been created).

Furthermore, the selectivity exercised by a government or town in selecting those messages with which it chooses to identify need not be limited or circumscribed in any way. As the *Walker* Court pointed out in comparing Texas's license plates to the monuments in *Summum*;

> Further, there may well be many more messages that Texas wishes to convey through its license plates than there were messages that the city in *Summum* wished to convey through its monuments. Texas's desire to communicate numerous messages does not mean that the messages conveyed are not Texas's own.

Walker, 135 S.Ct. at 2251-52.

In the instant case, the record is clear that the City exercises final approval authority over the flags that are raised on its flagpoles and that the flagpoles are treated differently than other locations at which the City hosts events. In order for a flag-raising to be approved, Rooney, as Commissioner of the Property Management Department must review the flag raising request to determine whether the proposed flag-raising is consistent with City message and practice. (SOF ¶ 36). In this particular case, Rooney, for the first time, evaluated a request to raise a flag purported to represent a religion. (SOF ¶ 42). Due to concerns related to the Establishment Clause brought about by the prospect of hanging a religious flag prominently in front of City Hall, in place of the City flag and alongside the United States and Massachusetts flags, Rooney consulted the City law department and reviewed historical flag-raisings to determine whether any overtly religious flags had been raised in the past. (SOF ¶¶ 41-42, 45). After conducting this thorough inquiry, and determining that the City had not raised overtly religious flags in the past, Rooney determined that it was not in the best interest of the City to raise a Christian Flag above City Hall. (SOF ¶ 54).

Though the City chooses not to fly overtly religious flags above City Hall,, the City allows religious events to occur on City Hall Plaza and other public forums that are owned by the City. (SOF ¶ 19). These religious events have consistently been approved by the City's Commissioner of Property Management because events occurring in the City's public forums are evaluated differently than those involving a flag-raising ceremony. (SOF ¶¶ 17-19). Where the City has shown selectivity over the flags it raises on its flag pole by vesting final approval authority in its Commissioner of Property Management and exercising that authority in a manner consistent with the City's desire to control the messages and identity it broadcasts to the public, it is clear that the City uses its flagpoles to convey government speech. This is especially true

11

given the contrast provided in how the City handles other religious events that take place on city owned properties considered to be public forums.

## II. THE CITY HAS NOT DESIGNATED ITS FLAG POLE AS A PUBLIC FORUM.

### A. The Facts Do Not Support The Conclusion That The City Hall Flag Pole Is A Designated Public Forum.

A government entity creates a designated public forum "only by intentionally opening a nontraditional forum for public discourse". Cornelius v. Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802 (1985). To determine whether a government has created a designated public forum Courts have looked to the policy and practice of the government to determine whether it intended such a designation. Id. A designated public forum will not be found to have been created where evidence of a contrary intent exists on the part of the government, and in cases where the principal function of the property would be disrupted by the designation. Id. at 804. Of particular importance in assessing the government's intent is the control that it asserts over the forum. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 47 (2001) (finding that a school's mail system had not been designated as public forum where permission to access the system needed to be granted by individual school principal); see also Ark. Edu. Television Comm'n, 523 U.S. at 679 (holding that government does not create a designated public forum by reserving access to a specific class of speakers that, in turn, must obtain permission to access the forum).

In the present case, Plaintiffs rely on a City website and written event application form to argue that the City has made an explicit designation of a public forum for the purpose of flag-raising ceremonies on one of its flagpoles. (SOF ¶¶ 10 – 14). Plaintiffs contend that the City has designated the single flagpole that typically hosts the City flag as a public forum because on its

website and Event Application, the City refers to the City-owned property *at the location* of the City Hall Flag Poles as a public forum. The *location* of the City Hall Flag Poles is different than the flagpoles themselves. To make this clear, The City makes no reference to a flag-raising event on either its event application website or the written application and it makes clear that the City has recognized several *locations* as public forums, including the City-owned property *at* the City Hall Flag Poles. Id. This language does not demonstrate an intention by the City to designate a public forum for flag-raising ceremonies, open to the general public, on a single flagpole out of the three at the location. Again, while the location of the City Hall Flag Poles is a public forum, the flagpoles themselves are not.

Plaintiffs further contend that the City's historical practice of granting permission to third parties to raise flags representing countries and other special interest organizations supports the determination that a public forum exists on its flagpole. The record in this case makes clear that access to the flagpole for a flag-raising ceremony is only granted upon approval by the Commissioner of the Property Management Department after review to determine whether the flag comports with the City's own message. (SOF ¶ 36). As the Court stated in *Cornelius*, "such selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum." 473 U.S. at 805. Thus the City has not designated a public forum where it maintains selectivity over the flags allowed to be raised, and the Plaintiffs have failed to demonstrate such a purposeful designation. Where the primary function of the City's flagpole, i.e. conveying a City message, would be disrupted by a finding that a designated public forum exists, the Court should not infer that the City intended such a designation.

    B. **By Engaging In Government Speech, The City Does Not Implicate The Defendants' Rights Under The First Amendment and Forum Analysis Is Inappropriate.**

Moreover, where the City is engaging in government speech when it decides to fly certain flags, the traditional forum analysis applied to government action related to private speech on government property does not apply and Plaintiffs cannot maintain their claims that the City has engaged in viewpoint discrimination. See Summum, 555 U.S. at 481 (City's decision is not subject to First Amendment where Court had found existence of government speech). When the City approves an applicant's flag-raising request, it has determined that the message conveyed by the proposed flag comports with the City's policies and positions, and that it agrees to engage in the expressive conduct of raising the third-party flag in place of the City flag on its own flagpoles. (SOF ¶ 36). Thus, the inquiry into whether the flagpoles constitute a "traditional" or "designated" or "limited" public forum does not apply. Unlike in the case of public parks or squares, there is no history of governments allowing their flagpoles to be used in a way that does not express a message with which the government agrees. Cf. Capitol Square Review and Advisory Bd. *v*. Pinette, 515 U.S. 753, 757 (1995) (finding analysis of content-based restriction on speech appropriate where statute authorized state-owned plaza at issue to be used for public speeches, gatherings and festivals, both religious and non-religious, and that property had been used this way for over a century). Additionally, by allowing applicants to make flag-raising requests, the City has not made an affirmative choice to open up its flagpoles as a public forum as it has maintained final approval authority over the flags that are raised. See New Rochelle, 72 F. Supp. 3d 468, 474, 478 (City was within its rights to delegate to a third party the display and maintenance of flags on a City owned flagpole without creating a public forum , or surrendering control of the flags displayed).

> C. **Forum Analysis Is Inappropriate In This Case Where The Viewpoint Neutrality And Open Access Mandated By The Forum Doctrine Are Incompatible With The Purpose Of The City's Flag Pole.**

In general, the Court has held that forum analysis is inappropriate in this type of case where the viewpoint neutrality and open access required by the forum doctrine is incompatible with the intended use of the property. Ark. Edu. Television Comm'n, 523 U.S. at 666, 672-73 (1998). The Court stated in *Summum* that "the forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of speakers without defeating the essential function of the land or the program." 555 U.S. at 478. In *Summum,* the Court's analysis addressed the issue of permanent monuments placed in public parks that had traditionally served as public forums for the free exchange of ideas and exercise of free expression. Id. The Court held that if forum analysis were applied to the selection of permanent monuments situated in public parks and the town was forced to maintain viewpoint neutrality in selecting monuments, it would result in cluttered parks or the removal of long-standing monuments, focusing on the space that such permanent monuments would occupy within the park. Id. In such a situation the town would have little choice but to refuse all monuments and the program of selecting monuments to place in public would cease to exist. Id. The park could not hold unlimited monuments without defeating the essential function of the government land or program which is that of a traditional public forum and thus, forum analysis was inappropriate. Id at 480-81.

The First Circuit relied on the Court's reasoning in *Summum* when it held that a town's use of its own website to advocate for approval of a budget, and its refusal to include a hyperlink to a website that communicated opposing views, constituted government speech because the town's decision to include certain hyperlinks, even to other private organizations, was within its sole discretion and communicated an important message about its own views. Sutliffe, 584 F.3d at 329. The Court supported its holding by determining that forum analysis was inappropriate

where the requirement of viewpoint neutrality and open access to the town's website was incompatible with the purpose of such a website. Id. at 334. The Court reasoned that the application of the public forum doctrine "could risk flooding the town website with private links, thus making it impossible for the town to effectively convey its own message and defeating the very purpose of the website and hyperlinks chosen by the town." Id. Where the town would be forced to open its website to such a degree that it lost the ability to communicate a town message through its own website, it would be reasonable for that town to eliminate all private links from its website. Id. Thus, the Court found that application of the forum doctrine was inappropriate in a situation where it would result in less as opposed to more speech. Id. Furthermore, where the City faces the potential "prospect of cacophony on the one hand, and First Amendment liability, on the other … the safe course is to avoid controversy… and by so doing diminish the free flow of information and ideas." Ark. Edu. Television Comm'n, 523 U.S. at 681(internal quotations omitted).

In the context of the present case, the Plaintiffs are asking the Court to hold that the City has created a designated public forum on its flagpoles, thus requiring that the City maintain viewpoint neutrality towards the flags it selects and presents on its flagpoles. The function of a City-owned flagpole, standing high above City Hall, is to host a flag, which is expressive by nature, and to communicate a message to the public on behalf of the City as the reasonably perceived speaker of the message as stated in the sections above. Much like the town's website in Sutliffe, the flags a City chooses to fly convey important messages to the public, and to force the City to maintain viewpoint neutrality in the flags it chooses to raise risks flooding those flagpoles with messages that do not comport with the City's messages and policies. In such a situation, it would be impossible for the City to convey any coherent message through its flags,

16

such as celebrating the many cultures and the diversity that make up the City of Boston, defeating the very purpose of owning a flagpole on which to raise flags.

If the City was required to allow any and all flags to fly in front of City Hall, it would have untenable and absurd consequences, bringing about the prospect of the cacophony warned of in in <u>Ark. Edu. Television Comm'n</u>, 523 U.S. at 681. If the City continued to fly the LGBT rainbow flag, it would also have to fly the requested flag flag advocating "Straight Pride" despite its prior decisions to fly flags celebrating transgender equality and the LGBTQ Pride flag. (SOF ¶ 67). The City should not be forced to place its imprimatur and broadcast the message of an organization whose values it does not share or wish to promote. In even more light-hearted scenarios, if the City had flown the flag of the Boston Bruins during the recent Stanley Cup Finals, it would also be subject to a viewpoint neutrality requirement forcing it to fly a St. Louis Blues flag upon request by a clever St. Louis fan.

Such a ruling would force the City to associate itself with positions that are offensive to residents and visitors alike. The City should not be forced to place its imprimatur on these messages and symbols that are inconsistent with the City's own messages and raise those messages high among the City skyline alongside the powerful image created by the United States and Commonwealth of Massachusetts flag. A requirement of viewpoint neutrality provides the City little choice but to choose to eliminate all third party flags from its flagpoles, thus resulting in less as opposed to more speech as a result of the application of the forum doctrine. Where the result will be less speech, application of the forum doctrine to the City's flagpoles is inappropriate. See <u>Sutliffe</u>, 584 F.3d at 334 (forum analysis inappropriate where finding of a public forum on town's website would lead to the closing of the website to all private links resulting in less, not more speech)(quotations omitted).

### D. The City Does Not Violate The Establishment Clause By Declining To Raise A Christian Flag On A City-Owned Flag Pole.

Even when engaging in government speech, there are restraints on the government's ability to express its desired message including a requirement that it comport with the Establishment Clause. See <u>Summum</u>, 555 U.S. at 468. The record in this case is clear that the Defendant's acted in an abundance of caution in an attempt to avoid any appearance of an Establishment Clause violation that may potentially be caused by raising a Christian flag on the city-owned flag pole high above City Hall. (SOF ¶¶ 41-42, 46, 49 & 51). The City does not disagree with the Plaintiffs that the basis of its decision to deny the raising of a Christian Flag was the belief that such a flag-raising would place the City at risk of a constitutional violation of the Establishment Clause. To hold otherwise; that the City commits an Establishment Clause violation by choosing to refrain from participating in speech that promotes a particular religion; would place the City in the impossible position of exposing itself to a potential Establishment Clause violation regardless of the decision it made with regards to the raising of a Christian flag on a city-owned flag pole.

Furthermore, Plaintiffs point out that there have been occasions where the City has raised flags containing religious symobols and imagery. (SOF ¶ 28 – 34). However, each example cited by the Plaintiffs relates to a flag serving a secular purpose, whether that purpose is to represent the sovereign nations of Portugal and Turkey, or the civic association dedicated to memorializing the Battle of Bunker Hill. Unfortunately for the Plaintiffs' argument "a flag that references religion by using religious symbols in part of its field is not itself a religious flag." <u>Shurtleff</u>, 2019 WL 2635622 at 23. Also absent from the record is any evidence that the City has ever raised a flag promoting any particular religion further supporting a finding that there is not an

Establishment Clause violation present under these circumstances where the City did not in fact raise a Christian flag.

> III. THE PLAINTIFFS CANNOT MAINTAIN THEIR EQUAL PROTECTION CLAIMS WHERE THE CITY DOES NOT IMPLCATE THE PLAINTIFFS' FIRST AMENDMENT RIGHTS WHILE ENGAGING IN GOVERNMENT SPEECH

> A. **Plaintiffs' Equal Protection Claim Fails Because Plaintiffs Do Not Have A First Amendment Right To Force the City To Adopt Their Speech As Its Own.**

Where, as here, the speech at issue is properly classified as government speech, Plaintiffs cannot assert a viable equal protection claim under the Equal Protection Clause of the Fourteenth Amendment because they do not have a constitutional right under the First Amendment to force the City to express itself in a particular way. See Perry Education Assn., 450 U.S. at 54-55 (the key to decisions finding that distinctions between classes of speech violated the Equal Protection Clause was the presence of a public forum that all parties had a constitutional right to access). In the absence of a public forum and a Constitutional right on which to base the Equal Protection claim, Plaintiffs' arguments under the First Amendment, including the vagueness of the City's policy, prior restraint on speech and content-based discrimination, must fail. In the absence of a public forum, not all speakers are similarly situated and "the state may draw distinctions which relate to the special purpose for which the property is used." Id. In such as a case as presented under the record here, the City may draw distinctions between speakers allowed access to flag-raising ceremonies on the city-owned flagpole for its stated purpose of celebrating Boston's varied and diverse communities. (SOF ¶ 27).

## CONCLUSION

For the foregoing reasons, the Defendant respectfully requests entry of judgment in its favor with regards to Plaintiff's claims of violation of Free Speech claimed under the First

Amendment to the United States Constitution and Article 16 of the Massachusetts Declaration of Rights. In addition the Plaintiffs respectfully request entry of judgment in its favor with regards to the claimed violations of the Establishment Clause under the First Amendment of the United States Constitution and Articles 2 and 3 of the Massachusetts Declaration of rights. Defendants further request judgment in their favor on Plaintiffs' Equal Protection Claims under the Fourteenth Amendment and Articles 1 and 3 of the Massachusetts Declaration of Rights.

Dated: July 8, 2019

Respectfully submitted,

**DEFENDANTS**
**CITY OF BOSTON and GREGORY T. ROONEY in his official capacity as COMMISSIONER OF THE CITY OF BOSTON PROPERTY MANAGEMENT DEPARTMENT,**

Eugene L. O'Flaherty
Corporation Counsel

By his attorney,

/s/ Robert S. Arcangeli
Robert S. Arcangeli (BBO# 689034)
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
(617) 635-4044
robert.arcangeli@boston.gov

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on July 8. 2019.

July 8, 2019
Date

/s/ Robert Arcangeli
Robert Arcangeli