# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | | |
|---|---|---|
| HAROLD SHURTLEFF, and CAMP CONSTITUTION, a public charitable trust, | : : | CIVIL ACTION |
| | : | No. 1:18-cv-11417-DJC |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF BOSTON, and GREGORY T. ROONEY, in his official capacity as Commissioner of the City of Boston Property Management Department, | : : : : | |
| | : | |
| Defendants. | : | |
| | : | |

---

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, HAROLD SHURTLEFF ("Shurtleff") and CAMP CONSTITUTION (collectively, "Camp Constitution"), pursuant to Rule 56, Fed. R. Civ. P., and Local Rule 7.1, submit this memorandum in support of Plaintiffs' Motion for Summary Judgment against Defendants, CITY OF BOSTON ("Boston" or the "City"), and GREGORY T. ROONEY, in his official capacity as Commissioner of the City of Boston Property Management Department ("Rooney" or the "Commissioner").

Ryan P. McLane (Mass. 697464)
MCLANE & MCLANE
975A Springfield Street
PO Box 105
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com

Mathew D. Staver (Fla. 701092)[†]
Horatio G. Mihet (Fla. 26581)[†]
Roger K. Gannam (Fla. 240450)[†]
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854-0774
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org
*Attorneys for Plaintiffs*
[†]Admitted to appear *pro hac vice.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

INTRODUCTION ................................................................................................... 1

SUMMARY OF KEY UNDISPUTED FACTS ...................................................... 2

    A.    Prior to Camp Constitution's Application, the City's Flag Raising Policies and Practices Accepted All Applicants to Use the City Hall Flag Poles. ...................... 2

    B.    Camp Constitution's Flag Raising Was Denied Solely Because of the Content and Viewpoint of the Flag Which Rooney Deemed Unacceptably Religious Because the Flag Was *Called* Christian. ................................. 3

    C.    After Denying Camp Constitution's Application the City Memorialized in Writing Its Policy and Practice of Reserving to Rooney's Office Unbridled Discretion to Approve or Deny Flag Raising Requests Regardless of Compliance with Criteria. ......................... 4

SUMMARY JUDGMENT STANDARD ................................................................ 5

LAW AND ARGUMENT ...................................................................................... 6

I.    CAMP CONSTITUTION IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS CLAIM THAT THE CITY RESTRICTED CAMP CONSTITUTION'S SPEECH IN THE CITY'S DESIGNATED PUBLIC FORUM AT THE CITY HALL FLAG POLES IN VIOLATION OF THE FIRST AMENDMENT. .................................. 6

    A.    The City's Explicit Policy and Undisputed Practice Demonstrate That It Intentionally Created a Designated Public Forum at and on the City Hall Flag Poles. ........................................... 6

        1.    The City's Written Policies Explicitly State That the City Hall Flag Poles Are a Public Forum. ......................... 7

        2.    The City's Long-Standing Practice Demonstrates That It Treats the City Hall Flag Poles as a Public Forum, Including for Flag Raising Events. ...... 9

            a.    The City's Acceptance of All Applications to Use the City Hall Flag Poles Forum Demonstrates That It Opened the Flag Poles as a Public Forum. ......................... 9

            b.    The City Does Not Request or Exercise Control over the Content of the Flags Allowed to Be Raised on the City Hall Flag Poles. ... 11

c. The City Cannot Possibly Contend That It Endorses the Messages of All Flags Flown by Private Organizations Granted Access to the City Hall Flag Poles Forum. ....................................12

3. That Some Government-Owned Flag Poles Traditionally or Historically May Have Been Used to Convey Government Messages Does Not Alter the City's Explicit Policy and Practice Designating the City Hall Flag Poles a Public Forum. ..............................................................................13

a. As a Matter of Law Speech Does Not Become Government Speech Merely Because the Government Opens a Forum for Such Expression. ..........................................................................13

b. Countenancing the City's Government Speech Argument Would Turn Decades of First Amendment Precedent on Its Head and Permit Post Hoc Justifications for Viewpoint Discrimination. ..........................................................................14

4. *Pleasant Grove* and *Walker* Are Inapposite to the City Hall Flag Poles Because the City Only Permits Access on a Temporary Basis and Does Not Exercise Any Control over the Content or Message of the Private Flags. ....................................................................................................15

a. *Pleasant Grove* and *Rochelle* Are Inapposite to the City Hall Flag Poles Forum Because the Private Speech of Private Organizations via Raising Flags Is Only Temporary – Not Permanent. ..........................................................................15

b. The Government Ownership and Control in *Pleasant Grove* and *Walker* Are Not Present in the City Hall Flag Poles Forum. .........17

c. The Reasonable Observer Familiar with All the Facts of the City's Policy and Practice Concerning the City Hall Flag Poles Would Not Perceive the Government to Be Speaking Through Any Temporary Substitute Flag Raised on the Flag Poles. ...........19

B. Because the City Opened a Public Forum on City Hall Flag Poles, Its Discriminatory Treatment of Camp Constitution's Speech Must Satisfy First Amendment Scrutiny. ........................................................................21

1. The City Discriminated Against Camp Constitution Based on Its Christian Viewpoint, Which Is Unconstitutional in Any Forum. ..............21

2. Because the City Opened a Designated Public Forum on the City Hall Flag Poles, Its Content-Based Restriction on Camp Constitution's Speech Must Satisfy Strict Scrutiny. ........................................................23

  3. The City's Denial of Camp Constitution's Flag Cannot Satisfy Strict Scrutiny. ................................................................................................25

    a. The City Bears the Burden of Satisfying Strict Scrutiny. ..............25

    b. The City's Pretextual Establishment Clause Justification Is Not a Compelling Interest as a Matter of Settled Law ..........................25

    c. The City's Policies and Practices Are Not the Least Restrictive Means. ...........................................................................................27

 C. Even If the City Hall Flag Poles Are a Limited Public Forum, Which They Are Not, the City's Policies and Practices Are Not Viewpoint Neutral or Reasonable. ..........................................................................................28

  1. The City's Policies and Practices Are Not Viewpoint Neutral. .................28

  2. The City's Policies and Practices Are Not Reasonable in Light of the Purposes of the Flag Raising Forum. .........................................................28

II. CAMP CONSTITUTION IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS CLAIM THAT THE CITY'S POLICY AND PRACTICE OF RESTRICTING RELIGIOUS SPEECH IN ITS CITY HALL FLAG POLES FORUM IS AN UNCONSTITUTIONAL PRIOR RESTRAINT. ...............................................................29

 A. Government Regulations That Vest in Government Officials Unbridled Discretion to Approve or Deny Protected Speech Are Unconstitutional Prior Restraints. ..............................................................................................29

 B. The City's Recently Memorialized Flag Raising Policies and Practices Vest Unbridled Discretion in the Hands of Government Officials. ...............................31

III. CAMP CONSTITUTION IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS ESTABLISHMENT CLAUSE CLAIM BECAUSE OF THE CITY'S HOSTILE AND DISCRIMINATORY TREATMENT OF CAMP CONSTITUTION'S RELIGIOUS SPEECH. ...................................................................32

 A. The City's Granting of Equal Access to Camp Constitution's Religious Speech Must Be Viewed Through the Lens of the Reasonable Observer. ........................32

 B. The Reasonable Observer Does Not View Equal Treatment of Religious and Non-Religious Speech in a Public Forum as an Endorsement of Religions as a Matter of Law. ......................................................................................33

 C. The City's Policy and Actions Impermissibly Demonstrate Hostility Towards Camp Constitution's Religious Speech. .................................................34

1.	The City's Discriminatory Treatment of Camp Constitution's Speech Impermissibly Discriminates Between Religion and Non-Religion..........35

2.	The City's Discriminatory Treatment of Camp Constitution's Speech Impermissibly Discriminates Between Religion and Religion..................35

IV.	CAMP CONSTITUTION IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS EQUAL PROTECTION CLAIM BECAUSE OF THE CITY'S CONTENT-BASED DISCRIMINATION AGAINST CAMP CONSTITUTION'S RELIGIOUS SPEECH....................................................................................................................36

A.	The Undisputed Material Facts in This Matter Demonstrate That the City Impermissibly Discriminated Between Similarly Situated Organizations on the Basis of Religion....................................................................................................36

B.	Content-Based Restrictions on Speech Are an Equal Protection Violation. .........37

C.	The City's Content-Based Restriction on Camp Constitution's Speech Cannot Survive Strict Scrutiny............................................................................................37

CONCLUSION..................................................................................................................38

CERTIFICATE OF SERVICE ..........................................................................................38

# INTRODUCTION

The undisputed evidentiary record now shows beyond doubt that the City's policies and practices governing flag raising events on the City Hall Flag Poles unconstitutionally restrict religious speech on the basis of content and viewpoint, and are unconstitutional prior restraints. Plaintiffs are entitled to judgment as a matter of law against the City because Plaintiffs' First and Fourteenth Amendment rights were and continue to be violated by the City's unconstitutional policies and practices.[1]

The parties' Joint Statement of Undisputed Facts filed contemporaneously herewith ("Joint Statement" or "JS"), which Camp Constitution incorporates herein by this reference, provides the Court with a developed factual record which was not available to the Court when it denied Plaintiffs' Motion for Preliminary Injunction (D.7, D.19), or to the First Circuit when it affirmed this Court's denial (D.53).[2] Both this Court and the appellate court based their decisions on the

---

[1]     Although Plaintiffs have pleaded Defendants' violations of Plaintiffs' rights under both the U.S. and Massachusetts Constitutions, Plaintiffs' authorities cited herein specifically illuminate Defendants' federal constitutional violations. However, "[t]he Mass. Decl. of Rights is generally coextensive with the federal constitution when it comes to the freedom of expression . . . . Where the two depart, **the state actually provides more extensive freedom of expression protections than its federal counterpart**." *Flaherty v. Knapik*, 999 F. Supp. 2d 323, 332 (D. Mass. 2014) (emphasis added); *cf. Hosford v. Sch. Comm. of Sandwich*, 659 N.E.2d 1178, 1180 n.5 (Mass. 1996) ("Our State freedom of speech analysis is guided by the Federal analysis. Because we find that [plaintiff's] First Amendment rights were violated, we need not distinguish between the State and Federal analyses." (citation omitted)); *Colo v. Treasurer & Receiver Gen.*, 378 Mass. 550, 558, 392 N.E.2d 1195, 1200 (1979) ("[W]e are aided by the criteria which have been established by the United States Supreme Court for judging [Establishment Clause] claims arising under the First Amendment, which criteria we believe are equally appropriate to claims brought under cognate provisions of the Massachusetts Constitution."). Thus, Defendants' Free Speech and Establishment Clause violations under the U.S. Constitution constitute violations of the "cognate provisions" of the Massachusetts Constitution.

[2]     In accordance with the Court's Order (D.52) Camp Constitution relies on the Joint Statement of Undisputed Facts, comprising "the material facts of record as to which there is no genuine issue to be tried" (JS at 1), in lieu of a "concise statement of the material facts of record

absence of a record of certain key facts. The key facts are now available and undisputed, and compel a result in Camp Constitution's favor. Following is a summary of the key undisputed facts showing Camp Constitution is entitled to judgment as a matter of law.[3]

**SUMMARY OF KEY UNDISPUTED FACTS**

A. **Prior to Camp Constitution's Application, the City's Flag Raising Policies and Practices Accepted All Applicants to Use the City Hall Flag Poles.**

The City uses a uniform application system to process applications for public events on City properties, including for flag raising events at the City Hall Flag Poles. (JS ¶ 16; JS ¶¶ 10– 15.) The City's uniform application policies explicitly designate the City Hall Flag Poles as one of "the City of Boston's **public forums**" for which the City "seeks to accommodate **all applicants**." (JS ¶ 14 (emphasis added).)

The City's actual practice is consistent with its "public forums" for "all applicants" policy because "for the most part, the City will allow any event" to take place on City Hall Plaza. (JS ¶ 35.) This liberal approval practice includes flag raising events on the City Hall Flag Poles: The City "never really had a lot of discussion prior to [Camp Constitution's] request related to flag raisings in any way," and "most had been approved in previous years." (JS ¶ 37.)

Rooney, as the City official with final approval authority for all flag raising events, never requested to review a flag prior to approval, never requested any changes to a flag prior to approval, and never denied a flag raising application prior to Camp Constitution's. (JS ¶¶ 18, 35, 36, 38.)

_____

as to which the moving party contends there is no genuine issue to be tried" otherwise required by Local Rule 56.1.

[3] Although Camp Constitution summarizes the key undisputed facts herein, Camp Constitution commends to the Court as material the entire Joint Statement.

Thus, prior to Camp Constitution's request for access to the City Hall Flag Poles, approved flag raisings were neither rare nor selective: The City approved **284 flag raising events** during the relevant period.[4] (JS ¶ 25.) In the year immediately preceding Camp Constitution's application, the City approved **39 flag raisings**, averaging more than three per month. (JS ¶ 25.)

### B. Camp Constitution's Flag Raising Was Denied Solely Because of the Content and Viewpoint of the Flag Which Rooney Deemed Unacceptably Religious Because the Flag Was *Called* Christian.

The City's express written purposes for opening the City Hall Flag Poles for flag raising events include to "*commemorate **flags from many** countries **and communities** at Boston City Hall Plaza during the year*," to create an environment in the City where **everyone feels included, and is treated with respect**," and "to **foster diversity** and build and strengthen connections among Boston's **many communities**." (JS ¶ 27 (bold emphasis added).)

Camp Constitution's express purpose for its proposed flag raising event was to commemorate the civic and social contributions of Boston's **Christian community** to the City and the Commonwealth. (JS ¶ 7.) The City's senior special events official, who received Camp Constitution's application, expected it would be approved by Rooney. (JS ¶¶ 8, 9, 43 ("I am just waiting for the approval from my bosses . . . .").)

But Rooney treated Camp Constitution's application differently from others, and delayed his consideration of it, because he deemed the flag "religious." (JS ¶¶ 17, 41, 42.) Rooney ultimately denied the application because Camp Constitution **called** the flag "the Christian flag," causing him "concern[]" that it "was promoting a specific religion," and he "didn't think that it

---

[4]      In reviewing Camp Constitution's flag raising application, Rooney relied on the City's records of 284 approved flag raising events for the time period of June 2005 through June 2017. (JS ¶ 25; Rooney Dep. 87:19–89:15, Ex. 17.)

was in the city's best interest to necessarily have that flag flying above City Hall." (JS ¶¶ 46, 54.) Rooney would not have been concerned if the **same flag** was **called** "the Camp Constitution flag" because then "it would have been the flag of the organization and not a religious symbol." (JS ¶ 54.)

Rooney's decision to deny Camp Constitution's flag raising was not based on any written policy of the City, or any past practice of denying "non-secular or religious flags," but rather was based on merely not knowing whether any "religious flag" had been approved in the past. (JS ¶¶ 46, 52, 53.) Thus, denying Camp Constitution's flag raising application did not serve any of the City's express public flag raising purposes (JS ¶ 27), but rather served only to allay Rooney's concern over the "so-called separation of church and state." (JS ¶ 58.)

To be sure, Rooney's concern with allowing the Christian flag was not based on the symbol of the flag ("a red cross on a blue field on a white flag"), but rather for Camp Constitution's having called it the "Christian Flag." If Camp Constitution had not called it a "Christian Flag," Rooney would have treated it no differently from the Bunker Hill flag ("a red cross on a white field on a blue flag"), which Rooney had approved. (JS ¶ 55.) Rooney did not consider the Bunker Hill flag a "religious" flag, despite its depiction of a red cross, because "it's to commemorate the Battle of Bunker Hill." (JS ¶ 55.) Thus, if the Bunker Hill flag had been presented to Rooney as "the Christian flag or a Christian flag, then Rooney "would . . . have had the same concerns that [he] had about Camp Constitution's flag." (JS ¶ 55.)

### C. After Denying Camp Constitution's Application the City Memorialized in Writing Its Policy and Practice of Reserving to Rooney's Office Unbridled Discretion to Approve or Deny Flag Raising Requests Regardless of Compliance with Criteria.

In October 2018 the City committed its past policy and practice to a written Flag Raising Policy. (JS ¶ 62.) The written Flag Raising Policy does not treat flag raising requests any

differently "from how they were handled when Camp Constitution submitted its request in July of 2017." (JS ¶ 63.) Under the written policy, as in July 2017, the Commissioner of Property Management has final approval authority for all flag raising requests, "such decision to be made in the City's sole and complete discretion." (JS ¶ 63.)

The written Flag Raising Policy incorporates seven Flag Raising Rules, including, "At no time will the City of Boston display flags deemed to be inappropriate or offensive in nature or those supporting discrimination, prejudice, or religious movements." (JS ¶¶ 64, 65.) Whether a flag is deemed "inappropriate or offensive in nature," supporting "discrimination" or "prejudice," or supporting "religious movements" is a determination to be made at Rooney's discretion, and there are no separate guidelines or criteria for Rooney to use to make any such determination. (JS ¶ 65.)

Despite the enumerated Flag Raising Rules, however, the Flag Raising Policy still reserves to Rooney "sole and complete discretion" to deny an application for a reason not reflected in the Rules. (JS ¶ 64.) The Flag Raising Policy also reserves to Rooney the discretion to offer applicants flexibility on rule compliance, and to approve a flag application even if it does not meet one or more of the Flag Raising Rules. (JS ¶ 64.)

## SUMMARY JUDGMENT STANDARD

Rule 56 dictates that a court "**shall** grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Once a party has properly supported its motion for summary judgment by demonstrating "an absence of evidence to support the non-moving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the "burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d

32, 37 (1st Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The factual issue must be both "material" (affects the outcome of the litigation) and "genuine" (a reasonable jury could return a favorable verdict for the nonmovant). *Anderson*, 477 U.S. at 248. Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The "party opposing summary judgment must present definite, competent evidence to rebut the motion, or the district court is obligated to grant the motion in favor of the moving party." *Mendez-Laboy v. Abbot Lab.*, 424 F.3d 35, 37 (1st Cir. 2005) (internal quotations and citations omitted). "The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue. Failure to do so allows the summary judgment engine to operate at full throttle." *Lawton*, 101 F.3d at 223 (citation omitted). This Court must grant a motion for summary judgment if it determines there are no genuine issues to be resolved at trial because there is not "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

## LAW AND ARGUMENT

I. **CAMP CONSTITUTION IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS CLAIM THAT THE CITY RESTRICTED CAMP CONSTITUTION'S SPEECH IN THE CITY'S DESIGNATED PUBLIC FORUM AT THE CITY HALL FLAG POLES IN VIOLATION OF THE FIRST AMENDMENT.**

   A. **The City's Explicit Policy and Undisputed Practice Demonstrate That It Intentionally Created a Designated Public Forum at and on the City Hall Flag Poles.**

Proper characterization of the City Hall Flag Poles forum requires that this Court look at the access sought by the speaker. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985) ("in defining the forum we have focused on the access sought by the

speaker"); *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45-46 (1983) (determining the relevant forum by the access sought by the speaker); *Irish Subcommittee of R.I. Hertigage Comm'n v. R.I. Heritage Comm'n*, 646 F. Supp. 347, 352 (D.R.I. 1986) (same). The City's undisputed policies and practices demonstrate that the City opened a public forum for private expression through flag raisings on City Hall Flag Poles.

"A public forum may be created by government designation of a place or channel of communication for use by the public at large for speech or assembly, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802; *Perry Educ. Ass'n*, 460 U.S. at 45-46 & n.7. "Designated public fora . . . are created by purposeful government action." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). Indeed, "the government creates a designated public forum "by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. To determine whether a designated public forum has been opened, courts look to the "policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," and "the property and its compatibility with expressive activity to discern the government's intent." *Id.* The First Circuit mandates that, in determining whether the government has created a designated public forum, this Court "must consider **both the explicit expressions about intent and the policy and practice of the government**." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 (1st Cir. 2004) (emphasis added).

> 1. **The City's Written Policies Explicitly State That the City Hall Flag Poles Are a Public Forum.**

The City's official policies and application forms make plain that it intended to and did open public fora at several City-owned venues. The City has made available designated City properties for the public to hold expressive events, including Faneuil Hall, Samuel Adams Park,

City Hall Plaza, the City Hall Lobby, the **City Hall Flag Poles**, and the North Stage. (JS ¶ 10.) The City's online and printable applications expressly designate the City Hall Flag Poles as a separate and distinct forum where the public can engage in protected expression. (JS ¶¶ 12–13.) Leaving no question as to the City's intention to designate the City Hall Flag Poles a public forum, the City's printable application guidelines for "the Use of Faneuil Hall, Sam Adams Park, City Hall Plaza, City Hall Lobby, North Stage or the **City Hall Flag Poles**" state that the City "seeks to accommodate **all applicants** seeking to take advantage of the City of Boston's **public forums**." (JS ¶ 14 (emphasis added).)

First, "words matter," *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 49 (1st Cir. 2004), and the City's explicit of the City Hall Flag Poles as one of Boston's "public forums" for "all applicants" demonstrates the City has purposefully opened the flag poles for public discourse in connection with permitted events. *Ark. Educ. Television Comm'n*, 523 U.S. at 677. As binding precedent dictates, an express statement of intention to open a public forum negates a government's contention that it was not opening up a forum for discourse. *See, e.g.*, *Ridley*, 390 F.3d at 76 ("explicit statements about intent" relevant to determining nature of the forum); *Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, 781 F.3d 571, 580 (1st Cir. 2015) (same). Indeed, "[t]he touchstone for determining whether a government property is a designated public forum is the government's intent," including the government's "stated purpose." *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1015 (D.C. Cir. 1988). Here, the City's explicitly stated intent evinces its creation of a designated public forum available to all applicants.

Second, the City's stated goal of permitting **all applicants**, and thereby the broadest range of expression, access to the City's designated fora, including the City Hall Flag Poles, demonstrates that the City intended to create a designated public forum. *See, e.g.*, *Ark. Educ.*

*Television Comm'n*, 523 U.S. at 677 (if forum opened up for expression by all or part of the public, government has created a designated public forum); *Int'l Soc'y for Krisna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (designated public forum is property "that the State has opened for expressive activity by part or all of the public"); *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273 (10th Cir. 1996) (government-owned senior center was designated public forum because the City had opened up the center for a "broad range of subjects . . . evidenced by the long list of diverse topics that have been presented"); *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010) ("The government creates a designated public forum when it opens a piece of public property to the public at large"); *Parks v. Finan*, 385 F.3d 694 (6th Cir. 2004) (grounds at state capital, opened by state government for public expressive activities on a permit system, are either a traditional public forum or a designated public forum). Thus, both by name and range of expression permitted, the City has intentionally designated the City Hall Flag Poles a public forum.

> **2.** **The City's Long-Standing Practice Demonstrates That It Treats the City Hall Flag Poles as a Public Forum, Including for Flag Raising Events.**
>
> > **a.** **The City's Acceptance of All Applications to Use the City Hall Flag Poles Forum Demonstrates That It Opened the Flag Poles as a Public Forum.**

Not only does the City's explicit expression of intent demonstrate that it created a designated public forum on City Hall Flag Poles, but "the policy and practice of the government" demonstrate it as well. *See Ridley*, 390 F.3d at 76; *see also Cornelius*, 473 U.S. at 802. While, standing alone, "a government actor's stated intent cannot determine the nature of the forum in the face of countervailing actions by that actor," when such stated intentions are consistent with the government's own conduct to open a forum, it has created a designated public forum. *Am. Freedom Def. Initiative*, 781 F.3d at 580.

The undisputed facts show that the City's acceptance of flag raising applications is consistent with its stated intention to allow all applicants to use the City Hall Flag Poles. (JS ¶¶ 14, 25.) Indeed, during the twelve years preceding Camp Constitution's flag raising request, **the City approved 284 flag raising events** at the City Hall Flag Poles. (JS ¶ 25.) From June 2016 to June 2017, the year preceding Camp Constitution's request, **the City approved 39 flag raising events**—averaging **more than three per month**. (JS ¶ 25.)

Moreover, prior to Cam Constitution's request, Rooney had **never denied a flag raising application**. (JS ¶ 35.) Indeed, according to the Commissioner, "for the most part, the City will allow any event" to take place at City Hall Plaza. (JS ¶ 35.) If the approval of **284 applications** and **never** denying a request does not count as "an affirmative act of a governmental body [sufficient] to support a finding that the authorities have designated a forum as a place for public expression," *New England Reg. Council of Carpenters v. Kinton*, 284 F.3d 9, 21 (1st Cir. 2002), then nothing ever could. To the contrary, the City's open invitation and the practice of accepting all flag raising applicants shows the City intended to and did open a designated public forum for speech and expression.

While the First Circuit recently opined in the preliminary injunction appeal that the City had not opened a designated public forum on the City Hall Flag Poles, it so concluded because "the record [was] barren of any indication that the City intentionally opened a nontraditional forum, on that flagpole, for public discourse." *See Shurtleff v. City of Boston*, No. 18-1898, 2019 WL 2635622, *6 (1st Cir. June 27, 2019) (D.53 at 21). The record is no longer barren of such facts, having birthed **284 examples** of the City's intentional treatment of the City Hall Flag Poles as a designated public forum for speech. (JS ¶ 25.) Moreover, the fertile testimony of the Commissioner reveals **he never denied a flag raising application prior to Camp Constitution's** and could not

point to any denials, as, "for the most part, the City will allow any event" to take place at City Hall Plaza. (JS ¶¶ 35, 37.)

### b. The City Does Not Request or Exercise Control over the Content of the Flags Allowed to Be Raised on the City Hall Flag Poles.

The other basis for the First Circuit's opinion that the City had not created a designated public forum on the City Hall Flag Poles was that the City "strictly controls which third-party flags are raised on the City Hall pole." *Shutleff*, 2019 WL 2635622, at *6 (D.53 at 21). Specifically, the court found "the flagpole at issue is only rarely occupied by a third-party flag," seeing "only fifteen instances, over a period of years," and thus concluding, "[t]hat rarity highlights the City's tight control over the flagpole in question . . . ." *Id.* at *5 (D.53 at 17). The court also found evidence of control from the Commissioner's supposed "screening all proposed flags for 'consisten[cy] with the City's message, policies, and practices.'" *Id.* at *6 (D.53 at 21) (modification in original). These findings and conclusions by the First Circuit, however, are now all disproved by the record.

Discovery reveals no record of any denial of a flag raising application among the 284 approved flag raisings prior to the denial of Camp Constitution's, and Rooney expressly disclaimed any denial on his watch. (JS ¶¶ 35, 37.) Moreover, Rooney testified that prior to Camp Constitution's application, the City "never really had a lot of discussion . . . related to flag raisings in any way," and "most had been approved in previous years." (JS ¶ 37.) Rooney has never requested review of a flag prior to approving a flag raising application, and prior to Camp Constitution's application had never requested changes to a flag in connection with approval. (JS ¶ 38.) Furthermore, the City does not require any applicant to give possession or ownership of its flag to the City as a condition for approval. (JS ¶ 38.) Approving 284 flag raising applications (with an average of more than three per month in 2016–17) (JS ¶ 25) is the opposite of rare, and approving 284 applications without review of the flags is the opposite of control.

### c. The City Cannot Possibly Contend That It Endorses the Messages of All Flags Flown by Private Organizations Granted Access to the City Hall Flag Poles Forum.

The First Circuit also concluded that the City engages in "symbolic speech" endorsing the messages of the flags it allows on the City Hall Flag Poles. *Shurtleff*, 2019 WL 2635622, at *5 (D.53 at 17–18). Again, however, the record disproves this conclusion. First, it simply cannot be said that the City endorses that which it has never really considered or discussed. As the Commissioner testified, he never reviews flags prior to approval, and his department "never really had a lot of discussion prior to [Camp Constitution's] request related to flag raisings in any way." (JS ¶¶ 37, 38.) To be sure, Rooney has no knowledge of any person's believing Boston has endorsed any organization or subject matter as a result of approving a flag raising event (JS ¶ 40), nor has the City produced any such evidence.

Moreover, the City cannot seriously contend (nor has it) that the political views, violent suppression of dissent, religious intolerance, and systematic human rights abuses well known in China, Cuba, and Turkey are "consistent with the City's message." (JS ¶ 36.) Thus, no "symbolic speech" endorsing these regimes reasonably can be inferred from the City's mere decision to approve Chinese, Cuban, and Turkish flag raisings among the 284 approvals on record. (JS ¶ 25.) Furthermore, the City cannot contend (nor has it) that Boston endorses the religion of Islam when it allows a Turkish flag on the City Hall Flag Poles (as it has done at least thirteen times), displaying the overtly and readily identifiable Islamic star and crescent of the Ottoman Empire (JS ¶ 30), just as it did not endorse the Catholic Church when it allowed the Vatican flag to be raised on a City-owned flag pole (JS ¶ 57). Thus, approving Camp Constitution's Christian flag as flag number 285 could not reasonably have been viewed as Boston's endorsement of Christianity.

3. **That Some Government-Owned Flag Poles Traditionally or Historically May Have Been Used to Convey Government Messages Does Not Alter the City's Explicit Policy and Practice Designating the City Hall Flag Poles a Public Forum.**

a. **As a Matter of Law Speech Does Not Become Government Speech Merely Because the Government Opens a Forum for Such Expression.**

"[W]hile the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse. **If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints**." *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017) (emphasis added); *see also Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 34-35 (2d Cir. 2018) (same). Thus, the government cannot, merely by reserving to itself permit rights, convert to government speech the private speech it allows in its fora designated for public use, even if a designated forum traditionally or historically was used for government speech. *Cf. Shurtleff*, 2019 WL 2635622, at *4–5 (D.53 at 13–15).

Countless courts across the country have recognized the error of categorizing the private speech of private organizations in a designated public forum as government speech merely because the government grants a permit. "**[S]peech that is otherwise private does not become speech of the government merely because the government provides a forum for the speech or in some ways allows or facilitates it**." *Wandering Dago*, 879 F.3d at 34 (emphasis added); *see also Freedom From Religion Found. v. Weber*, 628 F. App'x 952, 955 (9th Cir. 2015) (Smith, J., concurring) ("the allowance of private speech on public property does not necessarily turn the private speech into government speech"); *id.* (issuing special use permit to display religious cross on government land does not turn private religious expression into government speech); *Robb v.*

*Hungerbeeier*, 370 F.3d 735, 744 (8th Cir. 2004) (adopt-a-highway signs containing nothing more than the applicant/adopter's name – though created and placed by the government – does not represent government speech); *Arkansas Soc. of Freethinkers v. Daniels*, No. 4:09cv00925SWW, 2009 WL 4884150, *3 (E.D. Ark. Dec. 16, 2009) ("temporary display that is owned, possessed, maintained, and installed by a private group" is private speech and permit policy where government grants approval does not transform that into government speech).

> **b.** **Countenancing the City's Government Speech Argument Would Turn Decades of First Amendment Precedent on Its Head and Permit Post Hoc Justifications for Viewpoint Discrimination.**

Moreover, the Supreme Court has a long history of rejecting the notion that government approval of a permit application necessarily transforms all expression at the private event into government speech. Indeed, acceptance of this contention would radically transform the Supreme Court's forum doctrine in a way heretofore unrecognizable in First Amendment law. Put simply: the government's mere grant of a permit and access to an otherwise available public forum does not make the speech in that forum government speech. *See, e.g.*, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) (religious speech of a private organization was still private speech despite requiring approval of the government to access a public forum at a public school); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (speech of private student organization in a public forum not government speech despite requiring grant of funds from government fees and access to university-created forum for private expression); *Lamb's Chael v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) (speech of a private organization accessing a forum at public school was not government speech merely because government must grant access to the forum); *Capital Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) (speech of private organizations obtaining a permit to speak on public grounds not government speech just because

government permitted the group to access the forum it created). Approval of this radical transformation of the forum doctrine would drastically alter the jurisprudence on this issue and give government a powerful weapon to suppress disfavored viewpoints by merely superimposing a permit requirement on protected speech. The First Amendment knows no such theory.

4. ***Pleasant Grove*** **and** ***Walker*** **Are Inapposite to the City Hall Flag Poles Because the City Only Permits Access on a Temporary Basis and Does Not Exercise Any Control over the Content or Message of the Private Flags.**

In making its government-speech arguments throughout these proceedings, the City has argued that *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) and *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015) compel a finding that the First Amendment is inapplicable here. The law and now undisputed facts say differently, however. Indeed, neither *Pleasant Grove* nor *Walker* compels a finding that the private speech of private organizations in a designated public forum somehow undergoes a metamorphosis into government speech at the City Hall Flag Poles.

a. ***Pleasant Grove*** **and** ***Rochelle*** **Are Inapposite to the City Hall Flag Poles Forum Because the Private Speech of Private Organizations via Raising Flags Is Only Temporary – Not Permanent.**

In *Pleasant Grove*, the question was whether "the First Amendment entitled a private group to insist that a municipality permit it to place **a permanent monument** in a city park." 555 U.S. at 464 (emphasis added). The Court rejected such a First Amendment claim because it said that "the placement of a **permanent monument** in a public park is best viewed as a form of government speech." *Id.* (emphasis added). This was so because "[i]t is certainly not common for property owners to open up their property for the installation of **permanent monuments** that convey a message with which they do not wish to be associated." *Id.* at 471 (emphasis added). The **permanent** nature of the proposed monuments was critical to its rejection of the plaintiffs'

argument that the City had created a forum for private expression by accepting a limited number of other monuments. *Id.* at 478–79.

In *Pleasant Grove*, the plaintiffs' contention was that permanent monuments were akin to the delivery of speeches or a march or parade. *Id.* at 473. The Supreme Court rejected this argument because while "a park can accommodate many speakers and, over time, many parades and demonstrations," it "can accommodate only a limited number of **permanent monuments**." *Id.* at 478–79. Indeed,

> [s]peakers, no matter how long-winded, eventually come to the end of their remarks; persons distributing leaflets and carrying signs at some point tire and go home; monuments, however, endure. They monopolize the use of the land on which they stand and interfere **permanently** with other uses of public space. A public park, over the years, can provide a soapbox for a very large number of orators—often, for all who want to speak—but it is hard to imagine how a public park could be opened up for the installation of **permanent monuments** by every person or group wishing to engage in that form of expression.

*Id.* at 479 (emphasis added).

The importance of the **permanent** nature of the monuments at issue in *Pleasant Grove* was again highlighted in *Walker*. There, the Court stated "in *Summum*, we emphasized that monuments were "**permanent**," and we observed that public parks can accommodate only a limited number of **permanent monuments**." *Walker*, 135 S. Ct. at 2249. Indeed, "[w]e believed that the speech at issue was government speech" because "we found it hard to imagine how a public park could be opened up for the installation of **permanent monuments** by every person or group." *Id.* (emphasis added).

*United Veterans Memorial & Patriotic Ass'n of the City of New Rochelle v. City of New Rochelle*, 615 F. App'x 693 (2d Cir. 2015) is similarly inapposite. There, the flags at issue were more akin to permanent monuments because "United Veterans' flags are displayed for **long**

periods of time (**until they become tattered**) and then promptly replaced [such that] **their presence at the Armory is nearly as constant as that of the park monuments in *Summum*.**" *United Veterans Memorial & Partiotic Ass'n of the City of Rochelle v. City of New Rochelle*, 72 F. Supp. 3d 468, 475 (S.D.N.Y. 2014). Thus, as was true in *Summum*, it was their permanence that made the flags government speech, not merely the placement on government property.

Here, however, there is no such permanence. Indeed, as the undisputed material facts demonstrate, the City generally raises three flags on City Hall Flag Poles: the United States of America flag, the National League of Families POW/MIA flag and the Commonwealth of Massachusetts flag on another pole, and the City of Boston flag on the third pole. (JS ¶ 22.) However, when the City allows private organizations to host private events on City Hall Plaza, it has permitted those organizations to raise a different flag "in place of the City of Boston flag." (JS ¶ 23.) In his sworn testimony, the Commissioner noted that such "**substitute** flags" are raised after a request from the private organization and are raised in connection with a private event hosted by the permitted organization. (JS ¶ 23 (emphasis added).) The very nature of the "substitute" flag raised only in connection with a one-time, City-permitted, private event necessarily implies that the private flags of private organizations in the designated flag pole forum are just that— **temporary**. Thus, *Pleasant Grove*'s concern that the public forum doctrine cannot be applicable to permanent displays is not present with temporary raising of private flags.

> **b.    The Government Ownership and Control in *Pleasant Grove* and *Walker* Are Not Present in the City Hall Flag Poles Forum.**

In *Pleasant Grove*, the government "took ownership of the monument," "[a]ll rights previously possessed by the monument's donor [were] relinquished," and the government maintained the permanent monuments placed in the park. 555 U.S. at 473.

In *Walker*, the government also exercised all aspects of ownership over the specialty license plates. *Walker*, 135 S. Ct. at 2244. The state prepared the designs of the specialty plates, *id.*, owned the designs that were on all specialty plates, *id.* at 2248, and was responsible for making and disseminating the plates. *Id.* In addition, the government dictated the manner in which its drivers must dispose of the plates, which required that the specialty plates **be returned to the state**. *Id.* Moreover, Texas law required all drivers to obtain and display a license plate on their vehicle, which the Court noted was "primarily used as a form of government ID," bearing the state's name. *Id.* at 2251.

Here, the flags flown by private organizations at private events permitted at City Hall bear no such resemblance. The City does not require that a private organization requesting to raise a flag surrender ownership and control of that flag to the City; the City does not require that the organization relinquish all previous rights to the flag; the City is not responsible for designing or preparing the flag; and the City does not require that any flag bear the government's name and imprimatur. (JS ¶ 39.) As such, the elements of "effective control" in *Pleasant Grove* and *Walker* are absent from the designated public forum at the City Hall Flag Poles.

It should also be noted that the Supreme Court has said that *Walker* "**marks the outer bounds of the government speech doctrine**." *Matal*, 137 S. Ct. at 1760 (emphasis added). But, despite that admonition from the High Court, the First Circuit attached importance to Camp Constitution's identifying "only fifteen instances" of flag-raisings at the City Hall Flag Poles, and commenting that such "rarity highlights the City's tight control over the flagpole." *Shurtleff*, 2019 WL 2635622, at *5 (D.53 at 17–18). Upon development of the undisputed record, however, the City's "tight control" proved to be an illusion. First, the City does not "rarely" grant access to City Hall Flag Poles, but rather had permitted 284 private flag raisings before Camp Constitution's

18

application with no record of a denial. (JS ¶¶ 25, 35.) The City's approval of flag raisings is common and customary; the only "rarity" is a denial.

Moreover, the City no longer can contend that it exercises substantial control over the flag raising forum through the Commissioner's ostensible "review" for consistency with "the City's message, policies, and practices" (JS ¶ 36) because the Commissioner's sworn testimony demonstrates that his perfunctory "review" **does not include his even looking at a proposed flag, which he has never requested as a condition to approval**. (JS ¶ 38.) The First Circuit's discussion of control was based on an incomplete record, which now has been replaced by undisputed facts illuminating an entirely different scheme. Prior to Camp Constitution's application, the City did not exercise any meaningful control over the content of the private flags raised on the City Hall Flag Poles.

> **c.    The Reasonable Observer Familiar with All the Facts of the City's Policy and Practice Concerning the City Hall Flag Poles Would Not Perceive the Government to Be Speaking Through Any Temporary Substitute Flag Raised on the Flag Poles.**

Finally, the First Circuit said it has "little doubt" that an observer would attribute to the City the flags flown by private organizations over temporary private events at the City Hall Flag Poles. *Shurtleff*, 2019 WL 2635622, at *5 (D.53 at 15–16). Like many of the court's conclusions, this notion was based on an incomplete record that, now developed, removes all support. Indeed, as the Commissioner's sworn testimony demonstrates, neither the City nor the Commissioner has any knowledge of anyone's ever believing the City has endorsed or adopted the message of a private organization that was allowed access to the flag raising forum. (JS ¶ 39.) If the government itself has no knowledge of an observer's attributing the speech of private flag raiser to the City, then there is more than a little doubt that such an attribution is plausible.

Moreover, as many courts have noted, whether expression is likely to be viewed as government speech must be determined from the "perception of an informed and objectively reasonable observer." *Wells v. City and Cnty. of Denver*, 257 F.3d 1132, 1142 (10th Cir. 2001); *see also Pleasant Grove*, 555 U.S. at 487 (noting that the government speech observer inquiry should consider "whether a reasonable and fully informed observer would understand the expression to be government speech"); *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 338 n. 16 (1st Cir. 2009) (Torruella, J., concurring in part, dissenting in part) (noting that the government speech observer should be deemed a fully informed and objectively reasonable observer); *Eagle Point Educ. Ass'n/SOBC/OEA v. Jackson Cnty. Sch. Dist. No. 9*, 880 F.3d 1097, 1103 (9th Cir. 2018) (noting that in *Pleasant Grove*, "the focus was on whether a reasonable observer would view the statement made by the monument to be a statement by the government"); *A.N.S.W.E.R. Coalition v. Jewell*, 153 F. Supp. 3d 395, 413 (D.D.C. 2016) (same); *United Veterans Memorial v. City of New Rochelle*, 72 F. Supp. 3d 468, 474(S.D.N.Y. 2014) (noting that *Pleasant Grove* "placed considerable emphasis on whether, based on all the circumstances, a reasonable observer would have concluded that the government was the speaker").

Here, a reasonable and informed observer unquestionably would be aware: (1) that the City's open invitation policy and practice "seeks to accommodate all applications seeking to take advantage of the City of Boston's public forums" including the City Hall Flag Poles (JS ¶ 14); (2) that the City permits private organizations temporarily to raise their flags associated with their private events as a "substitute" for the government's flag (JS ¶¶ 23–24); (3) that the City has approved at least **284 flag raising events** on the City Hall Flag Poles (JS ¶ 25); (4) that during the year preceding Camp Constitution's application the City approved an average of over three flag raisings per month (JS ¶ 25); (5) that prior to Camp Constitution's application, flag raising denials

were exceedingly rare, and that Rooney **had never denied a flag raising request** (JS ¶ 35); (6) that the City will allow essentially any event to take place on City Hall Plaza (JS ¶ 35); and (7) that the City does not even review the content of the substitute flags it allows private organizations to raise on the City Hall Flag Poles (JS ¶ 38). A half-informed observer even marginally aware of these undisputed facts could not conclude that Boston speaks or intends to speak through the private flags it allows to be raised on the City Hall Flag Poles.

**B.** **Because the City Opened a Public Forum on City Hall Flag Poles, Its Discriminatory Treatment of Camp Constitution's Speech Must Satisfy First Amendment Scrutiny.**

**1.** **The City Discriminated Against Camp Constitution Based on Its Christian Viewpoint, Which Is Unconstitutional in Any Forum.**

Because the City's explicit policies designate the City Hall Flag Poles a "public forum" for private expression (JS ¶ 14; *supra* pt. I.A), the City's restrictions on speech in that forum are subject to the same level of First Amendment scrutiny applicable to traditional public fora. *Pleasant Grove*, 555 U.S. at 479 ("Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum."). Indeed, in a designated public forum, "restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *Cornelius*, 473 U.S. at 800 (same); *Yeo v. Town of Lexington*, 131 F.3d 241, 255 (1st Cir. 1997) (Torruella, J., concurring) ("regulation of speech in these designated public forums is also subject to strict scrutiny").

As *Minnesota Voters Alliance* makes plain, viewpoint-based restrictions are constitutionally prohibited in a designated public forum. 138 S. Ct. at 1885. Indeed, a viewpoint-based restriction on private speech has never been upheld by the Supreme Court or any court. Thus, a finding of viewpoint discrimination is dispositive. *See Sorrell v. IMS Health*, 131 S. Ct.

2653, 2667 (2011). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829. In fact, **viewpoint-based regulations are always unconstitutional**. *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others'") (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)); *see also McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004) (same). In fact, just this term, the High Court confirmed that all viewpoint-based restrictions on speech are unconstitutional, regardless of the forum. *See Iancu v. Brunetti*, No. 18-302, 2019 WL 2570622, at *3 (June 24, 2019) (noting that "all the Justices agreed" that where a restriction on speech "is viewpoint-based, it is unconstitutional").

The City's treatment of Camp Constitution's speech is contrary to long-standing precedent that **religion is itself a viewpoint**, and the exclusion of all religious speech is viewpoint discriminatory. *See, e.g.*, *Good News Club*, 533 U.S. at 112 and n.4 ("**Religion is the viewpoint from which ideas are conveyed**." (emphasis added)); *id.* ("we see no reason to treat the Club's use of religion as something other than a viewpoint merely because of any evangelical message it conveys"); *Rosenberger*, 515 U.S. at 831 ("viewpoint discrimination is the proper way to interpret the University's [policy of excluding religion as a subject matter]"); *Lamb's Chapel*, 508 U.S. at 393–94 (excluding the entire subject matter of religion from a forum represents viewpoint discrimination); *Byrne v. Rutledge*, 623 F.3d 46, 55 (2d Cir. 2010) ("our task here is greatly simplified by a trilogy of Supreme Court decisions each addressing blanket bans on religious

messages and **each concluding that such bans constitute impermissible viewpoint discrimination**" (emphasis added)).

Here, the City's reason for denying Camp Constitution's flag raising event was precisely because the City deemed the flag objectionably religious due to its being called "Christian" (JS ¶¶ 41, 42, 51, 52, 54, 55), even though Camp Constitution's purpose—to commemorate the contributions of one of Boston's diverse communities to the City and the Commonwealth—otherwise fit perfectly with the City's express purposes for allowing flag raisings on the City Hall Flag Poles (JS ¶¶ 7, 27). If religion is itself a viewpoint from which other subjects are discussed, which binding Supreme Court precedent declares, *see Good News Club*, 533 U.S. at 112 and n.4, then the City's denial of Camp Constitution's application was not viewpoint neutral. Rather, it is textbook viewpoint discrimination which is prohibited in any forum.

> ### 2. Because the City Opened a Designated Public Forum on the City Hall Flag Poles, Its Content-Based Restriction on Camp Constitution's Speech Must Satisfy Strict Scrutiny.

Even if the City's denial of Camp Constitution's access to the flag raising forum was not viewpoint discriminatory, the City's restriction of Camp Constitution's speech was content-based and subject to strict constitutional scrutiny. "Content-based laws—those that target speech on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling government interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (same). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both distinctions are drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Reed*, 135 S. Ct. at 2227 (emphasis added). Put simply,

the Supreme Court has handed down a firm rule: **laws that are content based on their face must satisfy strict scrutiny**. *Id.*; *see also id.* at 2233 (Alito, J., concurring) ("As the Court holds, what we have termed 'content-based' laws must satisfy strict scrutiny.").

Importantly, this firm rule mandating strict scrutiny of facially content-based restrictions applies regardless of the government's alleged purpose in enacting the policy. *Id.* at 2227. "On its face, the [policy] is a content-based regulation of speech. We thus have no need to consider the government's justifications or purposes for enacting the [policy] to determine whether it is subject to strict scrutiny." *Id.* In so holding, the Court rejected the lower court's rationale that the alleged purpose behind enacting the content-based policy can justify subjecting it to diminished constitutional protection. *Id.* "But this analysis skips the crucial first step . . . determining whether the law is content neutral on its face." *Id.* at 2228. The answer to that question, the *Reed* Court said, is dispositive of the level of scrutiny applicable to the regulation of speech. *Id.* "**A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech**." *Id.* (emphasis added). "[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.*

The City's denial of Camp Constitution's application for access to the City's designated flag raising forum was content-based as a matter of undisputed fact. The City's sole reason for denying Camp Constitution's flag raising was because the City deemed the message of Camp Constitution's flag to be religious. (JS ¶¶ 41, 42, 51, 52, 54, 55.) As the Supreme Court has said, "[r]egulation of the subject matter of messages, though not as obnoxious as viewpoint-based regulations, is also an objectionable form of content-based regulation." *Hill v. Colorado*, 5330 U.S. 703, 721 (2000). Even if Camp Constitution's request was not denied based on the Christian

viewpoint of its flag raising event (which it was; *see supra* pt. I.B.1), it undoubtedly was denied based on the religious "subject matter" of its flag, which is a content-based restriction on speech subject to strict constitutional scrutiny.

### 3. The City's Denial of Camp Constitution's Flag Cannot Satisfy Strict Scrutiny.

#### a. The City Bears the Burden of Satisfying Strict Scrutiny.

It is beyond peradventure that the City bears the burden of proving narrow tailoring at trial, because that principle is firmly entrenched and established as a matter of law. *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 2540 ("To meet the requirement of narrow tailoring, **the government must demonstrate** that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier" (emphasis added)); *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) ("Laws that burden political speech are accordingly subject to strict scrutiny, **which requires the Government to prove** that the restriction furthers a compelling state interest and is narrowly tailored to achieve that interest" (emphasis added) (citations omitted)).

#### b. The City's Pretextual Establishment Clause Justification Is Not a Compelling Interest as a Matter of Settled Law.

The City pretextual interest in avoiding an Establishment Clause violation by prohibiting equal access to Camp Constitution's religious speech provides no compelling interest as a matter of binding and settled law. Indeed, "[i]t does not violate the Establishment Clause for a public university to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups, including groups that use meeting rooms for **sectarian activities**, accompanied by some

devotional exercises." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 842 (1995) (emphasis added); *see also Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98, 114-15 (2001). The same is true of the designated public flag raising forum at the City Hall Flag Poles that has been opened to a wide spectrum of private organizations expressing private messages associated with their private events.

Moreover, "a significant factor in upholding governmental programs in the face of an Establishment Clause attack is their **neutrality towards religion**." *Rosenberger*, 515 U.S. at 839 (emphasis added). Such a "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, **including religious ones**, are broad and diverse." *Id.* (emphasis added). The Establishment Clause simply provides no justification for suppressing the religious content of Camp Constitution's speech in a forum that is available to similarly situated private speakers and organizations expressing content from non-religious perspectives. *See id.* (noting the Supreme Court has "rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching governmental programs neutral in design"). As has been well-documented throughout, City Hall Flag Poles are available to a broad range of speakers on "non-religious" topics, as at least 284 different applications have been approved and, until Camp Constitution's, there is no record of a denial. (JS ¶¶ 25, 35.) As such, the City's pretextual interest in avoiding an Establishment Clause violation by granting equal access to Camp Constitution on a neutral basis is not compelling. In fact, the City's policies and practices **violate** the Establishment Clause (*see infra* pt. III), and thus cannot serve any legitimate interest whatsoever, much less a compelling one.

### c. The City's Policies and Practices Are Not the Least Restrictive Means.

Even if the City could articulate a compelling interest for excluding religious speech, which it cannot, the flag-pole forum policy and the City's actions would still fail strict scrutiny because they are not narrowly tailored. "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Total prohibitions on constitutionally protected speech are substantially broader than any conceivable government interest could justify. *Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987). Indeed, the City cannot "burn the house to roast the pig." *Sable Commc'ns*, 492 U.S. at 127 (quoting *Butler v. Michigan*, 352 U.S. 380, 383 (1957)).

A narrowly tailored regulation of speech is one that achieves the government's interest "without unnecessarily interfering with First Amendment freedoms." *Id.* at 126. By purportedly prohibiting any "non-secular speech," (JS ¶¶ 51–55), the City's policies and practices completely prohibit and unnecessarily interfere with the speech of religious organizations. They, therefore, are not narrowly tailored. Indeed, a government policy that "totally prohibits [speech] cannot be considered narrowly tailored" because a total prohibition "does not leave open alternative channels of communication." *Loper v. New York City Police Dep't*, 999 F.2d 699, 705 (2d Cir. 1993). Because the City's policies and practices are not narrowly tailored, its treatment of Camp Constitution fails strict scrutiny and represents a gross violation of Camp Constitution's constitutionally protected speech.

**C. Even If the City Hall Flag Poles Are a Limited Public Forum, Which They Are Not, the City's Policies and Practices Are Not Viewpoint Neutral or Reasonable.**

Assuming *arguendo* that a policy explicitly designating the City Hall Flag Poles as among the City's "public forums" (JS ¶ 14), a practice of granting 284 private applications for flag raisings at the City Hall Flag Poles (JS ¶ 25), a practice of approving an average of more than three flag raisings per month in the year preceding Camp Constitution's application (JS ¶ 25), and a practice that, prior to Camp Constitution's application, leaves no record of a denial (JS ¶¶ 35, 37), were somehow insufficient evidence of an intentionally created, designated public forum, the First Amendment is still violated under the alternative limited public forum analysis. The First Amendment still demands that regulations of speech in a limited public forum be reasonable in light of the forum's purposes, and viewpoint neutral. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993). The City's policies and practices are neither.

**1. The City's Policies and Practices Are Not Viewpoint Neutral.**

As shown above (*see supra* pt. I.B.1), the City restricted Camp Constitution's speech based on its Christian viewpoint. This ends the inquiry under the limited public forum analysis. *See Lamb's Chapel*, 508 U.S. at 393 n.6 (holding that it need not inquire as to reasonableness after finding that the restriction was viewpoint based); *Good News Club*, 544 U.S. at 107 ("Because the restriction is viewpoint discriminatory, we need not decide whether it is unreasonably in light of the purposes served by the forum.").

**2. The City's Policies and Practices Are Not Reasonable in Light of the Purposes of the Flag Raising Forum.**

Even if not viewpoint discriminatory (which it was), the City's exclusion of Camp Constitution was also unreasonable given the express purposes of the flag raising forum: to "*commemorate **flags from many** countries **and communities** at Boston City Hall Plaza during the*

*year*," to create an environment in the City where **everyone feels included, and is treated with respect**," and "to **foster diversity** and build and strengthen connections among Boston's **many communities**." (JS ¶ 27 (bold emphasis added).) It cannot be said that the City acted reasonably in excluding Camp Constitution's flag raising commemoration of the contributions of Boston's Christian community, based solely on its flag being called "Christian." (JS ¶¶ 7, 55.) This exclusion ensured Boston's Christian community would not feel included or respected, and it certainly could not foster diversity or build and strengthen connections with Boston's Christian community. Thus, the City's exclusion of Camp Constitution thwarted the purposes of the forum (based solely on Camp Constitution's religious viewpoint) and cannot survive the limited public forum reasonableness inquiry.

II. **CAMP CONSTITUTION IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS CLAIM THAT THE CITY'S POLICY AND PRACTICE OF RESTRICTING RELIGIOUS SPEECH IN ITS CITY HALL FLAG POLES FORUM IS AN UNCONSTITUTIONAL PRIOR RESTRAINT.**

A. **Government Regulations That Vest in Government Officials Unbridled Discretion to Approve or Deny Protected Speech Are Unconstitutional Prior Restraints.**

The City's standard-less policies and practices amount to an unconstitutional prior restraint that vests unbridled discretion in City officials to determine whether speech is "non-secular" and can be denied despite meeting all of the criteria for use of the City's designated public fora. It is axiomatic that prior restraints are highly suspect and disfavored. *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Indeed, "**[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity**." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (emphasis added) (citing cases). "Because a censor's business is to censor, there inheres the danger that he may well be less responsive than a

court . . . to the constitutionally protected interests in free expression." *Freedman v. Maryland*,

380 U.S. 51, 57-58 (1965).

> It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so. . . . **[A] law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition**.

*Watchtower Bible & Tract Soc'y of N.Y. v. Vill. of Stratton*, 536 U.S. 150, 165–66 (2002) (emphasis

added).

"[I]n the area of free expression a licensing statute placing unbridled discretion in the hands

of a government official or agency constitutes a prior restraint." *City of Lakewood v. Plain Dealer*

*Publ'g Co.*, 486 U.S. 750, 757 (1988); *Hightower v. City of Boston*, 693 F.3d 61, 80 (1st Cir. 2012)

(same).

> [A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority. The reasoning is simple: If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted.

*Forsyth Cnty.*, 505 U.S. at 131 (internal quotation marks and citations omitted).

> It is settled by a long line of recent decisions of this Court that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) (alteration in original) (internal quotation

marks and citations omitted).

**B.  The City's Recently Memorialized Flag Raising Policies and Practices Vest Unbridled Discretion in the Hands of Government Officials.**

Prior to October 2018, the City had no written policies specifically applicable to flag raising events at the City Hall Flag Poles public forum. (JS ¶¶ 52, 62, 63.) Then the City memorialized in a written policy what it had practiced always, which is to grant unbridled discretion to the Commissioner to approve or deny flag raising requests regardless of compliance with stated criteria. (JS ¶¶ 62–65.) This policy and practice of the City, whether written or unwritten, represents the zenith of danger to First Amendment freedoms. The unwritten anti-religion policy and practice applied to Camp Constitution (JS ¶¶ 52, 53), however, never could have provided the requisite standards to appropriately cabin the discretion of government officials. *See, e.g.*, *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951) (holding that unwritten custom concerning permits for speech in a public park is an unconstitutional prior restraints because it fails to adequately cabin the discretion of the decisionmaker); *Southeastern Promotions, Ltd. v. City of West Palm Beach*, 457 F.2d 1016, 1022 (5th Cir. 1972) (holding that a government's unwritten policy concerning use of a public forum is "constitutionally intolerable" prior restraint because such an unwritten policy "regulates by means of the unabashed dictates of a government subaltern" and thus cannot have the requisite standards to survive constitutional scrutiny); *Ritchie v. Coldwater Cmty. Schs.*, 947 F. Supp. 2d 791, 813 n.9 (W.D. Mich. 2013) ("unwritten policies and practices lacking objective standards are particularly susceptible to judicial scrutiny because they afford the decisionmaker with limitless discretion"); *Batt v. City of Oakland*, No. C 02-04975-MHP, 2006 WL 299256871, *4 (N.D. Cal. Oct. 12, 2006) (noting that is "has long been recognized that unwritten policies . . . operate as unconstitutional prior restraints"); *Dansby v. Borough of Paulsboro*, No. 92-4558(JEI), 1995 WL 352995, *10 (D.N.J. June 7, 1995) ("The Supreme Court

has repeatedly held that unwritten policies requiring a potential speaker to procure a permit from a public official before engaging in speech in a public place are unconstitutional prior restraints.").

The City's denial of Camp Constitution's request to raise a flag is a perfect example of why unwritten, standard-less policies present a danger to First Amendment freedoms. The purported anti-religion policy and practice the Commissioner used to deny Camp Constitution's application was not listed in written guidelines provided to applicants seeking to use the City's public fora (JS ¶¶ 11–14, 52), nor was the anti-religion rationale for denial recorded in any record prior to Camp Constitution's demanding a reason for the denial. (JS ¶¶ 47–50.) Only after receiving word that the request had been denied, and then requesting a reason, was Camp Constitution advised by Rooney that the anti-religion policy and practice existed and had been used to deny Camp Constitution's application. (JS ¶¶ 51–53.) Even the October 2018 written memorialization of the City's flag raising policy and practice did not cure their unconstitutionality, however, for the written policy memorialized the very unbridled discretion rendering the flag raising policy and practice unconstitutional. (JS ¶¶ 62–65.)

## III. CAMP CONSTITUTION IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS ESTABLISHMENT CLAUSE CLAIM BECAUSE OF THE CITY'S HOSTILE AND DISCRIMINATORY TREATMENT OF CAMP CONSTITUTION'S RELIGIOUS SPEECH.

### A. The City's Granting of Equal Access to Camp Constitution's Religious Speech Must Be Viewed Through the Lens of the Reasonable Observer.

The standard by which this Court must examine any purported endorsement of religion is the "reasonable observer," and "requires the hypothetical construct of an objective observer who knows **all of the pertinent facts and circumstances** surrounding the symbol and its placement." *Salazar v. Buono*, 559 U.S. 700, 721 (2010) (emphasis added); *see also Capital Square Rev. & Advisory Bd. v. Pinnette*, 515 U.S. 753, 780 (1995) (O'Conner, J., concurring) ("The reasonable

observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears."); *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 866 (2005) (holding that the reasonable observer is not "**an absentminded objective observer**," but "one presumed to be familiar with the history of the government's actions and competent to learn what history has to show" (emphasis added)). Indeed, the endorsement test "does not turn on the *subjective* feelings of plaintiffs as to whether a religious endorsement has occurred," but instead "assumes the viewpoint of an objective observer . . . fully aware of the relevant circumstances." *Freedom from Religion Found. v. Hanover Sh. Dist.*, 626 F.3d 1, 10-11 (1st Cir. 2010) (italics original). Under that standard, any notion that the City endorses the messages of all flags granted access to the City Hall Flag Pole forum is eviscerated.

**B.    The Reasonable Observer Does Not View Equal Treatment of Religious and Non-Religious Speech in a Public Forum as an Endorsement of Religions as a Matter of Law.**

When viewed through the constitutionally mandated lens of the reasonable, objective observer, it simply "does not violate the Establishment Clause for [the City] to grant access to its facilities on a religion-neutral basis to a wide spectrum of private speakers." *Rosenberger*, 515 U.S. at 842. Indeed, "**no reasonable observer would think a neutral program . . . carries with it the imprimatur of government endorsement**." *Zellman v. Simmons-Harris*, 536 U.S. 636, 655 (2002) (emphasis added). *See also Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 252 (1990) (holding that the government "does not convey a message of state approval or endorsement of the particular religion" when it permits a religious group equal access to a forum); *id.* at 248 (granting equal access "does not confer any imprimatur of state approval on religious sects or practices. The message [of equal access] is **one of neutrality rather than endorsement** (emphasis added)); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 118 (2001) (holding that granting equal access to religious speech in a public forum poses no danger that the public "would

33

misperceive the endorsement of religion"); *Americans United for Separate of Church & State v. City of Grand Rapids*, 980 F.2d 1538, 1548 (6th Cir. 1992) (en banc) (holding that the government's grant of access to a religious group to temporarily display the Jewish symbol of a menorah at city plaza, under its equal access policy, does not convey an endorsement of religion); *id.* ("an equal access policy weighs **very heavily** in determining whether an endorsement of religion has occurred"); *Doe v. Small*, 964 F.2d 611, 619 (7th Cir. 1992) (en banc) ("the mere presence of religious symbols in a public forum does not violate the Establishment Clause since the government is not presumed to endorse every speaker that it fails to censor").

As the en banc Sixth Circuit said, "[a] reasonable observer who does not find endorsement in religious groups' use of school facilities would not find it in Chabad House's [temporary] use of Calder Plaza." *City of Grand Rapids*, 980 F.2d at 1548. Indeed, "[t]hose who worry about religious influence over their fellow citizens would be much less concerned about private religious activity in the Plaza than in the schools, **since they know that all sorts of groups speak in the Plaza**." *Id.* (emphasis added). The notion that permitting Camp Constitution equal access to the City's City Hall Flag Poles forum would somehow violate the Establishment Clause is plainly erroneous as a matter of settled law

### C. The City's Policy and Actions Impermissibly Demonstrate Hostility Towards Camp Constitution's Religious Speech.

The City's hostile and discriminatory exclusion of Camp Constitution's religious speech violates the Establishment Clause. "The touchstone for our analysis is the principle that 'the First Amendment mandates governmental neutrality between religion and religion, and between religion and non-religion.'" *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). Indeed, "[t]he fullest realization of true religious liberty requires that government neither engage in no compel religious practices, that it effect no

favoritism among sects or between religion or nonreligion, and that it work deterrence of no religious belief." *Sch. Dist. of Abington, Tp. v. Schempp*, 374 U.S. 203, 305 (Goldberg, J., concurring); *see also Van Orden v. Perry*, 545 U.S. 677, 690 (Breyer, J., concurring) (same). As the record demonstrates, the City has impermissibly discriminated between religion and non-religion, and also between religion and religion.

1. **The City's Discriminatory Treatment of Camp Constitution's Speech Impermissibly Discriminates Between Religion and Non-Religion.**

The undisputed material facts in this matter demonstrate beyond cavil that the City's denial of Camp Constitution's request for access to the City Hall Flag Poles Forum was based solely on hostility to Camp Constitution's religious viewpoint. Indeed, the City's reason for denying Camp Constitution's request to fly a Christian flag on the City Hall Flag Poles forum was precisely because it was deemed religious. Here, the City's reason for denying Camp Constitution's flag raising event was precisely because the City deemed the flag objectionably religious due to its being called "Christian" (JS ¶¶ 41, 42, 51, 52, 54, 55.) There can be no dispute that the City's treatment of Camp Constitution's religious speech discriminated between religious flags and non-religious flags.

2. **The City's Discriminatory Treatment of Camp Constitution's Speech Impermissibly Discriminates Between Religion and Religion.**

As the undisputed facts in this matter also show, the City has treated Camp Constitution's religious speech and flag differently than other flags containing religious imagery. (JS ¶ 28 (noting that the City has raised flags on City Hall Flag Poles that contain religious language and symbols).) The City of Boston flag, which is typically flown on City Hall Flag Poles when a substitute is not raised, contains the words "SICUT PATRIBUS, SIT DEUS NOBIS," which means "God be with us as He was with our fathers." (JS ¶ 29.) **At least thirteen times** between 2005 and 2019, the City

has permitted the Turkish flag to be raised on City Hall Flag Poles, and it contains the readily identifiable Islamic star and crescent adopted by the Ottoman Empire. (JS ¶ 30.) **At least three times** between 2016 and 2018, the City permitted the Bunker Hill Association to raise the Bunker Hill Flag on City Hall Flag Poles, and it is virtually identical to Camp Constitution's flag although with a slightly different color scheme. (JS ¶ 31.) The City has permitted the Portuguese flag to be raised on City Hall Flag poles, and it likewise contains religious imagery depicting "the five wounds of Christ when crucified" and the thirty pieces of silver "Judas received for having betrayed Christ." (JS ¶ 34.) Finally, and perhaps most notably, the City has permitted the Vatican Flag to be raised on a City-owned flagpole, which the Commissioner reconized is the exclusive flag of the Catholic Church. (JS ¶ 57.)

Yet, despite all of these many flag raisings containing religious symbols and imagery, and the City's allowing the official flag of the Catholic Church, Camp Constitution's proposed flag raising was denied because it was "religious." (JS ¶¶ 41–54.) There can be no dispute that the City's denial impermissibly discriminated between religion and non-religion, and discriminated between religious sects. Both violate the Establishment Clause.

**IV. CAMP CONSTITUTION IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS EQUAL PROTECTION CLAIM BECAUSE OF THE CITY'S CONTENT-BASED DISCRIMINATION AGAINST CAMP CONSTITUTION'S RELIGIOUS SPEECH.**

**A. The Undisputed Material Facts in This Matter Demonstrate That the City Impermissibly Discriminated Between Similarly Situated Organizations on the Basis of Religion.**

The Equal Protection Clause of the Fourteenth Amendment makes it unconstitutional for any state to "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. "The concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the government action

questioned or challenged." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). To establish an equal protection claim, a plaintiff needs to allege facts showing that "the person, compared with other similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible consideration such as . . . religion." *Davis v. Coakley*, 802 F.3d 128, 133 (1st Cir. 2015).

Here, the undisputed facts show that Camp Constitution was treated differently than similarly situated groups and that it was based on its religion. (JS ¶¶ 41, 42, 51, 52, 54, 55.) There can be no dispute that the City's treatment of Camp Constitution's religious speech discriminated between religious flags and non-religious flags, despite the fact that—other than the religious speech and identity of Camp Constitution—all groups were similarly situated.

### B.     Content-Based Restrictions on Speech Are an Equal Protection Violation.

"Content-based restrictions on speech also have been held to raise Fourteenth Amendment equal protection concerns because, in the courtse of regulating speech, such restrictions differentiate between types of speech." *Burson v. Freeman*, 504 U.S. 191, 197 n.3 (1992); *see also Erzoznik v. City of Jacksonville*, 422 U.S. 205,215 (1975) (under both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, the government "cannot discriminate on the basis of content"); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); *McGuire v. Reilly*, 260 F.3d 36, 50 (1st Cir. 2001) (content discrimination also raises equal protection concerns).

### C.     The City's Content-Based Restriction on Camp Constitution's Speech Cannot Survive Strict Scrutiny.

Even in the equal protection context, the City's content-based discrimination against Camp Constitution's fundamental right to free speech demands strict scrutiny. *See, e.g.*, *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976) (strict scrutiny required if government policy if it

"impermissibly infringes with the exercise of a fundamental right"); *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 9 n.6 (1st Cir. 2013) ("Classifications that impinge on fundamental rights, including free speech rights, are subject to strict scrutiny."). As demonstrated *supra* Section #, the City has not and cannot satisfy that demanding burden.

## CONCLUSION

Because there are no material facts in dispute and Camp Constitution is entitled to judgment as a matter of law, Camp Constitution's motion for summary judgment should be granted.

Respectfully submitted,

Ryan P. McLane (Mass. 697464)
MCLANE & MCLANE
975A Springfield Street
PO Box 105
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com

/s/ Horatio G. Mihet
Mathew D. Staver (Fla. 701092)[†]
Horatio G. Mihet (Fla. 26581)[†]
Roger K. Gannam (Fla. 240450)[†]
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854-0774
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org
*Attorneys for Plaintiffs*
[†]Admitted to appear *pro hac vice*.

## CERTIFICATE OF SERVICE

I hereby certify that on this July 8, 2019 I caused the foregoing to be electronically filed through the Court's ECF system. Service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.

/s/ Horatio G. Mihet
*Attorney for Plaintiffs*