## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

HAROLD SHURTLEFF , and CAMP
CONSTITUTION, a public charitable trust,

    Plaintiffs

v.

CITY OF BOSTON, and GREGORY T.
ROONEY, in his official capacity as
Commissioner of the City of Boston Property
Management Department

    Defendants.

</td><td>

**CIVIL ACTION NO. 18-CV-11417-DJC**

</td></tr>
</table>

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants, CITY OF BOSTON ("City") and GREGORY T. ROONEY ("Rooney"), in his

official capacity as Commissioner of the City of Boston Property Management Department

("PMD"), pursuant to Rule 56, Fed. R. Civ. P. and Local Rule 7.1, submit this memorandum in

opposition to Plaintiffs' Motion for Summary Judgment.

Robert S. Arcangeli
Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4044
robert.arcangeli@boston.gov

**ARGUMENT**

I. **THE PLAINTIFFS' FOCUS ON PERMANENCY AND OWNERSHIP OF THE FLAGS RAISED BY THE CITY IS MISPLACED GIVEN THE HOLDINGS IN SUMMUM AND WALKER.**

 A. <u>**The Court In Summum Did Not Hold That The Permanency Of the Monuments Was the Determining Factor In Finding the Existence Of Government Speech.**</u>

In <u>Pleasant Grove City, Utah</u> v. <u>Summum</u>, the Court's analysis addressed the issue of permanent monuments placed in public parks that had traditionally served as public forums for the free exchange of ideas and exercise of free expression. 555 U.S. 460, 478-79. The Court held that if forum analysis were applied to the selection of permanent monuments situated in public parks and the town was forced to maintain viewpoint neutrality in selecting monuments, it would result in cluttered parks or the removal of long-standing monuments, focusing on the space that such permanent monuments would occupy within the park. <u>Id.</u> Here the Plaintiffs point to the "critical" nature of the permanence of the monuments in <u>Summum</u> as the basis for the Court's decision. <u>See</u> Plaintiff's Memorandum ("PMemo") at p. 15-16. But Plaintiffs' fail to mention that the permanence of the monuments were important precisely because of their location within a public park whose principal function is to provide the public a space in which to exchange ideas and engage in First Amendment activities. As stated by the First Circuit, Plaintiffs' "argument takes <u>Summum</u>'s discussion of permanence out of context" where it was "important that the monuments were permanent because public parks could accommodate only a limited number or permanent monuments." <u>See</u> <u>Shurtleff et al</u> v. <u>City of Boston et al</u>, 2019 WL 2635622 at 19 citing <u>Summum</u>, 555 U.S. at 478.

The Plaintiffs attempt to further buttress the argument emphasizing the importance of permanence to the determination of a finding of the existence of government speech by

referencing the Walker Court's reference to permanence in Summum as a determining factor in the Court's decision. See PMemo p. 16. In fact, the Court in Walker "actually clarified that permanence is not a necessary element of its government speech framework." Shurtleff 2019 WL 2635622 at 19; See Walker v. Texas Division, Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2248(2015) (Finding that not every element, including permanence, was present in their discussion holding that personalized Texas License Plates were a form of government speech.). The Plaintiffs' argument that the absence of permanence with regards to the flags flown on a city-owner flagpole precludes a finding of government speech is unavailing given the holdings by the Summum and Walker Courts, where the importance of permanence related directly to the government owned property's classification as a public park.

The Plaintiffs' argument regarding the importance of the permanence of an object to a finding of government speech becomes even less availing in light of the Second Circuit's decision in United Veterans Mem'l & Patriotic Ass'n of the New Rochelle v. New Rochelle, 72 F. Supp. 3d 468, 474, 478 (S.D.N.Y. 2014) , aff'd, 615 F. App'x 693 (2d Cir. 2015).  In New Rochelle, the city ceded control over the flagpole at a city-owned armory to a private organization for a period of approximately seventeen years, allowing that organization to purchase flags, replace flags and paint the flagpole among other things. 72 F. Supp 3d at 471. Even in such a case, where the city had ceded control over a city-owned flagpole for a period of time well over a decade, the Court granted the city's motion to dismiss the plaintiff's claim that the city violated its First Amendment rights by removing its flag from city armory flagpole where reasonable observers would assume the flag, located on a flagpole on city property used for park and recreation purposes, was conveying a message on the city's behalf.

In the instant case, the purpose of a city-owned flagpole differs a great deal from the purpose of a public park that has been held in trust since time immemorial for the free exchange of ideas. The city-owned flagpole in question here is meant to host the City flag (SOF ¶22), or at certain times, following approval of a flag-raising event by the Commissioner of the Property Management Department ("PMD") (SOF ¶36), commemorate flags from the many countries and communities among Boston's many neighborhoods. (SOF ¶27). Permanence does not take on the same importance here where the purpose of the government property in question differs such a great deal from the property involved in <u>Summum</u>.

### B. <u>The City Does Not Need To Take Ownership And Control Over The Flags Raised On A City-Owned Flagpole To Maintain Control Over The Messages Conveyed Over Said Flagpole.</u>

The First Circuit has rejected the proposition that a finding of government speech requires "the government to take control over previously private expression, control every aspect of its design and maintenance, and require relinquishment of ownership rights" as a misreading of <u>Summum</u> and <u>Walker</u>. <u>See</u> <u>Shurtleff</u>, 2019 WL 2635622 at 16; <u>see also</u> <u>Sutliffe</u> v. <u>Epping Sch. Dist.</u>, 584 3d 314, 331 (1st Cir. 2009) (finding government speech on a town webpage where the town controlled the content of its message by exercising final approval authority over the selection of the hyperlinks on the website); <u>cf.</u> <u>Ridley</u> v. <u>Mass. Bay Trans. Auth.</u>, 390 F. 3d 65, 82 (1st Cir. 2004) (holding that public forum did not exist where MBTA policy evidenced clear intent to maintain control over forum)(internal quotations omitted).

In the present case, the record is clear that the City has evidenced intent to maintain control over its flagpole and has exercised final approval authority over the flags raised in place of the City flag on a city-owned flagpole. (SOF ¶36). An organization must submit an application to hold a Flag-Raising event at the City Hall Flag Poles before being able to raise a flag. (SOF ¶ ¶11-16). This application must be reviewed by staff at the PMD to ensure that the

application complies with all posted guidelines. Id. Specific to flag-raising requests, the application must then be reviewed by the Commissioner of the PMD to ensure the request is "consistent with the City's message, policies and practices. (SOF ¶36). By maintaining such control over the space, it is not necessary for the City to take ownership and control over all aspects of third-party flags raised on city-owned flagpoles as suggested by Plaintiffs in order to engage in government speech.

Moreover, Plaintiffs attempt to point to the fact that the City has held 284 flag-raising ceremonies over a twelve year period as evidence that the City has failed to maintain control of its flagpole, in turn designating a public forum in its place. See PMemo p. 10. When viewed in context though, 284 flag raisings over 12 years only amounts to a flag other than the City of Boston flag being raised approximately 15% of the time. Furthermore, the record only identifies thirteen (13) different countries and three (3) different civic organizations that have conducted flag-raising ceremonies over that twelve year period. (SOF ¶25). The Turkish flag itself has been raised over ten times during that twelve year time period (SOF ¶30); and the Bunker Hill Association flag riased three (3) times during that time period (SOF ¶31). This record demonstrates that the City has a practice of conducting recurring flag-raising events with over a dozen sovereign nations and several civic groups, and this practice has spanned at least twelve years and occupied the city-owned flagpole in place of the city flag 284 times over those 12 years. This type of selective program is not indicative of a City opening its flagpole to all comers wishing to broadcast whatever message they choose, high above the City in some type of come one, come all policy. See Shurtleff, 19 WL 2635622 at 17 (holding that City controls program of raising third-party flags through application process, approval by Property Management Commissioner and limited instances of flag-raisings over a period of years.). The City

furthermore maintains that on the instances it does open its flagpoles to third parties for flag-raisings, it does so pursuant to the goals stated on its website lending more support to the position that the City has not designated its flagpole as a public forum. (SOF ¶27). Moreover, even if the City has a number of messages it wishes to broadcast over its flagpole, it does not mean that those messages are not the City's own. See Walker, 135 S. Ct. at 2252 (stating that Texas's desire to state numerous messages through its specialty license plates does not mean the messages conveyed are not the state's own). Finally, the fact that the City, until recently, did not have a policy governing its flag-raising policy is irrelevant to the government speech analysis as well. See Summum, 555 U.S. at 473 (City did not adopt express policy regarding monuments until after rejection of Plaintiff's monument); see also Sutliffe, 584 F. 3d at 332 (stating that written policy is "irrelevant to whether (City's) actions constitute government speech").

**C. Plaintiffs' Reliance On the Court's Decision In Matal Is Misplaced Where Federal Trademarks Bear Little Resemblance To A Flag Raised On A 83 Foot Tall, City-Owned Flagpole Located In Front Of City Hall.**

Plaintiffs rely on language in Matal v. Tam where the Court warns that passing off private speech as government speech "by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." 137 S. Ct. 1744, 1758 (2017). Plaintiffs though merely repeat this holding without examining any of the facts forming the basis of the Matal Court's decision. In that case, the Court determined that the content of trademarks registered by the federal government did not qualify as a form of government speech in part because "an examiner does not inquire whether any viewpoint conveyed by a mark is consistent with Government policy or whether any such viewpoint is consistent with that expressed by other marks already on the principal register." Id. The Court in Matal made it a point to specify that the facts of that case were "far afield" from the decision in Summum where monuments had been used to speak to the public since ancient times, the town

exercised selectivity over the monuments, and found government speech where the essential function of the park would be destroyed if the town were forced to accept all monuments. Id. at 1759.

The facts presented by the instant case are inapposite to those presented in Matal, where here, the City does in fact review flag-raising requests to determine whether the message conveyed by a flag comports with City message and policies. (SOF ¶36). The City takes the position that the facts presented in this case are far more similar to those in Summum where the City is using its flagpole that has been used to convey messages to the public about the city's diversity and culture, the purpose of which would be destroyed if the City were forced to apply a policy of viewpoint neutrality with regards to the flags it chooses to raise. (SOF ¶27). The facts in Matal bear little relationship to those presented here and are inapplicable to this analysis.

Furthermore, the record shows that the City regularly grants permission for religious events to be held on City Hall Plaza. (SOF ¶19). The City has not refused the Plaintiffs the ability to hold an event featuring local clergy on City Hall Plaza celebrating Christianity. (SOF ¶51). Such actions by the City are in no way consistent with a desire to "silence or muffle the expression of disfavored viewpoints" as stated by the Plaintiffs. Matal, 137 S. Ct. at 1758.

   **D.  The Plaintiffs' Characterization Of The Reasonably Informed Observer Provides An Incomplete Description Of The City's Flag-Raising Events And Does Not Support A Holding That Such An Observer Would Conclude That The City Does Not Intend To Speak Through The Flags It Raises.**

Plaintiffs describe seven facts that an observer reasonably informed about the facts and circumstances of a flag-raising event on a city-owned flag pole would "unquestionably" be aware of but fail to mention other facts of which such an observer would be aware. See PMemo p. 20-21. Significantly, Plaintiffs fail to mention that the Commissioner of the PMD reviews all flag-raising requests to determine whether the message comports with the City's message, policy

and practice. (SOF ¶36). Plaintiffs also fail to mention that the flag substituted for the City flag would fly 83 feet in the air, next to the flags of the United States and Commonwealth of Massachusetts, creating a powerful image visible from areas where even the corresponding event on City Hall Plaza may not be visible. See Shurtleff, 2019 WL 2635622 at 15-16. A reasonable observer, familiar with all the facts of the City's policy and practice concerning the flagpoles should be aware of the above. See PMemo p.19. Also indicated in the record is that one requesting a flag-raising event must obtain a hand crank from the City in order for a flag to be raised, requiring the City to make an affirmative act demonstrating its willingness to allow the flag to be raised on its flagpole. (SOF ¶26).

Furthermore, as pointed out by the First Circuit in Shurtleff, the "reasonable and fully informed observer" test was proposed by Justice Souter in his concurring opinion in Summum, but is not the test that the Court adopted in deciding the second prong of the three prong test in Summum. 19 WL 2635622 at 15. The Shurtleff Court did point out that such a standard would "easily be met here," but it was not the standard applied in determining that the City engages in government speech when it raises a flag on a city-owned flagpole. In this case, the issue is "whether an observer would identify the City as the speaker when she sees a third-party flag, like a Christian flag, raised in front of City Hall and flying alongside the United States and Massachusetts flags." Id. The City relies on the language in Summum, stating in that case's context that "public parks are often closely identified in the public mind with the government unit that owns the land" meaning that "there is little chance that observers will fail to appreciate the identity of the speaker" as the government when it observes monuments placed inside public parks. 555 U.S. at 471-72. The City takes the position that its flagpoles are analogous to the public parks in Summum, in that the flagpoles flying high in front of City Hall, typically bearing

the United States, Massachusetts and City flags are closely identified in the public mind with the

City that owns and controls the flagpoles, and there is little chance that the observer would fail to

appreciate the City as the speaker when it observes any flags flying in such a manner.

    II.    **PLAINTIFFS FAIL TO ESTABLISH ANY RECORD OF AN EXPLICIT DESIGNATION OF THE CITY'S FLAG POLE AS A PUBLIC FORUM.**

    A.  <u>**The Facts Do Not Support The Conclusion That The City Hall Flag Pole Is A Designated Public Forum.**</u>

A government entity creates a designated public forum "only by intentionally opening a

nontraditional forum for public discourse". <u>Cornelius</u> v. <u>Legal Def. & Educ. Fund, Inc.,</u> 473 U.S.

788, 802 (1985). To determine whether a government has created a designated public forum

Courts have looked to the policy and practice of the government to determine whether it intended

such a designation. <u>Id.</u>  A designated public forum will not be found to have been created where

evidence of a contrary intent exists on the part of the government, and in cases where the

principal function of the property would be disrupted by the designation. <u>Id.</u> at 804. Of particular

importance in assessing the government's intent is the control that it asserts over the forum. <u>See</u>

e.g., <u>Perry Educ. Ass'n</u> v. <u>Perry Local Educators' Ass'n</u>, 460 U.S. 37, 47 (1983) (finding that a

school's mail system had not been designated as public forum where permission to access the

system needed to be granted by individual school principal); <u>see also</u> <u>Ark. Edu. Television</u>

<u>Comm'n</u> v. <u>Forbes,</u> 523 U.S. 666, 679 (1998) (holding that government does not create a

designated public forum by reserving access to a specific class of speakers that, in turn, must

obtain permission to access the forum).

In the present case, Plaintiffs only rely on a City website and written event application to

argue that the City has made an explicit designation of a public forum for the purpose of flag-

raising ceremonies on one of its flagpoles. (SOF ¶¶ 10-14). This is not enough. The Plaintiffs fail

to provide the proper context as to how the City Hall Flag Poles are referenced in the City's online and written applications, and do not once mention the fact that the "City Hall Flag Poles" are treated as a location at which one may request an event. The distinction is critical. A closer look at the actual verbiage used in the City's available materials provides the needed context.

With regards to the City's written application, it provides that the application applies to any public event proposed to take place ***at*** Faneuil Hall, Sam Adams Park, City Hall Plaza, City Hall Lobby, North Stage or the City Hall Flag Poles. (SOF ¶13)(emphasis added). Furthermore, the application contains a section entitled "**<u>Location:</u>**" (SOF ¶12). Within the "Location" section of the application, "City Hall Flag Poles" is listed with a square checkbox next to it among other locations at which one may request to hold a public event. <u>Id.</u> Even when one continues on to the City's website detailing the process for holding an event on city-owned properties near City Hall Plaza, the website in pertinent part states that one needs permission from the City to hold events ***at*** certain properties that include a list of ***locations***. (SOF ¶11)(emphasis added). Among these ***locations***, the City lists "***at the*** City Hall Flag Poles," <u>id.</u> (emphasis added). The City explicitly treats the ***location at the*** City Hall Flag Poles as a public forum in its written and website materials. The City agrees with the Plaintiffs that "words do matter" (<u>See</u> PMemo p. 8), and in this case the Plaintiffs have chosen to ignore two important words, namely ***at*** and ***location***. As stated by the First Circuit, other than a statement on the City's written application reading, "(w)here possible, the Office of Property and Construction Management seeks to accommodate all applicants seeking to take advantage of Boston's public forums" (SOF ¶14), the record is barren of any indication that the City intentionally open(ed) a nontraditional forum <u>on that flagpole</u>, for public discourse." <u>Shurtleff</u>, 19 WL 2635622 at 21 (citing <u>Sutliffe</u>, 584 F. 3d at 333) (internal quotations omitted). The record further reinforces the fact that the designation of the

location at the City Hall Flag Poles as a public forum has no implications on the separate and distinct flag-raising program. Hosting events at the City Hall Flag Poles does not necessarily entail a flag-raising ceremony. (SOF ¶21). While a flag-raising event would necessarily occur at the location of the City Hall flagpoles, such a request would be analyzed differently, with the Commissioner of PMD reviewing the request to ensure it aligns with City messaging, than a request at the same location not involving a flag-raising. (SOF ¶ 17 & 36).

Further distinguishing a flag-raising event from those events taking place in the public forums listed on the City's materials is the access that the public has to the locations referred to as public forums. The City concedes that despite its application process and set of posted guidelines, there is little it can do to prevent groups of citizens from arriving unannounced at those locations referred to as public forums in order to exercise First Amendment rights without first receiving the City's permission. At most, the City's application process serves as a way to reserve a public space for an event ahead of time. But if a group of dissatisfied citizens decided to descend upon the location at the City Hall Flag Poles to protest a decision made by City government, the City does not have the ability to remove such protesters from a public forum merely because they failed to fill out the proper application form. Those same dissatisfied citizens though would have no ability to raise a flag on the city-owned flag pole once they arrived at the location of the City Hall Flag Poles because to do so requires not only the approval of the Commissioner of PMD, but also the provision by the City of the hand crank necessary to lower the City flag and raise the substitute flag. (SOF ¶26). As the Court stated in <u>Cornelius</u>, "such selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum." 473 U.S. at 805. The City has not designated a public forum because it maintains discretion over the flags allowed to be raised and it must also provide the means by

which to raise the flag, and thus the Plaintiffs have failed to demonstrate such a purposeful designation. Where the primary function of the City's flagpole, i.e. conveying a City message, would be disrupted by a finding that a designated public forum exists, the Court should not infer that the City intended such a designation.

> **B.** **Even Assuming Arguendo That The City Did Create A Designated Public Forum On Its Flagpole, The City Retains The Ability To Close The Forum At Any Time.**

The First Circuit has held that "the government is free to change the nature of any nontraditional forum as it wishes." Ridley, 390 F.3d at 77 (citing Cornelius, 473 U.S. at 802). As such, "the government is not required to indefinitely retain the open character of the facility," and may close the forum as it sees fit. *Cornelius*, 473 U.S. at 802 (quoting Perry Educ. Ass'n, 460 U.S. at 46); see also Santa Monica Food Not Bombs v. Santa Monica, 450 F. 3d 1022, 1032 (9th Cir. 2006) (challenge to city ordinance unsuccessful where city banned all private parties from posting street banners and limited such activity to the city thus closing the forum); Shopco Distribution Co. v. Commanding Gen. of Marine Corps Base, Camp LeJeune, N.Carolina, 885 F.2d 167, 173 (4th Cir. 1989) (assuming that housing areas were designated as public forums, Commanding General not required to keep them open indefinitely); U.S. v. Bjerke, 796 F. 2d 643, 647 (3rd Cir. 1986) ("Officials may choose to close such a designated public forum at any time"); Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 143 (2d Cir. 2004) ("government may decide to close a designated public forum"); Currier v. Porter, 379 F. 3d 716, 727 (9th Cir. 2004) (stating that government may close a nontraditional public forum "whenever it wants"). The Court in Ridley did point out that the decision to close a forum must be made in "good faith" and that such good faith was found where the government entity "acted in response to expressed constitutional concerns about its prior guidelines, and cannot be faulted for trying to adhere more closely to the constitutional line." 390 F.3d at 77.

In this case, the City, even if it had created a public forum on its flagpole, has the right to close that forum in order to address concerns over the constitutionality of the program. Here, as evidenced by Commissioner Rooney's email denying Plaintiffs' flag-raising request, the City acted in what it deemed to be accordance with established First Amendment jurisprudence. (SOF ¶51). No evidence exists in the record to suggest that this was done as a pretext to conceal some hostility towards the Christian religion. In fact, Plaintiffs focus on prior occasions where the City has raised flags that contain Christian imagery as evidence that the City has opened its flagpoles to flags advancing a particular religion. (SOF ¶¶31,34). There is no history of the City having raised a flag primarily advancing religion in the past and there is no evidence in the record to suggest that it had ever even received such a request. If the City, when confronted for the first time with a request to raise a flag promoting a particular religion, responded by closing a designated public forum on the basis of well-founded Constitutional concerns, it is within its authority to do so.

The City's actions subsequent to Camp Constitution's request have remained consistent with the City's desire to maintain control over the messages sent out over its flagpole. There is no evidence in the record that the City has received any request similar to that of the Plaintiffs and thus no such flags have been raised. Furthermore, the City has adopted a written Flag-Raising policy that it has posted on its website that has adopted past policy and practice of the flag-raising program. (SOF ¶¶62-65). The posted flag-raising policy places discretion with the City as to the flags raised on its flagpole and sets up guidelines for those seeking to raise a flag on the city flag pole. Id.. The policy makes clear that the City maintains selectivity, control and discretion over the flags that are raised, demonstrating that it does not intend to create a public forum where all comers are free to raise a flag of his or her choosing. The adoption of such a

written policy subsequent to the rejection of a request is consistent with a City that is engaging in government speech when it allows certain activities to occur on city-owned property. See Summum, 555 U.S. at 465 (Town's adoption of a resolution putting policy regarding acceptance of monuments in writing a year following the Plaintiffs request supported a finding that the town was engaging in government speech). The City has continued to demonstrate its desire to control the messages broadcast over its flagpole as it has exercised the discretion described in its flag-raising policy to reject a request to fly a "Straight Pride" flag in place of the City flag on the city-owned flagpole at the location of the City Hall Poles.

C. **The City's Choice To Raise Flags Representing Sovereign Nations With The Goal Of Fostering Diversity and Building And Strengthening Connections Among Boston's Many Communities Has No Bearing On Its Decision To Refrain From Raising A Flag Representing A Particular Religion.**

Plaintiffs contend that the City does not engage in symbolic speech on its flagpole due to the fact that "it cannot seriously contend…that the political views" of certain countries whose flags have been raised have been endorsed by the City. PMemo p. 12. Such a position ignores the stated purpose of the flag raising program that has been presented in the joint statement of facts. (SOF ¶27). The City's flag-raising program is meant to strengthen the bonds among Boston's many communities, including those communities of people that hail from these countries that Plaintiffs describe as places of "violent suppression of dissent, religious intolerance and systemic human rights abuses." Id.; see also Pmemo p.12. There is nothing in the record to suggest that the City celebrates the regimes that hold power in Turkey, Cuba or China. Rather the record makes clear that the City seeks to build an inclusive environment where even persons that have arrived here from countries that do not share our political values can celebrate their heritage and inclusion in the Boston by raising a flag on the City's flagpole after receiving permission from the Commissioner of PMD. (SOF ¶27). Moreover, the Plaintiffs only describe

flags that represent sovereign nations and are unable to demonstrate any instance where the City raised a flag whose purpose was to represent and promote a particular religion. While the flags of Turkey, Portugal and the Vatican[1] do contain religious imagery, they still serve the secular purpose of representing a sovereign nation and are not similarly situated to the Christian flag Plaintiffs seek to raise. Furthermore, there is no First Amendment concern regarding flags that represent sovereign nations under the First Amendment as there is if the City were to choose to raise a Christian Flag.

If the people of the City of Boston disapprove of the City's decision to raise flags of certain countries whose values may not reflect those we hold dear in the United States, it is their right to voice these concerns at the ballot box and vote for an administration that chooses not to raise the flags of certain countries when engaging in government speech. The City and its leaders are subject to the democratic electoral process. Walker, 135 S. Ct. at 2245; Sutliffe, 584 F. 3d at 331 n.9 ("If the voters do not like those in governance or their government speech, they may vote them out of office or limit the conduct of those officials 'by law, regulation, or practice.'" (quoting Summum, 555 U.S. at 468) (citation omitted).

**D. Even If The City's Decision Not To Raise Non-Secular Flags Was Analyzed As A Restriction On Private Speech, The City's Decision Would Be A Constitutional Regulation Of Speech In A Non-Public Or Limited Public Forum.**

Even if the flags raised by the City on its flagpole are considered private speech, the City's policy of excluding non-secular flags is constitutional because it is reasonable and viewpoint neutral in that it does not discriminate between religious viewpoints, but excludes the category of non-secular flags entirely. The government may reserve a non-public or a limited

---

[1] There is no record of the Vatican flag having been raised on the City Hall flagpole. (SOF ¶57).

public forum[2] to the limited and legitimate purposes for which it was created by reserving it for certain types of groups or for the discussion of certain topics as long as the restrictions are both reasonable and viewpoint neutral. Perry Educ. Ass'n, 460 U.S. at 46; Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106-07 (2001). While the government may not refuse to allow the expression of a religious viewpoint on a subject that the government has allowed to be discussed in a non-public or limited public forum, see Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 393-94 (1993), the government may exclude categories of speech unless "its distinction is not 'reasonable in light of the purpose served by the forum,'…[or] it discriminate[s] against speech on the basis of its viewpoint." Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 829 (1995). In Rosenberger, the Supreme Court struck down the University of Virginia's decision to refuse to reimburse the printing costs of a student newspaper with a Christian editorial viewpoint where it maintained a policy of reimbursing the printing costs of other student newspapers. Id. In so ruling, the Supreme Court specifically emphasized that the constitutional infirmity in the University of Virginia's decision was that it was excluding religious editorial viewpoints on otherwise permissible subjects, as opposed to excluding religion as a subject matter, stating:

> the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints . . . [t]he prohibited perspective, not the general subject matter, resulted in the refusal to make third-party payments, for the subjects discussed were otherwise within the approved category of publications.

---

[2] If the flags raised by the City on its flagpole are considered private speech as opposed to government speech, contested but assumed for the purposes of this section of the City's memorandum, then the flagpole is likely to be viewed as either a nonpublic forum, which is a place "which is not by tradition or designation a forum for public communication," Perry Educ. Ass'n, 460 U.S. at 46, or a limited public forum, which is a non-public forum which the government "has opened for use by the public as a place for expressive activity," id. at 39-40. Courts have applied the same analysis regarding government restrictions on speech in non-public and limited public fora – to be constitutional, the restriction must be reasonable and viewpoint neutral. Rosenberger, 515 U.S. at 829 (restrictions in a limited public forum must be reasonable and viewpoint neutral); Cornelius, 473 U.S. at 806 (1985) (restrictions in a non-public forum must be reasonable and viewpoint neutral).

Id. at 831.

Following Rosenberger, courts have specifically identified religion as a subject that the government may exclude from a forum while remaining viewpoint neutral, as long as all speech on the subject of religion is excluded and not just particular religious viewpoints or religious viewpoints on otherwise permissible subjects. DiLoreto v. Downey Unified School District Board of Education, 196 F.3d 958, 969 (6th Cir. 1999); Archdiocese of Washington v. Washington Metro. Area Transit Auth., 281 F. Supp. 3d 88, 105 (D.D.C. 2017), S.C., 897 F.3d 314 (D.C. Cir. 2018).

The City's restriction on raising non-secular flags is consistent with the above authorities and is viewpoint neutral. Unlike in cases where the government refused to allow the expression of a religious perspective on an otherwise permissible subject, the City does not seek to restrict the Plaintiffs' expression of a Christian viewpoint on such a subject, but seeks to exclude flags that promote a particular religion from the flagpole entirely. (SOF ¶51). This is precisely the kind of content-based restriction that the City is permitted to make in a non-public or limited public forum. Additionally, the City's policy is reasonable where an onlooker would perceive that the City is endorsing a religion at the expense of other religious views. "[W]here allowing private expression in a nonpublic forum may imply government endorsement of that expression, limiting or excluding speakers may be reasonable." Cornelius, 473 U.S. at 809. These authorities are precisely applicable here, where the City would be selecting and raising the Christian Flag on a prominent flagpole in front of City Hall, alongside the United States flag and the Commonwealth of Massachusetts flag.

Finally, the City is not refusing to allow the Plaintiffs to hold an event on City Hall Plaza or refusing to allow the Plaintiffs to request a different flag raising. This demonstrates that the

City does not seek to silence the Plaintiffs and that the Plaintiffs have alternative public options available to engage in their speech.

E. **Even If The City Were To Prevail On The Grounds That The Restriction On Non-Secular Flags Was a Valid Restriction On Private Speech In A Limited Public Forum, The City Will Be Forced To Stop Accepting Third-Party Flag-Raising Requests Because Of The Viewpoint Neutrality Commanded By Forum Doctrine.**

For the above stated reasons, even if the City's decision not to raise non-secular flags on its flagpole was determined to be a valid restriction on private speech, the categorical exclusion of non-secular flags would not violate the Plaintiffs' constitutional rights but the City would still be compelled to adhere to a position of viewpoint neutrality going forward within the forum. As stated in Defendants' Cross-Motion for Summary Judgment, such a requirement is inconsistent with the purpose of the City Hall flagpole typically reserved for the City of Boston Flag. See Defs' Mem. Support Cross-Mot. Summ. J. at 14-17. The City would still be compelled to raise a "Straight Pride" flag or a flag of any other categorical viewpoint outside of religon. Thus, even if the Court finds in favor of the City on these grounds, the City's practice of accepting third-party flag-raising requests will come to an end, resulting in less as opposed to more speech.

III. **PLAINTIFFS' CLAIM OF A VIOLATION UNDER THE ESTABLISHMENT CLAUSE IS MERITLESS**

A. **The City When Engaging In Government Speech Does Not Violate The Establishment Clause By Declining to Raise A Flag Promoting A Particular Religion**

As discussed in the previous brief, the City does not violate the establishment clause by declining to raise a Christian flag on a city owned flag pole. See Defs' Mem. Cross-mot. Summ. J. 18-19. Both the First Circuit and this Court ruled that the "likelihood of success of Shurtleff's Establishment clause claim is dim" because "Shurtleff has not established that the City policy and practice shows a preference for one religion or religious denomination over another."

17

Shurtleff, 337 F. Supp. 3d at 77, S.C., 1st Cir., No. 18-1898 ("Applying the Lemon and endorsement test, the Court concludes that compelling the City to display the Christian flag on the City flagpole, as Plaintiffs seek to do, may well violate the Establishment Clause. "). The related facts have not changed since then. Courts have used the Lemon test, endorsement or reasonable observation test, the coercion test and the History and Traditions test in examining the violation of establishment. William A. Glaser, Worshiping Separation: Worship in Limited Public Forums and the Establishment Clause, Pepperdine Law Review, Vol. 38, Issue 4. In a recent case, the Supreme Court adopted the "history and traditions test" in upholding the establishment claim. Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2090 (2019).

> For some, that monument is a symbolic resting place for ancestors who never returned home. For others, it is a place for the community to gather and honor all veterans and their sacrifices for our Nation. For others still, it is a historical landmark. For many of these people, destroying or defacing the Cross that has stood undisturbed for nearly a century would not be neutral and would not further the ideals of respect and tolerance embodied in the First Amendment. For all these reasons, the Cross does not offend the Constitution.

Id. Particularly, The Supreme Court considered the location, the historical connection and the transformative meaning of the religious symbol. See id.

Here, it is clear from the stipulated facts that Plaintiffs' flag does not indicate any historical or traditional meaning other than a Christian flag for the "Christian community". (SOF ¶ 59). Moreover, flying the Christian flag above the City Hall and next to the United States flag, (SOF ¶¶ 41-42, 46, 49, 51), would cause the City to blur the Church and the state and thus violate the Establishment Clause. See e.g., Am. Legion, 139 S. Ct. at 2090–91 (The Court must instead consider each case in light of the basic purposes that the Religion Clauses were meant to serve: assuring religious liberty and tolerance for all, avoiding religiously based social conflict, and maintaining that separation of church and state that allows each to flourish in its "separate spher[e]."); Id.; Joki v. Bd. of Educ. of Schuylerville Cent. Sch. Dist., New York, 745 F. Supp.

823, 832 (N.D.N.Y. 1990) ("The painting lacks any meaningful neutralizing or negating features. Thus, it has the effect of conveying a message of government endorsement of Christianity.").

The Plaintiffs' arguments are meritless. The Supreme Court confirmed the transformed meaning of the cross in the flags of countries and organizations. Am. Legion 139 S. Ct. at 2075 (the image used in the Bladensburg memorial—a plain Latin cross—also took on new meaning after World War I; the Swiss flag is not a religious flag due to the cross symbol). Both the First Circuit and this Court already rejected Plaintiffs' argument that the City violated the Establishment Clause by rejecting flying their religious flag while flying other so called "religious" flags such as Portuguese flag, Turkish flag and Bunker Hill flag. Shurtleff 19 WL 2635622 at 23. As the City stated before, those flags are flags representing sovereign nations, the same as the Swiss flag discussed in Am. Legion. The cross on The Bunker Hill flag is a symbol related to a military victory. See Am. Legion 139 S. Ct. at 2075. Those flags are fundamentally different from Plaintiffs' Christian flag and thus, Plaintiffs' argument cannot stand.

The Plaintiffs' arguments are contradictive and baseless. On one hand, the Plaintiffs complain that the City discriminated against a religious symbol, Mem. Support Pls.' Mot. Summ. J. 35. On the other hand the Plaintiffs complain that the City flies other religious flags and thus discriminates between religions. Id. "Where the Establishment Clause is at issue," the Court must "'distinguish between real threat and mere shadow.'" Van Orden v. Perry, 545 U.S. 677, 704 (2005). The City has exercised caution by declining to fly a Christion flag in order to adhere to the Establishment Clause. The Plaintiffs have failed to establish any real threat raising to the level of an Establishment Clause violation. Therefore, in light of all these elements, the fact that the City did not allow Plaintiffs' Christian flag to be raised on the city-owned flag pole cannot

reasonably be understood as "a government effort to favor a particular religious sect" or to "promote religion over nonreligion" or "a hostility toward religion that has no place in our Establishment Clause traditions."  See Am. Legion 139 S. Ct. at  2091.

## CONCLUSION

For the foregoing reasons, the Defendant respectfully requests entry of judgment in its favor with regards to each of Plaintiffs' claims.

Dated:  July 29, 2019                                    Respectfully submitted,

                                                         **DEFENDANTS**
                                                         **CITY OF BOSTON and GREGORY T.**
                                                         **ROONEY in his official capacity as**
                                                         **COMMISSIONER OF THE CITY OF BOSTON**
                                                         **PROPERTY MANAGEMENT DEPARTMENT,**

                                                         Eugene L. O'Flaherty
                                                         Corporation Counsel

                                                         By his attorney,

                                                         /s/ Robert S. Arcangeli
                                                         Robert S. Arcangeli (BBO# 689034)
                                                         Assistant Corporation Counsel
                                                         City of Boston Law Department
                                                         One City Hall Square, Room 615
                                                         Boston, MA 02201
                                                         (617) 635-4044
                                                         robert.arcangeli@boston.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on July 29, 2019.

July 29, 2019                                            /s/ Robert Arcangeli
Date                                                     Robert Arcangeli