## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | | |
|---|---|---|
| HAROLD SHURTLEFF, and CAMP CONSTITUTION, a public charitable trust, | : : : | CIVIL ACTION |
| | : | No. 1:18-cv-11417-DJC |
| Plaintiffs, | : : | |
| v. | : : | |
| CITY OF BOSTON, and GREGORY T. ROONEY, in his official capacity as Commissioner of the City of Boston Property Management Department, | : : : : : | |
| Defendants. | : : | |

---

## MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, HAROLD SHURTLEFF ("Shurtleff") and CAMP CONSTITUTION (collectively, "Camp Constitution"), pursuant to Rule 56, Fed. R. Civ. P., and Local Rule 7.1, submit this memorandum in opposition to Defendants' Cross-Motion for Summary Judgment filed by Defendants, CITY OF BOSTON ("Boston" or the "City"), and GREGORY T. ROONEY, in his official capacity as Commissioner of the City of Boston Property Management Department ("Rooney" or the "Commissioner").

Ryan P. McLane (Mass. 697464)
MCLANE & MCLANE
975A Springfield Street
PO Box 105
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com

Mathew D. Staver (Fla. 701092)[†]
Horatio G. Mihet (Fla. 26581)[†]
Roger K. Gannam (Fla. 240450)[†]
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854-0774
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org
*Attorneys for Plaintiffs*
[†]Admitted to appear *pro hac vice*.

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

ARGUMENT ....................................................................................................................1

I.    PRIVATE FLAGS ON THE CITY HALL FLAG POLES PURSUANT TO THE CITY'S "ALL APPLICANTS" INVITATION DO NOT CONSTITUTE GOVERNMENT SPEECH.................................................................................................1

    A.    The Undisputed Material Facts Demonstrate the City Does Not Select or Control the Messages of Private Flag Raising Events. ............................................1

    B.    Any "Historical Practice" of Governments' Using Flags to Communicate Is Irrelevant to the City's Intentional Designation of its City Hall Flag Poles as a Public Forum for Private Speech. ............................................................................4

    C.    The City Misrepresents the 'Reasonable Observer' and Misappropriates Inferences Reserved to Camp Constitution...............................................................7

II.    THE UNDISPUTED RECORD OF THE CITY'S WRITTEN POLICY AND LONG-STANDING PRACTICE OF UNIVERSAL APPROVAL OF PRIVATE ORGANIZATIONS' FLAG RAISINGS SHOWS THE CITY OPENED A PUBLIC FORUM ON THE CITY HALL FLAG POLES. ...........................................................10

    A.    The City Cannot Escape Its Explicit Written Designation of the City Hall Flag Poles as a Public Forum.........................................................................................10

    B.    The City's Track Record of Universal Flag Raising Approvals Confirms It Intended to Designate the City Hall Flag Poles a Public Forum—*for* Flag Raisings, *on* the Flag Poles. ..................................................................................12

    C.    The City's Claimed Practice of "Selectivity" over the Content of Flags Raised by Private Organizations on the City Hall Flag Poles Is Rendered Illusory by the City's Actual Practice of Universal Approval. ................................................14

    D.    The City's Practice of Inviting and Allowing Private Organizations' Flag Raisings on the City Hall Flag Poles Is Not Incompatible with the Purposes of the Flag Poles......................................................................................................15

III.    BECAUSE THE CITY OPENED A PUBLIC FORUM ON CITY HALL FLAG POLES, THE CITY'S DISCRIMINATORY TREATMENT OF RELIGIOUS SPEECH VIOLATES THE ESTABLISHMENT CLAUSE.............................................17

    A.    The City's Policy and Actions Impermissibly Demonstrate Hostility Towards Camp Constitution's Religious Speech. ................................................................17

B.      The City Cannot Use the Establishment Clause to Justify Its Religious
        Discrimination...........................................................................................................20

CONCLUSION...........................................................................................................................20

CERTIFICATE OF SERVICE .....................................................................................................21

## ARGUMENT

I.   **PRIVATE FLAGS ON THE CITY HALL FLAG POLES PURSUANT TO THE CITY'S "ALL APPLICANTS" INVITATION DO NOT CONSTITUTE GOVERNMENT SPEECH.**

### A.   The Undisputed Material Facts Demonstrate the City Does Not Select or Control the Messages of Private Flag Raising Events.

It is now axiomatic that proper characterization of the forum requires that this Court look at the access sought by the speaker. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985) ("in defining the forum we have focused on the access sought by the speaker"); *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45-46 (1983) (determining the relevant forum by the access sought by the speaker); *Irish Subcommittee of R.I. Hertigage Comm'n v. R.I. Heritage Comm'n*, 646 F. Supp. 347, 352 (D.R.I. 1986) (same). It is undisputed that Camp Constitution requested approval for a flag raising event, at **and on** the City Hall Flag Poles.[1] (Joint Statement of Undisputed Facts ("JS"), D.60, ¶¶ 7–8.) The City's undisputed policies and actions demonstrate that the City opened a public forum for such expression  through flag raising events at and on the City Hall Flag Poles and does not select the messages of the flags.

"[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for speech or assembly, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802; *Perry Educ. Ass'n*, 460 U.S. at 45-46 & n.7. "Designated public fora . . . are created by purposeful government action." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). Indeed, "the government creates a

---

[1]   That the City offered to approve a Camp Constitution event without a flag raising (Defs.' Mem. Supp. Cross-Mot. Summ. Judgment ("City MSJ"), D.56, at 9) is irrelevant to whether it designated the City Hall Flag Poles a public forum for flag raisings and excluded Camp Constitution from the forum.

designated public forum "by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. To determine whether a designated public forum has been opened, courts look to the "policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," and "the property and its compatibility with expressive activity to discern the government's intent." *Id.* To determine whether the government has created a designated public forum, binding precedent requires that this Court "must consider **both the explicit expressions about intent and the policy and practice of the government**." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 (1st Cir. 2004) (emphasis added).

The City contends it has not designated the City Hall Flag Poles a public forum for flag raisings because it "[e]ffectively [c]ontrols [t]he [m]essages" by conducting a "thorough inquiry" and maintaining strict "selectivity" over the private organizations' flags raised on the Flag Poles. (Defs.' Mem. Supp. Cross-Mot. Summ. J. ("City MSJ"), D.56, at 9–13.) The City paraphrases the attorney-crafted Rooney Affidavit (D.11-1) to assert the Commissioner must review each flag "to determine whether the flag comports with the City's own message." (City MSJ 13 (citing JS ¶ 36).) But the record evidence tells a different story.

The undisputed material facts eviscerate the notion that the City exercises strict control over the private flags raised on the City Hall Flag Poles. Indeed, there is no record the City had ever denied a flag raising event at and on the Flag Poles prior to the Camp Constitution denial. (JS ¶ 35.) Rooney's sworn testimony shows that, prior to Camp Constitution's request, the City "never really had a lot of discussion [concerning] flag raisings in any way." (JS ¶ 37.) The Commissioner has **never denied** a flag raising event, **never reviews** flags prior to approving flag-raising events on the City Hall Flag Poles, does not have a practice of requesting such review, and has **never**

**requested a change** to a flag in order to receive approval. (JS ¶ 38.) Thus, in the twelve years preceding Camp Constitution's request the City had approved **284 flag raising events**, including **39 in the immediately preceding year** (averaging more than three per month). (JS ¶ 25.) Rubber-stamping 284 applications without ever actually reviewing a flag is not exercising control or selectivity as the City falsely contends. These facts alone establish the City does not strictly control access to the City Hall Flag Poles.

The First Circuit found it noteworthy that the limited record before it identified only fifteen instances of flags flown on the Flag Poles, and that the Commissioner was ostensibly required to review the flags for consistency with the City's "message." *Shurtleff v. City of Boston*, No. 18-1898, 2019 WL 2635622, *5 (1st Cir. June 27, 2019). The Court concluded "[t]hat rarity highlights the City's tight control over the flagpole." *Id.* But here and now, the undisputed record facts show the First Circuit's factual considerations were false.

First, the City does not "rarely" grant access to the City Hall Flag Poles for flag raisings as the First Circuit supposed, *id.*, but rather had approved 284 flag raisings on the Flag Poles with no record of a denial. (JS ¶¶ 25, 35.) If rarity evidences control, then the logically necessary corollary is that great frequency evidences lack of control. Without question, 284 instances of access to the City Hall Flag Poles makes such access common and customary, not rare.

Second, the City can no longer possibly contend that the Commissioner ensures all flags are "consistent with the City's message, policies, and practices" as the First Circuit found relevant. As shown above, the Commissioner's sworn testimony demonstrates that he does not see flags prior to granting approval and has never requested to review a flag prior to approval. (JS ¶ 38.) Moreover, the Commissioner admitted utter indifference to the content of Camp Constitution's flag in rejecting its application. (JS ¶¶ 18–19.) Rooney would not have been concerned with the

3

content of Camp Constitution's flag if it was called something other than the "Christian" flag. (JS ¶¶ 18–19.) Thus, whatever the relevance of the Commissioner's review of "the City's **decision** to raise a flag" (JS ¶ 36 (emphasis added)), it is clear there is no meaningful review of any **flag** or its message.

The First Circuit's conclusion of control was based on an incomplete record. It is now beyond dispute that, prior to Camp Constitution's request, the City had never exercised control over the message or content of flags raised by private organizations on the City Hall Flag Poles, and thus does not select, adopt, or endorse any message conveyed by the numerous and regularly appearing private flags.

**B.    Any "Historical Practice" of Governments' Using Flags to Communicate Is Irrelevant to the City's Intentional Designation of its City Hall Flag Poles as a Public Forum for Private Speech.**

The City relies heavily on the notion that governments have a historical practice of using flags to communicate a message. (City MSJ 4–6.) But, what **other** governments have done with their respective flag poles is irrelevant to a determination of whether **Boston** has opened a designated public forum in spite of historical practices of various other governments. Indeed, binding precedent mandates that the proper lens of inquiry is whether the City has a policy and practice of opening a public forum on the City Hall Flag Poles, not whether other governments have refused to designate such a forum. *See, e.g.*, *Ridley*, 390 F.3d 65, 76 (1st Cir. 2004) (noting that whether the government has opened a public forum on government-owned property looks to the policy and practice of the government, not the so-called historical practices of other governments). The City's policy and practice show that—despite the practices of other governments—it has chosen to open a public forum on the City Hall Flag Poles. (*See infra* pt. II; *see also* Pls.' Mem. Supp. Mot. Summ. J. ("Plaintiffs MSJ"), D.61, at 13–17.)

Countenancing the City's post-discriminatory rationale would vastly expand and sanction dangerous aspects of the government-speech doctrine. "[W]hile the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse. **If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints**." *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017) (emphasis added); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 34–35 (2d Cir. 2018) (same).[2] Indeed, "[h]olding that the [approval of private speech] converts the [speech] into government speech would constitute **a huge and dangerous extension of the government speech doctrine**." *Matal*, 137 S. Ct. at 1760 (emphasis added).

The City's argument is similar to that rejected by the Second Circuit in *Wandering Dago*. There, a private organization sought access to a generally available forum for food vendors at Empire State Plaza in New York. 879 F.3d at 25. Much like City Hall Plaza here, Empire State Plaza was distinctively governmental, including "multiple state buildings," "four [state] agency buildings," "the Legislative Office Building," the "New York State Capital Building," "the State Museum," "the State Library," and many others. *Id.* The government instituted a public forum for

---

[2]     Numerous courts across the country have recognized the error of categorizing the private speech of private organizations in a designated public forum as government speech merely because the government grants a permit. *See Freedom From Religion Found. v. Weber*, 628 F. App'x 952, 955 (9th Cir. 2015) (Smith, J., concurring) ("the allowance of private speech on public property does not necessarily turn the private speech into government speech"); *id.* (issuing special use permit to display religious cross on government land does not turn private religious expression into government speech); *Robb v. Hungerbeeier*, 370 F.3d 735, 744 (8th Cir. 2004) (adopt-a-highway signs containing nothing more than the applicant/adopter's name – though created and placed by the government – does not represent government speech); *Arkansas Soc. of Freethinkers v. Daniels*, No. 4:09cv00925SWW, 2009 WL 4884150, *3 (E.D. Ark. Dec. 16, 2009) ("temporary display that is owned, possessed, maintained, and installed by a private group" is private speech and permit policy where government grants approval does not transform that into government speech).

lunch vendors to provide food for state employees and visitors of government buildings. *Id.* at 26. Specifically, the government advertised the program as "instituted to provide lunch options to government employees and visitors [and] was created **as an extension of the cafeteria services**" at government buildings. *Id.* (emphasis added). More notably, the government **itself** "informed the public of the Lunch Program," including "advertis[ing] the Lunch Program on a closed-circuit television system located throughout Empire State Plaza concourse," and "promoted the Lunch Program on its Facebook page and other social media websites." *Id.* at 28.

When Wandering Dago applied for a permit to be a food vendor in the Lunch Program, the government denied its application stating that the term "dago" was a culturally insensitive term that the government did not want to convey. *Id.* at 34–35. As part of its rationale, the government stated that the vendors and the messages contained in the Lunch Program were government speech, so the First Amendment provided no barrier to its decision. *Id.* at 30.

The Second Circuit flatly rejected that rationale, holding that "**speech that is otherwise private does not become speech of the government merely because the government provides a forum for the speech or in some way allows or facilitates it.**" *Id.* at 24 (emphasis added). The court rejected the government's reliance on *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), and *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), because there was no "evidence of a well-established history of [the government's] controlling the names of Lunch Program vendors  in order to tailor a government message." *Wandering Dago*, 879 F.3d at 35. Most importantly, however, the Second Circuit held,

> to the extent that [the government] does have a history of screening applications for various permits to use Empire State Plaza, **we see little to distinguish [the government's] role from the role filled by any state or local government entity that decides whether to grant permits to use any public lands**.

*Id.* (emphasis added).

Indeed, the court noted that a permit system provides "no basis for thinking" that the speech of those granted permits "are closely identified with the government "in the public mind,'" despite the fact that it takes place on Empire State Plaza among numerous government buildings. *Id.* (quoting *Matal*, 137 S. Ct. at 1760)). Additionally, the court noted that a permit system—by its nature—is temporary. 879 F.3d at 35 ("[W]e find it significant that the food vendors participating in the Lunch Program are a **merely temporary feature of the landscape** . . . ." (emphasis added)).

Thus, the fact that governments may have historically, in some instances, used government property such as flag poles, plazas, or other spaces to convey government messages does not prevent a government's designating that space an open forum for private expression or automatically transform the private speech in that forum into government speech. The City's contentions to the contrary are without merit, contradicted by the undisputed record, and must be rejected.

### C.     The City Misrepresents the 'Reasonable Observer' and Misappropriates Inferences Reserved to Camp Constitution.

Citing the First Circuit's record-starved preliminary injunction analysis, the City contends there is "little doubt" that an observer would attribute to the City the messages of all the flags temporarily flown by private organizations under the City's "all applicants"–"public forums" policy, based solely on the height of the Flag Poles. (City MSJ 8–9 (citing 2019 WL 2635622, at *5).) The City's argument depends, however, on an intentionally ignorant observer who is unknown to constitutional law.

Whether speech on government property is attributable to the government or merely obliged by the government must be determined from the "perception of an **informed** and **objectively reasonable** observer." *Wells  v. City and Cnty. of Denver*, 257 F.3d 1132, 1142 (10th Cir. 2001) (emphasis added); *see also Pleasant Grove*, 555 U.S. at 487 (Souter, J., concurring)

("[T]he best approach that occurs to me is to ask whether a **reasonable and fully informed** observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige . . . ." (emphasis added)); *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 338 n. 16 (1st Cir. 2009) (Torruella, J., concurring in part, dissenting in part) (same); *Eagle Point Educ. Ass'n/SOBC/OEA v. Jackson Cnty. Sch. Dist. No. 9*, 880 F.3d 1097, 1103 (9th Cir. 2018) (explaining that in *Pleasant Grove*, under government speech doctrine, "the focus was on whether a reasonable observer would view the statement made by the monument to be a statement by the government"); *A.N.S.W.E.R. Coalition v. Jewell*, 153 F. Supp. 3d 395, 413 (D.D.C. 2016) (same); *United Veterans Memorial v. City of New Rochelle*, 72 F. Supp. 3d 468, 474 (S.D.N.Y. 2014) (teaching *Pleasant Grove* "placed considerable emphasis on whether, **based on all the circumstances**, a reasonable observer would have concluded that the government was the speaker").

Here, a reasonable and fully informed observer would know: (1) the City openly "seeks to accommodate all applications" for flag raisings on the Flag Poles so applicants can "take advantage of the City of Boston's public forums" (JS ¶ 14); (2) the City allows flag raisings by private organizations in which they temporarily "substitute" their own flags for the government's flag (JS ¶ 23–24), (3) the City had allowed at least **284 flag raisings** at and on the City Hall Flag Poles during the twelve years prior to Camp Constitution's request (JS ¶ 25); (4) the City granted flag raisings at the rate of **more than three per month** in the year immediately preceding Camp Constitution's request (JS ¶ 25); (5) prior to Camp Constitution's request, Rooney had **never denied a flag raising** request (JS ¶ 35), and there is **no record evidence of any other denial**; (6) the City essentially allows any event to take place on City Hall Plaza (JS ¶ 35); and (7) the City **does not review** the content of the substitute flags it allows to be raised on the City Hall Flag Poles

8

by private organizations (JS ¶ 38). Any reasonable observer aware of half of these undisputed facts could not come to the conclusion that Boston itself is speaking through others' flags.

The visibility argument is invalid for another reason. As shown *supra* in pt. I.A, the City does not care what observers see on the private flags raised on the Flag Poles. Rooney would have approved Camp Constitution's "red cross on a blue field on a white flag," just as he approved the Bunker Hill flag's "red cross on a white field on a blue flag," if Camp Constitution had not **called** its flag "Christian." (JS ¶ 55.) Thus, any argument that the City cares what observers see on a flag is disingenuous.[3]

Moreover, there is no record evidence to support the *ipse dixit* that private flags flown on the Flag Poles are "visible far beyond the immediate area of City Hall Plaza" where the associated flag raising events occur. (City MSJ 9.) There is no record evidence of the extent, if any, to which hypothetical observers not near a flag raising event can see the Flag Poles but not an associated event on City Hall Plaza.[4] Furthermore, the Commissioner has no knowledge, and the City put

---

[3]     To the extent the City's visibility argument is based on a distant observer's seeing a flag **and knowing** what the flag is called, then the City concedes that the relevant observer must be fully informed, which concession is fatal to the City's government speech position as shown above.

[4]     The following photo depicts the three City Hall Flag Poles in relation to the massive, brutalist City Hall, situated on the expansive City Hall Plaza:



(Decl. Roger K. Gannam, D.65, Ex. A.) There is no obvious vantage point from which to see the Flag Poles without seeing an associated flag raising event at their base on the Plaza.

forth no evidence, of any observer's ever perceiving that the City endorsed or adopted the message of a private organization's flag. (JS ¶ 39.) Inferring wide, uninformed visibility from the Flag Poles' height alone is pure speculation, and an inference to which Boston is not entitled as summary judgment movant. *See LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993) (holding court "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor.")

Finally, the City contends "it can be inferred from the circumstances" that Camp Constitution sought "the powerful image of City approval" rather than free speech in the City's "public forums" on the same terms as "all applicants." (City MSJ 9.) But the undisputed record shows Camp Constitution desired to conduct its own event, "sponsored by Camp Constitution," "to commemorate the civic and social contributions of the Christian community to the City . . . by raising a Christian flag on one of Boston's City Hall Flag Poles." (JS ¶¶ 7, 8.)  The inference the City seeks—that Camp Constitution sough the City's sponsorship of its message—is contradicted by the undisputed facts. Even without these record facts, however, the City would not be entitled to such a self-serving inference. *See LeBlanc*, 6 F.3d at 841.

**II.   THE UNDISPUTED RECORD OF THE CITY'S WRITTEN POLICY AND LONG-STANDING PRACTICE OF UNIVERSAL APPROVAL OF PRIVATE ORGANIZATIONS' FLAG RAISINGS SHOWS THE CITY OPENED A PUBLIC FORUM ON THE CITY HALL FLAG POLES.**

**A.   The City Cannot Escape Its Explicit Written Designation of the City Hall Flag Poles as a Public Forum.**

The City contends that its written policy and application are of no relevance because the City is simply engaging in government speech. (City MSJ 13.) This is nonsense, and the City cannot escape its own explicit statements. "[W]ords matter," *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 49 (1st Cir. 2004), and the City's explicit statement of its intention to open up a public forum on the City Hall Flag Poles demonstrates that it was purposefully opening up the

10

Flag Poles for public discourse in connection with permitted events. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). As binding precedent dictates, an express statement of intention to open a public forum negates a government's contention that it was not opening up a forum for discourse. *See, e.g.*, *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 (1st Cir. 2004) ("explicit statements about intent" relevant to determining nature of the forum); *Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, 781 F.3d 571, 580 (1st Cir. 2015) (same). Indeed, "[t]he touchstone for determining whether a government property is a designated public forum is the government's intent," including the government's "stated purpose." *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1015 (D.C. Cir. 1988). Here, the City's explicitly stated intent evinces its creation of a designated public forum available to all applicants.

First, as the undisputed record demonstrates, the City's official rules and application forms make plain that it intended to and did open a designated public forum at several venues, including the City Hall Flag Poles. As the Commissioner's sworn testimony shows, the City has made available designated City properties for public events featuring private expression, including Faneuil Hall, Samuel Adams Park, City Hall Plaza, the City Hall Lobby, **the City Hall Flag Poles**, and the North Stage. (JS ¶ 10.) The City's application forms indicate that the City Hall Flag Poles are a separate and distinct location designated for speech activities and events. (JS ¶¶ 12-13.) And leaving no question as to the City's intention, the City explicitly calls the Flag Poles a public forum: The guidelines on the printable application form governing the use of the Flag Poles state that the City "seeks to accommodate all applicants to seeking to take advantage of the City of Boston's **public forums**." (JS ¶ 14 (emphasis added).) Thus, there can be no dispute that the City's written application for use of these "public forums"—Faneuil Hall, Samuel Adams Park, City Hall

Plaza, the City Hall Lobby, **the City Hall Flag Poles**, and the North Stage, explicitly designates the Flag Poles a public forum for the use by the public for private expression and speech.

Second, the City's stated goal of allowing "**all applicants**" (*i.e.*, a broad range of expression) to access the City's public fora, including the Flag Poles, demonstrates that the City intended to the Flag Poles a public forum. *See, e.g.*, *Ark. Educ. Television Comm'n*, 523 U.S. at 677 (if forum opened up for expression by all or part of the public, government has created a designated public forum); *Int'l Soc'y for Krisna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (designated public forum is property "that the State has opened for expressive activity by part or all of the public"); *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273 (10th Cir. 1996) (government-owned senior center was designated public forum because the City had opened up the center for a "broad range of subjects . . . evidenced by the long list of diverse topics that have been presented"); *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010) ("The government creates a designated public forum when it opens a piece of public property to the public at large"); *Parks v. Finan*, 385 F.3d 694 (6th Cir. 2004) (grounds at state capital, opened by state government for public expressive activities on a permit system, are either a traditional public forum or a designated public forum). Thus, the City's explicit labeling of the Flag Poles as a public forum and explicit opening of the Flag Poles to all applicants makes it plain the City has created a designated public forum for flag raising events at the City Hall Flag Poles**.**

**B.**     **The City's Track Record of Universal Flag Raising Approvals Confirms It Intended to Designate the City Hall Flag Poles a Public Forum—*for* Flag Raisings, *on* the Flag Poles.**

Despite the unquestionable legal import of the City's explicit written designation of the City Hall Flag Poles as one of "Boston's public forums," the City urges this Court to look the other way due to a feigned difference between "the *location* of the City Hall Flag Poles" and "the flag poles themselves," and the supposed omission of flag raising events from the City's application

forms. (City MSJ 12–13.) These arguments are wrong as a matter of law, and as a matter of undisputed fact.

First, as a matter of black letter law, proper characterization of the forum is defined by the access sought by the speaker. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985) ("in defining the forum we have focused on the access sought by the speaker"). Thus, to properly determine what forum Camp Constitution sought access to, this Court must look at the **specific** access requested. Here, Camp Constitution sought access to the City Hall Flag Poles forum for a **flag raising event**—"***on*** one of Boston's City Hall Flag Poles." (JS ¶¶ 7–8 (emphasis added).) In its response denying Camp Constitution's request, the City likewise recognized that raising a flag ***on* the City Hall Flag Poles** was Camp Constitution's request. (JS ¶ 51.) Thus, Camp Constitution and the City are in agreement that the access Camp Constitution sought was specifically **to raise a flag *on* the City Hall Flag Poles**. As a matter of law, the relevant forum is the City Hall Flag Poles **as flag poles**—*i.e.*, a flag raising ***on*** the Flag Poles, not just **at "the location" of** the Flag Poles.

Second, the undisputed record shows that the feigned distinction between "the location" of the City Hall Flag Poles and the Flag Poles themselves, *qua* flag poles, is wrong as a matter of fact. The City Hall Flag Poles are located at City Hall Plaza, and the City's written policies and application forms designate City Hall Plaza and the City Hall Flag Poles as two separate "public forums." (JS ¶¶ 11–14, 20.) It would have been entirely superfluous to name the City Hall Flag Poles as one of "Boston's public forums" if the City's intent was merely to identify some patch of the Plaza grounds at the Flag Poles, because those grounds already would have been covered by the designation of City Hall Plaza as one of the "public forums." Furthermore, the City had allowed at least 284 flag raisings—on the City Hall Flag Poles—as discrete events (JS ¶ 25), and had

13

processed flag raising events as their own category alongside other events at the City's "public forums."  (JS ¶ 16 (citing Rooney Dep., D.57-1, at 98:2–104:12, 159:15–161:1, 162:11–167:4, 167:11–169:18, Exs. 18 (D.58-18), 34 (D.58-34), 35 (D.58-35), 36 (D.58-36).)

Third, the City's argument that its application forms do not mention flag raising events, and therefore exclude them from the City's invitation to "all applicants" to use the City's "public forum[]" for events at the City Hall Flag Poles (City MSJ 12–13), is directly contradicted by the City's procedures for, and records of, processing flag raising event applications. "The City processes all applications for public events on City properties, including flag raisings, in the same way." (JS ¶ 16.) Thus, applications for flag raising events come to the City, and the City responds to flag raising applicants, according to the same procedures used for all events at the City's other "public forums." (JS ¶ 16 (citing Rooney Dep. 98:2–104:12 ("Yes, this is every request regardless of the type."), 159:15–161:1, 162:11–167:4 ("Yes, it's for any event request."), 167:11–169:18, Exs. 18, 34, 35, 36.)

The City had no reason to separately identify the City Hall Flag Poles as one of "Boston's public forums" unless it meant the Flag Poles as flag poles (*i.e.*, **for** flag raisings **on** the Flag Poles), and not mere markers for a patch of the grounds within the already-designated City Hall Plaza. Nor did the City have any reason to specify flag raising events on its application forms inviting "all applicants" to use "Boston's public forums." Thus, the City's litigation-born distinctions make no legal or factual difference.

C.    **The City's Claimed Practice of "Selectivity" over the Content of Flags Raised by Private Organizations on the City Hall Flag Poles Is Rendered Illusory by the City's Actual Practice of Universal Approval.**

The entire premise of the City's claim that it exercises "selectivity" over the private flags temporarily flown on the City Hall Flag Poles hinges on the City's lawyer-crafted affidavit

claiming the Commissioner exercises "final approval for the flag-raising." (City MSJ 11 (citing JS ¶ 36).) But, as shown *supra* in part I.A, the undisputed record evidence reveals that, prior to the denial of Camp Constitution's application, the final approval process was superficial and indifferent to flag content. (JS ¶ 25 (revealing approval of **284 flag raising events** prior to Camp Constitution denial), ¶ 35 (revealing the Commissioner "'had never denied a flag raising application'"), ¶ 37 (revealing the City "'never really had a lot of discussion prior to [Camp Constitution's] request related to flag raisings in any way'" and that "'most had been approved in previous years'"), ¶ 38 (revealing the Commissioner does not even "see a proposed flag before approving a flag raising event" and had "**never requested to review a flag**" prior to granting approval (emphasis added)).) An official 'rubber stamp' evinces the opposite of selectivity.

### D.   The City's Practice of Inviting and Allowing Private Organizations' Flag Raisings on the City Hall Flag Poles Is Not Incompatible with the Purposes of the Flag Poles.

The City also contends that it has not created a designated public forum on the City Hall Flag Poles for flag raisings because observing its historical practice of universal access to flag raising applicants would somehow be incompatible with the Flag Poles. (City MSJ 14–17.) Specifically, the City contends that it should not be "force[d] to associate itself with positions that are offensive to residents and visitors alike." (City MSJ 17.) Though the First Circuit supposed the City was engaging in "symbolic speech," endorsing the messages of the substitute flags it permits on the City Hall Flag Poles, *Shurtleff v. City of Boston*, No. 18-1898, 2019 WL 2635622, *5 (1st Cir. June 27, 2019), the undisputed material facts say otherwise.

First, it simply cannot be said that the City endorses the messages of flags it never reviews, considers, or discusses. (*See supra* pt. I.A; JS ¶¶ 37–38.) Second, the City cannot possibly contend that it "symbolically" endorses the political views, violent suppression of dissent, religious intolerance, and systematic human rights abuses that are well known in China, Cuba, and Turkey

when it allowed groups to raise these countries' flags. (JS ¶ 25.) Did the City conveniently suspend its policy of "symbolic" endorsement for the short periods those flags were raised? Or, did the City explicitly endorse the Islamic religion when it permitted the Turkish flag's overtly Islamic star and crescent imagery to be raised on the City Hall Flag Poles? (JS ¶ 30.) Did the City explicitly endorse the Catholic Church when it permitted Vatican flag to be raised? (JS ¶ 57.) Did the City violate the Establishment Clause by allowing the temporary raising of these religious flags on the City Hall Flag Poles?

The answer to these questions is obvious: **No**. The City did not "symbolically" endorse the abhorrent practices of repressive regimes around the world by allowing private organizations from the City's diverse communities to display their flags according to the City's equal access policy. The City did not "symbolically" endorse the religions of Islam or Catholicism by permitting private groups from the community to raise flags associated with their events. And, perhaps most importantly for the instant matter, the City would not "symbolically" endorse Christianity by allowing Camp Constitution to raise its flag on the same terms as have been extended to "all applicants" to use "Boston's public forums." "**[S]peech that is otherwise private does not become speech of the government merely because the government provides a forum for the speech or in some way allows or facilitates it.**" *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 24 (2d Cir. 2018) (emphasis added). Granting Camp Constitution equal access to the City Hall Flag Poles does not communicate the City's endorsement of Camp Constitution's message. (*See also infra* pt. III.B; Plaintiffs MSJ 15–21.)

Contrary to the City's argument (City MSJ 17), maintaining a designated public forum for flag raising events on its Flag Poles, as has been its consistent policy and practice, does not deprive Boston of its right to engage in actual government speech on the Flag Poles at all times in between

the approved flag raisings of private organizations—which is the vast majority of the time. Thus, Boston can purchase a Boston Bruins flag and fly it on the City Hall Flag Poles whenever the City wants, without affecting the City's flag raising public forum. (*See* City MSJ 17.) Furthermore, the City is free to limit its designated Flag Poles forum to, *e.g.*, flags of local organizations, *see The Nationalist Movement v. City of York*, 481 F.3d 178, 183 n.4 (3d Cir. 2007) (upholding residency requirement against Equal Protection claim), or flags commemorating various communities' civic contributions to Boston, which is congruent with the current stated purposes of the forum.[5] (JS ¶ 27 ("'Our goal is to foster diversity and build and strengthen connections among Boston's many communities.'").)

## III. BECAUSE THE CITY OPENED A PUBLIC FORUM ON CITY HALL FLAG POLES, THE CITY'S DISCRIMINATORY TREATMENT OF RELIGIOUS SPEECH VIOLATES THE ESTABLISHMENT CLAUSE.

### A. The City's Policy and Actions Impermissibly Demonstrate Hostility Towards Camp Constitution's Religious Speech.

The City's hostile and discriminatory exclusion of Camp Constitution's religious speech violates the Establishment Clause. "The touchstone for our analysis is the principle that 'the First Amendment mandates governmental neutrality between religion and religion, and between religion and non-religion.'" *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). Indeed, "[t]he fullest realization of true religious

---

[5]     Such a public forum would not require acceptance of a St. Louis Blues flag raising or a "Straight Pride" flag raising, as speculated by the City (City MSJ 17), absent some plausible civic contributions to Boston by the represented communities, nor would such a limitation necessarily reduce the amount of speech occurring on the Flag Poles under current policies and practices. The Supreme Court in *Perry Educ. Ass'n v. Perry Local Educators Ass'n* explained the possibility of such a forum as a sub-classification within a designated public forum: "A public forum may be **created for a limited purpose** such as use by certain groups . . . or for the discussion of certain subjects." 460 U.S. 37, 46 n.7 (1983) (emphasis added) (citations omitted). The Court did not, however, relax the standards applicable to regulation of speech in such a designated public forum.

liberty requires that government neither engage in no compel religious practices, that it effect no favoritism among sects or between religion or nonreligion, and that it work deterrence of no religious belief." *Sch. Dist. of Abington, Tp. v. Schempp*, 374 U.S. 203, 305 (Goldberg, J., concurring); *see also Van Orden v. Perry*, 545 U.S. 677, 690 (Breyer, J., concurring) (same). As the record demonstrates, the City has impermissibly discriminated between religion and non-religion, and also between religion and religion.

The undisputed material facts in this matter demonstrate beyond cavil that the City's denial of Camp Constitution's request for access to the City Hall Flag Poles Forum was based solely on hostility to Camp Constitution's religious viewpoint. Indeed, the City's reason for denying Camp Constitution's request to fly a Christian flag on the City Hall Flag Poles forum was precisely because it was deemed religious. Here, the City's reason for denying Camp Constitution's flag raising event was precisely because the City deemed the flag objectionably religious due to its being called "Christian" (JS ¶¶ 41, 42, 51, 52, 54, 55.) There can be no dispute that the City's treatment of Camp Constitution's religious speech discriminated between religious flags and non-religious flags.

To be sure, the City also concedes that its "thorough inquiry" into Camp Constitution's flag raising application was a first-time occurrence for the City. (*Compare* City MSJ 11 (admitting "[i]n this particular case, Rooney, **for the first time**, evaluated a request to raise a flag" (emphasis added)), *with* JS ¶ 38 ("It is Rooney's usual practice not to see a proposed flag before approving a flag raising event, and Rooney has never requested to review a flag . . . .").) Such *sui generis* treatment of Camp Constitution's request demonstrates pretextual and post-hoc justification of religious discrimination.

As the undisputed facts in this matter also show, the City has treated Camp Constitution's religious speech and flag differently than other flags containing religious imagery. (JS ¶ 28 (noting that the City has raised flags on City Hall Flag Poles that contain religious language and symbols).) The City of Boston flag, which is typically flown on City Hall Flag Poles when a substitute is not raised, contains the words "SICUT PATRIBUS, SIT DEUS NOBIS," which means "God be with us as He was with our fathers." (JS ¶ 29.) **At least thirteen times** between 2005 and 2019, the City has permitted the Turkish flag to be raised on City Hall Flag Poles, and it contains the readily identifiable Islamic star and crescent adopted by the Ottoman Empire. (JS ¶ 30.) **At least three times** between 2016 and 2018, the City permitted the Bunker Hill Association to raise the Bunker Hill Flag on City Hall Flag Poles, and it is virtually identical to Camp Constitution's flag although with a slightly different color scheme. (JS ¶ 31.) The City has permitted the Portuguese flag to be raised on City Hall Flag poles, and it likewise contains religious imagery depicting "the five wounds of Christ when crucified" and the thirty pieces of silver "Judas received for having betrayed Christ." (JS ¶ 34.) Finally, and perhaps most notably, the City has permitted the Vatican Flag to be raised on a City-owned flagpole, which the Commissioner recognized is the exclusive flag of the Catholic Church. (JS ¶ 57.)

Despite these many flag raisings containing religious symbols and imagery, and the City's allowing the official flag of the Catholic Church, Camp Constitution's proposed flag raising was denied because it was "religious." (JS ¶¶ 41–54.) There can be no dispute that the City's denial impermissibly discriminated between religion and non-religion, and discriminated between religious sects. Both violate the Establishment Clause.

**B.      The City Cannot Use the Establishment Clause to Justify Its Religious Discrimination.**

The City admits that its decision to reject Camp Constitution's request to raise the Christian flag was based on its ill-informed belief that granting equal access to religious speech in a public forum would raise Establishment Clause concerns. (City MSJ 18.) Because the city has opened a designated public forum on the Flag Poles (*see supra* pts. I, II), however, the City cannot violate the Establishment Clause by granting equal access to religious speech. It simply "does not violate the Establishment Clause for [the City] to grant access to its facilities on a religion-neutral basis to a wide spectrum of private speakers." *Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 842 (1995). Indeed, "**no reasonable observer would think a neutral program . . . carries with it the imprimatur of government endorsement**." *Zellman v. Simmons-Harris*, 536 U.S. 636, 655 (2002) (emphasis added); *see also Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 252 (1990) (holding that the government "does not convey a message of state approval or endorsement of the particular religion" when it permits a religious group equal access to a forum); *id.* at 248 (granting equal access "does not confer any imprimatur of state approval on religious sects or practices. The message [of equal access] is **one of neutrality rather than endorsement** (emphasis added)); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 118 (2001) (holding that granting equal access to religious speech in a public forum poses no danger that the public "would misperceive the endorsement of religion"). Thus, the City's assertion that its denial was necessary to avoid an Establishment Clause violation is without merit.

## <u>CONCLUSION</u>

For all of the foregoing reasons, and the reasons in the Memorandum in Support of Plaintiffs' Motion for Summary Judgment (D.61), the City's motion for summary judgment should be denied, and Camp Constitution's motion for summary judgment granted.

Respectfully submitted,

Ryan P. McLane (Mass. 697464)     /s/ Roger K. Gannam
MCLANE & MCLANE                   Mathew D. Staver (Fla. 701092)[†]
975A Springfield Street           Horatio G. Mihet (Fla. 26581)[†]
PO Box 105                        Roger K. Gannam (Fla. 240450)[†]
Feeding Hills, MA 01030           LIBERTY COUNSEL
(413) 789-7771                    P.O. Box 540774
ryan@mclanelaw.com                Orlando, FL 32854-0774
                                  (407) 875-1776
                                  court@lc.org
                                  hmihet@lc.org
                                  rgannam@lc.org
                                  *Attorneys for Plaintiffs*
                                  [†]Admitted to appear *pro hac vice*.

## CERTIFICATE OF SERVICE

I hereby certify that on this July 29, 2019 I caused the foregoing to be electronically filed through the Court's ECF system. Service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.

/s/ Roger K. Gannam
*Attorney for Plaintiffs*