| | | |
|---|---|---|
| HAROLD SHURTLEFF, et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | No. 1:18-cv-11417-DJC |
| | : | |
| v. | : | |
| | : | |
| CITY OF BOSTON, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, HAROLD SHURTLEFF ("Shurtleff") and CAMP CONSTITUTION (collectively, "Camp Constitution"), pursuant to Rule 56, Fed. R. Civ. P., and Local Rule 7.1, submit this memorandum in further support of Plaintiffs' Motion for Summary Judgment (D.59) against Defendants, CITY OF BOSTON ("Boston" or the "City"), and GREGORY T. ROONEY, in his official capacity as Commissioner of the City of Boston Property Management Department ("Rooney" or the "Commissioner"), in supplementation of the Memorandum in Support of Plaintiffs' Motion for Summary Judgment (D.61, Plaintiffs' "MSJ Memorandum"), and in reply to Defendants' Memorandum of Law in Opposition to Plaintiffs' Cross-Motion for Summary Judgment (D.64, Defendants' "Opposition").

Ryan P. McLane (Mass. 697464)
MCLANE & MCLANE
975A Springfield Street
PO Box 105
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com

Mathew D. Staver (Fla. 701092)†
Horatio G. Mihet (Fla. 26581)†
Roger K. Gannam (Fla. 240450)†
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854-0774
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org
*Attorneys for Plaintiffs*
†Admitted to appear *pro hac vice*.

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 1

I.    THE UNDISPUTED RECORD FACTS NEGATE THE CITY'S GOVERNMENT SPEECH ARGUMENTS BECAUSE THE CITY HALL FLAG POLES HAVE CONTINUALLY ACCOMMODATED PRIVATE EXPRESSION, AND THE CITY'S CONTROL OVER THE PRIVATE FLAGS' MESSAGES IS AN INCONSEQUENTIAL FORMALITY. .............................................................. 1

    A.    The City Hall Flag Poles' Uninterrupted Accommodation of the Expression of "All Applicants" Conclusively Distinguishes *Pleasant Grove* and *Walker* and Renders Obsolete the First Circuit's Prior Decision on an Incomplete Record. ..... 1

        1.    The Permanence of the Monuments in *Pleasant Grove*'s Government Speech Finding Was Critically Important, Even if Not Dispositive. ........... 1

        2.    The "Direct" and "Effective" Government Control Found in *Walker*, and by the First Circuit on an Incomplete Record, Does Not Exist in Boston. ...................................................................................................... 4

        3.    *Pleasant Grove* and *Summum* Expressly Recognize Forum Analysis, Rather Than Government Speech Analysis, Applies to Nontraditional Forums Intentionally Designated by the Government for Private Expression. ................................................................................................... 5

        4.    The City's Track Record of Universal Flag Raising Approvals Confirms It Intended to Designate the City Hall Flag Poles a Public Forum—*for* Flag Raisings, *on* the Flag Poles. ............................................................... 8

    B.    284 Flag Raisings with No Denials Are Significant Because They Demonstrate the City's Claim of Control over Flag Raising Messages Is Illusory. ................... 10

    C.    *Pleasant Grove* Used the Informed Observer in Its Government Speech Analysis, Not the Ignorant Observer Supposed by the City. ................................. 12

    D.    Even If the City Hall Flag Poles Are a Limited Public Forum, Which They Are Not, the City's Policies and Practices Are Not Viewpoint Neutral or Reasonable. ........................................................................................................ 17

    E.    Boston's Feigned and Threatened Closures of the Flag Poles Forum Are in Bad Faith. ................................................................................................................... 18

1. The City's Feigned Closure of the City Hall Flag Poles Forum Is Contradicted by the Record, and Would Have Been Unconstitutional Viewpoint Discrimination in Any Event. ..................................................18

2. The City's Threat to Close the Forum Altogether if Required to Treat Camp Constitution Equally Is in Bad Faith. .............................................19

II. THE CITY HAS WAIVED ANY ARGUMENT IN OPPOSITION TO SUMMARY JUDGMENT ON CAMP CONSTITUTION'S PRIOR RESTRAINT AND EQUAL PROTECTION CLAIMS BY NOT RAISING IT IN THE CITY'S OPPOSITION. .......20

CONCLUSION ..............................................................................................................................20

CERTIFICATE OF SERVICE .....................................................................................................21

## INTRODUCTION

All of the City's arguments in opposition to summary judgment depend on a single premise—that the private flags raised on the City Hall Flag Poles pursuant to the City's "all applicants[–]public forums" policy are government speech because the Flag Poles forum is not compatible with private expression and the City must approve all flags that are raised. The undisputed record facts, however, reveal the City's premise to be false, because the City's express policies and actual practices prove the Flag Poles have consistently accommodated private expression for over a decade, and that the City's control over the private flags' messages is minimal to nonexistent. Thus, the undisputed record negates the City's government speech arguments, and Camp Constitution is entitled to summary judgment.

## ARGUMENT

I.  **THE UNDISPUTED RECORD FACTS NEGATE THE CITY'S GOVERNMENT SPEECH ARGUMENTS BECAUSE THE CITY HALL FLAG POLES HAVE CONTINUALLY ACCOMMODATED PRIVATE EXPRESSION, AND THE CITY'S CONTROL OVER THE PRIVATE FLAGS' MESSAGES IS AN INCONSEQUENTIAL FORMALITY.**

   A.  **The City Hall Flag Poles' Uninterrupted Accommodation of the Expression of "All Applicants" Conclusively Distinguishes *Pleasant Grove* and *Walker* and Renders Obsolete the First Circuit's Prior Decision on an Incomplete Record.**

      1.  **The Permanence of the Monuments in *Pleasant Grove*'s Government Speech Finding Was Critically Important, Even if Not Dispositive.**

The City's Opposition downplays the permanence of the monuments deemed government speech in *Pleasant Grove City v. Summum*, arguing that the Supreme Court was instead concerned with space; *i.e.*, the compatibility of space-occupying monuments with a public park's traditional speech function. (Opp'n 1–3.) *Cf. Shurtleff v. City of Boston*, 928 F.3d 166, 175 n.6 (1st Cir. 2019) (D.53, hereinafter the "*PI Appeal*"). The Court, however, later said in *Walker* that the two

concepts—space and permanence—were both important to the Court's analysis of the compatibility of the forum with private expression: "in [*Pleasant Grove*] we emphasized that monuments were 'permanent,' and . . . observed that public parks can accommodate only a limited number of permanent monuments." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2249 (2015). To be sure, *Walker* teaches that none of the "several factors" on which the *Pleasant Grove* Court based its decision, in and of itself, was dispositive. 135 S. Ct. at 2247 ("In light of these and a few other relevant considerations . . . ."), 2249 ("That is not to say that every element of our discussion in [*Pleasant Grove*] is relevant here."). But *Walker* nonetheless affirmed the importance of the permanence of the monuments in the *Pleasant Grove* government speech analysis.

The undisputed record facts[1] here show that the temporary nature of flag raisings allowed on the City Hall Flag Poles ensures that the Flag Poles are continually open for the City's own speech (*e.g.*, the usual City of Boston Flag), as well as the speech of a large number of other private organizations allowed to raise their flags pursuant to the City's "all applicants[–]public forums" policy, serving the City's express purposes of "foster[ing] diversity and build[ing] and strengthen[ing] connections among Boston's many communities." (JS ¶¶ 22–23, 27.) The *Pleasant Grove* Court provided several illustrations distinguishing such accommodations of private speech from permanent monuments constituting government speech:

> **The forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the**

---

[1] Camp Constitution again commends to the Court the parties' Joint Statement of Undisputed Facts (D.60, "Joint Statement" or "JS"), which Camp Constitution incorporates herein by this reference, as well as Camp Constitution's Summary of Key Undisputed Facts in Plaintiffs' MSJ Memorandum (D.61 at 2–5.)

**program**. For example, a park can accommodate many speakers and, over time, many parades and demonstrations. The Combined Federal Campaign permits hundreds of groups to solicit donations from federal employees. See *Cornelius*[]. A public university's student activity fund can provide money for many campus activities. See *Rosenberger*[]. A public university's buildings may offer meeting space for hundreds of student groups. See *Widmar v. Vincent*[]. A school system's internal mail facilities can support the transmission of many messages to and from teachers and school administrators. See *Perry Ed. Assn.*[].

**By contrast, public parks can accommodate only a limited number of permanent monuments**.

555 U.S. at 478 (emphasis added). The undisputed record facts now show where the City Hall Flag Poles belong in the above illustrations from *Pleasant Grove*: the Flag Poles are "capable of accommodating a large number of public speakers without defeating the essential function of the [Flag Poles]," *id.*, because they have done so frequently and continually, for "all applicants" over twelve years. (MSJ Mem. 2–3; JS ¶¶ 10–16, 18, 25, 35–38.) Thus, the Flag Poles "over the years, can provide a [forum] for a very large number of [flags] . . . for all who want to speak . . . ." *Id.* at 479.[2] *Pleasant Grove*'s government speech analysis could only apply to Camp Constitution if

---

[2]     The First Circuit, on an incomplete record, supposed a similar contrast between the City Hall Flag Poles and Boston's other public forums:

> And unlike many other public spaces controlled by a permitting process, for access to which the City might grant thousands of applications a year, the flagpole at issue is only rarely occupied by a third-party flag. Appellant's complaint lists only fifteen instances, over a period of years, in which the City has granted a third party's flag-flying request. **That rarity highlights the City's tight control over the flagpole in question and that it engages in symbolic speech as to the replacement flags it allows**.

*PI Appeal*, 928 F.3d at 174 (emphasis added). Now that the record wipes away any notion of rarity in flag raising approvals, and reveals that the Flag Poles accommodate the expression of all who ask, the contrast is no longer valid.

Camp Constitution had requested to permanently occupy space in City Hall Plaza by placing its own flagpole in the ground.

### 2. The "Direct" and "Effective" Government Control Found in *Walker*, and by the First Circuit on an Incomplete Record, Does Not Exist in Boston.

The City claims that it need not take ownership and control over the private flags raised on its Flag Poles under its "all applicants" policy in order to maintain control over the messages of those flags. (Opp'n 3–5.) But the City has fallen far short of showing any degree of actual control coming close to the "direct" and "effective" control found to create government speech in *Walker*, and supposed by the First Circuit on an incomplete record in the *PI Appeal*.

In *Walker*, the relevant government control over the specialty license plate messages was the state's "**direct control** over the messages conveyed," where the state "**actively exercised** this authority" and "**rejected** at least **a dozen** proposed designs." 135 S. Ct. at 2249 (emphasis added). Thus, the Court concluded, "Texas has effectively controlled the messages conveyed by **exercising** final approval authority over their selection." *Id.* (emphasis added) (internal quotation marks omitted). In this case, Boston does not actively exercise its authority to reject or even look at proposed flags for flag raisings, and there is no record of any denial prior to Camp Constitution's. (MSJ Mem. 2–3; JS ¶¶ 10–16, 18, 25, 35–38.) Thus, Boston cannot claim the "direct" or "effective" control present in *Pleasant Grove* and *Walker*, which is fatal to the City's government speech position.

Whereas the Supreme Court has held that the mere involvement of private parties in selecting a government message does not, in and of itself, make the message private expression, *see Walker*, 135 S. Ct. at 2247, 2251, the mere involvement of the government in approving a message likewise does not, in and of itself, constitute sufficient control to make the message government speech. *See Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017); *Wandering Dago, Inc. v.*

*Destito*, 879 F.3d 20, 34–35 (2d Cir. 2018) ("**[S]peech that is otherwise private does not become speech of the government merely because the government provides a forum for the speech or in some ways allows or facilitates it**." (emphasis added)). Thus, the government cannot, merely by reserving to itself approval rights, convert to government speech the private speech it openly solicits and uncritically allows in its designated forums.

Thus, where there is neither permanence nor government ownership of the expressive medium, and such little government control over the message that "all applicants" are approved without exception for twelve years, at an increasing rate to almost once a week, neither *Pleasant Grove*, *Walker*, nor the First Circuit in the *PI Appeal* provides any support for a government speech finding. The slender reed of government control on which the First Circuit rested its decision in the *PI Appeal*, and to which the City still clings, was broken by the weight of the developed record. Nothing remains to hold up the City's government speech position.

### 3. *Pleasant Grove* and *Summum* Expressly Recognize Forum Analysis, Rather Than Government Speech Analysis, Applies to Nontraditional Forums Intentionally Designated by the Government for Private Expression.

In *Pleasant Grove* the Supreme Court recognized that "a government entity may create 'a designated public forum' if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose," and "may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." 555 U.S. at 469–70. Despite this recognition of intentionally established forums, however, the Court viewed as incompatible the specific expression accomplished through permanent monuments accepted into a public park: "Permanent monuments displayed on public property typically represent government speech." *Id.* at 470. In so doing (and as shown *supra* in pt. I.A.1), the Court provided several illustrations of such nontraditional forums that were compatible with and intentionally

designed for private speech, and therefore subject to forum analysis, distinguishing them from the government speech accomplished through permanent monuments. *See* 555 U.S. at 478 ("The forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program."); *see also id.* at 480 (distinguishing public property that "can accommodate and may be made generally available for temporary private displays," which is subject to forum analysis, from public property housing permanent monuments, which is subject to government speech analysis).

The *Walker* Court highlighted some of the nonexclusive considerations deemed relevant to the government speech finding in *Pleasant Grove*, and in so doing clarified that *Pleasant Grove* did not provide a formulaic test for government speech that must be applied in all cases. *See Walker*, 135 S. Ct. at 2247 ("In light of **these and a few other relevant considerations**, the Court concluded that the expression at issue was government speech." (emphasis added)), 2249 ("That is **not to say that every element** of our discussion in [*Pleasant Grove*] is relevant here." (emphasis added)).[3] The *Walker* Court also, as in *Pleasant Grove*, recognized that forum analysis applies to intentionally established government forums for private speech, such as a designated public forum

_____

[3]     *Cf. PI Appeal*, 928 F.3d at 172 ("The *Summum*/*Walker* three-part test controls here . . . ."). At this stage of the proceedings, "this Court is not bound by the First Circuit's application of the law to the facts then in evidence" because "[i]t is well-settled that at the preliminary injunction stage, an appellate court's findings and holdings as to the merits of the case are not final but should be understood to be merely statements of probable outcomes based on the record as it existed before the district court." *Cohen v. Brown Univ.*, 879 F. Supp. 185, 193 (D.R.I. 1995) (internal quotation marks omitted) (citing *LeBeau v. Spirito*, 703 F.2d 639, 643 (1st Cir. 1983)), *aff'd in part, rev'd in part*, 101 F.3d 155 (1st Cir. 1996). Thus, now having the developed record that was unavailable to the First Circuit in the *PI Appeal*, this Court is not bound to apply *Pleasant Grove* and *Walker* with the same formulation or emphases as the First Circuit, but should be guided by all the "relevant considerations." *Walker*, 135 S. Ct. at 2247.

or a limited public forum. *Walker*, 135 S. Ct. at 2250. Importantly, the *Walker* Court found no such intention on the part of Texas because "the State exercises final authority over each specialty license plate **design**," "**takes ownership** of each specialty plate **design**," and "license plates have traditionally been used for government speech, are primarily used as a form of government ID, and **bear the State's name**." *Id.* at 2251 (emphasis added).

By contrast, Boston's flag raising policies include a critical component missing from *Pleasant Grove*'s permanent monument policy and *Walker*'s state license plate policy: an express, written intention to accommodate "all applicants" who want to use the City Hall Flag Poles as one of Boston's "public forums." (MSJ Mem. 2; JS ¶ 14.) This undisputed, express statement of intent, combined with an undisputed record of approving as many flag-raisers as apply, compel consideration—in the first instance—of whether Boston has intentionally designated the Flag Poles as a public forum for private expression. *See Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 (1st Cir. 2004). "To determine that intent, courts must consider **both explicit expressions about intent and 'the policy and practice of the government** to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum'" and "'examine[] the nature of the property and its compatibility with expressive activity . . . .'" *Id.* (emphasis added) (first modification in original) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)). According to the First Circuit in *Ridley*, the relationship between express intent and practice is important: "a statement of intent contradicted by consistent actual policy and practice would not be enough to support the [government's] argument" that its forum matches the statement of intent. 390 F.3d at 77. *A fortiori*, where Boston's "statement of intent" is reinforced by its "consistent actual policy and practice," the City's argument that the forum is different from its statement of intent has no force whatsoever. As shown *supra* in part

I.A.1, the City's policy, practice, and explicit expression of intent, as well as the continually demonstrated compatibility of the Flag Poles with private expressive activity, all point to an intentionally designated public forum for private speech.

To be sure, there is nothing inconsistent with classifying as government speech the relatively rare acceptance of a permanent monument for a public park in *Pleasant Grove*, and the tightly controlled, state-owned, state-designed, and state-accepted license plate designs bearing the state's name in *Walker*, while classifying as private speech the objectively frequent and regular private flag raisings of "all applicants" who are expressly invited to use the City Hall Flag Poles along with Boston's other "public forums," and whose flags are flown for only a short time and without any actual review of their content. Indeed, the stark factual differences between *Pleasant Grove* and *Walker* on the one hand, and this case on the other, counsel against any formulaic application of "the recently minted government speech doctrine." *Pleasant Grove*, 555 U.S. at 481 (Stevens, J., concurring); *see also Matal*, 137 S. Ct. at 1760 (cautioning *Walker* "marks the outer bounds of the government speech doctrine.")

> **4. The City's Track Record of Universal Flag Raising Approvals Confirms It Intended to Designate the City Hall Flag Poles a Public Forum—*for* Flag Raisings, *on* the Flag Poles.**

Despite the unquestionable legal import of the City's explicit written designation of the City Hall Flag Poles as one of "Boston's public forums," the City urges this Court to look the other way due to a feigned difference between "the ***location at the*** City Hall Flag Poles" and the Flag Poles **as flag poles**, and the supposed omission of flag raising events from the City's application forms. (Opp'n 8–11.) These arguments are wrong as a matter of law, and as a matter of undisputed fact.

First, as a matter of black letter law, proper characterization of the forum is defined by the access sought by the speaker. *See, e.g.*, *Cornelius*, 473 U.S. at 801 ("in defining the forum we have focused on the access sought by the speaker"). Thus, to properly determine what forum Camp Constitution sought access to, this Court must look at the **specific** access requested. Here, Camp Constitution sought access to the City Hall Flag Poles forum for a **flag raising event**—"***on one of Boston's City Hall Flag Poles***." (JS ¶¶ 7–8 (emphasis added).) In its response denying Camp Constitution's request, the City likewise recognized that raising a flag ***on* the City Hall Flag Poles** was Camp Constitution's request. (JS ¶ 51.) Thus, Camp Constitution and the City are in agreement that the access Camp Constitution sought was specifically **to raise a flag *on* the City Hall Flag Poles**. As a matter of law, the relevant forum is the City Hall Flag Poles **as flag poles**— *i.e.*, a flag raising **on** the Flag Poles, not just **at the location of** the Flag Poles.

Second, the undisputed record shows that the feigned distinction between "the location" of the City Hall Flag Poles and the Flag Poles themselves, *qua* flag poles, is wrong as a matter of fact. The City Hall Flag Poles are located at City Hall Plaza, and the City's written policies and application forms designate City Hall Plaza and the City Hall Flag Poles as two separate "public forums." (JS ¶¶ 11–14, 20.) It would have been entirely superfluous to name the City Hall Flag Poles as one of "Boston's public forums" if the City's intent was merely to identify some patch of the Plaza grounds at the Flag Poles, because those grounds already would have been covered by the designation of City Hall Plaza as one of the "public forums." Furthermore, the City had allowed at least 284 flag raisings—on the City Hall Flag Poles—as discrete events (JS ¶ 25), and had processed flag raising events as their own category alongside other events at the City's "public forums." (JS ¶ 16 (citing Rooney Dep., D.57-1, at 98:2–104:12, 159:15–161:1, 162:11–167:4, 167:11–169:18, Exs. 18 (D.58-18), 34 (D.58-34), 35 (D.58-35), 36 (D.58-36).)

Third, the City's argument that its application forms do not mention flag raising events, and therefore exclude them from the City's invitation to "all applicants" to use the City's "public forum[]" for events at the City Hall Flag Poles, is directly contradicted by the City's procedures for, and records of, processing flag raising event applications. "The City processes all applications for public events on City properties, including flag raisings, in the same way." (JS ¶ 16.) Thus, applications for flag raising events come to the City, and the City responds to flag raising applicants, according to the same procedures used for all events at the City's other "public forums." (JS ¶ 16 (citing Rooney Dep. 98:2–104:12 ("Yes, this is every request regardless of the type."), 159:15–161:1, 162:11–167:4 ("Yes, it's for any event request."), 167:11–169:18, Exs. 18, 34, 35, 36.)

The City had no reason to separately identify the City Hall Flag Poles as one of "Boston's public forums" unless it meant the Flag Poles as flag poles (*i.e.*, **for** flag raisings **on** the Flag Poles), and not mere markers for a patch of the grounds within the already-designated City Hall Plaza. Nor did the City have any reason to specify flag raising events on its application forms inviting "all applicants" to use "Boston's public forums." Thus, the City's litigation-born distinctions make no legal or factual difference.

B.     **284 Flag Raisings with No Denials Are Significant Because They Demonstrate the City's Claim of Control over Flag Raising Messages Is Illusory.**

The City tries to downplay the critical fact that it approved 284 flag raisings in the years preceding Camp Constitution's request (Opp'n 4), including 39 in the immediate year before—

which averages to more than three per month, or almost once per week.[4] But this frequency is important because it displaces the "rarity" supposition of the First Circuit in the *PI Appeal*, upon which the Court based its "control" conclusion. *PI Appeal*, 928 F.3d at 174. Moreover, the record of 284 flag raising approvals with no record of a denial, and an admission by Rooney that he has never denied a flag raising request, demonstrate—conclusively—that the City's claim of "control" is illusory. (MSJ Mem. 2–3; JS ¶¶ 10–16, 18, 25, 35–38.) To be sure, the City **says** it must review and approve flag raising requests (JS ¶ 36 (quoting Rooney Aff., D.11-1, ¶ 17)), but the City's bare "statement of intent [is] contradicted by consistent actual policy and practice" of never so much as looking at a flag before approving it. *Ridley*, 390 F.3d at 77. Thus, the City's claim of "control" over flag raising messages is reduced to a pretextual litigation contrivance, contradicted in full by the undisputed evidence of the City's actual practice.

The City also makes much of the percentage of time it calculated the City Hall Flag Poles are used for private flag raisings (15%), apparently arguing that the forum is less a forum because it is not used more. (Opp'n 4.) But the City's math does not support its argument. First, without a meaningful usage comparison from other public forums, the City's 15% estimate is meaningless. Second, no precedent holds a public forum is less a public forum because it is not being used to capacity. To be sure, Boston's expansive, open-air City Hall Plaza is undoubtedly one of "Boston's public forums," but, "'During the majority of the days of the year, it's kind of empty . . . or kind of underutilized and formless . . . .'" *Why is Boston City Hall the way it is?*, Boston.com (July 25,

---

[4]      The City misleadingly distinguishes between "countries" and "civic organizations" that conducted the 284 approved flag raisings. (Opp'n 4.) The record is devoid of any evidence that any "countries" applied to Boston to raise their flags on the Flag Poles, as opposed to private persons or organizations desiring to celebrate the heritages and contributions of various countries' constituents.

2018), https://www.boston.com/news/history/2018/07/25/boston-city-hall-brutalism (D.65 at ECF 6). The City Hall Plaza is no less a public forum because it is empty most of the time. By contrast, the City Hall Flag Poles are used for private expression almost weekly. (JS ¶ 25.) Given the City's documented "all applicants" policy and the absence of any record of a denial prior to Camp Constitution's, the estimated 15% utilization proves the Flag Poles can accommodate all the private speech that is requested, with plenty of room to grow. This reality further differentiates the Flag Poles from space-constrained public park in *Pleasant Grove*.

C. *Pleasant Grove* **Used the Informed Observer in Its Government Speech Analysis, Not the Ignorant Observer Supposed by the City.**

The City contends, relying on *Pleasant Grove*, that determining whether expression is government speech requires the Court to consult an ignorant observer, but that determining whether government speech violates the establishment clause requires the Court to consult an informed observer. (Opp'n 6–8.) The Court should reject this proposition because that is not what *Pleasant Grove* says.

Without using the precise terms "reasonable and fully informed observer," the *Pleasant Grove* Court nonetheless assumed an observer who is both reasonable and informed. The Court explained, "because property owners typically do not permit the construction of [permanent] monuments on their land, persons who observe donated monuments routinely—and **reasonably**—interpret them as conveying some message on the property owner's behalf." 555 U.S. at 471 (emphasis added). But the Court's explanation assumed the observers know (*i.e.*, are informed) that "government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land," and that "[i]t certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they

12

do not wish to be associated." *Id.* at 470–471. Thus, the reasonableness of the *Pleasant Grove* observers is proved by how they interpret messages in light of what they know (*i.e.*, are informed of) regarding the financing of donated monuments and what property owners typically allow on their property. The same kind of reasonable observer is consulted in Establishment Clause inquiries to determine whether the government endorses a message, as articulated by Justice O'Connor in her concurrence in *Capitol Square Review & Advisory Bd. v. Pinette*:

> **[B]ecause our concern is with the political community writ large, the endorsement inquiry is not about the perceptions of particular individuals** . . . .
>
> [T]he endorsement test creates a more collective standard to gauge the objective meaning of the government's statement in the community. . . . Thus, we do not ask whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think the State endorses religion. Saying that the endorsement inquiry should be conducted from the perspective of a hypothetical observer who is presumed to possess a certain level of information that all citizens might not share . . . simply recognizes the fundamental difficulty inherent in focusing on actual people: There is always *someone* who, with a particular quantum of knowledge, reasonably might perceive a particular action as an endorsement of religion. . . .
>
> **It is for this reason that the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears**.

515 U.S. 753, 779–80 (1995) (O'Connor, J., concurring in part) (emphasis added) (internal quotation marks and citations omitted).[5] The *Pleasant Grove* reasonable observers were "presumed to possess a certain level of information that all citizens might not share" and "deemed aware of the history and context of the community and forum in which the . . . display[s] appear[]."

---

[5] *See also Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98, 119 (2001) (majority opinion citing Justice O'Connor's informed "reasonable observer" description with approval).

Moreover, the Court's use of the plural "persons who observe" indicates a community of observers, furthering the congruence with Justice O'Connor's hypothetical community. *See Pinette*, 515 U.S. at 779–80.

Thus, in light of what the *Pleasant Grove* Court necessarily assumed regarding its reasonable observers, and given the recent minting of the government speech doctrine, Justice Souter's concurrence should be understood as simply urging the Court to say so explicitly, to ensure congruence with Establishment Clause precedents:

> It is simply unclear how the relatively new category of government speech will relate to the more traditional categories of Establishment Clause analysis, and this case is not an occasion to speculate. . . .
>
> To avoid relying on a *per se* rule to say when speech is governmental, the best approach that occurs to me is to ask whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige by allowing the monument to be placed on public land. This reasonable observer test for governmental character is of a piece with the one for spotting forbidden governmental endorsement of religion in the Establishment Clause cases. The adoption of it would thus serve coherence within Establishment Clause law, and it would make sense of our common understanding that some monuments on public land display religious symbolism that clearly does not express a government's chosen views.

*Pleasant Grove*, 555 U.S. at 487 (Souter, J., concurring in the judgment). There is nothing in *Pleasant Grove* or *Walker* to suggest the government speech inquiry depends on an uninformed observer. [6]

As shown in Plaintiffs' MSJ Memorandum, the undisputed record in this case proves Boston approves all requests to allow private flags to be raised temporarily on its City Hall Flag

---

[6] As pointed out elsewhere, the First Circuit's conclusion in the *PI Appeal*, that even an informed observer would interpret private flag raisings as government speech, 928 F.3d at 173 n.5, was based on an incomplete record.

Poles—284 times prior to Camp Constitution's request, and nearly once a week in recent years—**without reviewing the content of the flags whatsoever**. (MSJ Mem. 2–3, 20–21.) A reasonable observer in Boston would conclude, based on what Boston typically allows on its Flag Poles, that Boston is not speaking through the many and varied flags it allows to be flown on its Flag Poles. The reasonable observer certainly would not conclude that Boston is speaking its endorsement of China, or Cuba, or Turkey, based only on seeing those flags in the rotation.[7] To be sure, an observer with any quantum of knowledge about how Boston approves private flag raisings would reasonably conclude the private flags are communicating private messages; and the more an observer knows, the less reasonable would be a conclusion that Boston is speaking.[8]

The City also contends that, despite all other facts, the height of the Flag Poles alone would compel even a fully informed observer to conclude that Boston is speaking through the private flags it allows. (Opp'n 7; *cf. PI Appeal*, 928 F.3d at 174.) This visibility argument has no merit.

---

[7] Under Massachusetts statutory law, it is illegal—indeed, a crime—for anyone to "display[] the flag or emblem of a foreign country upon the outside of a . . . city . . . building" except under certain circumstances with the Governor's approval. Mass. Gen. Laws ch. 264, § 8. Such flag raising is a minor crime to be sure, and perhaps never prosecuted, but a crime nonetheless. For an observer, then, of the regular and frequent occurrence of the raising of foreign nations' flags on the Flag Poles, is it reasonable to conclude Boston—the Capital City of the Commonwealth—is intentionally violating the Commonwealth's criminal law? Or, is it more reasonable for the observer to conclude that Boston is accommodating the private speech of the organization that requested the flag raising, especially if it coincides with a flag raising event at the base of the Flag Poles?

[8] Indeed, the City selectively invokes the informed observer when it suits the City's purposes, such as to advance its argument that allowing the flags of Turkey, Cuba, and China to be raised on the Flag Poles does not communicate that "the City celebrates the regimes that hold power" in those countries, because "the record makes clear that the City seeks to build an inclusive environment where even persons that have arrived here from countries that do not share our political values can celebrate their heritage and inclusion in the [sic] Boston . . . ." (Opp'n 13.) But the City does not explain why, if the Christian flag was allowed to be raised, the same observer would conclude the City is endorsing Christianity, rather than letting Boston's Christians know that they can celebrate their inclusion in the Boston community regardless of their beliefs.

First, the City does not care what observers see on the private flags raised on the Flag Poles. Rooney would have approved Camp Constitution's "red cross on a blue field on a white flag," just as he approved the Bunker Hill flag's "red cross on a white field on a blue flag," if Camp Constitution had not **called** its flag "Christian." (JS ¶ 55.) Thus, any argument that the City cares what observers see on a flag is disingenuous.[9] Moreover, there is no record evidence to support the *ipse dixit* that private flags flown on the Flag Poles are "visible from areas where even the corresponding event on City Hall Plaza may not be visible." (Opp'n 7 (citing *PI Appeal*, 928 F.3d at 174.) There is no record evidence of the extent, if any, to which hypothetical observers not near a flag raising event can see the Flag Poles but not the associated event on City Hall Plaza.[10] Furthermore, the Commissioner has no knowledge, and the City put forth no evidence, of any observer's ever perceiving that the City endorsed or adopted the message of a private

---

[9]    To the extent the City's visibility argument is based on a distant observer's seeing a flag **and knowing** what the flag is called, then the City concedes that the relevant observer must be fully informed, which concession is fatal to the City's government speech position.

[10]    The following photo depicts the three City Hall Flag Poles in relation to the massive, brutalist City Hall, situated on the expansive City Hall Plaza:



(Decl. Roger K. Gannam, D.65, Ex. A.) There is no obvious vantage point from which to see the Flag Poles without seeing an associated flag raising event at their base on the Plaza.

organization's flag. (JS ¶ 39.) Inferring wide, uninformed visibility from the Flag Poles' height alone is pure speculation.[11]

### D. Even If the City Hall Flag Poles Are a Limited Public Forum, Which They Are Not, the City's Policies and Practices Are Not Viewpoint Neutral or Reasonable.

There is no merit to the City's alternative argument that its exclusion of Camp Constitution from the Flag Poles forum was constitutional because the Flag Poles are a limited public forum. (Opp'n 14–17.) As shown in Plaintiffs' MSJ Memorandum, even under limited public forum analysis, the City's exclusion of Camp Constitution's flag would be unconstitutional because it was neither viewpoint neutral nor reasonable in light of the purposes of the forum. (MSJ Mem. 28–29.) Camp Constitution only adds here that the City has already admitted that excluding Camp Constitution's flag serves no purpose of the Flag Poles forum, other than to allay Rooney's "concern for the so-called separation of church and state or the constitution's establishment clause." (JS ¶ 58.) Because allowing Camp Constitution's flag to be raised on the same terms as the 284 flag raisings that preceded its request would not violate the Establishment Clause (Pls. MSJ Mem. 32–34), the City can point to no reason to exclude Camp Constitution's flag in light of the diversity and inclusion purposes of the City's flag raising forum. (*See supra* pt. I.A.1; *supra* note 8; *infra* pt. I.E.2.)

---

[11]     Also purely speculative was the First Circuit's narration, "If the observer arrived in time, she could well see a City employee lower the Boston flag and replace it with a third party's flag." *PI Appeal*, 928 F.3d at 173–74. Rooney testified that the City typically provides the Flag Poles hand crank to the requesting organizations, and could not say whether City employees ever raise the private flags themselves. (Rooney Dep. (D.57-1) at 130:23–132:15, Ex. 20 (D.58-20).) The City's opposition makes much of the fact that groups raising flags must obtain the hand crank from the City (Opp'n 7), but providing the hand crank is no different, constitutionally, from providing a key to a City facility made available to a private group for a meeting—neither reasonably communicates endorsement of the private group's message.

E.    **Boston's Feigned and Threatened Closures of the Flag Poles Forum Are in Bad Faith.**

1.    **The City's Feigned Closure of the City Hall Flag Poles Forum Is Contradicted by the Record, and Would Have Been Unconstitutional Viewpoint Discrimination in Any Event.**

The City argues that, if subject to forum analysis, it "closed" the designated Flag Poles forum, and that it was free to do so. (Opp'n 11–13.) But this argument is disingenuous for an obvious reason: the forum did not change after the Camp Constitution denial. The City's stated purposes for for allowing flag raisings, and its printable application form inviting "all applicants" to the Flag Poles as one of "Boston's public forums," remained the same. (JS ¶¶ 12–14, 27.) The City's processing of applications for flag raisings remained the same. (JS ¶¶ 16, 23, 38.) And when the City adopted a new, written flag raising policy in October 2018, it simply codified what it had always done, and the written policy did not require the City to handle flag raising requests any differently from how flag raising requests were handled when Camp Constitution applied. (JS ¶¶ 62, 63.) Even the City's denial admits the forum remained unchanged: "The City **would be willing to consider a request to fly a non-religious flag**, should your organization elect to offer one." (JS ¶ 51 (emphasis added).)

Although the City theoretically is "free to decide *in good faith* to close the forum at any time," *Ridley*, 390 F.3d at 77, simply saying it intended to do so (after litigation commenced) is legally insufficient given the City's unequivocal practice. *See Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, 781 F.3d 571, 580 (1st Cir. 2015) ("[A] governmental actor's stated intent cannot determine the nature of the forum in the face of countervailing actions by that actor."); *Ridley*, 390 F.3d at 77 ("[A] statement of intent contradicted by consistent actual policy and practice would not be enough to support the [government's] argument."). Thus, the only conclusion supported by the record is that Boston excluded Camp Constitution from its designated

public forum because of the Christian viewpoint of Camp Constitution's speech (JS ¶¶ 46, 54–55), not because the City changed the nature of the forum.

While a good faith rationale for Boston's closure of the Flag Poles forum could suffice, if a purported decision to close a forum is "merely a ruse for impermissible viewpoint discrimination, that would be found unconstitutional regardless of the type of forum created." *Ridley*, 390 F.3d at 77; *Student Gov't Ass'n v. Bd. of Trustees of Univ. of Mass.*, 868 F.2d 473, 480 (1st Cir. 1989) (same). Indeed, "[o]nce the state has created a forum, **it may not** . . . **close the forum solely because it disagrees with the message being communicated in it**." *Student Gov't*, 868 F.2d at 480 (emphasis added). Even a **temporary** closure of a designated public forum is prohibited if motivated by a desire to prevent the expression of a certain viewpoint. *See, e.g.*, *Rhames v. City of Biddeford*, 204 F. Supp. 2d 45, 53 (D. Me. 2002) (holding that closing forum "temporarily so as to avoid a particular speech or a particular concert" is unconstitutional because "that is not a viewpoint neutral measure and violates the First Amendment").

### 2. The City's Threat to Close the Forum Altogether if Required to Treat Camp Constitution Equally Is in Bad Faith.

The City also threatens to close its Flag Poles to private flags altogether if it is not permitted to continue excluding Camp Constitution's flag based on its Christian viewpoint. (Opp'n 17.) This brazen attempt to shame the Court into ruling in the City's favor, and to shame Camp Constitution for requesting equal access to the Flag Poles, is also an admission of viewpoint discrimination from the start. The City is free to designate its Flag Poles forum, *e.g.*, for flags of local organizations, *see The Nationalist Movement v. City of York*, 481 F.3d 178, 183 n.4 (3d Cir. 2007) (upholding residency requirement against Equal Protection claim), or flags commemorating various communities' civic contributions to Boston, which is congruent with the current stated

purposes of the forum.[12] (JS ¶ 27 ("'Our goal is to foster diversity and build and strengthen connections among Boston's many communities.'").) Thus, to close the forum altogether, just to avoid equal treatment for Camp Constitution or Boston's Christian community, would be the epitome of bad faith viewpoint discrimination, and unconstitutional. *See Ridley*, 390 F.3d at 77.

## II. THE CITY HAS WAIVED ANY ARGUMENT IN OPPOSITION TO SUMMARY JUDGMENT ON CAMP CONSTITUTION'S PRIOR RESTRAINT AND EQUAL PROTECTION CLAIMS BY NOT RAISING IT IN THE CITY'S OPPOSITION.

The City did not make any argument in opposition to summary judgment on Camp Constitution's prior restraint and Equal Protection claims (MSJ Mem. 29–36), and therefore has abandoned any such argument. *See Montany v. Univ. of New England*, 858 F.3d 34, 41 (1st Cir. 2017); *Latin Am. Music Co., Inc. v. Cardenas Fernandez & Assocs., Inc.*, 60 F. App'x 843, 848 (1st Cir. 2003).

## CONCLUSION

Because there are no material facts in dispute and Camp Constitution is entitled to judgment as a matter of law, Camp Constitution's motion for summary judgment should be granted.

---

[12]     Such a public forum does not necessarily require acceptance of a "Straight Pride" flag raising, as speculated by the City (Opp'n 17), absent some plausible civic contribution to Boston by the constituent community. The Supreme Court in *Perry Educ. Ass'n v. Perry Local Educators Ass'n* explained the possibility of such a forum as a sub-classification within a designated public forum: "A public forum may be **created for a limited purpose** such as use by certain groups . . . or for the discussion of certain subjects." 460 U.S. 37, 46 n.7 (1983) (emphasis added) (citations omitted). The Court did not, however, relax the standards applicable to regulation of speech in such a designated public forum.

Respectfully submitted,

Ryan P. McLane (Mass. 697464)
MCLANE & MCLANE
975A Springfield Street
PO Box 105
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com

/s/ Roger K. Gannam
Mathew D. Staver (Fla. 701092)[†]
Horatio G. Mihet (Fla. 26581)[†]
Roger K. Gannam (Fla. 240450)[†]
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854-0774
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org
*Attorneys for Plaintiffs*
[†]Admitted to appear *pro hac vice*.

## CERTIFICATE OF SERVICE

I hereby certify that on this August 16, 2019 I caused the foregoing to be electronically filed through the Court's ECF system. Service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.

/s/ Roger K. Gannam
*Attorney for Plaintiffs*