UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **HAROLD SHURTLEFF et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF BOSTON et al.,**<br><br>Defendants. | Case No. 18-cv-11417-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                February 4, 2020

### I.   Introduction

Plaintiffs Harold Shurtleff and Camp Constitution (collectively, "Plaintiffs") filed this lawsuit against Defendants, the City of Boston and Gregory T. Rooney, in his official capacity as Commissioner of the City of Boston Property Management Department (collectively, "Defendants" or "the City"), seeking to enjoin the City from denying permission to the Plaintiffs to display "the Christian flag" on a City Hall flagpole in conjunction with their Constitution Day and Citizenship Day event.  D. 1.  Plaintiffs and Defendants have now both moved for summary judgment.  D. 55; D. 59.  For the reasons discussed below, the Court ALLOWS Defendants' motion for summary judgment, D. 59, and DENIES Plaintiffs' motion for summary judgment, D. 55.

### II.   Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter

1

of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant "bears the burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor," Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (alteration in original) (quoting Anderson, 477 U.S. at 249). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009). On cross-motions for summary judgment, the standards of Rule 56 remain the same and require the courts "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

### III.    Factual Background

The following facts are drawn from the parties' joint statement of undisputed facts, D. 60. Plaintiff Harold Shurtleff is a resident of Massachusetts and the Director and co-founder of Plaintiff Camp Constitution, which is a public charitable trust registered in New Hampshire. D. 60 at ¶¶ 1-2. Defendant Gregory Rooney has been the Commissioner of the City of Boston Property Management Department since August 1, 2016. Id. at ¶ 6. Defendant City of Boston is

a public body corporate and politic, established, organized, and authorized under and pursuant to the laws of Massachusetts.  Id. at ¶ 5.

This lawsuit arises out of an application by Plaintiffs to Defendants to have the City raise the Christian flag on one of Boston City Hall's three flag poles at City Hall Plaza to commemorate the contributions of the Christian community to the City and the Commonwealth, religious tolerance, the rule of law and the U.S. Constitution.  Id. at ¶ 7.  Plaintiffs made the application on July 18, 2017 and the City denied the application on September 5, 2017.  Id. at ¶¶ 8, 48.

The City owns and manages three flagpoles located in front of the entrance to City Hall, in an area called City Hall Plaza.  Id. at ¶ 20.  One pole regularly displays the flags of the United States and the National League of Families of Prisoners of War/Missing in Action ("POW/MIA") flag.  Id. at ¶¶ 22.  A second pole flies the flag of the Commonwealth of Massachusetts.  Id.  The third pole usually flies the City of Boston flag, but at times the City raises other flags instead of the City of Boston flag, usually after application by a third party.  Id. at ¶¶ 22-23.  Examples of other flags that have been raised on the third flagpole are country flags, e.g., the flags of Brazil, Ethiopia, Portugal, the People's Republic of China and Cuba, and the flags of private organizations, including the Juneteenth flag recognizing the end of slavery, the LGBT rainbow pride flag, the pink transgender rights flag, and the Bunker Hill Association flag.  Id. at ¶ 25.  The flag of Portugal contains "dots inside the blue shields represent[ing] the five wounds of Christ when crucified" and "thirty dots that represents [sic] the coins Judas received for having betrayed Christ."  Id. at ¶ 34.  The City of Boston flag includes the Boston seal's Latin inscription, which translates to "God be with us as he was with our fathers."  Id. at ¶ 29.

At the time of Plaintiffs' flag request, the City had no written policies specifically addressing flag raising applications.  Id. at ¶ 37.  From June 2005 through June 2017, the City

approved 284 flag raising events, including 39 event approvals in the year directly preceding Shurtleff's request. Id. at ¶ 25. These flag raisings have denoted country or cultural celebrations, arrival of dignitaries, commemoration of historic events and causes (e.g., Juneteenth observation, gay pride). Id.; D. 58-17.

Defendant Rooney had never denied a flag raising request prior to Shurtleff's request. Id. at ¶ 35. Rooney had also never requested to see a proposed flag prior to approval of a flag raising request. Id. at ¶ 38. Rooney considered Plaintiffs' request to be the first he had received related to a religious flag. Id. at ¶ 41. Rooney conducted a review of past flag raising requests and determined that the City had no past practice of flying a religious flag. Id. at ¶ 45. Following the denial of the request, Plaintiffs requested an official reason for the denial. Id. at ¶ 48. Rooney responded that the City's policy was to refrain respectfully from flying non-secular flags on the poles in accordance with the First Amendment's prohibition of government establishment of religion and in keeping with the City's authority to decide how it uses limited government resources. Id. at ¶ 51. On September 13, 2017, Plaintiffs renewed their flag raising request. Id. at ¶ 59. The City did not respond to the second request. Id. at ¶ 61.

In October 2018, after the denial at issue in this case, the City promulgated a written Flag Raising Policy that codified past policy and practice and did not change how flag requests would be handled by the City. Id. at ¶¶ 62-63. The written policy includes seven "Flag Raising Rules," the first of which is "[a]t no time will the City of Boston display flags deemed to be inappropriate or offensive in nature or those supporting discrimination, prejudice, or religious movements." Id. at ¶¶ 64-65. Under the policy, the City has final approval authority for all flag raising requests. The City's flag raising website reflects the purpose of the City's sole and complete discretion regarding the approval of any flag raisings: "[w]e want to create an environment in the City where

everyone feels included, and is treated with respect"; [w]e also want to raise awareness in Greater Boston and beyond about the many countries and cultures around the world" and "[o]ur goal is to foster diversity and build and strengthen connections among Boston's many communities." D. 60 at ¶ 63; D. 58-32 at 1.  Since the adoption of the written policy, the City has denied another flag raising application, which was for a "Straight Pride" flag. D. 60 at ¶ 67.

## IV.     Procedural History

On July 6, 2018, Plaintiffs filed the present complaint seeking injunctive relief, declaratory relief and damages against Defendants.  D. 1.  Plaintiffs moved for a preliminary injunction, D. 7, which the Court denied on August 29, 2018, D. 19.  Plaintiffs appealed the Court's decision.  D. 23.  The Court denied Plaintiffs' motion to stay these proceedings during the pendency of the appeal.  D. 34.  On November 30, 2018, Defendants moved for judgment on the pleadings.  D. 39.  The Court denied Defendants' motion for judgment on the pleadings on May 3, 2019.  D. 48.  On June 27, 2019, the First Circuit affirmed the Court's decision on the preliminary injunction.  D. 54.  In the interim, the parties have conducted discovery and now have filed cross motions for summary judgment.  D. 55; D. 59.  The Court heard the parties on the pending motions for summary judgment and took the matters under advisement.  D. 69.

## V.      Discussion

Plaintiffs and Defendants both seek summary judgment on all of Plaintiffs' claims: 1) a violation of the First Amendment free speech clause; 2) a violation of the First Amendment establishment clause; 3) a violation of the Fourteenth Amendment equal protection clause; 4) a violation of the freedom of speech clause of Article 16 of the Massachusetts Declaration of Rights; 5) a violation of the non-establishment of religion clauses of Articles 2 and 3 of the Massachusetts Declaration of Rights; and 6) a violation of equal protection under Articles 1 and 3 of the

Massachusetts Declaration of Rights. As the Court noted in resolving the motion for judgment on the pleadings, D. 48 at 5-6, since the standard for the claims arising under Massachusetts Declaration of Rights is the same as applies under the U.S. Constitution, the Court focuses on the federal law here in resolving Plaintiffs' claims. See, e.g., Commonwealth v. Barnes, 461 Mass. 644, 650 (2012) (classifying the free speech provisions of Article 16 of the Massachusetts Declaration of Rights as a "cognate provision" of the First Amendment); Brackett v. Civil Serv. Comm'n, 447 Mass. 233, 243 (2006) (noting that "[t]he standard for equal protection analysis under [Massachusetts'] Declaration of Rights is the same as under the Federal Constitution"); Opinion of the Justices to the House of Representatives, 423 Mass. 1244, 1247 (1996) (explaining that the court's analysis under Article 2 of the Massachusetts Declaration of Rights was "based on the same standards applied under the establishment clause of the First Amendment").

At the hearing on the motions for summary judgment, much of the parties' arguments focused on what has changed in the record since the rulings on the preliminary injunction, motion for judgment on the pleadings and the interlocutory appeal before the First Circuit: 1) over the course of the twelve years preceding the denial of Camp Constitution's application, the City approved 284 flag raising events; 2) there is no record of any denials prior to Camp Constitution's application; and 3) the City's website now expressly states the particular purposes that the City seeks to further through the flag raising program.

    **A.**    **The City's Flag Display Constitutes Government Speech**

The parties' central disagreement remains whether the display of third-party flags on the pole in question constitutes government speech. The outcome of this question is crucial "[b]ecause [when] the State is speaking on its own behalf, the First Amendment strictures that attend the

various types of government-established forums do not apply." <u>Walker v. Tex. Div., Sons of Confederate Veterans, Inc.</u>, __ U.S. __, 135 S. Ct. 2239, 2250 (2015).

As the Court noted in its prior opinion, D. 48 at 7, there are two leading Supreme Court cases that inform whether the City's display of flags on the City flagpole constitutes government speech. In the first case, <u>Pleasant Grove County, Utah v. Summum</u>, 555 U.S. 460 (2009), members of a religious organization called Summum sued the city of Pleasant Grove under the free speech clause of the First Amendment for the city's failure to include Summum's proposed monument in a public park. <u>Summum</u>, 555 U.S. at 464. Other privately donated monuments in the park had included a monument of the Ten Commandments. <u>Id.</u> at 465. Summum's proposed monument was "the Seven Aphorisms of SUMMUM" and would "be similar in size and nature to the Ten Commandments monument." <u>Id.</u> The city rejected Summum's proposal pursuant to an unwritten rule "limit[ing] monuments in the Park to those that 'either (1) directly relate[d] to the history of Pleasant Grove, or (2) were donated by groups with long-standing ties to the Pleasant Grove community.'" <u>Id.</u> The Supreme Court unanimously concluded that the city's rejection of Summum's proposal constituted government speech and that the "Free Speech Clause . . . does not regulate government speech." <u>Id.</u> at 467.

The Supreme Court looked at the issue again in <u>Walker</u>. <u>Walker</u> concerned the Texas Department of Motor Vehicle Board's rejection of a proposal by the Sons of Confederate Veterans for a Confederate flag license plate. <u>Walker</u>, 135 S. Ct. at 2243-44. After public comment, the Board voted unanimously to reject the proposed plate because "many members of the general public [found] the design offensive," "such comments [were] reasonable" and "a significant portion of the public associate the confederate flag with organizations advocating expressions of hate directed toward people or groups that is demeaning to those people or groups." <u>Id.</u> (internal

quotation mark omitted).  The Court held that the Texas license plates, like the monuments in Summum, constituted government speech and thus were not subject to the free speech clause's strictures.  Id. at 2246.  The Court focused on three primary factors:  1) the history of the speech at issue; 2) a reasonable observer's perception of the speaker and 3) the state's control over the speech.  Id. at 2248-50.  Following Summum, the Court concluded that 1) license plates "long have communicated messages from the States;" 2) license plates "are often closely identified in the public mind with the [State]" and reasonable observers "interpret them as conveying some message on the [State's] behalf" and 3) the state had "effectively controlled" the content of the license plates by exercising approval authority over each request.  Id. at 2247-49 (first alteration in original) (citations omitted).

The First Circuit, in affirming the denial of Plaintiff's motion for preliminary injunction, concluded that "[t]he Summum/Walker three-part test controls here and each of its factors strongly favors a finding that the City engages in government speech when it decides which flags to display in place of the City flag on the City Hall flagpole" and "[t]his case lies well within the established bounds of the government speech doctrine."  Shurtleff v. City of Boston, 928 F.3d 166, 172 (1st Cir. 2019).  Now, on a fully developed record, post-discovery, this remains true as a consideration of the Summum/Walker factors on the present record show.

First, the use of flags to communicate messages throughout history and into the present day is beyond dispute.  See, e.g., W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 632 (1943) (noting that "[t]he use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind" and "[c]auses and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner"); Griffin v. Sec'y of Veterans Affairs, 288 F.3d 1309, 1324 (Fed. Cir. 2002) (noting that "[w]e have no

doubt that the government engages in speech when it flies its own flags over a national cemetery"). That is, "flags themselves communicate a message," Shurtleff, 928 F.3d at 173 n.4. This has been historically true as to governments using flags to communicate messages, id. (citing examples), and as evidenced here as to the City. See D. 60 at ¶¶ 27, 62-65. "Shurtleff's proposed flag is no different" in conveying a message, Shurtleff, 928 F.3d at 173 n.4, as it was described by the applicant as "the Christian flag." D. 60 at ¶ 8. On the present record, it remains the case that "the City recognizes flag flying as a symbolic act and that it uses flags – in particular those raised on the City Hall pole – to speak to the public." Shurtleff, 928 F.3d at 173.

As to the second factor, this Court also concludes that a flag waving on the City Hall flagpole would be attributed to the City as the speaker. It is not only that the flagpole on which Shurtleff's Christian flag would be flying is on the steps of City Hall, but also that this "third-party flag would keep company with the United States flag and the flag of the Commonwealth of Massachusetts, two powerful governmental symbols." Shurtleff, 928 F.3d at 174. That a keen observer might also observe that this third-party flag was flying on the pole ordinarily reserved for the flag of the City of Boston for a time would be even greater cause to attribute such speech to the City. By any measure of identity of the speech being that of the City or, alternatively, by any reasonable observer standard, see Shurtleff, 928 F.3d at 173 & n.5, the Christian flag waving on the City's flagpole would be readily attributed to the City. See Summum, 555 U.S. at 471.

Contrary to Plaintiffs' suggestion otherwise, the fuller record as to the third prong—whether the City maintains control over the speech—strengthens the factual foundation for concluding that this last prong of the government speech test is satisfied. Plaintiff points to the total number of 284 flag-raising at City Hall Plaza to contend that this shows lack of governmental control over the City Hall flagpole. D. 61 at 16. Such argument ignores at least two important

9

points. First, it ignores the context, that of these 284 flag-raising, they represented celebrations of a dozen or so different countries (including but not limited to Albania, Brazil, Italy, Mexico, China, Cuba, Turkey) and only a handful of civic organizations (e.g., Chinese Progressive Association, National Juneteenth Observance Foundation, Bunker Hill Association, Boston Pride), some of which had multiple flag raisings during this period. D. 64 at 5; D. 60 at ¶¶ 25, 30-31. Second, also as to context, such flag raisings occurred over a twelve-year period, only approximately fifteen percent of the time, D. 64 at 5; see D. 60 at ¶¶ 25, 29, hardly a significant occasions in comparison to all of the other times when the usual flag, that of the City, flies of the flagpole. That is, it remains correct that "the flagpole at issue is only rarely occupied by a third-party flag." Shurtleff, 928 F.3d at 174. To the extent that even small number of countries and entities may have different messages that the City wants to convey, does not mean that the messages are not the City's own, Walker, 135 S. Ct. at 2252, particularly since the City has conveyed several interests in considering flags to be flown on its flagpole. D. 60 at ¶ 27 (commemorating flags "from many countries and communities," wanting to create an inclusive environment, raise cultural awareness and "foster diversity and build and strengthen connections among Boston's many communities"). Third, both the City's practice and policy at the time of the denial of Shurtleff's 2017 flag request and the City's subsequently adopted written policy make clear that that the City controls which third-party flags are raised in place of the City flag and such decision is "in the City's sole and complete discretion." D. 60 at ¶¶ 62, 63. That is, the City exercises final approval authority and remains the gatekeeper of the speech that is displayed on the flagpoles that it owns and controls on the very doorstep of City Hall.[1]

---

[1] The lack of permanence of the City allowing different flags to be displayed on its flagpole does not undercut the conclusion that flags on the City flagpole are government speech. As the First Circuit concluded that although permanence may be relevant to finding of a government

All three Summum/Walkers factors, therefore, show that the flag display is government speech and not subject to First Amendment restrictions.[2]

### B. The Record Does Not Support Finding the City Has Shown a Preference for Non-Religion Over Religion

Plaintiffs also argue that the City's policy violates the First Amendment's Establishment Clause and the Equal Protection Clause of the Fourteenth Amendment.

#### 1. The City Has Not Violated the Establishment Clause

Even as the Court has concluded that the speech at issue is government speech, as discussed above, government speech must comply with the Establishment Clause and cannot, as Plaintiffs allege, be overtly hostile to religion. Summum, 555 U.S. at 468. The test for considering Plaintiffs' Establishment Clause claim against the City is the Lemon test: 1) whether the City's conduct "ha[s] a secular legislative purpose," 2) the "principal or primary effect [of that conduct] must be one that neither advances nor inhibits religion" and 3) the City's actions "must not foster an excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971) (internal quotations omitted).

Like government speech, "the Establishment Clause must be interpreted 'by reference to historical practices and understandings.'" Town of Greece, N.Y. v. Galloway, 572 U.S. 565, 576 (2014) (citation omitted); see Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 309 (2000) (reviewing a challenged policy's history to determine its purpose). Analysis of the Establishment

---

speech, it is not a necessary element of government speech. Shurtleff, 928 F.3d at 175 (contrasting Summum and Walker in this respect); see D. 64 at 2-3 and cases cited.

[2] Since the Court has concluded that the display of flags outside City Hall is government speech, "the First Amendment strictures that attend the various types of government-established forums do not apply," Walker, 135 S. Ct. at 2250, and the Court need not address the alternative arguments about government-established forums. See Shurtleff, 928 F.3d at 175 (noting that success on a "public forum" argument "is precluded by our government-speech finding").

Clause is also "a delicate and fact-sensitive one." Lee v. Weisman, 505 U.S. 577, 597 (1992); see Town of Greece, 572 U.S. at 587 (noting that analysis of prayer at town board meetings under the Establishment Clause is "fact-sensitive" and that the Court "considers both the setting in which the prayer arises and the audience to whom it is directed").

Applying the first prong of the Lemon test, the City's flag raising rules and regulations further a secular legislative purpose, as discussed above, of encouraging inclusion and diversity within the City. D. 60 at ¶¶ 27, 62-65. The second prong, that the City's regulation's "principal or primary effect must be one that neither advances nor inhibits religion," on which Shurtleff focuses as he alleges hostility and discrimination towards religion as evidenced by the denial of the Camp Constitution application. See D. 61 at 37. In support of this argument, Shurtleff point to the fact that other flags with religious imagery or symbols have flown on Boston flagpoles. Id. at 41. All of these flags, although they contained religious imagery, are secular flags of sovereign nations. See American Legion v. American Humanist Ass'n, 139 S. Ct. 2067, 2075 (2019); Shurtleff, 928 F.3d at 177 (noting that "a flag that references religion by using religious symbols in part of its field is not itself a religious flag"). Permitting such flags to be flown also allowed for the City's purpose of "commemorate[ing] flags from many countries and communities" and is not similar to the Christian flag proposed to be flown by Shurtleff, which was a religious flag. D. 60 at ¶ 58. Such a flag is even different than the flag of the Vatican (which, the present record reflects has not been flown on the City Hall flagpole, D. 64 at 15 n.1), which while containing religious imagery and symbolism, also is the flag of a sovereign state. The Court is not convinced that flags of countries or secular organizations and entities that contain religious references or imagery are the same as the Christian flag that Shurtleff sought to fly from the City's flagpole, which nobody disputes is a non-secular flag. That is, the denial of Camp Constitution's application to fly the

Christian flag on City Hall Plaza is not a departure from the City's usual practice, rather the application of its practice and policy, given that it, unlike any other application, sought to fly a religious flag. D. 60 at ¶ 41. The City's desire not to have its speech coopted to promote a religious message cannot be seen as an improper inhibition of religion, when its primary reason for denying the application was to avoid the risk of violating the Establishment Clause by appearing to make "a government effort to favor a particular religious sect," Van Orden v. Perry, 545 U.S. 677, 702 (2005) (Breyer, J., concurring); D. 60 at ¶ 58. It remains the case, now on a developed record, that "Shurtleff has not established that the City's policy and practice shows a preference for one religion or religious denomination over another." Shurtleff, 928 F.3d at 177. Nor does it reflect a preference for "non-religion" over religion. See Shurtleff, 928 F.3d at 177 (noting that "the 'secular' flags – really, flags of secular organizations or cause – the City has allowed to fly instead of the City flag do not show that the City has espoused a preference for non-religion over religion"). Lastly, as to the third prong, there is no allegation of excessive entanglement with religion brought about by the City's policies and practices here, a point that cannot be forcefully made on this record. Accordingly, there has been no showing that City's declination of Shurtleff's request violated the Establishment Clause.

       2.  *The City Has Not Violated the Equal Protection Clause*

  The Equal Protection Clause requires that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish an Equal Protection claim, Plaintiffs must show that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights,

or malicious or bad faith intent to injure a person." Davis v. Coakley, 802 F.3d 128, 132-33 (1st Cir. 2015) (citation omitted).

As discussed above, Rooney had never considered a religious flag prior to Plaintiffs' application. D. 60 at ¶ 41. Rooney also does not recognize any "goal or purpose of the City . . . by excluding religious flags, except 'concern for the so-called separation of church and state or the constitution's establishment clause.'" D. 60 at ¶ 58. There are no additional facts in the record that would suggest any improper preference for non-religion over religion or selective treatment of any person or group based on religion. The City did not alter its procedures for review of flag applications because of Camp Constitution's request, instead Camp Constitution's request presented a novel issue for the City's consideration, which the City considered consistent with its practice and policy. D. 60 at ¶¶ 52, 54, 58. The record does not support a claim of an Equal Protection violation here.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 59, and DENIES Plaintiffs' motion for summary judgment, D. 55. Judgment is entered in favor of Defendants.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge