```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2

 3      _____

 4      HAROLD SHURTLEFF, et al.,

 5                         Plaintiffs,      Civil Action
                                            No. 18-11417-DJC
 6      v.
                                            August 28, 2019
 7      CITY OF BOSTON, et al.,             3:03 p.m.

 8                         Defendants.
        _____
 9

10

11                    TRANSCRIPT OF MOTION HEARING

12               BEFORE THE HONORABLE DENISE J. CASPER

13                  UNITED STATES DISTRICT COURT

14               JOHN J. MOAKLEY U.S. COURTHOUSE

15                      1 COURTHOUSE WAY

16                     BOSTON, MA  02210

17

18

19

20
                     DEBRA M. JOYCE, RMR, CRR, FCRR
21                     Official Court Reporter
                    John J. Moakley U.S. Courthouse
22                   1 Courthouse Way, Room 5204
                          Boston, MA  02210
23                     joycedebra@gmail.com

24

25
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:

 3   ROGER GANNAM, ESQ.
     HORATIO G. MIHET, ESQ.
 4   Liberty Counsel
     P.O. Box 540774
 5   Orlando, FL 32854
     407-875-1776
 6
     FOR THE DEFENDANTS:
 7
     ROBERT S. ARCANGELI, ESQ.
 8   City of Boston Law Department
     One City Hall Plaza
 9   Room 615
     Boston, MA 02201
10   617-635-4048

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

        (The following proceedings were held in open
court before the Honorable Denise J. Casper, United States
District Judge, United States District Court, District of
Massachusetts, at the John J. Moakley United States Courthouse,
1 Courthouse Way, Boston, Massachusetts, on August 28, 2019.)

        THE CLERK:  Court is in session.  Please be seated.

        Civil action 18-11417, <u>Shurtleff v. City of Boston</u>.

        Would counsel please state your name for the record.

        MR. GANNAM:  Good afternoon, your Honor.  Roger Gannam
for the plaintiff Harold Shurtleff and Camp Constitution.

        THE COURT:  Good afternoon, counsel.

        MR. MIHET:  And Horatio Mihet, also for the plaintiff.
Good afternoon.

        THE COURT:  Good afternoon.

        MR. ARCANGELI:  Good afternoon.  Robert Arcangeli on
behalf of the defendant.

        THE COURT:  Good afternoon, counsel.

        Counsel, we're here on the parties' cross-motions for
summary judgment.  I've had a chance to review the papers on
either side.  I'm somewhat familiar with the record, the
previous record, in regards to the preliminary injunction, but
I've reviewed the summary judgment materials as well.

        Counsel, why don't I hear from the plaintiff first,
then I'll let you respond and address your cross-motion, and

```
 1    then I'll give plaintiff last word.

 2              MR. GANNAM:  Thank you, your Honor.

 3              A little housekeeping.  Again, my colleague,

 4    Mr. Mihet, his flight is earlier than mine; he may have to

 5    leave a little bit early if we're not done yet, I just wanted

 6    to let you know.

 7              THE COURT:  Thank you.

 8              MR. GANNAM:  Your Honor, as you know, we're here on

 9    motions for summary judgment.  As I argue for the plaintiffs'

03:05 10  motion, the same arguments would apply to oppose the city's

11    motion for summary judgment on the same grounds.

12              I think the question that we should cover first is

13    what's changed.

14              Obviously this Court denied plaintiffs' motion for

15    preliminary injunction, and that was affirmed by the 1st

16    Circuit.  So what's changed since those rulings that could lead

17    the Court to grant summary judgment now?  And the answer to

18    that question is, is the record that we have that we did not

19    have before.  We only had a verified complaint and its exhibits

03:05 20  to offer to this Court and the 1st Circuit previously.  We now

21    have a developed record, having taken the deposition of the

22    commissioner, one of the defendants in this case, and

23    received -- having received some documentary discovery as well.

24              And the record that we have now fills in all the

25    blanks that we didn't know before, and it changes everything,
```

1   primarily because we have now 284 approved flag-raising events

2   preceding Camp Constitution's denial over the course of 12

3   years, and there's no record of any denials during that run of

4   284 approved flag raisings.

5         And we also have the facts about the approval process,

6   which shows us that the commissioner essentially granted all

7   applicants.  There was no meaningful review of any application

8   that came in.  As I said, there's no record of any denials

9   during those 284 approvals, and the Commissioner Rooney himself

03:06 10   testified he never looked at a flag, never reviewed any of the

11   actual flags themselves, and essentially said, We pretty much

12   granted everyone who applied.

13         So these facts stand in contrast to what the 1st

14   Circuit focused on.  The 1st Circuit focused on there only

15   having been 15 flag raising events identified in plaintiffs'

16   moving papers, and the Court attributed that to the strict

17   control of the government over what flags were allowed.

18         We know now that that's not the case.  It's not 15,

19   it's 284.  We know that there was no meaningful control over

03:07 20   the flags that were allowed to be raised, pretty much everyone

21   who applied got to raise one.

22         And so the record before the 1st Circuit is so

23   different from the record that we have now.  And also the

24   record before this Court when we moved for preliminary

25   injunction is so different from what we have now that those

1    prior rulings really don't count now that we have a full

2    record.

3            THE COURT:  And I understand your point about the

4    volume.  But, as I understood it, they all -- all of the

5    approvals went through the same process, meaning the same city

6    department and so forth, Mr. Rooney; am I correct?

7            MR. GANNAM:  All public events on Boston's public

8    forums, as they describe them, City Hall Plaza, the City Hall

9    flagpoles, Faneuil Hall, things like that, they all go through

03:07 10   the same process.  It's the same application, it's the same

11   recipient at the city, and they all go through the same

12   process.

13           What we know about flag raisings is there's no real,

14   meaningful review that's applied to them.  The application

15   comes in, and if the time slot is available, they were simply

16   approved.

17           Again, the commissioner never asked to see a flag,

18   never looked at any of them, never scrutinized them, never

19   asked for any flag to be changed, anything like that, prior to

03:08 20   Camp Constitution's request.

21           And legally, this is significant because we know that

22   from the Walker case that just because private parties happen

23   to participate in selecting a government message, that doesn't

24   necessarily change government speech into private speech.  But,

25   on the other end, we also know that just because the government

provides a forum or even has a permit process for private

speech, going through that process does not in and of itself

change private speech into government speech.

So we have to look at what the government actually

says and what the government actually does, as we're told in

the Ridley case; and to be more specific, we look for explicit

statements of intent, we look for the actual policy and

practice, and we look at whether the property at issue is

compatible with the forum that's being claimed.

So here, where the plaintiffs say that this is -- the

flagpole is a public forum for private speech in the form of

private flags, we first have to ask, well, is there any

explicit statement of intent?

In the presentation that we've prepared, your Honor,

we can see that in the printable application form, this is

Plaintiffs' Exhibit 31, filed at 58-31, this is an application

form that existed when Camp Constitution filed their request;

it still exists now, it's never been replaced.  And it says

very specifically that these are guidelines for any person or

group requesting the use of, and it lists many venues

concluding with the City Hall flagpoles.

And going down further towards the bottom of this

slide, it says, "Where possible, the Office of Property and

Construction Management seeks to accommodate all applicants

seeking to take advantage of the City of Boston's public

1    forums."

2          So we have here, your Honor, an explicit statement by

3    the city on a city document treating the City Hall flagpoles as

4    one of Boston's public forums and also inviting all applicants

5    and making it clear that we try to accommodate everyone.

6          So that satisfies that first prong in Ridley, we have

7    an explicit statement of intent.

8          Now we have to look what the has the city actually

9    done.  And that's where the actual policy and practice comes

03:10 10   into play.  And just to repeat, we have this uninterrupted

11   track record, over 12 years, of 284 flag raisings that were

12   approved with no record of any denial.

13         That is significant because it matches the city's

14   actual policy and practice with its explicit statement of

15   intent to welcome all applicants to the public forum of the

16   flagpoles.

17         And then, finally, the question is:  Is the property

18   compatible with the forum that's being claimed?  This forces us

19   to look at the Pleasant Grove v. Summum case where a group

03:11 20   wanted to place a permanent monument in a public city park.

21   And there the Court said a permanent monument is not compatible

22   with the public forum nature of a city park because there's

23   only so much space that can be taken up by permanent monuments

24   before there is none left over for the traditional function of

25   private speech.

1          Here, the same track record that shows 284 approvals

2     proves that the City Hall flagpoles are perfectly compatible

3     with private expression because the city does it all the time,

4     in the year preceding Camp Constitution's request, more than

5     three times a month.  So almost once a week one of the City

6     Hall flagpoles is used for private expression in the form of a

7     private flag belonging to a private organization.

8          So with the explicit statement of intent, with the

9     actual policy and practice, and then the compatibility of the

03:12 10     property with the forum that's being claimed, all of those

11     point towards this being a public forum designated by the City

12     of Boston for private expression.

13          And a final point about this.  Flagpoles -- obviously

14     a flagpole belonging to the City of Boston can be used by the

15     city however it wants.  It can put whatever flag it wants on

16     there, and generally speaking, that would be considered

17     government speech.  But the very nature of a designated public

18     forum, it's when the government takes something that's a

19     nontraditional forum or a nonpublic forum and opens it up for

03:12 20     private expression.  And here we have exactly that.  We have

21     the City of Boston welcoming all applicants asked to raise

22     their flag on one of the flagpoles, and they've granted them

23     without fail 284 times until Camp Constitution came along and

24     applied.

25          THE COURT:  But doesn't the fact that they have a

1    process -- well, first of all, there's the argument I know the

2    city has in regards to it being a flagpole and its location in

3    front of City Hall, but doesn't the fact that it is not open,

4    it's subject to approval, even as I see your point about the

5    number of approvals as opposed to declinations, but isn't the

6    fact that there's a process and a process that the city uses to

7    decide or not suggest that it is not a public forum?

8         MR. GANNAM:  No, your Honor.  And I think the best

9    case to illustrate this is the 2nd Circuit's Wandering Dago

03:13 10   case where in New York at the Empire State Plaza or Empire

11   Plaza, the government opened up this opportunity for food

12   trucks to come in and -- or on one day a week to provide food

13   or to sell food to the various users of that property.  It was

14   all government property.  The entire thing was arranged by the

15   government, it was advertised by the government, and then they

16   rejected one of the vendors because the government didn't like

17   the name.  They felt it was racially insensitive.  And so what

18   the Court there said is, look, just because the city or the

19   government screens applicants or screens the names and has a

03:14 20   permit process to allow someone to use the forum, it doesn't

21   make it government speech.

22         And so what we have here, your Honor, is just because

23   the government has a process where there is an approval process

24   of some kind, that does not in and of itself convert private

25   speech into government speech, especially where here the

1   approval process is perfunctory.  Again, the undisputed record

2   facts show that the city doesn't really do anything other than

3   receive the application, and if the space or the time slot's

4   available, it gets approved without any meaningful review of

5   the flag or the request itself.

6        And so the truth of the matter is that most

7   governments have some kind of approval process for using its

8   property for speech, and that in and of itself doesn't

9   transform private speech into government speech.

03:15 10        So whereas we had an argument before that there was

11   some selectivity here looking even at the affidavit of the

12   commissioner filed early on in this case that there must be

13   some review to make sure that the flag is consistent with the

14   city's messages or the city's policies.  When we got discovery

15   on what that policy actually looked like, there was no

16   meaningful review, it was simply perfunctory.  So there's not

17   enough government control there to transform this private

18   speech into government speech.  Certainly nothing close to the

19   active control that was displayed in the Walker case where to

03:15 20   get a license plate created the whole design process was

21   subject to the government's approval, and the government looked

22   at lots of them and rejected lots of them.

23        So we don't have a situation here where the City of

24   Boston receives a lot of applications for flag raisings and

25   picks the ones it likes and declines the others.  They simply

1    accepted all of them until Camp Constitution came along.  And

2    for those reasons, we don't think it would be proper to

3    characterize this as government speech when it looks much more

4    like a forum that the city opened to all comers, and, in fact,

5    treated it like that for 12 years before Camp Constitution came

6    along.

7            Because, as we assert, this must be viewed as a public

8    forum or at worst a limited public forum which is a forum

9    opened for a specific purpose by the city, the forum analysis

03:16 10    applies.

11            Now, if it's a designated public forum, that means any

12    viewpoint-based restriction on speech is unconstitutional,

13    period.  Any content-based restriction on speech is

14    presumptively unconstitutional and must satisfy strict

15    scrutiny.

16            In this case, your Honor, it doesn't matter which one

17    we look at, whether it's viewpoint or simply a content-based

18    restriction.  In both cases it fails the test.

19            From a viewpoint standpoint, what Camp Constitution

03:17 20    wanted to do was to have a flag raising to celebrate the

21    contributions of the Christian community to Boston and to the

22    Commonwealth.  The very same type of flag raising had been

23    approved by the city numerous times.  We can show the Court one

24    example is the Portuguese flag-raising ceremony that was

25    approved by the commissioner in this case.  And the highlighted

1   language it says, The Portuguese-American community in Boston

2   contributes greatly to the rich history, culture, and diversity

3   of the City of Boston.  The Portuguese flag-raising ceremony

4   and reception represents the official recognition of the

5   Portuguese community's presence and importance in the state of

6   Massachusetts.  That's the subject matter; that's the purpose

7   of the flag raising that was allowed.

8           Yet, when Camp Constitution wanted to do something

9   essentially identical, as shown in our statement of undisputed

03:17 10   facts, what Camp Constitution wanted to do was commemorate the

11   civic and social contributions of the Christian community to

12   the City of Boston and to the Commonwealth of Massachusetts.

13   It was denied, and the only reasonable conclusion is it's

14   because it was Christian or because they wanted to raise a

15   Christian flag in association with the exact same type of

16   event.

17           So whether it's the viewpoint of the participants that

18   was excluded or because the celebration of this particular

19   community's contributions to the city was going to be

03:18 20   celebrated from a Christian viewpoint, either way it looks

21   like, to us, the city declined this application based on the

22   viewpoint being expressed by Camp Constitution.

23           But even if we give the city the benefit of the doubt

24   on viewpoint, it's still being -- their application was still

25   rejected based on the content of what they wanted to do because

1    they were deemed religious.  It was a flag that had a red cross

2    on a blue field on a white flag that was rejected.  But the

3    nearly identical flag of the Bunker Hill Association, which was

4    a red cross on a white field on a blue flag, was accepted by

5    the city.  There's no reasonable distinction that could be made

6    there based on the content of the flag, other than that Camp

7    Constitution called its flag "religious."

8         And so we have -- because it had religious content, it

9    was rejected, whereas if it had secular content or nonreligious

03:19 10    content, it would have been allowed.

11         So whether we look at it as a viewpoint-based

12    restriction or simply a content-based restriction, there is no

13    way that this policy can survive constitutional scrutiny.

14         Even if we look at it as a limited public forum, your

15    Honor, it still can't satisfy the test because if it were a

16    limited public forum, meaning a forum that the city created not

17    for all private speech but private speech that matches some

18    particular purpose of the city, even then it must be a

19    viewpoint-neutral restriction and the restriction must

03:20 20    reasonably serve the purpose of the forum.

21         If we look at the purpose of the city's flag raising

22    forum -- this comes straight from the city's website -- it says

23    that we commemorate flags from many countries and communities

24    at Boston City Hall Plaza.  We want to create an environment in

25    the city where everyone feels included and is treated with

1    respect.  Our goal is to foster diversity and build and

2    strengthen connections among Boston's many communities.

3            This is the only express statement of purpose for flag

4    raisings that Boston provides on its website.

5            If this is a purpose statement intended to restrict

6    what kinds of flags can go up on the City Hall flagpoles, there

7    would be no reason to exclude Camp Constitution's request from

8    City Hall flagpole because they wanted to do exactly what this

9    purpose statement calls for, celebrate the Christian

03:20 10   community's contributions to Boston, to celebrate their

11   diversity.  There would be no other reason to reject the Camp

12   Constitution request under this purpose statement.

13           In fact, we have the testimony from the commissioner

14   himself who said there was no other purpose for excluding Camp

15   Constitution's request other than that the city wanted not

16   violate the Establishment Clause.

17           Well, if the purpose of the forum, as defined by the

18   city, was to celebrate the diversity of its many communities

19   and not violate the Establishment Clause, well, the law is very

03:21 20   clear that allowing a Christian organization the same access as

21   everyone else demonstrates neutrality towards religion and

22   complies with the Establishment Clause.  It's when the

23   government singles out religion for different treatment that

24   the Establishment Clause is violated.

25           So even if this is viewed not as a designated public

1    forum but as a limited public form with the different test, it

2    still fails because, as we've already said, it discriminates on

3    the basis of viewpoint, and it also doesn't satisfy any purpose

4    of the forum to exclude Camp Constitution simply because it's

5    religious.

6            Your Honor, at this point I would just like to reserve

7    the rest of my time for rebuttal to the city's arguments.

8            THE COURT:  Thank you.

9            Counsel, I'll hear from the city.

03:22 10     MR. ARCANGELI:  Yes, your Honor, Robert Arcangeli for

11   the city.

12           Your Honor, with regards to the case and what my

13   brother said earlier, you know, what should be addressed at

14   this point is what has changed.  And actually, what I was going

15   to highlight first for you as to what has changed with regards

16   to the record since we've been here for the preliminary

17   injunction and for the motion on judgment of the pleadings is

18   what's in front of you right now, it's this statement of

19   purpose by the city as to why it conducts flag raisings on its

03:22 20   flagpole.  This provides a purpose for the forum.  It provides

21   a measure of control that the city maintains over the forum.

22           The fact that there were 284 flag raisings approved

23   over the course of 12 years doesn't mean that those 284 flag

24   raisings did not serve this purpose, and it does not mean that

25   those flag raisings were in any way, you know, contrary to the

1    purpose that was stated by the city.

2            There's nothing in the record to indicate that there

3    was anything similar proposed to the city in the past to the

4    plaintiffs' request.  They never received a request restricting

5    a religious flag in the past.

6            Furthermore, with the 284 flag raisings, most of those

7    are multiple -- are the same flag being raised multiple times

8    year after year after year.

9            I know that the plaintiff has pointed to the flag of

03:23 10   Turkey which has been raised 10 to 12 times.  These are

11   expressions from a group of what I can identify from the joint

12   statement of facts from the record from 16 different groups.

13   And the fact that they happen to two to three times a month

14   raise a flag on the City Hall flagpoles does not necessarily

15   mean that it takes the city's speech or it takes the speech

16   that occurs on that flagpole outside the realm of government

17   speech.  The Walker case, in particular, stated with regards to

18   the license plate that the city may have many messages that it

19   may want to -- or that the state may have many messages that it

03:24 20   may want to convey through its license plates, and the fact

21   that it has those many messages does not mean that those

22   messages do not fit within government speech.

23           There are three factors that Summum really set forth

24   to determine whether government speech existed.  One of them --

25   one of which was the tradition and history of the government

1    property at issue.  I think in this case we're dealing with the

2    flag.  In terms of the traditional purpose of flags, you know,

3    the case -- I've cited cases on this, it's been placed in my

4    brief with regard to how flags have been used traditionally in

5    the past.

6         This statement here shows traditionally the purpose of

7    the city's flag and how they view that flagpole in the city and

8    how they view flag-raising events.

9         Furthermore, the city has ordinances.  The city has

03:24 10   ordinances that control the flags that are raised on its

11   flagpoles, and there are ones stating when the national flag is

12   raised, which is, you know -- it's in the brief, but it's

13   basically all the time, and then there's a separate ordinance

14   that states the city flag must fly on City Hall at all times

15   when the national flag is raised.

16        The city does at times lower its flag and substitute

17   another flag in its place to support the purposes of its

18   flag-raising program, but these actions by the city fit well

19   within the first Summum factor.

03:25 20        The second factor looked at was the reasonably

21   perceived speaker of the message.  As has been stated in the

22   record, these are flagpoles prominently displayed in front of

23   City Hall.  The flagpoles next to it display the flags of the

24   commonwealth and the United States.  For the city to raise

25   another flag approximately 83 in the air in front of the front

1  door to City Hall creates a very powerful image.  It was an

2  image that was recognized by the 1st Circuit in their decision

3  regarding the preliminary injunction in this case.

4       The ordinances as well speak to the fact that the city

5  would be the reasonably perceived speaker of this.  The city

6  is -- it's city-owned property.  Especially when dealing with

7  government property, as Summum has stated, it's likely that the

8  city is the speaker of the message.  The example used in Summum

9  was the fact that a home owner typically doesn't place a

03:26 10  monument that it doesn't agree with outside of their home.  I

11  think the same is spoken to as a flag.  A city typically

12  doesn't raise a flag in front of the seat of their city

13  government that they don't support or believe serves some sort

14  of purpose of that city government.

15       The third factor in it was the exercise of final

16  approval authority, which in this case is there.  The

17  commissioner of property management has been clear that he

18  reviews flag requests and provides final approval for them.  I

19  know my had brother has stated it's a perfunctory approval, but

03:26 20  this perfunctory approval that he has described in this case

21  resulted when he received a flag request that he believed was

22  constitutionally -- that he believed would place the city in

23  jeopardy of violating a constitutional principle, he went, he

24  reviewed past flag raisings, he consulted with his law

25  department regarding constitutional law principles.  It's not

1  evidence of somebody who was conducting a perfunctory review of

2  these types of requests.

3       If the requests are occurring year after year and

4  they're ones that have occurred in the past, there's not

5  necessarily as much of a review that goes into it.

6       In this case what we're dealing with was a request to

7  raise, as described by the applicant, a Christian flag.  He

8  didn't ask to raise a Camp Constitution flag, he described it

9  as a Christian flag; and the person who exercises approval

03:27 10  authority over that treated it as such and reviewed the

11  request.

12       THE COURT:  And what, if anything, does the case law

13  say about what the exercise of the final control needs to be to

14  satisfy this factor or is it some spectrum of exercise of

15  control or approval?

16       MR. ARCANGELI:  Your Honor, I think it's the exercise

17  of control.  There's also evidence of intent to maintain

18  control of the property on the city's part, which is based

19  upon, again, its statement of purpose on the website, as well

03:28 20  as in Summum that exercise of control was seen in steps

21  subsequent that were taken by Pleasant Grove, where they

22  enacted a written policy with regards to the monuments they

23  would accept.  In this case, the city subsequently has adopted

24  a written policy which it has posted publicly with regards to

25  flag-raising events.

1        Beyond that, the city has exercised that policy in

2   denying other flag raisings.  There was a request by a group to

3   raise a straight pride flag that was denied by the city under

4   it's flag-raising policy.

5        And it is even stated by my brother in I believe it's

6   his reply brief that the city policy mainly codifies what it

7   had been doing in the past.  It codified government speech.  It

8   codified the city's program of raising flags that promoted

9   diversity within the city over which the commissioner of

03:29 10   property management exercised final approval authority.

11        And then the city -- while it is irrelevant -- the

12   case law does state that it's irrelevant whether we have a

13   written policy, the level of control that the city exercises

14   over the flagpoles can be demonstrated by subsequent actions

15   such as enacting a written policy, which has occurred in this

16   case.

17        Your Honor, furthermore, just to address the

18   designated public forum arguments.  The city's position is that

19   forum analysis in a case such as this is inappropriate.  I

03:29 20   really look to the Sutliffe case in the 1st Circuit, where it

21   was decided by the 1st Circuit that a town website was

22   conducting -- or was engaging in government speech by the

23   choice of links that was allowed on the town website.  Really

24   what the holding of the court was in that case was that to find

25   it was anything else other than government speech where the

1    government, using those links to identify itself and set its

2    message as a city, if it were created to be a public forum, it

3    would destroy the purpose of that forum, it would risk that

4    town web page being flooded with links where they would be able

5    to get out no coherent message throughout that website.

6              The same is possible here with the city flagpoles.  It

7    creates a situation if it is treated as a public forum where

8    the city does have to -- where the city is mandated to give

9    public access and engage in viewpoint neutrality over the flags

03:30 10   that it allows up on the flagpole.  Where the stated purpose of

11   this is to promote certain countries and communities that are

12   inclusive and promote the diversity of Boston, to allow just

13   anybody to go in there and raise a flag could defeat the

14   purpose of that program.  It could risk flooding that flagpole

15   with flags that do not promote that inclusivity and diversity

16   that the city seeks through these flag raisings.

17             Your Honor, I think the case law in these cases

18   support a finding, especially, you know -- and this is from

19   Summum -- where the -- where forum analysis would destroy the

03:31 20   essential function of the property, it is inappropriate to

21   apply that forum analysis, and government speech is the more

22   appropriate finding of the Court.

23             And, your Honor, that is really the city's concern

24   within this case, is if it were to be forum analysis, it is

25   that requirement of viewpoint neutrality over the flags that

```
 1    the city raises, and that really is what the city is seeking to
 2    avoid in this case because it does believe it has control over
 3    that flagpole, it has stated control over that flagpole, there
 4    are ordinances that control what goes up on that flagpole.  And
 5    then to have viewpoint neutrality imposed upon what flags go up
 6    on that flagpole would defeat its essential purpose and it
 7    would cause the city to have to reconsider how it conducts flag
 8    raisings in the future.
 9              THE COURT:  Thank you.
10              MR. ARCANGELI:  Thank you, your Honor.
11              THE COURT:  Counsel, rebuttal.
12              MR. GANNAM:  Thank you, your Honor.
13              I first want to start with the -- going back to the
14    city's express policies, the -- in the same document that we
15    pointed to the Court earlier that identifies or makes a
16    statement that the city welcomes all applicants to the city's
17    public forums, it goes -- it's in a section called "What are
18    the reasons a request could be denied," and there's a long list
19    given, but not any of the items on that list have anything to
20    do with the content of the flag or say anything about this is
21    our -- this is Boston's speech and, therefore, your flag or
22    your use of the public forum must comply or match up with
23    Boston's messages.
24              So the city, by creating this document -- and this
25    maps the same points on the city's website for people who apply
```

1    electronically, all of this is in our joint statement of

2    facts -- the city, by creating this policy and publishing it,

3    is saying these are the reasons why your flag could be denied,

4    and none of them say if we don't like what it says or if we

5    don't think it matches up with Boston's message.  Candidly,

6    your Honor, that would be inconsistent with what the document

7    also says, which is, we want to welcome all applicants to use

8    our public forums.

9          Along those lines, and I concur with my brother here

03:33 10   that the Summum case did say that if the -- if treating a piece

11   of city property or government property as a public forum would

12   destroy the function or character of the property, then that

13   would be the wrong analysis to provide.  But the track record

14   here of approving 284 flag raisings without a denial proves

15   that the flags are perfectly -- the flagpoles are perfectly

16   compatible with this kind of speech.  And the city's concern

17   about a floodgate of requests to raise flags, it doesn't seem

18   to be plausible in light of the fact that this policy has been

19   around for at least 12 years and the city has had no problem

03:34 20   accommodating all requesters.

21         As far as the straight pride flag, all we know on the

22   record before the Court is that their request was denied.

23   Whether the commissioner denied it because he thought they were

24   an unserious, satirical group or whether he denied it for some

25   other reason, we don't know because that's not in the record.

1    But what the Ridley case teaches us that is if the city has a

2    track record, a policy and a practice and an intent to create

3    or to designate a forum, an erratic once or twice departure

4    from that doesn't change the nature of the forum.

5         So certainly the fact that when Camp Constitution

6    applied, the city took a different tact with Camp Constitution

7    and applied this very rigorous review doesn't change the nature

8    of the forum that had been established over the preceding 12

9    years.  And the fact that maybe one time since Camp

03:35 10  Constitution was denied there has been another denial, this

11   straight pride group, again, an erratic departure from an

12   otherwise consistent policy and practice doesn't change the

13   nature of the forum.  So we don't think that the straight pride

14   denial is relevant at all.

15        And the Camp Constitution denial, of course, is why

16   we're here, it's because the city did depart from the public

17   forum that it had designated.

18        I also wanted to point out that the 1st Circuit

19   applied or emphasized three points from the Walker case because

03:35 20  they're the same three points that Walker emphasized from

21   Pleasant Grove v. Summum.  But the Walker case also said that

22   Summum denied the request based on those three points and other

23   relevant considerations.  And Walker later in the case made the

24   point that not everything that was relevant in the Summum case

25   is relevant to this analysis.

1          When we look at that, your Honor, and then we add to

2    it the admonition from the <u>Matal</u> case that said the <u>Walker</u> case

3    represents the outer boundaries of the government speech

4    doctrine, I think what this tells us is that all of these

5    government speech cases have to be viewed in relation to their

6    specific facts and not any one or set of factors from one case

7    is necessarily going to decide another.

8          There are too many differences between the City Hall

9    flagpoles here and how the City of Boston has actually treated

03:36 10   them to make any kind of close comparison to <u>Walker's</u> license

11   plates or <u>Summum's</u> permanent monuments in the public park or

12   the city website that was brought up.

13         If on a city website there was an invitation to all

14   applicants to submit their links and the city would try to put

15   as many of them on as possible, well, then that case would be

16   much more like our case here today, but that wasn't the

17   situation in that case.

18         Here, Boston has done something intentional with the

19   flagpole that it controls.  It has said we welcome all

03:37 20   applicants and we try to accommodate everyone on our public

21   forums, and it has, in fact, done that by allowing so many at

22   even accelerating rates, where almost once a week now the city

23   is allowing a private flag to be flown there.

24         The new written policy about flag raisings, the

25   testimony says it doesn't change how the city does anything as

1    compared to when Camp Constitution was denied.  So there has

2    been no change in the policy that created the public forum in

3    the first place just because these new written guidelines were

4    created.

5          And I guess the final point I would make, your Honor,

6    is that in this policy the city -- and the published policies

7    on the website and this printable application form, the city

8    has basically removed from itself the discretion to reject

9    flags based on content or at least has stated its intention to

03:38 10   do otherwise.

11          When the city rejected Camp Constitution and said out

12   of thin air, oh, we have this policy not to allow religious

13   flags and then put that in writing a year later in its new

14   written policy, that was very different from what was published

15   before as far as why flags could be denied.  And so if the city

16   were to make a change to all of a sudden go from accepting all

17   comers to now rejecting religious flags based on content, we

18   still have to apply the forum analysis based on the forum that

19   had been established.  Rejecting religious flags would be

03:38 20   viewpoint discriminatory and unconstitutional, and it would

21   also be unconstitutional based on a content-based inquiry

22   because it couldn't satisfy strict scrutiny.

23          Then, finally, your Honor, again, even if there is a

24   limited purpose intended by the city for these flagpoles, that

25   being celebrating the diversity of Boston's many communities

1    and even giving the city that their intention is also not to

2    violate the Establishment Clause, rejecting Camp Constitution's

3    request was unreasonable in light of those purposes because

4    Camp Constitution wanted to do the exact same thing that all

5    the other flag-raising parties wanted to do, which is celebrate

6    its particular community or its particular constituents.  And

7    showing neutrality to Camp Constitution's request certainly

8    wouldn't violate the Establishment Clause, but, in fact,

9    showing different treatment towards Camp Constitution is what

03:39 10    violates the Establishment Clause.

11             Thank you, your Honor.

12             THE COURT:  Thank you.

13             Counsel, again, I appreciate the arguments you've

14    presented today.  I certainly -- I understand why you started

15    with what has changed because that was my focus as well in

16    terms of your now having had the opportunity to conduct

17    discovery.

18             I will review the papers again with that in mind and

19    issue a decision.

03:39 20             Thank you.

21             MR. GANNAM:  Thank you, your Honor.

22             MR. ARCANGELI:  Thank you, your Honor.

23             THE CLERK:  All rise.

24             (Court adjourned at 3:39 p.m.)

25                      - - - - - - - - - - - -

1                          CERTIFICATION

2         I certify that the foregoing is a correct transcript

3    of the record of proceedings in the above-entitled matter to

4    the best of my skill and ability.

5

6

7

8    /s/Debra M. Joyce                    March 26, 2020
     Debra M. Joyce, RMR, CRR, FCRR       Date
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25